**EXHIBIT 1**

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

KATHLEEN L. LIEBAU,

            Plaintiff,

    vs.                  Case No. 21-cv-11823

                         Hon. George Caram Steeh

DYKEMA GOSSETT, PLLC, a     Mag.  Judge David R. Grand

Michigan professional limited

liability company,

            Defendant.

_____/

    The Deposition of KATHLEEN LIEBAU, Volume 1,

    Taken at 280 North Old Woodward Avenue, Suite 400,

    Birmingham, Michigan,

    Commencing at 1:08 p.m.,

    Wednesday, March 9, 2022,

    Before Cheri L. Poplin, CSR-5132, RPR, CRR.

659a85a1-c8a4-452f-a8bb-7df7097c36f2

**EXHIBIT 1**

KATHLEEN L. LIEBAU Volume 1
March 09, 2022

Page 2

APPEARANCES:


    FOR PLAINTIFF:

        BRIAN J. FARRAR
        Sterling Attorneys at Law, P.C.
        33 Bloomfield Hills Parkway
        Suite 250
        Bloomfield Hills, Michigan 48304
        (248) 644-1500
        bfarrar@sterlingattorneys.com


    FOR DEFENDANT:

        ELIZABETH HARDY
        DAVID PORTER
        Kienbaum, Hardy, Viviano, Pelton & Forrest, PLC
        280 North Old Woodward Avenue
        Suite 400
        Birmingham, Michigan 48009
        (248) 645-0000
        ehardy@khvpf.com
        dporter@khvpf.com


ALSO PRESENT:

    James Herman, Dykema Gossett

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L. LIEBAU Volume 1
March 09, 2022

## Page 3

1    TABLE OF CONTENTS
2
3    WITNESS                          PAGE
4    KATHLEEN LIEBAU
5
6    EXAMINATION BY MS. HARDY              4
7
8              EXHIBITS
9
10   EXHIBIT                          PAGE
11   (Exhibits not offered.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

```
1    Birmingham, Michigan
2    Wednesday, March 9, 2022
3    1:08 p.m.
4
5              KATHLEEN LIEBAU,
6    was thereupon called as a witness herein, and after
7    having first been duly sworn to testify to the truth,
8    the whole truth and nothing but the truth, was
9    examined and testified as follows:
10            MS. HARDY:  Let the record reflect that
11   this is the discovery deposition of Kathy Liebau in
12   the case of Liebau versus Dykema Gossett.
13            EXAMINATION
14   BY MS. HARDY:
15   Q.  Good afternoon.  My name is Elizabeth Hardy and I
16       represent Dykema and I'm going to take your deposition
17       today, which will consist of asking you a series of
18       questions about the factual support that you have for
19       the allegations that you've made in this lawsuit.
20            Have you ever been through a deposition
21       before?
22   A.  I have not.
23   Q.  Okay.  Well, let me start with just one of the
24       critical background questions, which is concerning
25       your medical condition.  Do you currently have any
```

## Page 5

```
1    medical issue that would in any way interfere with
2    your ability to listen to questions and to respond
3    truthfully?
4    A.  Not at this time, no.
5    Q.  Or comprehend questions and respond?
6    A.  No.
7    Q.  Are you taking any medications today?
8    A.  No.
9    Q.  Do you take any medications on a regular basis?
10   A.  No.
11   Q.  All right.  So the rules of the deposition are that
12       I'm going to pose questions and you need to take the
13       time to listen carefully to the question, think about
14       it before you answer, and then respond verbally to my
15       questions.  If you don't understand, please ask me to
16       repeat, let me know what it is you don't understand
17       about the question, and I'll try to modify it to make
18       sure we're communicating.  Is that understood?
19   A.  Understood.
20   Q.  Okay.  And if at any point need a break, let me
21       know.  I'll be happy to accommodate you as long as a
22       question isn't pending on the table.
23            All right.  One other tip and reminder is
24       that you've got to make sure I finish my question
25       before you start your response.  It's very common for
```

## Page 6

```
1    lawyers and witnesses to end up talking over one
2    another.  I need to get my question out so our court
3    reporter can take down my question, and I'll do my
4    best to let you answer before I pose another question.
5    If at any point in time you start to answer before I'm
6    done, I'm going to have to remind you to, you know,
7    let me finish, and if I step on your answer at some
8    point, let me know as well.  Fair enough?
9    A.  Very good.  Yes.
10   Q.  Okay.  All right.  What is your legal name?
11   A.  Kathleen Lynn Liebau.
12   Q.  Okay.  How is your middle name spelled?
13   A.  L-Y-N-N.
14   Q.  And was that your legal name at birth?
15   A.  No.
16   Q.  Okay.  What was your legal name at birth?
17   A.  Kathleen Lynn Mulkeran, M-U-L-K-E-R-A-N.
18   Q.  Okay.  And have you been known by any legal name other
19       than the one at birth and your current legal name?
20   A.  No.
21   Q.  All right.  Are you married?
22   A.  Yes.
23   Q.  When were you married?
24   A.  '88.
25   Q.  And what's your husband's name?
```

659a85a1-c8a4-452f-a8bb-7df7097c36f2

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 7

1  A.  Theodore.
2  Q.  And do you have children?
3  A.  Yes.
4  Q.  And names and ages, please?
5  A.  Katelyn and Jessica.
6  Q.  And what are their ages?
7  A.  Jessie is 27 now and Kate's 19.
8  Q.  Okay.  Do either of your children live with you and
9      your husband?
10 A.  Katie's in college.  And Jessie's off on her own,
11     so . . .
12 Q.  So Katie's in college and living away from home?
13 A.  Right.  But comes home weekends and still has a room
14     and -- yeah.  So . . .
15 Q.  Okay.  What is your current address?
16 A.  64341 Limerick Lane, Washington, Michigan, 48095.
17 Q.  That's your family home?
18 A.  Correct.
19 Q.  Where you and your husband reside?
20 A.  Correct.
21 Q.  And your children visit from time to time?
22 A.  Correct.
23 Q.  All right.  How long have you lived there?
24 A.  19 years.
25 Q.  Okay.  Good.  What's your date of birth?

## Page 8

1  A.  10/10/1965.
2  Q.  And what was your date of hire at Dykema?
3  A.  February 4th, '85.  Might have been February 5th.
4      February 4th or 5th.
5  Q.  Do you have a high school degree?
6  A.  Yes.
7  Q.  Do you have a college degree?
8  A.  No.
9  Q.  Do you have any college credits?
10 A.  Oh, yes.
11 Q.  When did you first earn college credits?
12 A.  The '90s.
13 Q.  Where did you attend?
14 A.  Macomb Community College.
15 Q.  Did you enroll in a degree program?
16 A.  Back in the '90s -- I don't think I declared it.  I
17     took a -- I'm giving too much.  I did not declare a
18     degree program until I went back to school.
19 Q.  All right.  You're in school currently?
20 A.  Correct.
21 Q.  College?
22 A.  Correct.
23 Q.  Okay.  So how many college credits did you complete
24     before you enrolled in your recent program?
25 A.  Just like eight.  I'm not certain, though.

## Page 9

1  Q.  Okay.  But very minimal?
2  A.  Minimal.
3  Q.  Couple classes?
4  A.  Correct.
5  Q.  Okay.  And that was all at Macomb Community College?
6  A.  Correct.
7  Q.  All right.  And then you enrolled in college after
8      your termination from Dykema?
9  A.  Correct.
10 Q.  Where did you enroll?
11 A.  Macomb Community College.
12 Q.  And what year was that that you enrolled, year and
13     month?
14 A.  January 2020 was the first semester available is the
15     next one.
16 Q.  Are you enrolled in a degree program now?
17 A.  Yes.
18 Q.  What is that program?
19 A.  Paralegal, associate's, applied science.
20 Q.  How many credits have you completed?
21 A.  I'm going to have to guess.
22 Q.  Okay.
23 A.  67.  I'm almost done.
24 Q.  How many credits did you take in the first semester of
25     2020, the winter semester?

## Page 10

1  A.  It -- so what I've been doing -- I mean, I can't say
2      for sure.  What I've been doing is I've been trying to
3      do the eight-week courses so I can wedge two eight
4      weeks in a semester so that I could still work, you
5      know, so that I could manage all that.  And they're
6      not all for credit classes.  I mean, I could give you
7      my transcript.
8  Q.  Well, we'll eventually get your transcript, but I'm
9      just trying to figure out how many hours per week you
10     have been devoting to your course of study since your
11     enrollment in January 2020.
12 A.  Oh.  Enough so that I could work, so 20 hours,
13     estimated.
14 Q.  Did you go to school in the winter semester, summer,
15     and then reenroll again in the fall?
16 A.  Correct.
17 Q.  All right.  So you've been continuously since
18     January 2020 taking classes that require approximately
19     20 hours of time in terms of your attendance?
20 A.  Correct.
21 Q.  And then studying on top of that?
22 A.  Correct.
23 Q.  Okay.
24 A.  Could do it all in about 20 hours.
25 Q.  All right.  Thinking that you were leaving roughly

4 (Pages 7 to 10)

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 11

1      20 hours to work if you were to find a job?

2   A.  I was leaving 40 hours to work if I found a job.  I

3      didn't want more than 20 school so that I could work.

4   Q.  All right.  So if you found a job for 40 hours a week,

5      you would have been working 60 hours a week between

6      school and a job?

7   A.  Correct.  Which I did.

8   Q.  Which you did?

9   A.  Yes.

10  Q.  When was that?

11  A.  I got a job at Borland's in February 2020, and that

12     was a 40-hour-a-week job.

13  Q.  And how long did that last?

14  A.  Till the pandemic hit.  We -- they furloughed us along

15     with the rest of the state in April, and then sadly

16     they had to lay us all off in September when things

17     didn't correct themselves, so . . .

18  Q.  So how many paid weeks did you work for that firm or

19     months?

20  A.  Probably six to eight paid weeks.

21  Q.  And then you were just on layoff unpaid and then

22     advised in September 2020 that you were permanently --

23  A.  Furloughed at first and then in September --

24  Q.  Separated?

25  A.  -- they had to lay us all off.

## Page 12

1   Q.  And so have they ever brought anyone back since

2      business has been functioning again?

3         MR. FARRAR:  Object to form.

4         But you can answer.

5   A.  I've been in contact with them a bit, but they are in

6      the foreclosure and eviction sector, and I don't think

7      they are up and running, so I've periodically gotten

8      emails, you know, and they're group emails, not just

9      me, but, you know, who's still out there available to

10     work, and so if you are, respond, so I'd respond, but

11     they're still not up and running, so . . .

12  BY MS. HARDY:

13  Q.  Have you since your termination from Dykema made a

14     concerted effort to find a job as a legal secretary or

15     administrative assistant, whatever the title may be at

16     given firms?

17  A.  I am not a very good legal secretary.  I haven't done

18     that work since 2005.  So I have been looking for

19     legal assistant, paralegal positions.

20  Q.  So that's exclusively the type of work you've been

21     looking for since leaving Dykema?

22  A.  Correct.

23  Q.  All right.  But you don't have the educational

24     background currently for --

25  A.  But I have --

## Page 13

1   Q.  -- that type of job; correct?

2   A.  Did you want to restate?

3   Q.  Did you hear the question?

4         MS. HARDY:  Can you read it back?

5         COURT REPORTER:  But you don't have the

6      educational background currently for that type of job;

7      correct?

8   A.  I have through experience and training the ability to

9      do that job, and because I do not have the

10     educational, that's why I'm back in school.

11  BY MS. HARDY:

12  Q.  Okay.  But focusing in the interim, prior to getting

13     your degree as a legal assistant or paralegal on that

14     type of work was not going to produce a job for you

15     because you lacked the education; correct?

16  A.  False.  I was a senior paralegal at Borland's.

17  Q.  Has any other firm that you've sought employment with

18     been willing to entertain your application in light of

19     the fact that you don't have a degree, paralegal or

20     legal assistant degree?

21  A.  Many.  And it's my opinion that it's Dykema's

22     reporting me as a secretary that wipes me out of the

23     running, because they are misreporting my service and

24     have been.

25  Q.  Your title or classification at Dykema was either

## Page 14

1      legal secretary or administrative assistant at all

2      times; correct?

3   A.  False.

4   Q.  What do you claim your title was and when?

5   A.  Project administrator, discovery for over a decade.

6   Q.  Your job classification was always legal secretary or

7      administrative assistant; correct?

8   A.  I'm not human resources.  My title was project

9      administrator, discovery for over a decade.

10  Q.  You weren't aware that your classification at all

11     times was legal secretary or administrative assistant

12     once that title was changed at the firm?

13  A.  Once that title was unilaterally changed, that was one

14     of the events and issues leading to where we are now.

15  Q.  Do you know when the title legal assistant was changed

16     to administrative assistant?

17  A.  Yes.  August 2017.

18  Q.  All right.  We'll return to that later.  We jumped

19     ahead of it.  Let's go back to some other background

20     questions.

21         Have you ever been a plaintiff or a

22     defendant in litigation other than this particular

23     case?

24  A.  Yes.

25  Q.  A plaintiff or a defendant or both at some point?

5 (Pages 11 to 14)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 15

1    A.  Both.
2    Q.  Okay.  Let's start with the list.  Let's talk about
3        the times you've been a plaintiff.  How many different
4        cases have you been a plaintiff in and what are the
5        titles of those actions?
6    A.  Just one and it was Liebau versus Romeo Community
7        Schools.
8    Q.  What were you suing Romeo Community Schools about?
9    A.  They were restricting my daughter from eating any
10       peanut or tree nut related food for lunch.
11   Q.  What was the legal claim that you brought against
12       Romeo?
13   A.  That's where I messed it up.  It ended up being
14       dismissed because I failed to properly state the
15       claim.
16   Q.  Did you have an attorney representing you?
17   A.  I did not.
18   Q.  Where was the case filed?
19   A.  Macomb County.
20   Q.  When was it filed?
21   A.  I gotta guess.
22   Q.  Okay.  Give me a general.
23   A.  2010.
24   Q.  How long was the case pending before it was dismissed?
25   A.  Three years.

## Page 16

1    Q.  And what was your theory as to why your daughter was
2        entitled to eat peanuts if they had a restriction due
3        to allergies of other children?
4    A.  My daughter had a condition called GERD where she
5        couldn't eat other foods but she could eat peanut
6        butter and jelly, and it was -- she thrived on it, so
7        I felt that was a violation of me being able to care
8        for my own daughter.
9    Q.  Did you try to work with the school to make an
10       arrangement for some kind of accommodation as to how
11       your daughter could have her peanut butter sandwiches
12       in an area where it would not create issues for other
13       children?
14   A.  Absolutely.
15   Q.  All right.  And what did you propose in that regard?
16   A.  I said, well, if you can't remove the other child,
17       remove the peanut people and let the peanut people eat
18       in another room, and the superintendent said too many
19       people will use it, so no.
20   Q.  Okay.  So the case was dismissed and you did not
21       receive any kind of settlement; is that correct?
22   A.  I did not.
23   Q.  All right.  So you've been a defendant in litigation?
24   A.  I have.
25   Q.  Okay.  Why don't you list the cases.

## Page 17

1    A.  Bender.  Just one.  Bender versus me.
2    Q.  Who is Bender?
3    A.  My mother.
4    Q.  Okay.  What's her first name?
5    A.  Pauline.
6    Q.  What did she sue you about?
7    A.  Well, we -- my husband and I built a house with her up
8        in Midland County, and as part of her divorce she gave
9        it to her ex-husband and then he suddenly died, and so
10       she sued me to get it back.
11   Q.  What was the outcome of that case?
12   A.  We ended up selling it.
13   Q.  And where was it pending?
14   A.  Midland.
15   Q.  Were you represented by an attorney?
16   A.  Yes.  Partly.  He --
17   Q.  Was -- go ahead.  I'm sorry.
18   A.  He kept getting our names wrong and so I fired him.
19       I'm like you're not even getting our names right.
20   Q.  When was that case filed?
21   A.  Jeez.  When was that?  I'm going to have to guess
22       again.  My daughter wasn't even born -- second
23       daughter wasn't even born yet, so . . .  '99.
24   Q.  How long was it pending before you resolved it?
25   A.  Shorter.  Six months.

## Page 18

1    Q.  Have you been estranged from your mother since then?
2    A.  Yes.
3    Q.  So no contact at all?
4    A.  Nope.
5    Q.  And is your father deceased?
6    A.  He is.
7    Q.  All right.  And he was deceased before this action was
8        filed?
9    A.  No.  He was deceased in '14, I believe.
10   Q.  Okay.  Did you maintain contact with your father --
11   A.  Oh, yes.
12   Q.  -- up until the time of his death?
13   A.  Yeah.
14   Q.  Do you have siblings?
15   A.  Yes.
16   Q.  Were they involved in the litigation?
17   A.  They didn't help build the house.
18   Q.  Did they support your mother in her litigation against
19       you or moral support or support of other kinds?
20   A.  Well, I mean, it's a very long story.  They remained
21       neutral for most of it, and then at my mother's
22       pressing they submitted a half a page letter toward
23       the end, so . . .
24   Q.  Okay.  So the only two lawsuits that you have been
25       involved in as a party prior to this lawsuit was the

659a85a1-c8a4-452f-a8bb-7df7097c36f2

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 19

1    one that you filed against Romeo Schools and the one
2    that your mother filed against you?
3    A.  Correct.
4    Q.  Were you deposed in either of those actions?
5    A.  Oh, you know, I actually did forget about that.  Yes.
6    In the -- in the Bender issue I was.  I totally forgot
7    about that.  Yes, I was.  I forgot.
8    Q.  So you gave a deposition or was --
9    A.  I did.  I did.
10    Q.  Is that the only deposition you've given prior to
11    today's?
12    A.  Yes.
13    Q.  Focusing now on Dykema and the legal issues that gave
14    rise to this case, when did you first seek legal
15    counsel concerning the employment issues that you felt
16    you were having at Dykema?
17         THE WITNESS:  Can she ask me that?  That's
18    not waiving any privilege?
19    BY MS. HARDY:
20    Q.  No.
21         MR. FARRAR:  You can answer that.
22         THE WITNESS:  I can?
23         MR. FARRAR:  Yes.
24    A.  May 2019.
25    BY MS. HARDY:

## Page 20

1    Q.  Was that before or after you were placed on probation?
2    A.  After.
3    Q.  And is the Sterling Law Firm the only firm that you
4    have sought legal counsel from in connection with your
5    employment at Dykema or have there been other firms?
6         THE WITNESS:  And I can answer these?
7         MR. FARRAR:  You can't -- without getting
8    into anything you discussed with attorneys, you can
9    answer whether you talked to any attorneys.
10    A.  Okay.  Just Sterling.
11    BY MS. HARDY:
12    Q.  When in May did you first seek legal counsel?
13    A.  I don't recall the exact date.
14    Q.  Was it right after your probation or shortly after?
15    A.  Very shortly after, yes.
16    Q.  Let's talk about your devices that you have that you
17    use for communication.  Do you have a mobile phone
18    currently?
19    A.  I do not.
20    Q.  Okay.  Have you ever had a mobile phone that you use
21    for your purposes?
22    A.  I have not.
23    Q.  So you have truly gone until 2022 never having --
24    A.  It's actually a joke.  I say I'm the last person in
25    America without a cell phone.  It's a decision I made.

## Page 21

1    Q.  Why?
2    A.  I see the way that the -- as my kids were growing up,
3    kids would be over, and then I've seen the way social
4    people, you be out to dinner with someone, they grab
5    their phone.  I think it's rude.  I had a phone in my
6    desk, phone in my house, phone in my car, and I -- you
7    can always reach me if you needed me, and if you
8    couldn't, I was busy, so . . .
9    Q.  What setup do you have in your car with a phone?
10    A.  OnStar.  It's not connected right now, but . . . I --
11    Q.  When did you first acquire OnStar connection for the
12    purposes of making calls or receiving calls from your
13    car?
14    A.  When I purchased my G6 it came with it and then I let
15    it go, and when I purchased the car that I have now it
16    came with it and then I let it go, but I had to
17    reinstate it when Sue Choma insisted that I make calls
18    on the road going to and from work.
19    Q.  All right.  So let's go back to 2015.  Did you have
20    OnStar connection at that point for the purposes of
21    making phone calls or receiving them from your car?
22    A.  I couldn't tell you.
23    Q.  Between 2015 and your termination from Dykema, when
24    did you have phone connection from your car?
25    A.  When Sue Choma required that I call her if I'm a

## Page 22

1    minute late on the highway.
2    Q.  So do you recall when it is you had it reinstated for
3    that -- as a result of that conversation?
4    A.  Based on what she put in my file and we had
5    conversations about calling her for even a minute, it
6    was right in there.  Like probably following -- I
7    probably did it the next day, because she told me to
8    go find a pay phone.  I said okay.
9    Q.  All right.  Well, we'll go back to that in a bit.  So
10    you've never texted -- used the text function on a
11    phone?
12    A.  I wouldn't say that.  I have a phone for my daughter.
13    My husband has a phone, so on vacation.  I've got
14    Google Voice, so I use that for text.  So yeah, I'm
15    not technologically unsavvy.  I just choose not to
16    have a cell phone.
17    Q.  What did you say you used for texting?  Google Voice?
18    A.  Um-hmm.
19    Q.  How does that work?
20    A.  It's like email, but -- so it comes through my
21    computer.
22    Q.  Comes through a laptop?
23    A.  Anywhere you can access your Gmail account.
24    Q.  Okay.  And so what's the difference on Google Voice
25    between a text and an email?

7 (Pages 19 to 22)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 23

1   A.  Nothing to the person I'm corresponding with.
2       Nothing.
3   Q.  So let's go over your email addresses.  What have been
4       your personal email addresses since 2015?
5   A.  I believe I just have the one that I still have to
6       this day, Kathyl123456@gmail.
7   Q.  At Gmail.com?
8   A.  Correct.
9   Q.  And you access that email -- do you have a personal
10      laptop that's yours?
11  A.  Yes.
12  Q.  Okay.  That you've -- have you had the same laptop
13      since 2015?
14  A.  No.
15      What different laptops have you had since 2015 that
16      have been dedicated to you?
17  A.  Let's see.  '15.  Maybe it has been the same.  I had
18      to get a new computer at one point because it -- I
19      don't know.  I got malware or something, so . . .  But
20      I think that was prior to '15.
21  Q.  What kind of laptop is that?
22  A.  Gateway.
23  Q.  And what service do you have for --
24  A.  Actually Gateway is my desktop.  My laptop is a Zeus.
25  Q.  Do you have a desktop at home?

## Page 24

1   A.  Yes.
2   Q.  So you have both a laptop that you use and a desktop?
3   A.  Correct.
4   Q.  All right.  And who do you get your service through?
5       Who's your provider?
6   A.  AT&T U-verse.
7   Q.  And how long has AT&T U-verse been your provider?
8   A.  Forever.  In Romeo they're virtually the only one,
9       so . . .
10  Q.  So since 2015 you've had a desktop, a Gateway desktop,
11      and a Zeus laptop?  You've had the same devices
12      continuously since '15?  Yes?
13  A.  Yes.  Correct.
14  Q.  And AT&T U-verse has been your provider?
15  A.  Correct.
16  Q.  And all emails, personal emails have been on -- you've
17      used just one email address for that purpose?
18  A.  Correct.
19  Q.  All right.  Do you use your -- any of your children's
20      emails to communicate with people or your husband's
21      email?
22  A.  No.
23  Q.  Just yours?
24  A.  Correct.
25  Q.  All right.  What about social media?  Are there any

## Page 25

1       platforms that you've been on?
2   A.  Facebook, LinkedIn.
3   Q.  Okay.  How long have you been on Facebook?
4   A.  I think I joined it in '18, late to that party, and
5       then quickly departed from that party because it's a
6       waste of time.  And LinkedIn, I joined it at the firm.
7       When it came about, they said everyone should make
8       one, so I made one.
9   Q.  When was that?
10  A.  I'm guessing.  When did they do it?  2005, 2006.
11  Q.  All right.  So what is your screen name on Facebook?
12  A.  Kathy Liebau, I think.  I don't have any acronym or
13      handle or anything.
14  Q.  Did you actually disconnect from Facebook?
15  A.  No.  I just don't look at it.
16  Q.  So you initially acquired a Facebook page in '18, and
17      how long and often did you use it since?
18  A.  I mean, very rare -- occasionally I still -- okay.  I
19      volunteer for the Humane Society, so they ask us to
20      forward posts, so I do use it for that.  I forward
21      Humane Society posts.
22  Q.  Have you ever posted on Facebook anything about
23      Dykema?
24  A.  No.
25  Q.  Have you used any other social media platforms other

## Page 26

1       than Facebook and LinkedIn?
2   A.  No.
3   Q.  Okay.  So what is your user name or screen name on
4       LinkedIn?
5   A.  Kathy Liebau.
6   Q.  And have you ever used LinkedIn for any purpose other
7       than to post your information about your employment?
8   A.  No.
9   Q.  And is there anything on LinkedIn other than
10      information about your employment at Dykema?
11  A.  Borland's.  I think I've got Humane Society volunteer
12      work on there.  I think that's it.
13  Q.  Tell me what you did to search for documents that were
14      requested by Dykema pursuant to its document request.
15  A.  Well, anything that I would have, you guys would have
16      because I would have forwarded them to my home address
17      from my work computer, so search for anything sent to
18      Kathy Liebau 123456 and you'll know exactly what I
19      have.
20  Q.  Well, that's -- thank you for that information, but
21      that's not responding to my question.  So let me
22      phrase a new question.  Did you ever look at the
23      document request that Dykema served on you?
24  A.  Yes.
25  Q.  Okay.  You went through and actually read the request

8 (Pages 23 to 26)

**EXHIBIT 1**

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

Page 27

```
 1      so you know what documents they were asking for?
 2   A.  Yes.
 3   Q.  All right.  Did you make any attempt to search your
 4      either, you know, home or on your computer, desktop,
 5      on your laptop for documents that were responsive to
 6      those requests?
 7   A.  Yes.
 8   Q.  All right.  What did you do in that regard?
 9   A.  Okay.  So I'm very organized.  I utilize folders in my
10      mail account, and so things relating to Dykema went in
11      that folder.
12   Q.  What were the names of the folders that related to
13      Dykema?
14   A.  Actually I think it's labeled Sterling Law, so you
15      can't have everything in there, so . . .
16   Q.  When did you create the folders related to Dykema?
17   A.  Probably 2019.
18   Q.  After your termination or before?
19   A.  Before.
20   Q.  After retaining the Sterling Law Firm?
21   A.  No.
22   Q.  And then you -- what did you place in that folder
23      prior to retaining the Sterling Law Firm?
24   A.  I was preparing a rebuttal response to the false
25      allegations against me, and so I had sent from my work
```

Page 28

```
 1      computer some evidence to show that these allegations
 2      against me were false, so I have those, which you now
 3      have as well.  I gave them to you guys.  So that --
 4      that's what I had.  I had sent myself to prepare my
 5      response so that I could attach them to refute these
 6      allegations against me.
 7   Q.  You never finished that rebuttal and gave it to
 8      Dykema, did you?
 9   A.  No, I didn't.
10   Q.  Okay.  So in the folder prior to anything coming from
11      or related to the Sterling Law Firm, you had the
12      documents that you thought supported your case for
13      false allegations and the draft of the rebuttal?
14   A.  Correct.
15   Q.  Anything else?
16   A.  I -- I can't tell you -- I gave you everything that
17      was in there.
18   Q.  What was the title of that folder before you retained
19      the Sterling Law Firm?
20   A.  I may not have created the folder un -- until it
21      started growing, so --
22   Q.  What do you mean growing?
23   A.  Well, okay.  Like things related to my daughter's
24      college I put under Kate, you know, and stuff like
25      that.  But before this thing with Dykema happened, I
```

Page 29

```
 1      didn't have a lot of documents that needed to be
 2      segregated, so . . .
 3   Q.  What do you mean before this "thing" happened?
 4   A.  Before I was wrongfully terminated because of my age.
 5      I didn't have a lot of documents that needed to be
 6      segregated.
 7   Q.  Did you segregate any documents concerning Dykema
 8      before your termination?
 9   A.  Before my termination.  Yes.
10   Q.  And they were in a folder on your desktop at home?
11   A.  Correct.  Correct.
12   Q.  And they were forwarded from the firm's email account
13      to your personal email account?
14   A.  Correct.
15   Q.  And then after you retained the Sterling Law Firm,
16      additional documents were placed in that folder?
17   A.  That's when I made the folder and started saying,
18      okay, let's get organized on this.
19   Q.  When did you start forwarding documents or emails that
20      were work-related and on the Dykema system to your
21      personal email account?
22   A.  Okay.  You're going to have to kind of back up a
23      little bit.  So throughout -- or say it again, because
24      I guess I don't want to give you your question.
25          MS. HARDY:  Cheri, could you read it back?
```

Page 30

```
 1          COURT REPORTER:  When did you start
 2      forwarding documents or emails that were work-related
 3      and on the Dykema system to your personal email
 4      account?
 5   A.  2005.
 6   BY MS. HARDY:
 7   Q.  And what was your pattern as of 2005 in terms of
 8      forwarding work-related emails to your personal
 9      account?
10   A.  It was work-related, so I -- I worked a reduced
11      schedule, but the mandate that I understood from my
12      partner in charge was I could keep my reduced schedule
13      as long as I got the work done, so I would forward to
14      myself discovery responses so that I could prepare the
15      doc requests at home, so that is work-related that I
16      would send to my home so that I could prepare the doc
17      request, and I'd send it back to work and then send
18      the doc request to the client the next workday, so it
19      was work-related.
20   Q.  When did you start forwarding to your personal email
21      account from the Dykema system emails or work -- other
22      work documents that related to the issues in this
23      lawsuit?
24   A.  I would say in January 2018 when false allegations
25      started being made against me.
```

9 (Pages 27 to 30)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 31

1    Q.  In 2018?
2    A.  Yes.
3    Q.  All right.  So when in 2018 did you start forwarding
4        emails and work-related documents to your personal
5        email account related to complaints you had about your
6        treatment at Dykema?
7    A.  Okay.  That was really long.
8            THE WITNESS:  Can you read it back again,
9        please?
10           COURT REPORTER:  So when in 2018 did you
11       start forwarding emails and work-related documents to
12       your personal email account related to complaints you
13       had about your treatment at Dykema?
14   A.  I would say after my 2018 review with Sue Choma where
15       there were some allegations in there that shocked me,
16       I forwarded that review to my home, and I was going to
17       prepare responses there as well, and so things that
18       would refute these allegations that were being made
19       against me starting in 2018.
20   BY MS. HARDY:
21   Q.  Okay.  And with what degree of regularity did you
22       forward either work-related emails or any
23       communications or documents from Dykema to your home
24       account related to the issues that give rise to this
25       lawsuit?

## Page 32

1    A.  All right.  So not doing document requests and things
2        like that?
3    Q.  Right.  Put that aside.  What you thought demonstrated
4        bad behaviors by people at Dykema.
5    A.  When -- how often would I do that?
6    Q.  I'm trying to understand whether this is something you
7        did daily, weekly.
8    A.  Oh.  When I would be shocked by some allegation
9        against me, I would try to send something to my home
10       so I could think about it at home.  We were busy at
11       work.  I didn't have time for this stuff at work.  So
12       I would forward it to home so that I could digest it,
13       and then things that -- documents that would help
14       refute the things being said against me I would send
15       to myself.
16   Q.  All right.  So there's quite a steady stream of
17       information you were forwarding to your home email
18       address; correct?
19           MR. FARRAR:  Objection to form.
20           You can answer.
21   A.  Steady stream.  When something would be -- when I
22       would falsely be accused of something, there would
23       usually be an email to myself at home.
24   BY MS. HARDY:
25   Q.  All right.  So where did you store electronically that

## Page 33

1        information covering 2018 and 2019?
2    A.  Originally it would just sit in my inbox.  Again, I
3        didn't start moving it out until summer of 2019.
4    Q.  What did you do in your search process concerning the
5        response to the document request to identify and
6        produce all of the emails and documents that you sent
7        from Dykema to your home address that related to
8        things you had a complaint about?
9    A.  I went through that Sterling folder and gave you
10       anything that wasn't from my attorney.
11   Q.  But it sounds like there's a lot -- potentially a lot
12       of other emails that you were forwarding in the 2018
13       and 2019 time frame that didn't make it into that
14       Sterling folder; correct?
15   A.  They ultimately did.  Like right now in my inbox I've
16       only got 20 emails.  I don't like 5,000 emails in my
17       inbox.  And if you look at my computer that I used to
18       have at work, you will see that this is true.  I keep
19       it tidy.  So right.  When the Dykema stuff started to
20       get slightly voluminous, I -- I -- I moved it all.  So
21       there's only like 20 items in my inbox at the moment.
22       There's nothing I missed.
23   Q.  So let's take the 2018 time frame.  Did all of those
24       forwarded emails make it into the Sterling folder?
25   A.  Yes.

## Page 34

1    Q.  You went back through and pulled all of them into the
2        folder?
3    A.  Yes.
4    Q.  When did you do that?
5    A.  Summer of 2019.
6    Q.  After your termination?
7    A.  No.
8    Q.  Before?
9    A.  Yes.
10   Q.  All right.  And how did you go about locating,
11       searching for all those emails and making sure that
12       you got them moved into the Sterling folder?
13   A.  You can see what they are and you just drag them over.
14   Q.  How were they identified so that you could easily pick
15       them out and make sure they got moved?
16   A.  From Kliebau@dykema.com.
17   Q.  So everything that you forwarded in '18 and '19 was
18       labeled -- did it have different subject titles to
19       them?
20   A.  Sure.
21   Q.  All right.  So what was your methodology for
22       determining what should go into the Sterling folder?
23   A.  Anything that was not from my attorney.
24   Q.  So what is in the Sterling folder --
25   A.  Wait, wait, wait.  I think I misunderstood your

10 (Pages 31 to 34)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

**EXHIBIT 1**

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 35

1    question.  I heard you -- my brain heard say how did I
2    determine what to give to you, and that wasn't the
3    question, was it?
4    Q.   No, it was not.  I'm asking about how you determined
5         what would go into the Sterling folder.  What would be
6         electronically transferred?
7    A.   Anything having to do with Dykema.
8    Q.   But you didn't transfer, for instance, the work
9         assignments that you had been --
10   A.   Oh, those had -- those are deleted.  Like -- like when
11        I would do doc requests or whatever, I would just
12        clean them out.  I mean, I had no use for it once I
13        did a doc request, you know.  Or there was an issue --
14        okay.  I'm giving too much information.  Never mind.
15   Q.   If there was an issue.  Complete your sentence.
16   A.   I was accused of working unauthorized overtime in
17        January of '18 when I worked on assessment summaries
18        at home because it was Martin Luther King weekend, and
19        so I sent myself vehicle records to do those
20        assessment summaries.  I've lost my train of thought.
21        So yeah.  So, but that was work-related.  That wasn't
22        Dykema issue related.  That was actually getting the
23        work done related.  And so then I'd delete them.  Once
24        I prepared the summaries, emailed them back to myself
25        I'd just get rid of them.

## Page 36

1    Q.   So it's your testimony that everything that you sent
2         from Dykema to your home email address or to your
3         Gmail address has been retained, concerning the issues
4         underlying this lawsuit, has been retained and put in
5         the Sterling folder and produced but for documents
6         that your attorney has declared privileged?
7    A.   Correct.
8         MS. HARDY:  Have you provided a privilege
9    log?
10        MR. FARRAR:  I'm not sure.  Did you receive
11   one?
12        MS. HARDY:  Not that I'm aware of.  Did you
13   prepare one?
14        MR. FARRAR:  I don't recall if we did one.
15   I don't recall if we're withholding any documents on
16   the grounds of privilege.  But if we did, then we'll
17   provide a privilege log.
18        MS. HARDY:  Okay.  You're not aware of
19   having done that yet?
20        MR. FARRAR:  I don't recall having done
21   one, and I also don't recall that we withheld any
22   documents on the grounds of privilege.
23        MS. HARDY:  Okay.  All right.  Well, we'll
24   follow up on that or David will follow up on that.
25        MR. FARRAR:  Okay.

## Page 37

1    BY MS. HARDY:
2    Q.   So do you have any hard copies of Dykema documents or
3         emails that you've retained?
4    A.   Some of the things that we produced I had to scan.
5         They were -- they were printed.
6    Q.   And where do you retain Dykema related documents in
7         hard copy?  Are they retained in your home?
8    A.   Yes.
9    Q.   Anywhere else other than your home?
10   A.   No.
11   Q.   And where in your home?  In a folder?
12   A.   Sitting in the back room in the basement.
13   Q.   Are they in an identifiable area?
14   A.   Yeah.  They're in a folder, a file, yes.
15   Q.   I mean, kept all in a particular area?
16   A.   Yeah.
17   Q.   All right.  And did you search that area?
18   A.   Yes.
19   Q.   All right.  And describe that area.  Is it a
20        particular box?  Is it a folder in a drawer?
21   A.   It's a blue folder with -- in a Red -- Redweld.
22   Q.   All right.  And you have searched for anything
23        related -- that's responsive to the document request?
24   A.   Yes.
25   Q.   Are you confident that you have searched all areas for

## Page 38

1         hard copy documents and for electronic documents that
2         are responsive to the document request?
3    A.   There is a small possibility that I might have another
4         folder in my garage, but right now the patio
5         furniture's in there and so is the Christmas
6         decorations, so I'm not certain if there might be
7         another file in my garage.
8    Q.   Are you able to testify under oath that you have done
9         a comprehensive search of your computers for all
10        responsive documents?
11   A.   Yes.
12   Q.   All right.  And you have done a comprehensive search
13        for all copies but for the documents that may be in
14        your garage?
15   A.   Correct.
16   Q.   There's not any other area where documents could be
17        located?
18   A.   No.
19   Q.   All right.  Well, you're going to have to follow up
20        and --
21   A.   Look in my garage.
22   Q.   -- get whatever is in the garage irrespective of the
23        patio furniture, so . . .
24        So are documents stored electronically
25        anyplace other than on your desktop or in your email

11 (Pages 35 to 38)

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 39

1    system?
2    A.  No.
3    Q.  In your Gmail?
4    A.  No.
5    Q.  Do you have any audio recordings or did you at any
6        point in time have any audio recordings of
7        conversations with employees at Dykema?
8    A.  No.
9    Q.  What about photographs?
10   A.  No.
11   Q.  Never took any photographs of coworkers at parties or
12       any kind of get-together?
13   A.  No.  Remember I don't have a phone.
14   Q.  You might have a camera.
15   A.  No.  I didn't walk around with a camera.
16   Q.  Did you receive any photos that colleagues sent you of
17       parties or events that would, you know, depict the,
18       you know, coworker get-togethers or any kind of
19       interactions with them?
20   A.  I think after some events Sue Choma would circulate
21       some photos.  I did not download them or save them.
22       On bring your daughter to work day they went around
23       and took pictures of everyone who brought their kid,
24       so they took a picture of me and my kid.
25   Q.  Those were sent to your work email address or were

## Page 40

1    they posted through some other --
2    A.  Work email.
3    Q.  And you didn't retain any of those?
4    A.  Huh-uh.
5    Q.  Did you keep a calendar when you were at Dykema?
6    A.  Yes.
7    Q.  Okay.  And what was your typical habit in terms of
8        what you would record on your calendar?
9    A.  That changed over time.  On the discovery project I
10       tracked due dates for the various things when
11       documents are done.  So that was actually both
12       electronic and I'd keep a hard copy on my desk so that
13       I could highlight it, doc request done.  I'd do it in
14       green, you know, sent to opposing counsel.  I'd, you
15       know, cross it out with a pen.  So I had like a
16       two-method kind of thing going there.  On the consumer
17       group project there -- it was -- I used the calendar
18       less because those were prepare the assessments
19       immediately.  They came in this morning; they're due
20       now.  So I did not waste time calendaring for the same
21       day.  So you will see very little on my calendar under
22       the consumer group project because it's immediate.
23       But I still kept it for, you know, if there was --
24       like for the launch meeting for this consumer group
25       project, that was on my calendar.

## Page 41

1    Q.  Let's take the 2015 time frame again through your
2        termination.  Did you record through an electronic
3        system your events on a calendar or did you have a
4        hard copy or did you do both?
5    A.  I would print out -- okay.  I'd do it electronically
6        through Outlook.  And then I would print that out,
7        like I said, so that -- so like okay.  The first due
8        date in discovery is you've got to do the answers, so
9        those would go on the calendar that I actually shared
10       with Clay so that he was also aware when our answers
11       were due.  But then like so that would be all full
12       with, you know, answer, la la la.  But I'd print that
13       out and then I would keep the manual one on my desk,
14       so, okay, those answers are done, I did the doc
15       request, now it's green.  You know, now I got the
16       documents back, I sent them to opposing counsel, now
17       it's -- I'm crossing it out with my -- my pen, you
18       know.  So -- so both.  I did not do that document
19       portion electronically because it only affected me.
20       It didn't affect Clay.  So really just the first due
21       date would be shared with the client.
22   Q.  Did you make entries on your calendar either
23       electronically or in hard copy about events such as
24       your performance review, performance counseling, any
25       conversations that you had with --

## Page 42

1    A.  No.
2    Q.  -- attorneys, members of management about things you
3        had a complaint about?
4    A.  No.  Sue would send the invite, your review's this
5        day, so that would show up on there.  But no, I did
6        not use it to journal or -- or -- no.
7    Q.  All right.  So you didn't put anything on your
8        calendar at Dykema other than things that were
9        strictly related to work assignments?
10   A.  Yes.
11   Q.  Did you keep any of your hard copy calendars?
12   A.  No.  They would all be on my desk, so they would be
13       there.
14   Q.  When you were notified of your termination, did you at
15       that point in time take any documents, gather up any
16       documents to take home with you?
17   A.  Impossible.  I was escorted out like a criminal.  So
18       impossible.
19   Q.  Did you at any time from the time of your probation up
20       until the time of your termination go back into the
21       system and look for documents or emails that you
22       forwarded to yourself?
23   A.  During the probation?
24   Q.  From the probation forward.
25   A.  Okay.  Before the probation -- I think I've already

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 43

1  answered this.  Yes, when there would be a false
2  allegation made against me, I would send myself at
3  home so that I could think about it at home and craft
4  my response at home documents to refute these false
5  allegations against me.  Like, for example, Chelsea,
6  ridiculous, on my review in '19 said that I didn't
7  understand the urgency of calculations, and I'm like
8  what?  So I screen printed my folder called
9  calculations that -- that like how I whipped them off.
10  I mean, I did them constantly.  So I sent that to
11  myself.  And I sent myself emails where she got the
12  documents in January, sends me the documents in March
13  to do the calculations, and I turn them back to her in
14  24 hours.  So who doesn't understand the importance of
15  calculations?  It wasn't me that didn't understand the
16  importance of calculations.  So those things I sent to
17  myself at home, and I believe you got those.
18  Q.  All right.  Did you at any point in time create any
19  notes or a diary, a journal, doodles, anything to keep
20  track of or memorialize these issues that you had with
21  various attorneys or management at Dykema?
22  A.  The one rebuttal that I never ended up sending was a
23  pretty in-depth chronicle of what happened.  There
24  were some others like when -- again, when some false
25  allegation would be made against me, sometimes I would

## Page 44

1  email myself like WTF and -- but I would only send it
2  to myself, but it was like a way to get rid of the
3  shock of what is being said.  So . . .  But I don't
4  have those at home.  They're on my computer.  You
5  guys -- I would like them, too, if you find them.  So
6  yes, I would journal to alleviate that shock and
7  stress of what was falsely being said about me.
8  Q.  In what detail would you try to memorialize the things
9  that you considered shocking and false?
10  A.  Okay.  Well, one that comes to mind --
11  Q.  Did you do something more than WTF?
12  A.  Sometimes.  Sue Choma sends me an email after -- I
13  don't even remember what the reprimand is now.  I'd
14  have to go back and look at things to get the dates in
15  order.  But she sends me an email going you admitted
16  to taking several short breaks a day, and I email
17  my -- I'm like -- I emailed myself back and I'm like
18  WTF, I said I have to stand up and move my legs every
19  several hours because you can't sit without moving for
20  several hours.  So that's going to be on my computer.
21  You're going to find that.
22  Q.  And that's --
23  A.  To refute her that I admitted, quote quote, taking
24  several small breaks.
25  Q.  Did you forward those emails to your home email?

## Page 45

1  A.  I did not.  So you guys have them.  I'd like them,
2  too, please.
3  Q.  And so that would be an email from Kathy Liebau --
4  A.  To Kathy Liebau.
5  Q.  -- to Kathy Liebau?
6  A.  Yeah.
7  Q.  And the subject would be?
8  A.  Whatever the allegation was.  I would like just reply
9  to myself and release some steam, so to speak.
10  Q.  All right.  Is there any other way in which you
11  memorialized events that you had an issue with?
12  A.  Other than with my attorney, no.
13  Q.  You didn't do anything in handwriting?  You didn't
14  like prepare, you know, kind of a substantive
15  description of what had happened --
16  A.  No.
17  Q.  -- that you'd email to yourself?
18  A.  No.  Other than, like I said, the rebuttal is pretty
19  detailed.
20  Q.  Why didn't you finish that rebuttal?
21  A.  It was so weird, this whole atmosphere of -- and the
22  hostility that I was like this isn't going to do any
23  good, and so I thought it was better to consult
24  counsel.
25  Q.  Was that the rebuttal to the 2019 performance review?

## Page 46

1  A.  The probation.
2  Q.  To the probation.  All right.  So you -- how close
3  were you to being finished with the draft that you
4  have on your computer?
5  A.  I can't say.  I mean, I'd have to go back and read it,
6  I guess.
7  Q.  We'll do that later.  Let's talk for a moment about
8  your medical history.  Have you at any point ever
9  sought counseling for emotional related reasons or
10  mental health?
11  A.  No.
12  Q.  Have you ever shared with a family physician,
13  internist, somebody that you see for other medical
14  matters issues related to your problems at Dykema?
15  A.  No.
16  Q.  Have you ever asked a family doctor or internist or
17  any other physician with whom you've sought treatment
18  for any kind of medications to help you deal with
19  stress, anxiety, depression, or sleeplessness that you
20  feel are related to employment issues at Dykema?
21  A.  I have not.
22  Q.  Have you ever suffered from any form of anxiety, to
23  your knowledge?
24  A.  In the last few years, yes.  Since this incident has
25  happened, yes.

13 (Pages 43 to 46)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 47

1   Q.  Have you sought any kind of counseling, whether it's
2       with a medical professional or somebody else, to help
3       sort through the issues?
4   A.  Guide to Meditation through Netflix.
5   Q.  Anything other than that?
6   A.  Other than that, no.  But it works with some success.
7   Q.  Have you ever been diagnosed with anxiety?
8   A.  No.
9   Q.  Have you ever talked to your family doctor or
10      internist about what you feel is anxiety that you've
11      been suffering from?
12  A.  I have not talked to them, no.
13  Q.  Have you ever suffered from depression, to your
14      knowledge?
15  A.  Only recently.
16  Q.  All right.  And, again, in the same time frame as the
17      anxiety?
18  A.  Correct.
19  Q.  Have you ever talked to any professional about what
20      you consider to be depression symptoms?
21  A.  No.
22  Q.  Have you ever sought any kind of treatment for it?
23  A.  No.
24  Q.  Why not?
25  A.  I am actually a very -- I perceive myself to be a very

## Page 48

1       strong person.  I've always been a very positive
2       person.  The meditation helps.  These issues are real.
3       They're not going to go away with medication.  So I am
4       the kind of person that prefers to stay in control of
5       my own self.
6   Q.  Do you take any form of prescription medication?
7   A.  None.
8   Q.  None?  Have you ever?
9   A.  Birth control.
10  Q.  Okay.  Other than that?
11  A.  Occasional headache.  But no.  No.  Nothing -- not
12      over-the-counter other than birth control.
13  Q.  All right.  And you haven't done anything to help sort
14      through whatever issues you feel you're having since
15      your termination other than use meditation?
16  A.  Correct.
17  Q.  All right.  So let's go back to your employment at
18      Dykema.  You said that your date of hire was back in,
19      what was it, 1985?
20  A.  Correct.
21  Q.  All right.  And you never bothered to pay attention to
22      what your job classification was?  Is that what you're
23      saying?
24  A.  I knew I was -- I originally was hired at 19 years old
25      as a secretary.  So yes.  I knew that.  But over the

## Page 49

1       years my responsibilities changed and evolved, and I
2       was clearly operating in a paralegal capacity since at
3       least 2005, and, you know, when -- when things are
4       fine, there's no need to turn over rocks that don't
5       need to be turned over.
6   Q.  All right.  So you say 2005 you felt you started to
7       function as a paralegal?
8   A.  Yes.
9   Q.  What were you doing at that time?
10  A.  And I said at least 2005 because before that I had an
11      IT -- IP project that also was not secretarial.  So I
12      went from the IP project where I streamlined processes
13      for paying the foreign associates, and that was highly
14      successful, so the success on that I think is why they
15      tapped me for the national discovery work that the
16      client was bringing in, and so it was not secretarial
17      at all.  I was doing -- Lori Hagopian was doing the
18      document responses, but I was doing the document
19      requests and the responses, and then when they let
20      Lori Hagopian go in 2000 I'm going to say 9, then I
21      also was doing the responses, so I was doing -- there
22      used to be two people doing the job that I did once
23      Lori Hagopian was terminated, so . . .
24  Q.  All right.  So you reported to the office
25      administrator at Bloomfield Hills who was responsible

## Page 50

1       for the administrative staff, correct, at all times?
2   A.  I'm not HR.  I -- on a day-to-day basis I reported to
3       Clay Guise.
4   Q.  Do you know who your supervisor was when you were at
5       Dykema?
6   A.  Sue Choma is the office administrator.
7   Q.  At the Bloomfield Hills office; correct?
8   A.  Correct.
9   Q.  And you reported to her from 2012 through the time of
10      your termination; correct?
11  A.  Reported.  I -- I don't know what you mean by that.
12  Q.  You did not understand that she was your supervisor
13      and that she was the one responsible for your
14      performance reviews, for reviewing your time cards,
15      for making sure you abided by administrative policies
16      for secretaries?  You weren't aware of that?
17  A.  She -- she was the person that administered the annual
18      reviews.  She was the office administrator.  But Sue
19      had very little knowledge on what I did on a
20      day-to-day basis.  I reported to Clay.
21  Q.  Do you know who was responsible for managing the
22      paralegals?
23  A.  I do.  But I've got --
24  Q.  And what's her name?  April?
25  A.  And Sarah Staup.  Okay.  However, you gotta back up

14 (Pages 47 to 50)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 51

1    because unbeknownst to me, Sue Choma was in charge of
2    a new classification of staff paralegal that she was
3    in charge of paralegals.
4    Q.  Where did you acquire that understanding?
5    A.  Oh, with her lovely response when I asked Clay to move
6    me over to Sarah and April's group.  So --
7    Q.  When did you ask if she would move you from her group,
8    which was devoted to administrative personnel, over to
9    April and -- April's group?
10   A.  I don't think that -- again, I'm not HR, but I --
11   don't think that I said -- I don't know what Sue does.
12   Okay?  But she did say that she's in charge of staff
13   paralegals.  It was -- it was after the probation.  I
14   was -- I got Chelsea's age bias on this side and I got
15   Sue on this side, and it was so incredibly hostile
16   that I was like, "Clay, can you move me over to Sarah
17   and April's group?"  And Clay was -- seemed okay with
18   it, but apparently . . .
19   Q.  When did you talk to Clay about being moved to April
20   and Sarah's group so that you would be with the -- in
21   the paralegal realm as opposed to the administrative
22   assistant?
23   A.  This conversation where Sue sent me the nastygram
24   after that was -- it was in May after the probation.
25   Q.  May 2019 is when --

## Page 52

1    A.  Correct.
2    Q.  -- you asked Clay --
3    A.  To move me, yes.
4    Q.  -- to move you to -- over into --
5    A.  To Sarah and April's.
6    Q.  -- the paralegal realm?  And what did he tell you?
7    A.  He said he would talk to Sue.  And I actually said,
8    "Why is it up to Sue?"
9    Q.  All right.  So you understood you reported to Sue;
10   correct?
11   A.  Not on a day-to-day.
12   Q.  You understood that she was your supervisor for
13   purposes of your performance review, making sure you
14   abided by policy related to the administrative staff,
15   reviewing your timekeeping practices, reviewing your
16   schedule to make sure you were adhering to the
17   schedule for administrative employees?  All those
18   things were the responsibility of Sue Choma in terms
19   of supervising you; correct?
20   A.  I knew that Sue Choma was the office manager, yes.  I
21   knew that.  Yes.
22   Q.  And you knew that she was responsible for the
23   administrative staff?
24   A.  That's not my job.  I don't know who she was
25   responsible for.

## Page 53

1    Q.  You never applied for a paralegal opening, did you, or
2    a staff paralegal opening?
3    A.  I was tapped to do different projects.  Kathy, we've
4    got a project, can you come on in on it.
5    Q.  That's not my question.  My question is you never
6    applied to become a paralegal or a staff paralegal,
7    did you?
8    A.  I was already working as one, so no.
9    Q.  Did you ever inquire what the qualifications were to
10   be classified as a paralegal at Dykema?
11   A.  Okay.  I was there since 1985, so back in 1985 and for
12   many years they were called -- paralegals were called
13   legal specialists, and there were legal specialists
14   that didn't have the degree.  Adrian Schneider was
15   one.  I don't think you've been around that long.  But
16   when they went to paralegal, it was my understanding
17   you had to have the degree, that they would not bestow
18   upon anyone that paralegal title without the degree.
19   However -- well, that is why actually I was called a
20   project administrator, because they wouldn't bestow
21   that title on me without the degree.  It came to be
22   known to me after May 2019 that the staff paralegal
23   existed and that there were staff paralegals without
24   the paralegal degree, including Diane Guerrero, who
25   was a work friend of mine.  So did I apply for one?

## Page 54

1    No.  Because I was already working as one.  Did the
2    firm give me the title -- once they changed their
3    policy, did they bestow that title on me?  They did --
4    they failed to do that.  But I was -- the project
5    administrator set me apart from secretarial, and it
6    was good enough it worked.
7    Q.  When did the title legal specialist change and become
8    paralegal?
9    A.  I couldn't tell you.  I'm going to have to guess, but
10   I would say -- okay.  So it came about because there
11   was confusion outside of the firm that someone called
12   a legal specialist might be an attorney, so there was
13   this whole -- and it was kind of with the advent of
14   all the emails and everything, so I'm going to say
15   around 2000, so I don't know.  Maybe it was later than
16   that.  You guys would know better.  You have access to
17   Dykema's records on when they switched that over.  But
18   it was because they didn't want anyone outside of the
19   firm to confuse a non-attorney with an attorney, which
20   is why I had to have some title, which is why I was
21   given project administrator, so the exact timing you
22   guys would know better than I would.
23   Q.  You actually requested that you be reclassified as a
24   legal specialist; correct?
25   A.  Legal assistant.

15 (Pages 51 to 54)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 55

1  Q.  What's the difference between legal assistant in your
2      view and legal specialist?
3  A.  Zero.  But at the time that I requested it, I still
4      thought the firm required the degree for the paralegal
5      title.  I still thought that was true.  I found out
6      after that -- so I said, well, then call me a legal --
7      legal assistant, but I found out after that that they
8      did bestow it on people without the paralegal degree,
9      including Diane, there may be others, I don't know, so
10     I -- I was still under the antiquated idea that the
11     degree was required to have the title, but that's not
12     true, so . . .
13 Q.  All right.  Let me go back.  So you requested that
14     your classification be changed from legal secretary to
15     legal assistant?
16 A.  Correct.
17 Q.  When was that and who did you make that request of?
18 A.  Well, which -- okay.  That would be May of 2019.  In
19     August of 2017 when Sue unilaterally changed me back
20     to legal secretary, I protested and I said, you know,
21     this is still a project, so let me keep project
22     administration or let me be a legal assistant, and Sue
23     said you're in a gray area.
24 Q.  So you're talking about when the project that you
25     worked with Clay Guise on phased out, that time frame?

## Page 56

1  A.  It was -- it was after that project phased out that
2      Sue unilaterally changed my title without even telling
3      me.  I -- yeah.  I saw -- I copied myself on the email
4      and saw she had changed it.
5  Q.  Let's go back to this alleged project administration
6      or administrator.  What was it?  What are you claiming
7      was your title?
8  A.  It actually was project administration, but
9      administrator is fine.
10 Q.  All right.  So who do you claim gave you that title?
11 A.  Kathleen Horchler.
12 Q.  Who is she?
13 A.  She was the partner in charge before Clay came on
14     board.
15 Q.  And do you have any documentation that confirms that
16     you were actually told that was your title as opposed
17     to it being a descriptor of what you were doing at a
18     point in time when you were working for her?
19 A.  We had to have our titles under our names on all
20     emails so that we weren't mistaken as attorneys by
21     anyone outside of the firm.
22 Q.  All right.  So that was a title that was used for
23     purposes of communications with people outside the
24     firm?
25 A.  In addition to the other things, yes.

## Page 57

1  Q.  In addition to what other things?
2  A.  The work that I was doing.
3  Q.  The firm never gave you that title for internal
4      purposes; correct?
5  A.  Kathleen Horchler is a partner of the firm, so yes,
6      I -- yes, I did.
7  Q.  What do you claim she said to you in writing or
8      verbally that gave you the impression that that was a
9      title change within the firm as opposed to simply
10     being a title used for external purposes?
11 A.  I don't see the distinction, and I don't know what
12     you're looking for there.  I don't know what you would
13     want me to say.
14 Q.  What did she say to you about that title?  What were
15     the communications?
16 A.  We all have to have titles under our names now.  What
17     should we call me?  And --
18 Q.  Did she say why you had to have titles under your
19     name?  So that outsiders would know that you're not a
20     lawyer?
21 A.  Correct.
22 Q.  All right.  What's Kathleen's last name again?
23 A.  Horchler.
24 Q.  Could you spell it?
25 A.  It's spelled oddly, and this was back in 2005,

## Page 58

1      so . . .  H-O-E-R-C-H-L-E-R or something like that.  I
2      don't really recall.
3  Q.  So in 2005 you started putting on your signature line
4      this title when you emailed people outside the firm;
5      correct?
6  A.  Correct.  Well, it's automatic.  It like goes.
7  Q.  Was there ever any written communication that
8      recognizes that title for internal purposes at the
9      firm?
10 A.  I believe Sue had to approve it for the IT department
11     to attach it to my emails.
12 Q.  What do you base that on?  Just an assumption?
13 A.  No.  She had to.  It might be in my garage stuff.
14 Q.  Well, we need to see your garage stuff.
15 A.  Yeah.  I mean, the reason I didn't go dig out there is
16     because it's old stuff, so I thought, well, there's
17     nothing relevant to these issues in that old stuff,
18     but if that's relevant, that might be out there.
19 Q.  All right.  So did you use this title on your email
20     for outside communication purposes from 2005 up until
21     the phaseout of the project that you worked on with
22     Clay Guise?
23 A.  Up until Sue unilaterally changed it in August of
24     2017.
25 Q.  All right.  And that's what you call a demotion is

16 (Pages 55 to 58)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 59

1  when Sue told you that you -- when you were no
2  longer -- when there was no longer work available on
3  the Clay Guise project that you had to find another
4  position within the firm if you were going to remain
5  employed?  And you considered that to have been a
6  demotion when --
7  A.  Yeah.  She didn't use the words that you used, but
8  yes.  There's nothing wrong with being a legal
9  secretary.  There's nothing wrong with that.  But she
10  tells me to go get my own work but I'm going to give
11  you a secretary title.  Okay.  Well, people who don't
12  know me, how are they going to give me -- allow me to
13  draft their responses with the secretary's title.  It
14  actually inhibited me being able to reinvent myself
15  and go and find new work.  And if I was a secretary,
16  she would assign me somewhere.  She doesn't assign me
17  somewhere.  She told me to go find my own work, which
18  is what a paralegal does.  And I did, in fact, find my
19  own work.  I got a new project.  So . . .
20  Q.  You're referring to the project with Chelsea Larsen?
21  A.  That Clay Guise pulled me in on, yes.
22  Q.  Okay.  All right.  So let's go back to another title
23  change.  You started with the title of legal
24  secretary; correct?
25  A.  Correct.

## Page 60

1  Q.  And then you know that your title internally for under
2  the firm's system changed to administrative assistant?
3  A.  At some point, yes.
4  Q.  Okay.  And that was a change that occurred across the
5  board?  All legal secretaries assumed the title of
6  administrative assistant when that change was made?
7  A.  I believe so, yes.
8  Q.  All right.  Do you have any complaint about that
9  change?
10  A.  Actually yes.  A lot of us did.  Because there's
11  administrative assistants that work for insurance
12  companies or lumber companies, and we felt that it was
13  slightly degrading to take the legal out of it.  A
14  legal secretary was always a bit more than your lumber
15  company secretary.  We had quite a bit more
16  responsibility than that.  So we -- all of us felt it
17  was a bit degrading.
18  Q.  But all of you were treated the same in terms of the
19  title change; correct?
20  A.  Yes.
21  Q.  All right.  So when you saw yourself and thought of
22  yourself as a project administrator, did you ever talk
23  with anyone in administration about a title -- or
24  about a classification change within Dykema?
25  A.  No need.

## Page 61

1  Q.  Why do you say no need?
2  A.  The work was being done.  The projects were moving
3  smoothly.  I was getting raises.  I was general -- I
4  mean, everyone wants to be paid more, but I was
5  generally satisfied with my compensation.  I was --
6  there was -- there was no need to turn over rocks that
7  didn't need to be turned over, so . . .
8  Q.  So it wasn't important to you to be classified as a
9  staff paralegal or paralegal or whatever the term was
10  for that classification?
11  A.  I thought I was.  I -- I thought -- I believed that I
12  was.
13  Q.  So you thought that just doing paralegal type work was
14  good enough even though you were an administrative
15  assistant reporting to the office manager responsible
16  for administrative assistants?
17  A.  I wasn't an administrative assistant, so no.
18  Q.  All right.  You reported to Carol Lally, correct,
19  before Sue?
20  A.  She was the office manager before Sue, yes.
21  Q.  All right.  And at all times while you were at Dykema
22  you reported either to Carol or to Sue; correct?
23  A.  No.  There were people before that.  I can't tell you
24  their names.
25  Q.  Before Carol?

## Page 62

1  A.  Yeah.  Yeah.  Carol came from Florida.  Yeah.
2  There -- I've been there 34 years eight months, so
3  there were a lot.
4  Q.  When did you start reporting to Carol?
5  A.  When she arrived in Bloomfield.
6  Q.  So the last two direct supervisors were Carol Lally
7  and then Sue Choma?
8  A.  They were the office managers.  Correct.
9  Q.  And they were the people responsible for supervising
10  you with respect to everything other than particular
11  work assignments that you were handling on a
12  day-to-day basis?
13  A.  They were the office managers, yes.
14       MS. HARDY:  All right.  So let's take a
15  short break and then be back in five minutes.
16       (Recess taken at 2:28 p.m.)
17       (Back on the record at 2:49 p.m.)
18  BY MS. HARDY:
19  Q.  I need to go back to the effort you made to locate all
20  electronic documents that are responsive to
21  defendant's document request.  You testified that
22  starting in January 2018 you started sending emails to
23  yourself every time you felt that there's something
24  problematic happening at work.
25  A.  Not every time, but yes.

17 (Pages 59 to 62)

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

### Page 63

1  Q.  Everything significant?
2  A.  Yeah.  I mean, starting -- yes.  When -- yes.
3  Q.  All right.  And that you stored those on your
4       computer, on your home computer?
5  A.  Correct.
6  Q.  All right.  Did you store them in a desktop file?
7  A.  No.  It was email pretty much.  I mean, they'd be
8       attachments.
9  Q.  Did you make a Gmail file?  Did you have a desktop
10      file or did you --
11 A.  Gmail file.
12 Q.  Gmail file.  That was then a place that you moved all
13      these emails to?
14 A.  Correct.
15 Q.  Okay.  And you still have that file; correct?
16 A.  Correct.
17 Q.  And that's on your email system, on your Gmail system?
18 A.  Correct.
19 Q.  All right.  And so don't delete anything from there.
20 A.  Okay.  Yeah.  I wouldn't.
21 Q.  All right.  And that contains everything from January
22      '18 through your termination?
23 A.  Yes.
24 Q.  All right.  And did all of those documents get moved
25      into the Sterling file when you created the Sterling

### Page 64

1       file?
2  A.  Yes.  They went from my email inbox.  If you want me
3       to reiterate it.  But right.  So first they stayed in
4       my inbox, but once I contacted counsel and this wasn't
5       resolving, I tidied it up and labeled the file
6       Sterling and -- and moved everything over there.
7  Q.  All right.  So to find all these emails that you sent
8       to yourself from the firm starting in January '18, one
9       could go to your inbox, one could go to your Gmail
10      file, or one could go to the Sterling file?  Those are
11      the three places where they would be stored
12      electronically?
13 A.  The Sterling file and the inbox file are the same
14      thing.  Okay.  So like on your Gmail, you know, you
15      got your regular inbox, and then by default off to the
16      side it's got like whatever, promotions, whatever.  It
17      gives you some files.  Well, I make my own and, you
18      know, like I said, I have one for Kate, for my
19      daughter, so her stuff goes in there, and the one I
20      labeled Sterling, everything Dykema related went in
21      there.
22 Q.  So the Gmail file that you had up until the time you
23      created the Sterling file, is that still there
24      independent of the Sterling file?
25 A.  They were in my inbox before I created the Sterling

### Page 65

1       file.
2  Q.  So the emails were all individually in your inbox?
3  A.  Yes.  Until I created the Sterling file and then I
4       moved them all over.
5  Q.  How did you go about identifying all those emails to
6       get them into the Sterling file?
7  A.  I think I answered this, but they would be from
8       Kliebau@dykema.com.
9  Q.  Well, did you do a search?
10 A.  There weren't that many.  Again, I don't keep 5,000
11      emails in my inbox.  I delete garbage right away, and
12      so anything from Kliebau@dykema was Dykema related and
13      so I moved it over.
14 Q.  Did you just scroll through your entire inbox and then
15      pick them individually and move them over or did you
16      do a search to pull --
17 A.  You're saying the entire inbox like I have 5,000.  I
18      didn't have 5,000.  So yes, I went through my entire
19      inbox and moved them over.
20 Q.  How many emails did you have in your inbox at the
21      time?  Just give me an approximation.
22 A.  I couldn't tell you.  I mean, now I only have 20 in my
23      inbox.  Like not Dykema.  At that time before I moved
24      them to a file, I don't know, I don't know, 50.
25 Q.  Did you ever delete any of the emails that you sent

### Page 66

1       from January 2018 up through the time of your
2       termination?
3  A.  No.  Because I might need them.
4  Q.  Okay.  Good.  How many were there?  I mean, we're
5       talking about dozens or . . .?
6  A.  You've got them.  I don't know.
7  Q.  Tell me what you recall.
8  A.  I would say 20 maybe.  I'm totally guessing here,
9       though.
10 Q.  In that range?  I mean, 15, 20, 22?
11 A.  Not voluminous.  I mean, certainly not voluminous.
12 Q.  But 20 is a --
13 A.  A guess.
14 Q.  -- reasonable estimation?
15 A.  Yeah.  Yeah.  A manageable amount.  It's not like it's
16      tons.
17 Q.  Did you review all the documents that were produced to
18      Dykema before they were produced to make sure that the
19      production was complete at least in terms of all your
20      electronic documents?
21 A.  Like -- I gave what I had to my counsel and they took
22      it from there.
23 Q.  All right.  So you gave -- turned them over to your
24      counsel, but you didn't look to see --
25 A.  Like, again, no.

18 (Pages 63 to 66)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

**EXHIBIT 1**

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

### Page 67

1  Q.  -- what your counsel was producing?  All right.
2       Where did you acquire the understanding
3  that there was a staff paralegal classification that
4  reported to Sue Choma?
5  A.  When Sue Choma said, "You report to me.  If you think
6  that you can be a staff paralegal which also reports
7  to me, then apply for something on the digest."
8  Q.  When did that conversation allegedly occur?
9  A.  After I asked Clay to move me over to Sarah and
10      April's group.
11  Q.  All right.  And that was after the probation in May
12      '19?
13  A.  Yes.
14  Q.  Do you know anyone who was classified as a staff
15      paralegal?
16  A.  Diane Guerrero.
17  Q.  How do you know that she has that particular
18      classification?
19  A.  I guess two ways.  First I know her.  We've been work
20      friends for 20 years or whatever.  And when we went
21      to -- which system was it?  We did some training on
22      a -- on a new system, and I honestly can't remember
23      what it was, but when we had to sign in, she signed in
24      staff paralegal and I signed in project administrator,
25      and another woman, Chris Sylvester, signed in with

### Page 68

1  another unique title, and so we just kind of laughed.
2  We're like oh -- and even the instructor -- what's her
3  name?  Her last name's Belizi (ph) or something.  She
4  just laughed.  She goes, "Oh, we've got a lot of
5  unique ones here."  So . . .
6  Q.  What do you mean sign in?
7  A.  For the training you have to sign in that you took the
8  training.
9  Q.  You're putting down your name and putting down your --
10      what you think your title is?
11  A.  Right.  Right.  Right.  Right.
12  Q.  It's not anything in the computer system?
13  A.  No.  No.  But yeah.  We noticed that we all had unique
14      titles.
15  Q.  Did you ever discuss with Diane whether or not this
16      was her title and if so when it became her title?
17  A.  I didn't need to ask her what her title is.  She
18      signed in on that.  But when Sue Choma -- can you tell
19      my disdain?  But told me to go reinvent myself and
20      introduce myself around the office and bring doughnuts
21      and she said and then -- she said -- she specifically
22      said, "Why don't you go see if Diane needs some help."
23          And so I went and talked to Diane and said,
24  "Do you need help?"
25          And she said, "No."

### Page 69

1          And I said, "Well, keep me in mind."
2  Q.  All right.  So Diane is the woman that you claim has a
3  staff paralegal --
4  A.  Title.
5  Q.  -- title or classification?
6  A.  To me they're one and the same.
7  Q.  But does not have a degree?
8  A.  Correct.  I think she's a master gardener.  She has a
9  degree in master gardening.
10  Q.  Do you know where she acquired the understanding that
11      her title was staff paralegal?
12  A.  No.
13  Q.  Did you ever ask her?
14  A.  No.
15  Q.  Have you ever discussed the issue with her?  Like when
16      did you become staff paralegal?  What is that title?
17      That's new.  Who do you report to?
18  A.  No.
19  Q.  Did you ask her what do you do that's paralegal like?
20      Anything like that?
21  A.  I asked her what she did, but honestly I don't
22      remember her -- this was after, you know, Sue actually
23      pointed me toward her to see if she needed help.  I --
24      gosh, what was she doing?  I don't -- I don't
25      remember.

### Page 70

1  Q.  All right.
2  A.  She didn't need much -- she didn't need any help.  I
3  told her to keep me in mind, so . . .
4  Q.  What is the automotive industry group, to your
5  understanding?  Where does that expression come from?
6  A.  I think it's been thrown around in our group.
7  Q.  Have you ever seen that in a document, any particular
8  group referred to as the automotive industry group?
9  A.  Actually I think on the -- the agenda for the
10      January 20 -- no, that was 2019 meeting, we had a meet
11      and greet with our -- our client, and I think that was
12      the title of it, and it said Kathy Liebau, paralegal,
13      responsible for case assessments.  So I believe it's
14      on that document.
15  Q.  What do you think the automotive industry group
16      consists of?
17  A.  People-wise or what we do?
18  Q.  Well, let's take -- within the firm.  Who's a member
19      of that group, to your understanding?
20  A.  Jim Feeney is the big guy and then Clay and Dave
21      George.
22  Q.  All right.  So you're just referring to loosely people
23      who do work related to automotive clients?
24  A.  Yes.
25  Q.  Okay.  It's not a formal group?  It's just that

659a85a1-c8a4-452f-a8bb-7df7097c36f2

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 71

1    there's a lot of people at Dykema that do work for
2    automotive clients and that's the group you're
3    referring to?
4    A.  I -- well, you say it's not a formal group.  I think
5         it -- it's quasi formal.  You know, you have people
6         in -- it's a big firm.  So yeah.  I mean, I think
7         there might even be a little directory of those
8         involved in the automotive industry group.  And -- and
9         names evolve over time.
10   Q.   Does anything link them together other than the fact
11        that they provide legal services to clients in the
12        automotive industry?
13   A.  I would say providing services is a link.  Yeah.  Did
14        they all go to the same college?  No.  Did they --
15        nothing like that.
16   Q.  All right.  Let's switch gears.  You became 50 in
17        October 2015?
18   A.  Correct.
19   Q.  Okay.  And they had a celebration for you at the firm?
20   A.  If you call it that.
21   Q.  Okay.  Do you know who organized it?
22   A.  Chelsea Larsen.
23   Q.  How do you know that?
24   A.  Because she laughed and said, "Look what we did," and
25        it was her wheelchair and -- yeah.  I mean, your use

## Page 72

1    of the word "celebration" I'm going to take exception
2    to that.  It wasn't very much fun for me, so . . .
3    Q.  Well, it was a milestone birthday?
4    A.  Indeed.
5    Q.  Right.  And they wanted to recognize it?  You don't
6         disagree with that, do you?
7    A.  No.
8    Q.  Okay.  As they have for many other employees?
9    A.  But not like that.
10   Q.  Was there something different about yours versus
11        others?
12   A.  Very much so.
13   Q.  What was different about it?
14   A.  Birthday celebrations happen regularly and it's
15        usually cookies, doughnuts, balloons, flowers.  This
16        was the first and only time I had ever witnessed adult
17        diapers and pill bottles and replacing your chair with
18        a wheelchair and -- I had never witnessed one like
19        that before.
20   Q.  Have you ever been to a celebration of any other
21        employee's milestone birthday at Dykema?
22   A.  Yes.
23   Q.  Whose?
24   A.  Shannon.  She is the secretary -- or the
25        administrative assistant on the project.

## Page 73

1    Q.  So you went to her 60th?
2    A.  I don't know what birthday -- yeah, it must be.  She's
3         older than me.  It must be her 60th.
4    Q.  Okay.  And what was different about Shannon's versus
5         yours?
6    A.  She got a tiara, flowers, like, you know, royal crown
7         kind of thing.  So yeah.
8    Q.  Did you think her celebration was fun?
9    A.  I mean, you're calling them celebrations like they're
10        hourlong parties.
11   Q.  Recognition event.  Is that --
12   A.  Did I think it was fun?  I think I should be there
13        since we've worked on the same projects, so, I mean,
14        yeah --
15   Q.  Was there anything inappropriate about the event
16        recognizing Shannon Stewart's 60th birthday?
17   A.  I -- I thought it contrasted sharply with the way mine
18        was recognized.
19   Q.  Did you think there was anything inappropriate about
20        Shannon's?
21   A.  A tiara.  I guess not.  Flowers.  No.
22   Q.  Anything else?
23   A.  I don't think so.
24   Q.  Did you have any problem with the fact that she was in
25        a wheelchair and they were taking photos of her?

## Page 74

1    A.  I --
2    Q.  Didn't bother you?
3    A.  Well, actually now that you say that, I -- that was
4         the same wheelchair because I said great, store it
5         here now, but it didn't.  It ended up back at my desk.
6    Q.  It would have been okay if it stayed at Shannon's desk
7         but you didn't want it at yours?
8    A.  Yeah.  I didn't want it at mine.
9    Q.  But it was okay if it was at Shannon's?
10   A.  Well, maybe she would have had better luck in getting
11        them to store it somewhere else.  Why did it end up
12        back at my desk?  She used it last.
13   Q.  How long had the wheelchair been at the firm?
14   A.  Chelsea Larsen said she borrowed it from her church
15        when she replaced my chair with the wheelchair.  So it
16        doesn't even belong to the firm apparently.  It
17        belongs to Chelsea Larsen.
18   Q.  Well, Shannon's about six years older than you; right?
19   A.  I don't know.
20   Q.  Do you have any idea what her age is?  You just know
21        she's older?
22   A.  You just said 60.  Yeah.  I mean, she's a couple years
23        older.
24   Q.  Okay.  But the wheelchair that they used as a prop for
25        her celebration was the same wheelchair used for

20 (Pages 71 to 74)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 75

1    yours?
2    A.  Yes, it was.
3    Q.  Okay.  So it had been at the firm several years before
4        your celebration?
5    A.  No.  No.  No.
6    Q.  Oh, it was your celebration first?
7    A.  Correct.
8    Q.  Oh, okay.  All right.  So describe everything you
9        recall about the event recognizing your 50th birthday
10       at the firm.
11   A.  Got into work to a decorated desk.
12   Q.  What was on the desk?
13   A.  Adult diapers, pill -- those, you know, weekly pill
14       bottle things, Skittles, like to represent pills
15       apparently, the wheelchair.  I think there was black
16       crepe paper.  And I think that's it.
17   Q.  And that was all there when you arrived?
18   A.  Correct.
19   Q.  All right.  And when did people gather for the
20       celebration part of the event?
21   A.  Morning, I guess.
22   Q.  How much after your arrival?
23   A.  Hour.
24   Q.  Did you talk to anyone when you arrived about what
25       they'd done to decorate, even though it was a spoof,

## Page 76

1    your desk?
2    A.  I called them evil fairies.  I mean --
3    Q.  Who did you call an evil fairy?
4    A.  Chelsea and Shannon.
5    Q.  Did you know that they were going to decorate your
6        desk and plan some kind of celebration?
7    A.  No.  No.
8    Q.  So how did you know who had done that if you didn't
9        know anything about it in advance?
10   A.  You're making me guess because I don't recall.  I
11       think they came like over.  Like when I walked in and
12       like I think they --
13   Q.  So they didn't wait an hour to come over?  They came
14       right away?
15   A.  Well, other people came over in like an hour to --
16   Q.  To actually have a --
17   A.  Saying, oh, I didn't know you were 50, I would have
18       never guessed you were 50.
19   Q.  Were there anything other than the diapers, pill
20       bottles, Skittles, and wheelchair and black crepe?
21   A.  I'll think about it, but not that I'm recalling at the
22       moment.
23   Q.  Okay.  So was there a birthday card?
24   A.  No.
25   Q.  Anyone sing happy birthday?

## Page 77

1    A.  I don't think so.
2    Q.  Were there any kind of treats, like a cake or
3        cupcakes?
4    A.  I think there were cookies.
5    Q.  Cookies?
6    A.  Yeah.
7    Q.  Okay.  Any flowers?
8    A.  No.
9    Q.  And so when you arrived, Chelsea and who else comes
10       over?
11   A.  I believe Shannon.
12   Q.  All right.  And you called them black -- or evil
13       fairies?
14   A.  Yes.
15   Q.  Okay.  And what tone of voice did you use?
16   A.  I mean, trying to be a good sport.  So I was like,
17       "You evil fairies."
18   Q.  Okay.  What did they say?
19   A.  Ha ha ha ha.
20   Q.  Anything else in terms of your exchange?
21   A.  Not that I recall.
22   Q.  Was there a gathering of more people at any point in
23       time when, you know --
24   A.  There -- because -- yes.  Because Chelsea said send
25       out an email and tell them to come get a cookie, so

## Page 78

1    that's right.  I do remember that.  So --
2    Q.  So did people just come over kind of one at a time --
3    A.  I think so.
4    Q.  -- or did they come as a group?
5    A.  I think it was one at a time because I remember the
6        group of the four younger associates that were really
7        showering me with the compliments was -- was pretty
8        humiliating was it was just the four of them, so yeah.
9        I think people were kind of coming and going kind of
10       thing.
11   Q.  How did you feel about becoming 50?  Was it a --
12   A.  Actually fine.  I mean -- I'm in good shape.  I mean,
13       I'm fine with it.
14   Q.  So you weren't like going through a tough time?  You
15       didn't have any particular hang-ups about it?
16   A.  Not until everyone kept going I can't believe you're
17       50, wow, I would have never guessed you're 50.  And
18       then also after that I was --
19   Q.  Wait a minute.  Don't you take that as a compliment, I
20       never would have guessed you're 50?
21   A.  Well, but then I was treated differently after that.
22       You know, like there's -- you know, as in any office,
23       there's like little cliques or whatever, so -- like I
24       wasn't in a clique anymore.  Like, you know, yeah.  I
25       think I was treated differently after that.

21 (Pages 75 to 78)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 79

1   Q.   What clique were you in before you turned 50 that you
2        were excluded from after?
3   A.   I might -- I think I misspoke on clique.  But the Sara
4        Corbello thing just really hurt.  So I was working
5        with her on a general products case, and we were very
6        friendly, very, you know -- you know, she was
7        pregnant, so, you know, talking about, you know, some
8        home stuff in addition to work, and things just got
9        colder after -- after that.
10  Q.   Who got colder?
11  A.   The -- the chitchat from Sara.
12  Q.   And who's Sara?
13  A.   Sara Corbello.  She was an associate that was working
14       on general products with me.
15  Q.   You said a moment ago that this Sara thing just really
16       hurt.  What are you referring to?
17  A.   Well, that I would have never guessed you were 50 and
18       then the change, so it did hurt.
19  Q.   What was the change?
20  A.   Didn't I just answer that?
21  Q.   No.  You said the chitchat --
22  A.   The way we used to kibitz more, and then after --
23       after that party like the kibitzing kind of stopped.
24  Q.   Describe the kibitzing before versus the lack of
25       kibitzing or whatever the change was after.

## Page 80

1   A.   You are talking 2015, so we are talking seven years
2        ago now.  I -- and that was never top -- on top of my
3        mind.  It was just a source of hurt.  I can't verbatim
4        give you a conversation with me and Sara on that.
5   Q.   Did you ever ask Sara like I sense a kind of change in
6        our friendship and the amount of interaction,
7        what's --
8   A.   She left the firm shortly thereafter, so I guess the
9        point was moot.
10  Q.   Well, how long was she there after your 50th birthday
11       celebration?
12  A.   Four months.
13  Q.   And so in that four-month period you were really hurt
14       by a change in the amount of kibitzing with Sara?
15  A.   It's overall feeling of -- of inclusion, so . . .
16  Q.   And you can't be more specific about what changed --
17  A.   Yeah.  I mean, I don't have a problem with Sara.  I
18       don't have a problem with Sara.  She's not the one who
19       instigated this and, you know, so . . .
20  Q.   So let's go back to the event, the celebration.  Who
21       came to your desk and was a part of it at some point
22       during the day other than Chelsea and Shannon?
23  A.   I'm -- I would be guessing, but, I mean, I had been --
24       I had been at the firm, you know, for quite some time,
25       so, I mean, quite a few people stopped by.

## Page 81

1   Q.   Can you think of anyone other than Chelsea and
2        Shannon?
3   A.   I mean, certainly Jeannie Maison.  I think Dave Dell
4        grabbed a cookie.  Diane Chemke (ph) grabbed a cookie,
5        Patty.
6   Q.   Clay?
7   A.   Sherry Medley, Clay.  I mean, and I'm actually just
8        guessing.  I'm just -- you know, from people that I
9        had been friendly with for years and years.  Usually
10       people that you're friendly with you stop by on their
11       birthday.
12  Q.   Right.  And they stopped by, said happy birthday;
13       correct?
14  A.   Right.  Right.
15  Q.   Got a cookie?
16  A.   Right.
17  Q.   Chatted for a few minutes?
18  A.   Right.
19  Q.   Went back to work?
20  A.   Right.  So it was really that group of the four
21       younger associates that was the more painful thing
22       where they just showered me with compliments, quote
23       quote, you know, so that was the painful part.
24  Q.   Who are the four?
25  A.   So Sara, Erin Katz.  Who were the other two?  I think

## Page 82

1        they're both gone now.  Two other younger associates.
2   Q.   So what offended you was the -- what Sara, Erin, and
3        these other two associates said that --
4   A.   But you have to understand they weren't saying it in a
5        mean way, but when you are being showered with -- so
6        right.  I didn't see myself as old and now I'm being
7        showered with, oh, my God, you really are old.  Like I
8        never knew you were 50.  So, yes.  It just --
9   Q.   All right.  So that comment you attribute to Sara?
10  A.   You can't hold me to this.  This is 2015.  It's years.
11       It was one of the four.  They said I would have never
12       guessed you're that old, you don't look that old.  I
13       can't attribute which was said by which person.  And
14       it was kind of a barrage with the four of them, you
15       know, and I just like (nonverbal).
16  Q.   Did Chelsea say anything that you considered offensive
17       or concerning or sensitive in connection with your
18       50th birthday?
19  A.   Yeah.  "Are you going to retire now?"
20  Q.   This was at the time when she was around your desk and
21       they're having this recognition of your birthday?
22  A.   I can't say if it was then, the next day.  I don't
23       recall.
24  Q.   With others around?  Did she allegedly make that
25       comment "Are you going to retire now" when other

22 (Pages 79 to 82)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

**EXHIBIT 1**

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 83

1    people were around your desk?
2    .  I -- I don't -- not that time, but another time, which
3    was like I'm going to say like 2017 right after this
4    project started, she actually got kind of accusatory,
5    like I was somehow at fault that after all these years
6    I can't retire yet.  "I can't believe after all these
7    years you can't retire."
8            And I said -- I got a little ticked.  I'm
9    like, "Chelsea, I was never paid the big bucks.  I had
10   kids to raise.  The government wants me to work till
11   I'm 67 and a half."
12           And Jeannie Maison hopefully will remember
13   this because she was unaware that the -- and she
14   commented.  She's like, "67 and a half?  I thought it
15   was 65."
16           I said, "No.  For me it's 67 and a half."
17           So she was like whoa.
18           And I was like, "Yeah.  If I work that
19   long, I'll have been here 48 years or some ridiculous
20   thing."
21           So hopefully Jeannie Maison will remember
22   this conversation, but I actually got a little -- had
23   enough, especially when Chelsea is like accusing me
24   that I am somehow deficient, that I can't retire in my
25   50s.

## Page 84

1    Q.  Let's hold on.  I'm staying on the birthday
2    celebration back -- the 50th birthday.
3    A.  Well, you were asking me about her saying retirement.
4    I believe she asked me about my retirement then too.
5    Q.  All right.  So on the day of your 50th birthday when
6    they've done the gag gifts and everything, Chelsea
7    made the comment, I assume jokingly, "Are you going to
8    retire now?"
9    A.  Who -- I thought at the time it was joking.  Turns out
10   not so much.
11   Q.  All right.  Did she make any other comment now that
12   you're looking back on it that you found in any way
13   offensive or problematic on that day?
14   A.  On that day?  I don't recall.
15   Q.  Or about your 50th birthday.
16   A.  I don't recall anything specific.
17   Q.  All right.  So that one comment and then the comments
18   that were made I can't believe you're 50, you don't
19   look 50 by the associates?
20   A.  Correct.
21   Q.  Those are the things you recall on your 50th birthday
22   at the firm that looking back on it now you find --
23   you have a problem with?
24   A.  I had a problem with it then as well, but yes, that
25   was probably the start of -- yeah.  The start of

## Page 85

1    things.
2    Q.  All right.  Anything else on that day that you recall
3    that looking back you have a problem with?
4    A.  Not that I recall at this -- at this time.
5    Q.  Do you know if anyone took photos of the gag setup
6    that they did?
7    A.  I don't know.
8    Q.  All right.  Did you talk to anybody about the fact
9    that you had a problem with it, with how the day went?
10   A.  I mean, over -- overall I tried to be a good sport.
11   Right?  I'm not a whiner.  I can take a joke.  I -- I
12   might have bitched to somebody about not liking it,
13   but I can't specifically say who, but I might have
14   said, you know, this stinks or something.  I might
15   have.  I'll have to think about that.
16   Q.  Well, take your time now to think about it because I
17   need to know whether on that day or any time
18   thereafter you told anyone at the firm that, gee, I
19   had a problem with the way they celebrated my
20   birthday?
21   A.  Did I run to management or something?  No, I did not.
22   Q.  All right.  So you treated it as a joke and you let it
23   go; right?  You didn't turn it into I've got a
24   complaint --
25   A.  Right.

## Page 86

1    Q.  -- about what they did on my 50th birthday?
2    A.  Right.
3    Q.  At no point?
4    A.  At no point then.
5    Q.  If you at any point in time complained about it, when
6    was that?
7    A.  When the wheelchair would not leave my desk.  So after
8    that birthday, I put all the paraphernalia back on the
9    chair, wheeled it into Chelsea's office, and Monday
10   morning the chair's back at my desk.  So --
11   Q.  What do you mean it's at your desk?  It's not sitting
12   in lieu of your normal chair?
13   A.  Yeah.  There's -- so the way the firm is, is you know,
14   there's the cubbies, you know, so I'm here, no one's
15   here, so it was here.
16   Q.  Another cubicle?
17   A.  They're not separated, so they're -- they're one area,
18   and in some places someone's -- Shannon actually used
19   to occupy it for a while, but it's been empty.  It was
20   empty for a long time.
21   Q.  So let's get it straight.  You have a cubicle where
22   you've got your desk, your desktop computer, your
23   chair?
24   A.  Correct.
25   Q.  All right.  And then there's another cubicle next to

23 (Pages 83 to 86)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L. LIEBAU Volume 1
March 09, 2022

## Page 87

1    you which has got the same setup; right?
2    A. Correct. Correct.
3    Q. And the chair was moved into the cubicle next to you?
4    A. Correct.
5    Q. Okay. And it sat there in lieu of a chair for that
6    empty cubicle?
7    A. Correct.
8    Q. Okay. Do you know who put it there?
9    A. Chelsea.
10   Q. How do you know that?
11   A. Because I said, "Chelsea, you gotta take this back to
12   your church," you know.
13   Q. But how do you know she put it there?
14   A. Who else would have? Because I put it in her office.
15   Q. All right. So you're speculating?
16   A. True.
17   Q. All right. So the first time you mentioned the chair
18   to management was in 2019 and after your probation;
19   right?
20   A. No.
21   Q. When do you claim you mentioned it prior to that?
22   A. Sue Choma -- I mean, everyone thought the chair was
23   mine. Even Sue Choma. So she called me, I can't
24   remember exactly when this was, probably '18, to
25   borrow it.

## Page 88

1    Q. In 2018?
2    A. I think so. Might even have been '17. But I think it
3    was '18. To borrow it. And I said, "Well, it's not
4    mine, but I'm sure Chelsea wouldn't mind if you
5    borrowed it and please store it somewhere else."
6    Q. Okay. Is that the extent of your exchange with Sue?
7    A. Yes.
8    Q. Okay. And then the next time you raised it was in a
9    performance counseling meeting in the spring of 2019
10   following your probation?
11   A. And I was less subtle at that point and I said, "If
12   you don't move the chair, I'm going to file an age
13   discrimination lawsuit."
14   Q. Okay. You never talked about the overall birthday
15   events on your -- that occurred with the diapers and
16   the other gag gifts until the spring of 2019 when you
17   got more pointed and said you want the wheelchair
18   removed; right?
19   A. I never complained about the birth -- never complained
20   about the birthday.
21       THE WITNESS: I'm sorry. Can you read that
22   back?
23   BY MS. HARDY:
24   Q. I can repeat it. The first time you ever addressed to
25   management any complaint about your 50th birthday

## Page 89

1    celebration or recognition event was in the spring of
2    2019 following your probation?
3    A. I don't think that's true, no.
4    Q. When did you raise it prior to that?
5    A. While asking Sue to store that wheelchair somewhere
6    else -- let me think if there was anything even
7    earlier. More around the wheelchair itself than the
8    party, because, again, I'm trying to be a good sport
9    about the stupid party, but I complained -- and is
10   Chelsea my management? Because I complained to her
11   uncountable times to get rid of it. Because people
12   would assume it was mine and what's wrong with you?
13   How come you need a wheelchair? And so I complained
14   to Chelsea at least a hundred times.
15   Q. Just to get rid of the wheelchair?
16   A. Yes.
17   Q. Right.
18   A. Yes.
19   Q. All right. You never complained to Chelsea or to Sue
20   Choma about the overall birthday party, celebration
21   until --
22   A. We --
23   Q. -- till the spring of 2019 following your probation?
24   A. When I realized this pattern, yes.
25   Q. Okay. And how was Sue Choma when you said in 2018,

## Page 90

1    you know, it's not my wheelchair, you know, get rid of
2    it, how was she to know what it was connected to or
3    how it got there?
4    A. I don't. I assume she called Chelsea because I said
5    it belongs to Chelsea, so . . . I assume she called
6    her.
7    Q. Do you know when in 2018 you believe you had that
8    conversation?
9    A. It's -- it's hard to place it. Yeah. It's hard to
10   recall exactly when that was. But I will try to think
11   of it if you want to continue.
12   Q. So when did the 50th birthday party or celebration
13   start to bother you? When did you kind of look at it
14   in that light, start looking at it in that light?
15   A. Immediately. However, like I said, I'm not a whiner.
16   I'm going to be a good sport. But immediately. I
17   mean, I walked in and went -- especially the diapers.
18   Right? I mean, that's pretty bad taste. Yeah. I was
19   like . . .
20   Q. But no one knew that's how you felt --
21   A. No.
22   Q. -- until --
23   A. No.
24   Q. -- just shortly before your termination; right?
25   A. I don't know if that's a true statement. That -- no.

24 (Pages 87 to 90)

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 91

1    I think Chelsea knew that I didn't like it.
2    Q.  Well, but you're just assuming she intuited that?
3    A.  Well, you're assuming that -- yeah.  You just made an
4    assuming statement yourself, so . . .
5    Q.  Well, I'm looking at the documents.  I mean, you
6    brought it up after your probation in 2019.  There is
7    a meeting close to the time of your termination in
8    which you made reference to the birthday party and the
9    wheelchair and so forth, and at that point in time --
10   A.  With a point on it because subtle hints were not being
11   taken.
12   Q.  All right.  So before that it was subtle hints; right?
13   A.  Yes.  Yes.
14   Q.  All right.  So how was Chelsea to know before that
15   point where you became direct about it that this was
16   something that was upsetting to you as opposed to you
17   wanting the wheelchair removed?
18        MR. FARRAR:  Objection to form.
19        You can answer.
20   A.  How did she know it was upsetting to me?
21   BY MS. HARDY:
22   Q.  How was she supposed to know that?
23   A.  Okay.  You're asking me how does Chelsea think.  I
24   don't know how to answer that.  My repeated requests
25   for her to remove that wheelchair that would, no,

## Page 92

1    nobody cares, it doesn't matter.  Yeah.  I don't think
2    she was -- she cared about my feelings at all,
3    so . . .
4    Q.  Did you explain to her why you wanted the wheelchair
5    removed?
6    A.  Yes.
7    Q.  What did you say to her?
8    A.  I said, "People are asking me what's wrong with me.
9    People are asking me why I need a wheelchair."
10   Q.  And her response was it's no big deal?
11   A.  Yes.
12   Q.  What was your relationship with Chelsea back in 2015
13   at the time of the birthday celebration?
14   A.  Before that -- actually -- I thought we were friends.
15   I think she actually at my -- preceding my birthday I
16   had an anniversary, I had a 30th anniversary, and she
17   seemed genuinely surprised that I had been at the firm
18   30 years, and I -- actually I think that was the first
19   time she asked me if I was going to retire, and I
20   laughed.  I'm like I'm 49.  No.  So I think that's how
21   she knew I was 49.  So before that I thought we were
22   friends.  I gave her Little Tykes kitchen for her
23   kids.  We would go to lunch occasionally.  I thought
24   we were friends honestly.
25   Q.  And when did that perception on your part change?

## Page 93

1    A.  After the wheelchair.  And then --
2    Q.  Why did it change at that point?
3    A.  Because she would blow me off, you know.  I'm like,
4    "Chelsea, you know, people are asking me."  So like,
5    yeah, my opinion, screw you, you know.  I don't care
6    about your feelings.  So, yeah.  It's -- it totally
7    changed.  But I did not work with her, so I avoided
8    her.  I mean, hi in the halls.  When she would come
9    by, I'd say, you know, "Wheelchair.  You're not
10   borrowing it anymore.  It's been years now.  Church
11   probably wants that back."
12        She's like, "Oh, the church has a whole
13   bunch of them."
14        I'm like, "Well, you're not borrowing it."
15   Q.  What did you mean you're not borrowing it anymore?
16   A.  When it's been two years, now three years, that's no
17   longer borrowing.  That's stealing.  So I was trying
18   to put it on her to get this thing back to your
19   church, you know, so . . .
20   Q.  All right.  So the two of you just weren't connecting
21   on what you were trying to say about the wheelchair?
22   A.  Apparently not.  Until I said I will file an age
23   discrimination lawsuit against you if you don't get
24   rid of it, and then she finally moved it.
25   Q.  So your being subtle just was somehow not -- she

## Page 94

1    wasn't understanding what you were saying?
2    A.  I don't know what Chelsea was thinking.  I think she
3    was purposely blowing me off.
4    Q.  Why would she blow you off?
5    A.  Because she had a problem with my age.
6    Q.  Why do you think she had a problem with your age?
7    What leads you to believe that?
8    A.  Well, we were friends before she found out how old I
9    was.  Then she did -- something meant -- it's like
10   passive-aggressive thing.  Oh, Kathy's old, let's let
11   everyone know she's old, you know.  And, again, I
12   don't feel old, so thanks a lot for that.  But I think
13   it was her passive-aggressiveness going, yeah, let's
14   let everyone know how old she is and, you know, why
15   don't you retire?  What's wrong with you?  You haven't
16   managed your money enough to retire after 30 years?  A
17   lot of -- a lot of putting me down.  But, again, we
18   did not work together.  So I just stomached it.
19   Right?  I mean . . .
20   Q.  Do you know what the age disparity is between you and
21   Chelsea?
22   A.  I think ten years.
23   Q.  Where did you get that idea?
24   A.  I saw it in a LinkedIn thing or something that she
25   turned 40.

25 (Pages 91 to 94)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 95

1    Q.   That she turned 40 recently?
2    A.   I think it's --
3    Q.   How about 50?
4    A.   Yeah.  I don't know.  Is she 50?
5    Q.   Yeah.
6    A.   Yeah.  Well, she had a problem with me.  Shall we go
7         put diapers on her desk and see how she likes it?
8    Q.   All right.  So let's cover the reasons you believe you
9         were treated differently than other employees because
10        of your age.  Let's start with who the people are that
11        you think treated you differently at least in part
12        because of your age.
13   A.   Chelsea.
14   Q.   Okay.  Anyone else?
15   A.   She was pretty much the driving force.
16   Q.   Okay.  Anyone else, though?
17   A.   Well, Sue Choma didn't say age, but when she told me
18        that I'd been with the firm for a really long time and
19        I had been on that project a really long time so it's
20        time for me to reinvent myself, I was like yeah, but
21        I've had commendable service.  Like why are you
22        telling me to reinvent myself?
23   Q.   Let's just get a list of the people.  So Chelsea --
24   A.   Chelsea and Sue.
25   Q.   Chelsea and Sue?

## Page 96

1    A.   Yeah.
2    Q.   All right.  So it's limited to those two?
3    A.   Correct.
4    Q.   All right.  So let's start with Chelsea and let's walk
5         through everything that she did or said that impacted
6         you that you think exhibited an age bias or somehow
7         disadvantaged you because of your age.
8    A.   Okay.  So when Clay brought me into this project
9         and -- so okay.  You've gotta go back, though.  So our
10        relationship changed after the birthday.  We weren't
11        friends anymore.
12   Q.   Like on a dime after your 50th birthday?
13   A.   And the repeated ignoring of my get this wheelchair
14        out of my desk.  It deteriorated.  But we were still
15        polite.
16   Q.   All right.  Let's stay with that thought for a moment.
17        How did your relationship deteriorate other than the
18        fact that she did not respond to your subtle kind of
19        complaints about the wheelchair?
20   A.   Okay.  I'm sorry.  That was a lot.
21   Q.   How did the relationship change after the 50th
22        birthday party?
23   A.   Okay.  Well, it was not as friendly as it was.
24   Q.   Can you be more descriptive than that?
25   A.   We would occasionally have lunch prior, and I don't

## Page 97

1         think we ever did after.  When her behavior really
2         turned, though, was when we got on the same project
3         together, so like we abided by each other, was still
4         cordial.  I would say, you know, here is this
5         wheelchair, so we had those.  But it was still
6         cordial.  When we got on this project together --
7         she's very jovial.  I don't know if you've met her.
8         She appears very jovial.  So when this new project
9         came up, she came over all very happy and jovial, "I
10        got a new project."
11             And I said, "Me too.  Clay called me
12        yesterday."
13             And she went, "Really?"  And like frowned.
14        And then actually I would love her text.  What was she
15        texting her husband when she was constantly doing
16        that?  I would love to see that text that she sent
17        right there.
18   Q.   When was that exchange?
19   A.   When we got the project.  Clay had called me the day
20        before her.  I can't tell you the exact date, but I
21        bet if I had access to the information on my computer
22        I could whittle down that date for you.
23   Q.   Did you create an email to yourself about that
24        conversation?
25   A.   No.  Because this one wasn't horrible yet.  But I -- I

## Page 98

1         was like, okay.  I mean, she just deadpan really and
2         like frowned, and I was like okay.
3    Q.   So that was the fall of 2017?
4    A.   Correct.
5    Q.   Okay.  And did she do anything other than say "Really"
6         that you think indicated she was unhappy?
7    A.   Well, she walked back to her office, so that was --
8         that was the end of that.  But then Clay sent us the
9         invites to the launch meeting, and so, you know, we're
10        all at our own desks participating in that, so there
11        were two that Clay invited both of us to, two launch
12        meetings, and so the last one the three of us, Clay,
13        Chelsea, and I, talked, and Clay said, "Okay.
14        Chelsea, you get everybody -- you know, you get you
15        and Kathy access and, you know, I'm going to kind of
16        bow out of this," you know, and -- and Chelsea
17        wouldn't give me access.
18   Q.   Access to what?
19   A.   The client systems.
20   Q.   So --
21   A.   And I was never invited to another meeting.
22   Q.   So you had two luncheon meetings with Clay --
23   A.   Launch.  Launch.
24   Q.   Pardon me?
25   A.   Launch.  Launch.

26 (Pages 95 to 98)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 99

1    Q.  Launch meetings.  Okay.  Just the three of you?
2    A.  No.  It was a conference call.
3    Q.  Okay.  And that was introducing you to what the
4         project was?
5    A.  With the client on the line.
6    Q.  Okay.  And then Chelsea would not give you access to
7         the client system or whatever --
8    A.  So yeah.  Do you want me to --
9    Q.  Yeah.  Go ahead.
10   A.  -- briefly explain?  So it's lemon law stuff.  Mostly
11        in California, so -- and there was actually a class
12        action going on in California.  So the client wanted
13        to get it -- get itself in line because there was
14        severe sanctions if you don't move in 30 days.  So
15        tight -- tight time frame.  So this project was when
16        someone files a complaint, they wanted us on it right
17        away, do an assessment, if it was -- if it was
18        eligible for a buyback, get that offer out there and
19        try to settle these within 30 days so that the client
20        doesn't get hit with, you know, sanctions and --
21        and -- and I think it's built into their statute some
22        damages.  You know, I think it was triple damages or
23        something.  So very fast.  Very fast.  Very fast.  So
24        in order to facilitate all that, we were to get access
25        to the client's warranty system.  So, you know, you

## Page 100

1         have to know what's on the vehicle.  Right?  So that
2         was core to be able to get in there and see what was
3         done on this vehicle, what do we know about.  And
4         Clay, marching orders, Chelsea, get you guys both
5         access and she didn't.  She got herself access right
6         away.  She didn't get me access.  So I asked her about
7         it, you know.
8    Q.  What did she say?
9    A.  She said, "Oh, yeah, yeah, yeah, I'm gonna."
10        And I'm like, "Well, you know, do you want
11        me to start working on these or what?"  You know.
12        "Yeah, yeah, yeah.  Here, let me log you on
13        with my credentials."
14        So she would come to my computer and log on
15        so that I could use her name to go into the system.
16        So -- okay.  So the launch was in September, so middle
17        of October I still don't have access.  And I was like,
18        "Chelsea, you know, can I have access?"
19        "Oh, yeah, yeah.  I'm gonna -- I'm gonna do
20        that."
21        Okay.  End of October I still don't have
22        access.  So then I email, and I think you got this in
23        your stuff, I email Shannon as part of a different
24        email and I said, "Do you have access yet?  You know,
25        like what's going on?"

## Page 101

1         And Shannon rather than emailing me back
2    came by and just said, she goes, "I just do the
3    intake, so I'm not getting access."
4         And so I was like okay.  You know, because
5    if Chelsea's not here and cases come in, I can't do
6    anything because she didn't give me her credentials.
7    She would like log it on on my computer.  So, okay,
8    this is a problem; right?  So then I'm going to say
9    late November, early December we got a ton of cases.
10   Like 20 in a day.  And she couldn't keep up her age
11   bias against me and she had to give me access because
12   she couldn't -- she couldn't do 20.  So I finally got
13   access.  So that was a way that she just -- she wasn't
14   going to let me in this project.  She just wasn't
15   going to let me in.  I wasn't invited to any more
16   meetings.
17   Q.  Do you know if there were any more meetings?
18   A.  Yes.  I know that there were other meetings.
19   Q.  Who attended them?
20   A.  Chelsea.
21   Q.  Just Chelsea?
22   A.  Yeah.
23   Q.  Okay.  And why did you think you needed to be there?
24   A.  Paralegals usually are, and when -- okay.  Since this
25   was a launch, this was a brand-new thing, changes are

## Page 102

1    being made, different marching orders, and actually
2    that's why the paralegals are there.  Chelsea wouldn't
3    downstream stuff to me.  She didn't invite me to a
4    meeting, so I didn't know.  But then when I did
5    something that I wasn't aware was changed, she would
6    like, "We're not doing it like that anymore."
7         Oh, so right.  Her tone became no longer
8    jovial toward me.  Her tone was snarky and snappy
9    whenever she spoke to me.  And so like I'm supposed to
10   know that there was a change in a meeting that you
11   didn't invite me to but now you're going to yell at me
12   for it?  So yeah.  It was very tense.  Very tense.
13   Right from the get-go.
14        So then like in -- it was the Christmas
15   season.  Clay called me on a -- on a switch case and
16   he said, "Oh, by the way, how's the new thing going?"
17        And I'm like, "Terrible.  I have no idea
18   what's going on.  I'm not in the loop.  Terrible."
19        So he said, "Okay.  Okay.  In January we'll
20   meet."
21        And I said, "Okay.  Great."
22        Want me to keep going?  Am I talking too
23   much?
24   .   No.  Keep going.
25        MR. FARRAR:  Just answer the question.

27 (Pages 99 to 102)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 103

1    A.  What was the question?  Oh, how did Chelsea treat me
2    different.  So right.  The not getting me access, her
3    tone, and not inviting me to the launch meetings which
4    I should have been.  So all those right away.
5    BY MS. HARDY:
6    Q.  Did you get access at some point?
7    A.  Yes.  It was like --
8    Q.  When was that?
9    A.  It was like mid November I would say, and it was
10   because we got a ton, like 20 of them in one day.
11   Q.  Did you ask her why you didn't have access before
12   that?
13   A.  As I said, yes.  Several times.  Every -- every week.
14   Q.  And what was her response?
15   A.  "I'm gonna.  Just use mine.  It's fine.  Just use
16   mine.  I'll get you -- I'll get it.  I'll get it."
17   Q.  All right.  So your complaints about her in 2017 are
18   the slow giving you access, not inviting you to
19   additional launch meetings, and her tone?
20   A.  Yes.
21   Q.   Were there any witnesses to any of the conversations
22   where you thought her tone was inappropriate?
23   A.  I notice you guys have Joe Hickey on your Witness
24   List.  His office is right there.  We can ask Joe.
25   Q.  Anyone that you know of who was a witness?  Anyone

## Page 104

1    that you can identify?
2    A.  No.  Joe's office is right there.
3    Q.  All right.  So did you ever talk to anyone about why
4    you weren't invited to the launch meetings after the
5    first two?
6    A.  Not specifically, because, if you recall, Clay wanted
7    hands off, and, again, I'm not a whiner.  I am not
8    going to go, oh, she's not inviting me to -- no.  It's
9    not -- that's not the way I worked.  I just wanted to
10   get the job done, and I was being prevented from
11   getting the job done.
12   Q.  All right.  So did you ever attend any further launch
13   meetings after the initial two?
14   A.  I don't believe so.
15   Q.  And how many launch meetings do you believe occurred
16   after those initial two?
17   A.  Well, launch with that term, I would say there were
18   probably three.
19   Q.  So you went to two out of the three?
20   A.  Two out of the five.
21   Q.  Oh, three additional?
22   A.  Yes.  Because then certain changes were made.  Like
23   one of them -- so at one of the earlier launch
24   meetings our client said he wanted Kelley Blue Book
25   values so like he has something to gauge our

## Page 105

1    assessments against.  So at a subsequent meeting
2    apparently they changed to NADA value, and, oh, yeah.
3    Chelsea yelled, "We're using NADA now."  Okay.  You
4    just gotta tell me.  Right?  How would I know?  I
5    wasn't there.  So that was one of the things that she,
6    you know, I had no way of knowing it, but chose to
7    call me out that I didn't know that we changed to
8    NADA.
9    Q.  All right.  So anything else about how --
10   A.  He's staring at me.  It's a little weird.
11   Q.  What's your problem?
12   A.  Nothing.  It's just weird being stared at.
13   Q.  Well, people are just listening to you and they tend
14   to look at someone who's speaking.
15   A.  I know.  I know.  And this is weird for me.  You've
16   gotta understand that.
17   Q.  Well, I can understand it's a different experience,
18   but when you're talking, people in the room are going
19   to look at you because they're trying to listen to
20   what you're having to say.
21   A.  Fine.  Fine.  Fine.  Yes.
22   Q.  So did your relationship with Chelsea change in any
23   other way beyond the problems that you've identified?
24   A.  Yes.
25   Q.  How?

## Page 106

1    .  Okay.  So I'll continue with the story.  So in January
2    Clay has me, Shannon, Chelsea in his office, to you,
3    know, go over the division of work.  You know, we all
4    are very clear that Shannon does intake, you know, she
5    runs the conflict, she does intake, and so then, you
6    know, Clay dismissed Shannon from the rest of the
7    discussion.  So then Clay was like, well, you know --
8    so Clay kind of divided up the work.  He said -- do I
9    need to back up?  Because I did miss something.
10   Shannon -- or not Shannon.  Chelsea was sometimes
11   doing the assessment summaries.  I start at 9:30 to
12   5:30 were my hours.  So sometimes she would like get
13   in there early and try to get them done before I came
14   in so that like -- I guess so that I wouldn't have any
15   work to do, I guess.  I don't know.  So -- so, anyway,
16   so Clay said -- made it pretty clear.  He's like,
17   "Kathy should be, you know, reviewing the documents,
18   doing the assessment summaries.  Chelsea, you should
19   be reaching out to opposing counsel to settle these
20   things.  So that's -- that's where, you know, your
21   core thing is.  Let Kathy do the assessments.  You do
22   the settling."
23           Chelsea also, backing up, she didn't want
24   to copy me on anything.  You know, like when she did
25   do settlement negotiations with somebody, she

28 (Pages 103 to 106)

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 107

1    didn't -- she didn't want to copy me on anything, and
2    this actually predated the January, which is why it
3    came up in the January, and I asked her about it and
4    she's like, "Well, the Greenberg firm like copies like
5    ten people and I don't want to do that."
6              And I said, "Well, just me," you know.  You
7    know, "I need to kind of be apprised of the status,"
8    because I also had to at the end update the database.
9    So she just -- she just didn't want to copy me.
10             So at this January meeting Clay's like,
11   "Copy Kathy.  Let her -- let her update -- you know,
12   let her do her job.  Let her update the database."  So
13   he cleared that up.
14             The other thing I was doing is I was
15   preparing an initial case summary, so if you search
16   the system with me as author, you're going to get my
17   initial summaries, and I think I want those.  So it
18   proves that, no, I was not just updating the database.
19   That was the end of the status.  Well, so you'd review
20   the complaint.  You'd pull the vehicle record.  You'd
21   review those.  You need a total.  You need how much
22   was spent on the repairs.  You'd have to look at the
23   client's customer contact database, which is another
24   database, see if that customer ever called in, alleged
25   lemon law, claimed lemon law, so you'd have to review

## Page 108

1    all that.  You'd have to look at recalls, how many
2    recalls.  So that's another database.  Did it have
3    recalls.
4              So a lot of the information that I had to
5    look at for each and every case didn't get into the
6    final assessment spreadsheet because Excel only gives
7    you so much room.  You know, like it's actually built
8    into Excel.  It only gives you -- so a lot of stuff I
9    reviewed, I wanted a record that I reviewed it, and it
10   just didn't make it into the assessment spreadsheet,
11   so I would do these initial case summaries, and
12   Chelsea hated it.  She's like, "That's a waste of
13   time."
14             I'm like, "Well, it's not a waste of time
15   because if you asked me recalls didn't make it in
16   here, you asked me if I looked at it, I could say yes,
17   I looked at it, I did, and there weren't any."
18             Or we get, you know, more repair records
19   from the dealer because dealer -- you guys work with
20   Ford, so -- okay.  So you know that dealers had their
21   own systems.  That's not the warranty system.  So we
22   would get more repair orders either from the dealer or
23   from the plaintiff, so in my initial case summary I
24   could add it to what I already have so that I have a
25   clearer picture of the true repair history.  So that

## Page 109

1    was useful for that, you know.  And -- but Chelsea
2    hated it.
3              And Clay said, "Kathy, you can keep doing
4    your initial case summaries.  Makes sense."  So he
5    gave me direct approval to keep doing those.
6    Q.   That was in the meeting with Chelsea in January of
7         '18.
8    A.   Yes.  Yes.
9    Q.   So you did those for yourself, not for --
10   A.   I did them to prepare the final, but I needed a record
11        of what I reviewed because they --
12   Q.   Why did you need all that information?  Why did you
13        have to go through all the work involved in creating
14        that if it wasn't needed by Chelsea or Clay?
15   A.   Okay.  So let's use recalls, for example.  So you go
16        onto the recall database and there was a recall on
17        tires and there was a recall on paint.  Okay?  So
18        that's not going to go into the spreadsheet if they're
19        talking about their transmission.  That's just not --
20        it's not relevant.  Okay?  But I wanted -- I wanted to
21        know that I looked at it.
22   Q.   Why?
23   A.   Because if I didn't look at it and there was a
24        transmission recall, then I missed something.
25   Q.   Well --

## Page 110

1    A.   Okay.
2    Q.   -- why is that efficient if it's a transmission issue
3         to start creating records about what you looked at on
4         the tires?
5    A.   To note that I looked at them.
6    Q.   But --
7    A.   Different way of organizing.
8    Q.   A different way of doing it?
9    A.   Right.  When -- when -- okay.  By the time that I was
10        terminated, we had 2,000 something in our database.
11        Are you going to remember if John Smith -- did you
12        look at the recalls on John Smith?
13   Q.   So you wanted to take the time to record that you'd
14        looked at the tires when it was a transmission issue
15        just in case sometime down the road some question came
16        up about the tires?
17   A.   But -- but questions came up all the time.  So like I
18        used recall as an example, but one thing that did come
19        up all the time is so I would do the grid about the
20        repairs, and so during -- when we're doing the actual
21        assessments, both Chelsea and Clay would say, "Well,
22        how much was that engine replacement?"  That doesn't
23        make it to the spreadsheet.  I would have to look at
24        my initial case summary and tell you how much that
25        engine replacement was.  It was $8,000.  Okay?  So --

29 (Pages 107 to 110)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 111

1    or just questions.  Did they have any customer
2    contacts?  I can look at my -- didn't make it to the
3    final, but I can look at my initial case summary and I
4    said it was but they never said lemon law.
5    Q.  Did you --
6    A.  And I didn't type everything.  They were notes,
7    so . . .  And I'm a damn quick typist, so . . .  It's
8    not like I took a lot of time to --
9    Q.  Did you record in your time that you put down what --
10   when you were working on the initial case summaries?
11   A.  One and the same.  It flowed.  Okay.  You -- first you
12   review the Complaint, then you review the vehicle --
13   you know, the warranty records, then you review this,
14   so it just -- it just flowed.
15   Q.  Let's move on to whatever other issues you had with
16   Chelsea.
17   A.  So -- well, and because of her -- okay.  So we thought
18   we had good marching orders.  I was actually
19   delighted.  Right?  Now the big guy has given us our
20   marching orders.  I was delighted.  Well, because of
21   her age bias she would not work for me and so she
22   started lying about my performance.
23   Q.  She would not work for you?
24   A.  She would not work with me I said.  Didn't I say with?
25   So she started lying about my performance.  She

## Page 112

1    said -- the first lie was in January 2018 soon after
2    the meeting with Clay where she wrote I gave
3    inaccurate information to someone.  And I actually put
4    a question mark next to it because I -- she never told
5    me I did that.  I had never done that.  I am usually
6    very careful.  I don't give inaccurate information.
7    So that was her first lie.  She just would not work
8    with me.  She -- I think she planned right there get
9    her fired because I -- her -- she's got a problem with
10   my age, I guess.
11   Q.  You guess.  Why do you think she had a problem with
12   your age?
13   A.  Well, look at this history.  Like -- like what's going
14   on?  Why --
15   Q.  Maybe she had a problem with how you approached your
16   job.  Maybe she had a problem with your personality.
17   Why do you assume it's your age?
18   A.  The party, the wheelchair, the asking me about
19   retirement over and over and over and over.  One would
20   start to see a pattern, which it took me a while to
21   see the pattern because, again, I don't see myself as
22   old.  So it took me a while to identify her pattern,
23   but because of her age bias, she was determined then
24   to get me fired if I'm not retiring, I guess.
25   Q.  That's just the assumption when you put together that

## Page 113

1    you thought --
2    A.  Why would she -- okay.  So she put this lie -- I put
3    the little -- you might remember the question mark.
4    So after that I'm furious because I'm like no one ever
5    discussed -- she never discussed this with me.  So I
6    do some research.  I go back through all my sent items
7    because it was only from September now to when Chelsea
8    said that, so --
9    Q.  Which was when?
10   A.  I think the reviews come out in March, April, so not a
11   ton.  It was still a lot.
12   Q.  So March, April 2018?
13   A.  Yes.  So, but I went back to September and looked at
14   all my things outside the firm.  I didn't give anyone
15   any incorrect information ever, and so I -- I called
16   her out on it and I said, "Chelsea, what are you
17   talking about?  You never -- you never told me about
18   it.  You write this on my review."
19        And she said, "I don't remember."
20        And I said, "Well, you wrote it on my
21   review."
22        And she goes, "Well, I wrote it so it must
23   be true."
24   Q.  Did that conversation occur with Sue Choma present?
25   A.  I -- I told Sue about it because when Sue -- when I

## Page 114

1    wrote the question mark, I told Sue, I'm like this
2    never happened.  So yes.  After I told Chel --
3    confronted Chelsea on that first lie, I did tell Sue
4    about it.  Okay.  Deaf ears.  But what became a
5    pattern that I didn't see till later is that when I
6    called her out on that, then she sent me another
7    something about -- like the next thing was a really
8    nasty email.  "You need to tell me when I am this
9    close to a settlement.  This has been sitting for two
10   weeks and he's just looking for confirmation."
11        I said, "You didn't tell me that you wanted
12   me to track that.  Fine.  I'll track that."
13        So, again, my fault for something that she
14   didn't tell me that she -- but it was just days after
15   I called her out on the other lie.  So I started
16   preparing weekly, I think I called them miscellaneous
17   things to wrap up, and a weekly -- you gotta settle --
18   you gotta settle this, you gotta do this, you gotta do
19   this, you gotta do this.
20   Q.  Did you send yourself an email about everything that
21   she did that you considered to be a false accusation
22   or a lie or . . .?
23   A.  I don't think I started doing that yet.
24   Q.  You said you started doing that in January '18.
25   A.  I might have -- I think I sent myself the performance

30 (Pages 111 to 114)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 115

1    review, so, you know, where I got my question mark on
2    there.  But yeah, there weren't any backup
3    documentation to send myself on that.  I had to do
4    that at work.
5    Q.  And you didn't create any kind of memorialization of
6    these events that you found so upsetting?
7    A.  Well, I talked to Chelsea and then I talked to Sue
8    Choma.  Did Sue Choma document that I came and talked
9    to her about this was misinformation?  Ask Sue.  She
10   should have.  She should have documented it.  I don't
11   know if she did.  I'd like to see.  So right.  So
12   shall I continue?  Yeah.  It was horrible, and it just
13   got progressively worse and worse and worse.  So
14   then --
15   Q.  So it was horrible as of the very beginning according
16   to you; right?
17   A.  Well, it was -- how would you like to be tasked with a
18   new project that you really wanted because the client
19   took the other stuff inhouse?  And that was not my
20   fault.  I mean, you guys work with this client.  They
21   mix up their people every three to five years, and the
22   person that took it decided to take the discovery back
23   inhouse.  So not my fault.  So yes, I was very excited
24   to do a very good job on this new project, and I was
25   being prevented from doing so.

## Page 116

1    Q.  But from the day you started on this lemon law project
2    with Chelsea, from your perspective the relationship
3    was awful?
4    A.  It got -- well, she went, "Really?"  And stomped off
5    on her phone.
6    Q.  Were there ever positive moments from the fall of 2017
7    up until the time of your termination in '19?
8    A.  I'm sure there were.  We're human beings.  I'm sure
9    there were.  I can't recall any.
10   Q.  All right.  Is there anything else of significance
11   that occurred after the last event you referred to in
12   the --
13   A.  Yeah.  When she said, "You need to tell me when."
14   Yes, there was.  So --
15   Q.  Identify all the key events with Chelsea that you have
16   a problem with.
17   A.  Okay.  So then that's when she brought in Robin after
18   the nastygram about you need to tell me about -- so
19   then I get in to work one day and, you know, Shannon
20   usually said, oh, you know, we got five today, we got
21   six today, whatever.  So get -- get the email from
22   Chelsea, I believe, saying, this isn't going to be
23   verbatim, right, but we got like eight, and Robin is
24   now on the email.
25   Q.  Robin's another -- she's an administrative assistant;

## Page 117

1    right?
2    A.  No.  She's a paralegal.
3    Q.  Where did you get the impression she's a paralegal?
4    A.  She's a paralegal.
5    Q.  You just assume she's a paralegal?
6    A.  Well, okay.  We're talking about Chelsea, so I hate to
7    get us all muddled here, but part of the demeaning
8    treatment from Sue Choma is she made me act like a
9    secretary to my peers, so she never assigned me to an
10   attorney to be secretary.  She only assigned me to
11   other paralegals, which to me was meant to demean,
12   which it did.  Because I even had them say, "Why are
13   you doing this?"  Okay.  And so I was assigned, not at
14   this juncture, but I was assigned to be Robin's
15   secretary when their secretary was on vacation because
16   of Sue Choma.  So yeah.  That was -- I think that's
17   demeaning.  And even -- even those that I was assigned
18   to thought it was weird.  Like why are you doing this?
19   And I'm like Sue's making me.
20   Q.  When did that happen?
21   A.  When Sue started making me do this.
22   Q.  When was that?  I mean, that's the question.
23   A.  When did she start making me do this?  Probably about
24   January of '18.
25   Q.  So you assume that Robin Kowalski was a paralegal?

## Page 118

1    A.  Yeah.  Is she not?  It would be news to me if she's
2    not.
3    Q.  Not her classification.
4    A.  Really?  What is she?
5    Q.  Well, I'm not here to answer your questions.  Why did
6    you assume she was a paralegal?
7    A.  I think that was her title on her --
8    Q.  On what?
9    A.  On her emails.  Yeah.  If she's not, then I'm
10   surprised.  Is she not?  Well, then why did Sue later
11   assign me to do this?
12   Q.  What did you do for Robin?
13   A.  I don't remember.  Make a copy, go get a folder from
14   the supply room.  Something else, like -- yeah.  And
15   this was at Sue Choma's insistence, so . . .
16   Q.  So the reason that you assume Robin Kowalski was a
17   paralegal is because you think you saw that on her
18   signature block at some point?
19   A.  Well, you know, she just -- she got hired in shortly
20   before that.  Yeah.  I mean.  If she's not a paralegal, that's
21   news to me.
22   Q.  All right.  But in response to my question, you just
23   assumed that?  You don't know why other than you may
24   have seen it on a signature block?
25   A.  Yes.

31 (Pages 115 to 118)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 119

1    Q.  All right.
2    I guess.
3    Q.  What about Lisa Myers?  Did she also work at some
4    point on the lemon law project?
5    A.  Yep.  Chelsea brought her in more toward the end, like
6    a year later, so like in March of '19, April of '19.
7    Q.  And what did you think her classification was?
8    A.  She's a contract paralegal.
9    Q.  And where do you get the notion she's a contract
10   paralegal as opposed to a legal secretary or
11   administrative assistant?
12   A.  Her emails again.
13   Q.  Again.  All right.  So that's the sole basis is what
14   her -- what's on her email?
15   A.  Yeah.  I mean, I'm not HR.  I don't go independently
16   investigate people.  Yeah.
17   Q.  Did you think anyone who was a non-attorney who worked
18   on the lemon law project was a paralegal because they
19   were working on a project?
20   A.  Shannon Stewart is an administrative assistant.  She
21   did intake, which is more what an administrative
22   assistant does, the conflicts, opening up the matters.
23   See, I didn't do that.  That was not my role.
24   Q.  All right.  So let's go back to Chelsea and the things
25   that she did that led you to believe that she had an

## Page 120

1   age bias.  You've listed the -- you didn't think she
2   wanted you on the project to begin with, that she
3   didn't invite you to all of the launch meetings, she
4   didn't give you access as quickly as you thought she
5   should have to the client database, and she used a
6   tone with you that you didn't like, and then you
7   mentioned she -- you thought she lodged criticisms of
8   your performance that weren't fair.
9   A.  They weren't true.
10   Q.  Weren't true.  Okay.  So that's the list thus far; is
11   that correct?
12   A.  So far, yes.
13   Q.  Is there more?
14   A.  Yes.
15   Q.  What?
16   A.  So I come in that morning and I'm going to -- I think
17   there were like eight.  So she said, "Kathy, Robin,
18   split these up."
19   Q.  When are you talking about?
20   A.  When I -- so this is like at -- it was after her email
21   to me, "You need to tell me when I'm that close to
22   settling something."  So like within days of that I
23   come into work, and the email's not from Shannon but
24   from Chelsea.  It says, you know, Kathy, Robin, split
25   these up.  And so I go into her office and I was like,

## Page 121

1   "Chelsea, you know I need this work.  What -- what are
2   you doing?"
3        And she said, "Well, you've been here
4   forever.  You have a ton of vacation."
5        I said, "Yeah."
6        She's like, "Do you plan to take it?"
7        And I was like, "Yeah."
8        She said, "Well."
9   Q.  Well?
10   A.  That's the end of the discussion.  I was dismissed,
11   so . . .
12   Q.  You were dismissed from the --
13   A.  From speaking with her anymore.
14   Q.  Okay.  And what conclusions did you draw from that
15   exchange?
16   A.  Shut the fuck up.  Shut up.  I mean, how would you
17   take that?
18   Q.  I'm asking how you took it and why --
19   A.  I took it hard.  I was like okay.  So I went back
20   and --
21   Q.  What did you say to her?
22   A.  I had already said, "Chelsea, you know, I need this
23   work.  What are you doing?"
24        And then she said that about the vacation.
25   And so yeah.  Like it was a glare.  She was like, "Do

## Page 122

1   you plan to take it?"
2        I was like, "Yes."
3        "Well?"  With a glare.
4        I mean, what would a normal person do?
5   What would a regular person do?  I went back to my
6   desk and started doing them.  So . . .  But weird;
7   right?
8        So then -- gosh, there's probably more.
9   Then --
10   Q.  What month in --
11   A.  So now we're like in April of '18, something like
12   that.  Maybe May by now.  Gosh, I kind of wish I had
13   access to my computer because then I could give you
14   accurate dates.  Okay?  Okay.  I would really like
15   that.  The way I kept it.  Very organized.  So right.
16   If I get these a little off, it's been a few years
17   now.  So then I guess the next event was when she just
18   cut me off cold turkey, like no more copying me on
19   emails.  And so I sent something to myself that said
20   radio silence, Chelsea's been here all day.
21   Q.  So that's one of the emails that you sent to yourself
22   that ended up in the Sterling folder?
23   A.  No.  You have it.
24   Q.  From you.  You produced it.
25   A.  Correct.

32 (Pages 119 to 122)

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 123

1  Q.  All right.
2  A.  So right.  So she just cut me off.  And -- okay.  Like
3      why did you do that?  You know.  So I did ask her
4      about that.  So let me think -- whenever I would ask
5      her about something, and I didn't realize this until
6      more recently, but whenever I would question her about
7      something that to me was improper and a form of
8      discrimination, that she would within days allege
9      something else against me, so I think -- I'm not sure
10     if the radio silence came up first or the thing about
11     waiting to do the assessments until Shannon finished
12     her conflict check.  Okay.  Because --
13 Q.  Now, you're in '19.
14 A.  No.  We're still in '18.  Yeah.  It went on for a long
15     time.  It was -- it was -- it was hell.  So -- so this
16     is the way she would treat -- one of the ways she
17     treated Robin differently is she admonished me even
18     though hurry, hurry, hurry, hurry, go faster, go
19     faster, go faster.  Then all of a sudden she's like,
20     "You can't start the assessments until Shannon
21     finishes conflicts."
22         And I was like no, because Clay -- oh, did
23     I cover that in the January '18 meeting?  Okay.  We do
24     have a policy about conflicts and it's very, very firm
25     policy.  You do not communicate outside of the firm

## Page 124

1      until it clears conflicts.  Very firm policy.  But
2      between me and Clay and Chelsea, he said because of
3      our time constraints, you can start working on it
4      before it clears conflicts but do not communicate
5      outside of the firm.  Okay?  So he's stretching a
6      little bit, but we're not violating.  All right?
7      Because if it ends up there's a conflict, we'll just
8      throw the work away.  Right?  No one's ever -- it's
9      never going to see the light of day.  So -- so the
10     practice was when Shannon got them, she would save the
11     complaints to the system so I could get to the
12     complaints because that's the first thing you review
13     and then do her conflicts deal and all that, you know,
14     but we could get working.  So I was admonished to -- I
15     can't begin work until Shannon finishes the conflicts,
16     and I'm like all right.  Well, this is new.  And why?
17     Like, you know.
18         Anyway, so then like a week later she's
19     sending them to Robin before Shannon even gets them.
20     So -- so she's circumventing the Shannon thing at all
21     and she's sending them directly to Robin.  So okay, I
22     have to wait so that you can then tell me that I'm not
23     fast enough, but you're going to send them to Robin
24     before they even go to Shannon?  Okay.  So that's
25     disparate; right?

## Page 125

1         And then okay.  The whole thing in the file
2      about I am not to work one second of extra hours, and
3      this is verbatim what Sue Choma said.  "If this
4      requires a full-time position, more hours, we'll get a
5      full-time person to do it and then where would that
6      leave you?"  Okay.  So no extra hours for Kathy.
7      Zero.
8         Robin would continually say, "I'm busy but
9      I'll do mine at home tonight.  I'll do" --
10        So, again, my emails, the way I kept it,
11     you will see Robin repeatedly -- I need some more
12     water -- repeatedly saying "I'll do mine at home
13     tonight.  I'll" --
14 Q.  He'll get you water.  Just keep going.
15 A.  Was she reprimanded?  Not to my knowledge.
16 Q.  All right.  So what other complaints do you have about
17     how Chelsea treated you vis-a-vis other people?  You
18     pointed out the conflict issue, about waiting to start
19     your work until the conflicts cleared and over time.
20 A.  Right.  All of those.  There was still -- again,
21     Chelsea is very jovial on the outside.  So lots of
22     laughter.  Lot of work to do.  Kathy's over at her
23     desk, frigging working.  Lots of laughter in Chelsea's
24     office, her and Robin, lots -- you know, la la la la,
25     laugh, laugh, laugh.  So I'm reviewing a complaint and

## Page 126

1      there was an injury allegation in there and we don't
2      do any injury.  That goes to a different team.  So I
3      come in to tell her that she's going to have to send
4      one back to Ford because they had an injury allegation
5      in it.  But like I walked in the door and like stone
6      face.  Okay.  No more laughing.  Okay.  How would that
7      make you feel?  Would that make you feel kind of
8      uncomfortable?
9  Q.  Anything else that's responsive?
10 A.  What's the initial question?  How else was I treated
11     differently?  To my knowledge, Chelsea didn't lie
12     about Robin's performance the way she lied about mine.
13     Let's see.  What else?  It was -- it was pretty bad.
14     That's all that's coming to mind right now.
15 Q.  Okay.  So you've identified the -- you believe Chelsea
16     lied about your performance but not to your knowledge
17     about Robin's.  She allowed Robin to start work on new
18     cases before the conflicts cleared.  You believe she
19     treated --
20 A.  Before they were even done.  Because we all
21     originally -- I'm sorry.
22 Q.  She treated you differently on overtime.
23 A.  Yep.
24 Q.  Is there -- did I miss anything?
25 A.  Tone.

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 127

1    Q.  Anything else about you vis-a-vis Robin?
2    A.  To my knowledge, she never asked Robin about
3        retirement.  Did we say anything else?
4    Q.  No.  Is that complete?
5    A.  I think so.  I mean . . .
6    Q.  All right.  So is there anybody else you claim she
7        treated differently than you who you would consider to
8        be kind of comparable in terms of their job
9        responsibilities?
10   A.  On this project at that point in time it was just
11       Chelsea, me, Shannon did intake, Clay was the boss
12       that didn't want to be involved, and Robin, and so
13       that -- that was it.  That was it.
14   Q.  What about Lisa Myers?
15   A.  She didn't get brought in until about a year later.
16   Q.  Are you claiming that Chelsea treated her differently
17       than you?
18   A.  Not to my knowledge.
19   Q.  So Robin's the only person who you're claiming was
20       treated differently?
21   A.  Yes.
22   Q.  You mentioned that Chelsea asked you about retirement,
23       and you've testified about the retirement party when
24       she made some crack about, you know, now you can
25       retire.  When else do you claim that she broached that

## Page 128

1        topic?
2    A.  It was frequent.  I wouldn't say it was constant, but
3        whenever an event would lend itself, like somebody
4        else's anniversary, or, you know, my subsequent
5        anniversaries or my birthdays or someone maybe else's
6        birthday, there would be a comment.
7    Q.  Tell me about every one you can remember.
8    A.  I can only generalize right now.  I can't -- other
9        than that one where -- ask Jeannie Maison if she
10       remembers that, that one where it came out that I have
11       to be 67 and a half because Jeannie was surprised by
12       that.  So --
13   Q.  What did Chelsea say in the context of that
14       conversation?
15   A.  She was the one that started it by saying, "I can't
16       believe after all your years that you can't retire."
17       Like that -- that's almost verbatim.
18   Q.  How did that conversation get started?
19   A.  Chelsea started it.
20   Q.  How would -- why would she say that unless something
21       had preceded it?
22   A.  Everything was around my birthday in '17.
23   Q.  In 2017?
24   A.  I believe so.
25   Q.  Were there any witnesses other than this one woman?

## Page 129

1    A.  Joe's office is right there.  I don't know if he was
2        in it.
3    Q.  What was that woman's name again?
4    A.  Jeannie Maison.
5    Q.  And she heard everything that Chelsea said?
6    A.  She actually -- well, I believe so because she chimed
7        in when I said I had to be 67 and a half.
8    Q.  So let's -- got that comment in the context of that
9        conversation and then the comment at the 50th birthday
10       party in October 2015.  Do you recall any other time
11       in which she referenced retirement?  Do you have a
12       memory of anything?
13   A.  I mean, if I sat down and meditated on it, I would
14       probably get a picture of some other specific times,
15       but I -- I don't think I can do that in this
16       environment right now, so . . .
17   Q.  Well, this is your deposition.
18   A.  I hear you, but if I -- if I can't recall -- again,
19       you know, you're talking from 2015.  It's now 2022.
20   Q.  I understand.  I don't want you to make anything up.
21   A.  Right.  Right.
22   Q.  But I do need to hear what your memory is of anything
23       she said about retirement that you found indicative of
24       some kind of age focus or bias.
25   A.  All I can tell you if I had to say how many times

## Page 130

1        maybe did she ask me, I'd put it around the ten to 12
2        mark.
3    Q.  But you can't recall the context or the substance?
4    A.  I mean, if I can't specifically remember where we were
5        like I could with the Jeannie Maison situation when
6        she chimed in, although most of them did take place in
7        that area, I mean, because that's where our area was,
8        so I don't -- maybe Joe Hickey can say how many.
9    Q.  Did you ever think about the fact that maybe she
10       thought that that was quite an accomplishment and
11       that, you know, she'd look forward herself to retiring
12       when she had 30 years and was able to do so?
13   A.  That's why I kind of blew them off the first time, the
14       second time.  That time in 2017, though, it was almost
15       accusatory.  "I -- I can't believe you can't retire."
16   Q.  But she was referring then to the Social Security
17       requirement; right?  Retirement pursuant to Social
18       Security?
19   A.  No.
20   Q.  The 67 and a half was a --
21   A.  It was part of the -- okay.  Conversations are
22       conversations.  So she was accusatory to me like I was
23       somehow deficient that I couldn't retire after 30 some
24       years, and I -- I remember saying, I don't know if
25       it's verbatim, but pretty darn close, I said,

U.S. Legal Support | www.uslegalsupport.com

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 131

1      "Chelsea, I was never paid the big bucks and I raised
2      kids and the government wants me to work till I'm 67
3      and a half.  So no, I'm not retiring any time soon."
4   Q.  But you don't recall how that conversation got
5      started?
6   A.  I said like three times Chelsea said.
7   Q.  She just blurted that out, "I can't believe you can't
8      retire"?
9   A.  Yeah.  I mean, again, I think it was around my
10     birthday, so . . .
11   Q.  Just out of the blue?
12   A.  Yeah.  Things would trigger, like either my birthday
13     or my -- something would trigger her to say something.
14   Q.  And you don't know whether she was joking or whether
15     she was saying, gosh, you know, I wish I was in a
16     position to retire, I mean, because I look forward to
17     retirement myself?
18   A.  By this point I -- I'm no longer joking with her.  I
19     took it as a joke earlier because I agree with you.  I
20     didn't know she had age bias.  And, again, I don't see
21     myself as old, so how could she have age bias against
22     me?  I'm not even old.  But after so many times and
23     then to be accusatory like I'm deficient, I got mad.
24   Q.  Why did you take that as saying you were deficient?
25   A.  "I can't believe after all these years you can't

## Page 132

1     retire."
2   Q.  Deficient in the sense that you hadn't prepared
3     yourself for that?
4   A.  Yes.
5   Q.  And that's what you assumed?
6   A.  That's her tone, her body language.  This is now the
7     multiple times that she's asked me about it.
8     Question, answer -- asked and answered.  I already
9     told you.  So yeah.  It got a little more heated that
10     time.  So yes.  And yes, that's the way I took it.
11     That's all I can do.  It's my perception; right?
12   Q.  And so your perception was that she wasn't joking?
13     She may have been joking but you didn't take it that
14     way?
15   A.  And she's clearly passive-aggressive.  Like the
16     birthday was supposed to be a joke.  That's supposed
17     to be a joke, but she still gets her digs into the
18     victim, which is me.
19   Q.  Okay.  So let's talk for a moment about Clay.  Do you
20     have any complaints about Clay?
21   A.  I need to breathe.  Can I just walk around here a
22     little bit?
23        MR. FARRAR:  Do you need to take a break?
24        THE WITNESS:  Yeah.  I'm just really upset.
25     Can we take a five-minute break, please?

## Page 133

1        MS. HARDY:  Sure.
2        (Recess taken at 4:23 p.m.)
3        (Back on the record at 4:30 p.m.)
4   BY MS. HARDY:
5   Q.  All right.  We took a break and do you feel better?
6   A.  Yes.
7   Q.  Okay.  All right.  So let's just finish up on a few
8     things.
9        Do you have any emails between you and
10     Chelsea when -- discussing the wheelchair issue?
11   A.  No.
12   Q.  So there's nothing in writing that would confirm your
13     story that you asked Sue or Chelsea to remove the
14     wheelchair?
15   A.  Chelsea since she's physically there.  Right.  It was
16     all verbal.  Sue, I don't know if she's got a phone
17     recording.  It would be there.  I don't know if she
18     has such things.
19   Q.  Did you leave voicemails for Sue about the wheelchair?
20   A.  No.  No.  Sue called me to borrow it from me and I
21     told her it wasn't mine.  So yeah.  It was just that.
22   Q.  All right.  So no emails or written documentation
23     about the wheelchair issue?
24   A.  No.
25   Q.  All right.  What about the retirement issue?  Did you

## Page 134

1     ever -- did Chelsea ever make any comment about
2     retirement, joking or otherwise, in an email?
3   A.  No.
4   Q.  Did you ever say anything to Chelsea in an email that
5     you sent her about, you know, I -- I don't think the
6     retirement questions or comments are funny?
7   A.  No.
8   Q.  Anything to that effect?
9   A.  No.
10   Q.  All right.  So let's go to Clay.  Do you have any
11     complaints about Clay that are relevant to the issues
12     in this lawsuit?
13   A.  No.
14   Q.  What do you think Clay has knowledge of that would
15     be -- have any bearing on what you have to say about
16     the issues here?
17   A.  I would be curious because it became somewhat apparent
18     that Chelsea was bad-mouthing me to Clay, so I would
19     be curious as to what Chelsea said to Clay.  I would
20     be curious to know.
21   Q.  Okay.  You think she may have complained about you to
22     Clay?
23   A.  Right.  And there was an example.  So we're finalizing
24     the assessments and -- and Clay said -- let me think
25     if I can get it verbatim.  He said, "You've gotta be

35 (Pages 131 to 134)

**EXHIBIT 1**

KATHLEEN L. LIEBAU Volume 1
March 09, 2022

## Page 135

1   more careful because Chelsea said she keeps having to
2   make the same corrections."
3           And I -- and I -- and I -- as Chelsea and I
4   were walking back to our side of the office I said,
5   "What corrections?"
6           And they were like, "She wants an acronym
7   in all caps."
8           Well, she never told me that. That might
9   have been during one of the launch meetings that I
10  wasn't there. So that was one. And because of the
11  limited space on the spreadsheets, sometimes every
12  character mattered, so Chelsea actually initiated
13  this. Instead of writing out miles for the mileage
14  she did MI. So consistency was a big thing in our
15  spreadsheet. We wanted it consistent. So I would go
16  through and make them all MI because we're
17  consistency. But no. She only wanted it MI if we
18  needed the character spacing, so she was going back in
19  and making them all miles. Well, she should have told
20  me.
21  Q.  But let's stay with Clay. Did Clay ever say anything
22      to you critical of Chelsea?
23  A.  No.
24  Q.  Did he ever say anything to you critical of the firm
25      about how you were treated?

## Page 136

1   A.  No.
2   Q.  Did he ever express any disagreement with any of the
3       decisions that were made or any of the criticisms that
4       were lodged against you?
5   A.  He -- yes. As to my title. So when -- so in August
6       of '17 when Sue unilaterally changed my title and then
7       I got this project through Clay, I asked Clay if I
8       could get my title back because at the client that
9       hierarchy is kind of important, you know, that and --
10      and so --
11  Q.  The project administration title?
12  A.  Yeah. Or legal assistant, anything. So I -- but then
13      I never heard back from Clay, so . . . But then when
14      I asked the second time, he said, "Well, when I
15      checked back in August or whatever, Sue said no."
16          So I guess he actually did check. He just
17      didn't tell me he checked and -- and I said, "Well, do
18      you agree with that or something?"
19          And he said, "No. I'll ask her again."
20          And that's when I said, "Well, why is it up
21      to Sue?"
22  Q.  What did he say?
23  A.  I think he made a gesture.
24  Q.  Did you talk to Sue about the title?
25  A.  That -- those were the emails. Clay said he would

## Page 137

1   intercede.
2   Q.  Did you talk to Sue about wanting your title to be
3       changed from administrative assistant?
4   A.  I sent her email when I first discovered she had
5       changed it, and I said, "How am I going to get work
6       when you've changed my title?" Because remember
7       secretaries are assigned. Paralegals have to find
8       their work. Well, you just gave me a secretarial
9       title and told me to go find my work. So how does
10      that work? Are you setting me up for failure here?
11      So yes, there is an email where I said to Sue, and I
12      clipped the definition from the web where it said
13      paralegal/legal assistant is on the basis of
14      education, experience, or training, and I highlighted
15      the experience and training and I said I am qualified
16      for this different title.
17  Q.  And that's when Sue told you then go apply for a
18      paralegal job in the firm?
19  A.  No. That was -- that was later. That was when she
20      said I was in a gray area.
21  Q.  And she told you to apply and you never did?
22  A.  I already had a job. I mean, I should have gotten out
23      of it, hindsight.
24  Q.  Why didn't you apply for a paralegal job when the work
25      with Clay got phased out in March 2017?

## Page 138

1   A.  I think there weren't any posted.
2   Q.  And you didn't bother to apply thereafter even though
3       you clearly knew at that point that your title within
4       the firm was administrative assistant?
5   A.  But I objected to it.
6   Q.  You may have objected to it, but you knew that that
7       was the title and you didn't like it, and if you
8       didn't like it, then your other option was to apply
9       for a paralegal job?
10  A.  Well, when -- that's not exact -- you didn't work
11      there, so you don't know the environment. When I got
12      the new project, that was a new paralegal job. Okay?
13      So I actually was successful in securing new work for
14      myself.
15  Q.  Your title was administrative assistant?
16  A.  According to Sue.
17  Q.  Where did you get the impression it was a paralegal
18      job?
19  A.  On that agenda that I mentioned that I think you have,
20      it says DPS6 litigation team, Kathy Liebau, paralegal,
21      case assessments.
22  Q.  Who prepared that?
23  A.  Paul Nystrom.
24  Q.  So that's what you base your understanding on that you
25      moved into a paralegal job when you started to work on

36 (Pages 135 to 138)

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

## Page 139

1    the lemon law project?
2    A.  I was already in a paralegal job.  There was a couple
3    of months where the discovery work had gone away.
4    There were a couple of months where I didn't have a
5    specific assignment but I was still doing the
6    transition of the discovery work to the client, so I
7    was still doing discovery work during the summer and
8    then I got the new project.  So we're only talking two
9    months, and, again, I was doing transition work, so I
10   was never an administrative assistant.
11   Q.  Let's go -- we're going to adjourn in the next few
12   minutes and then come back at a later date that we
13   agree upon with your counsel, but before we adjourn, I
14   have a question about Sue Choma.  You mentioned early
15   on that you kind of considered her to be somebody who
16   was part of what you considered the age discrimination
17   at the firm, but you haven't said anything specific
18   about her at least today that identifies why you would
19   associate her with age discrimination.
20   A.  Well, based on Chelsea's bias and Chelsea telling lies
21   about my performance, I would give Sue documents that
22   prove that Chelsea's allegations about my performance
23   were false and she refused to consider it, and so to
24   me if someone's impartial and not, you know, not --
25   not allowing this other person to be age bias, they

## Page 140

1    would have -- you know, at least acknowledge and
2    accepted it and looked into it a little bit more
3    closely that, okay, well, I guess you don't want to
4    get into details here, but I gave her documentation
5    and you guys have this.
6         And then, secondly, when -- during a
7    meeting just after the discovery project ended, Sue
8    herself used words like "You have been at the firm for
9    an extremely long time and you have been on the
10   discovery project for a long time and so it's time you
11   reinvent yourself."  To me like -- like, okay, what do
12   you mean by that?  And to me that was discriminatory.
13   I think that.
14   Q.  But she meant and you knew that she meant that you
15   didn't have a job because your prior job was being
16   phased out, no fault of your own but it was phased
17   out, and that you needed, since your title was
18   administrative assistant, to make yourself skill-wise
19   able to perform that function; right?
20        MR. FARRAR:  Objection to form.
21        You can answer.
22   A.  I don't even know how to answer that.  You called me
23   an administrative assistant again.  So that's false.
24   BY MS. HARDY:
25   Q.  But you had that conversation with Sue at that time.

## Page 141

1    Right?
2    A.  I can't answer that the way you said it.
3    Q.  Well, let me rephrase it, then.  You had a
4    conversation with Sue at the time the project with
5    Clay was being phased out about the fact that you were
6    in an administrative assistant classification and you
7    needed --
8    A.  No.  Incorrect.
9    Q.  -- to -- what's incorrect?
10   A.  She did not inform me at that time that I was in an
11   administrative position.  She never informed me.  I
12   saw it when I got some work with Dave George doing
13   discovery work and I copied myself so that I could
14   follow up and I saw she had changed it.  She never had
15   the decency to even tell me that she did that.  I just
16   saw it on the email, and that's when I sent her the
17   email and I said, "Sue, I just saw that you have
18   changed my title."  And that's when I clipped the
19   thing.  So no, that is incorrect what you were saying.
20   Q.  All right.  And in the course of trying to help you
21   get relocated within the firm following the phaseout
22   of Clay Guise's work, she said you needed to reinvent
23   yourself?  That's your testimony; right?
24   A.  Correct.
25   Q.  All right.  And why did you take exception to that?  I

## Page 142

1    mean, you did need to find a new job in the firm;
2    right?
3    A.  Okay.  Well, reinvent yourself.  I had decades and
4    decades of people seeking me out for harder and harder
5    and more responsibility work.  My work was commended
6    over and over and over again, my accuracy, my
7    demeanor, my -- so why exactly would you take these
8    traits and reinvent them?  Like --
9    Q.  Did you know --
10   A.  Like where does that come from?
11   Q.  Was there another job that you were aware of in the
12   spring of 2017 that you could have moved into and done
13   comparable work to what you've done for Clay Guise
14   that you were aware of?
15   A.  Once that did end, and, again, I was continuing to do
16   transition work, I was also Lisa Myers' paralegal, I
17   had a sick aunt, so I was covering her cases during
18   the same period, and then I reached out to people in
19   our group that -- I did not know Dave George
20   personally, but I knew April, and through April I got
21   to work with Dave George, so I didn't have to reinvent
22   myself because my traits are solid.  What I needed to
23   do was go find some work that needed to be done, which
24   I did.
25   Q.  Well, that's my question.  Spring of 2017 before the

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L. LIEBAU Volume 1
March 09, 2022

## Page 143

1    lemon law project came around in October 2017 --
2    A.   September.
3    Q.   September or October.  Was there a job that you were
4         aware of where you could have done work comparable to
5         what you'd done for Clay Guise that was open?
6    A.   I gotta laugh because clearly not.  Why would I be
7         looking for a job when I had a job?  Once it happened,
8         I did seek work.  So you're asking me did I look for
9         work before the one was gone.  No.
10   Q.   No.  I'm asking whether there was a job opening at the
11        firm.
12   A.   I have no idea.
13   Q.   Okay.
14             MS. HARDY:  All right.  Let's wrap up for
15        the day.
16             (The deposition was concluded at 4:44 p.m.
17        Signature of the witness was not requested by
18        counsel for the respective parties hereto.)
19
20
21
22
23
24
25

## Page 144

CERTIFICATE OF NOTARY
STATE OF MICHIGAN )
            ) SS
COUNTY OF WAYNE   )


        I, Cheri L. Poplin, certify that this
deposition was taken before me on the date
hereinbefore set forth; that the foregoing questions
and answers were recorded by me stenographically and
reduced to computer transcription; that this is a
true, full and correct transcript of my stenographic
notes so taken; and that I am not related to, nor of
counsel to either party nor interested in the event of
this cause.






        Cheri L. Poplin, CSR 5132, RPR, CRR
        Notary Public,
        Wayne County, Michigan
My Commission expires:  August 21, 2025

659a85a1-c8a4-452f-a8bb-7df7097c36f2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

**A**

**abided** 50:15
52:14 97:3
**ability** 5:2 13:8
**able** 16:7 38:8
59:14 100:2
130:12 140:19
**absolutely** 16:14
**accepted** 140:2
**access** 22:23
23:9 54:16
97:21 98:15,17
98:18 99:6,24
100:5,5,6,17
100:18,22,24
101:3,11,13
103:2,6,11,18
120:4 122:13
**accommodate**
5:21
**accommodation**
16:10
**accomplishme...**
130:10
**account** 22:23
27:10 29:12,13
29:21 30:4,9
30:21 31:5,12
31:24
**accuracy** 142:6
**accurate** 122:14
**accusation**
114:21
**accusatory** 83:4
130:15,22
131:23
**accused** 32:22
35:16
**accusing** 83:23
**acknowledge**
140:1
**acquire** 21:11
51:4 67:2
**acquired** 25:16
69:10

**acronym** 25:12
135:6
**act** 117:8
**action** 18:7
99:12
**actions** 15:5
19:4
**actual** 110:20
**add** 108:24
**addition** 56:25
57:1 79:8
**additional** 29:16
103:19 104:21
**address** 7:15
24:17 26:16
32:18 33:7
36:2,3 39:25
**addressed** 88:24
**addresses** 23:3,4
**adhering** 52:16
**adjourn** 139:11
139:13
**administered**
50:17
**administration**
55:22 56:5,8
60:23 136:11
**administrative**
12:15 14:1,7
14:11,16 50:1
50:15 51:8,21
52:14,17,23
60:2,6,11
61:14,16,17
72:25 116:25
119:11,20,21
137:3 138:4,15
139:10 140:18
140:23 141:6
141:11
**administrator**
14:5,9 49:25
50:6,18 53:20
54:5,21 56:6,9
60:22 67:24
**admitted** 44:15

44:23
**admonished**
123:17 124:14
**adrian** 53:14
**adult** 72:16
75:13
**advance** 76:9
**advent** 54:13
**advised** 11:22
**affect** 41:20
**afternoon** 4:15
**age** 29:4 51:14
74:20 88:12
93:22 94:5,6
94:20 95:10,12
95:17 96:6,7
101:10 111:21
112:10,12,17
112:23 120:1
129:24 131:20
131:21 139:16
139:19,25
**agenda** 70:9
138:19
**ages** 7:4,6
**ago** 79:15 80:2
**agree** 131:19
136:18 139:13
**ahead** 14:19
17:17 99:9
**allegation** 32:8
43:2,25 45:8
126:1,4
**allegations** 4:19
27:25 28:1,6
28:13 30:24
31:15,18 43:5
139:22
**allege** 123:8
**alleged** 56:5
107:24
**allegedly** 67:8
82:24
**allergies** 16:3
**alleviate** 44:6
**allow** 59:12

**allowed** 126:17
**allowing** 139:25
**america** 20:25
**amount** 66:15
80:6,14
**anniversaries**
128:5
**anniversary**
92:16,16 128:4
**annual** 50:17
**answer** 5:14 6:4
6:5,7 12:4
19:21 20:6,9
32:20 41:12
79:20 91:19,24
102:25 118:5
132:8 140:21
140:22 141:2
**answered** 43:1
65:7 132:8
**answers** 41:8,10
41:14 144:9
**antiquated**
55:10
**anxiety** 46:19,22
47:7,10,17
**anybody** 85:8
127:6
**anymore** 78:24
93:10,15 96:11
102:6 121:13
**anyplace** 38:25
**anyway** 106:15
124:18
**apart** 54:5
**apparent** 134:17
**apparently**
51:18 74:16
75:15 93:22
105:2
**appearances** 2:1
**appears** 97:8
**application**
13:18
**applied** 9:19
53:1,6

**apply** 53:25 67:7
137:17,21,24
138:2,8
**apprised** 107:7
**approached**
112:15
**approval** 109:5
**approve** 58:10
**approximately**
10:18
**approximation**
65:21
**april** 11:15
50:24 51:9,19
113:10,12
119:6 122:11
142:20,20
**aprils** 51:6,9,17
52:5 67:10
**area** 16:12 37:13
37:15,17,19
38:16 55:23
86:17 130:7,7
137:20
**areas** 37:25
**arrangement**
16:10
**arrival** 75:22
**arrived** 62:5
75:17,24 77:9
**aside** 32:3
**asked** 46:16
51:5 52:2 67:9
69:21 84:4
92:19 100:6
107:3 108:15
108:16 127:2
127:22 132:7,8
133:13 136:7
136:14
**asking** 4:17 27:1
35:4 84:3 89:5
91:23 92:8,9
93:4 112:18
121:18 143:8
143:10

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

Page 146

assessment
35:17,20 99:17
106:11,18
108:6,10
assessments
40:18 70:13
105:1 106:21
110:21 123:11
123:20 134:24
138:21
assign 59:16,16
118:11
assigned 117:9
117:10,13,14
117:17 137:7
assignment
139:5
assignments
35:9 42:9
62:11
assistant 12:15
12:19 13:13,20
14:1,7,11,15
14:16 51:22
54:25 55:1,7
55:15,22 60:2
60:6 61:15,17
72:25 116:25
119:11,20,22
136:12 137:3
137:13 138:4
138:15 139:10
140:18,23
141:6
assistants 60:11
61:16
associate 79:13
139:19
associates 9:19
49:13 78:6
81:21 82:1,3
84:19
assume 84:7
89:12 90:4,5
112:17 117:5
117:25 118:6

118:16
assumed 60:5
118:23 132:5
assuming 91:2,3
91:4
assumption
58:12 112:25
atmosphere
45:21
attach 28:5
58:11
attachments
63:8
attempt 27:3
attend 8:13
104:12
attendance
10:19
attended 101:19
attention 48:21
attorney 15:16
17:15 33:10
34:23 36:6
45:12 54:12,19
117:10
attorneys 2:4
20:8,9 42:2
43:21 56:20
attribute 82:9
82:13
audio 39:5,6
august 14:17
55:19 58:23
136:5,15
144:25
aunt 142:17
author 107:16
automatic 58:6
automotive 70:4
70:8,15,23
71:2,8,12
available 9:14
12:9 59:2
avenue 1:17
2:10
avoided 93:7

aware 14:10
36:12,18 41:10
50:16 102:5
142:11,14
143:4
awful 116:3

_____

**B**

back 8:16,18
12:1 13:4,10
14:19 17:10
21:19 22:9
29:22,25 30:17
31:8 34:1
35:24 37:12
41:16 42:20
43:13 44:14,17
46:5 48:17,18
50:25 53:11
55:13,19 56:5
57:25 59:22
62:15,17,19
74:5,12 80:20
81:19 84:2,12
84:22 85:3
86:8,10 87:11
88:22 92:12
93:11,18 96:9
98:7 101:1
106:9 113:6,13
115:22 119:24
121:19 122:5
126:4 133:3
135:4,18 136:8
136:13,15
139:12
background
4:24 12:24
13:6 14:19
backing 106:23
backup 115:2
bad 32:4 90:18
126:13
badmouthing
134:18
balloons 72:15

barrage 82:14
base 58:12
138:24
based 22:4
139:20
basement 37:12
basis 5:9 50:2,20
62:12 119:13
137:13
bearing 134:15
becoming 78:11
beginning
115:15
behavior 97:1
behaviors 32:4
beings 116:8
believe 18:9
23:5 43:17
58:10 60:7
70:13 77:11
78:16 83:6
84:4,18 90:7
94:7 95:8
104:14,15
116:22 119:25
126:15,18
128:16,24
129:6 130:15
131:7,25
believed 61:11
belizi 68:3
belong 74:16
belongs 74:17
90:5
bender 17:1,1,2
19:6
best 6:4
bestow 53:17,20
54:3 55:8
bet 97:21
better 45:23
54:16,22 74:10
133:5
beyond 105:23
bfarrar 2:6
bias 51:14 96:6

101:11 111:21
112:23 120:1
129:24 131:20
131:21 139:20
139:25
big 70:20 71:6
83:9 92:10
111:19 131:1
135:14
birmingham
1:18 2:11 4:1
birth 6:14,16,19
7:25 48:9,12
88:19
birthday 72:3
72:14,21 73:2
73:16 75:9
76:23,25 80:10
81:11,12 82:18
82:21 84:1,2,5
84:15,21 85:20
86:1,8 88:14
88:20,25 89:20
90:12 91:8
92:13,15 96:10
96:12,22 128:6
128:22 129:9
131:10,12
132:16
birthdays 128:5
bit 12:5 22:9
29:23 60:14,15
60:17 124:6
132:22 140:2
bitched 85:12
black 75:15
76:20 77:12
blew 130:13
block 118:18,24
bloomfield 2:4,5
49:25 50:7
62:5
blow 93:3 94:4
blowing 94:3
blue 37:21
104:24 131:11

U.S. Legal Support | www.uslegalsupport.com

KATHLEEN L.   LIEBAU Volume 1
March 09, 2022

blurted 131:7
board 56:14
  60:5
body 132:6
book 104:24
borlands 11:11
  13:16 26:11
born 17:22,23
borrow 87:25
  88:3 133:20
borrowed 74:14
  88:5
borrowing
  93:10,14,15,17
boss 127:11
bother 74:2
  90:13 138:2
bothered 48:21
bottle 75:14
bottles 72:17
  76:20
bow 98:16
box 37:20
brain 35:1
brandnew
  101:25
break 5:20
  62:15 132:23
  132:25 133:5
breaks 44:16,24
breathe 132:21
brian 2:3
briefly 99:10
bring 39:22
  68:20
bringing 49:16
broached
  127:25
brought 12:1
  15:11 39:23
  91:6 96:8
  116:17 119:5
  127:15
bucks 83:9
  131:1
build 18:17

built 17:7 99:21
  108:7
bunch 93:13
business 12:2
busy 21:8 32:10
  125:8
butter 16:6,11
buyback 99:18

**C**
c 2:4
cake 77:2
calculations
  43:7,9,13,15
  43:16
calendar 40:5,8
  40:17,21,25
  41:3,9,22 42:8
calendaring
  40:20
calendars 42:11
california 99:11
  99:12
call 21:25 55:6
  57:17 58:25
  71:20 76:3
  99:2 105:7
called 4:6 16:4
  43:8 53:12,12
  53:19 54:11
  76:2 77:12
  87:23 90:4,5
  97:11,19
  102:15 107:24
  113:15 114:6
  114:15,16
  133:20 140:22
calling 22:5 73:9
calls 21:12,12,17
  21:21
camera 39:14,15
cant 10:1 16:16
  20:7 27:15
  28:16 44:19
  46:5 61:23
  67:22 78:16

80:3,16 82:10
82:13,22 83:6
83:6,7,24
84:18 85:13
87:23 97:20
101:5 116:9
123:20 124:15
128:8,15,16
129:18 130:3,4
130:15,15
131:7,7,25,25
141:2
capacity 49:2
caps 135:7
car 21:6,9,13,15
  21:21,24
caram 1:8
card 76:23
cards 50:14
care 16:7 93:5
cared 92:2
careful 112:6
  135:1
carefully 5:13
cares 92:1
carol 61:18,22
  61:25 62:1,4,6
case 1:7 4:12
  14:23 15:18,24
  16:20 17:11,20
  19:14 28:12
  70:13 79:5
  102:15 107:15
  108:5,11,23
  109:4 110:15
  110:24 111:3
  111:10 138:21
cases 15:4 16:25
  101:5,9 126:18
  142:17
cause 144:14
celebrated
  85:19
celebration
  71:19 72:1,20
  73:8 74:25

75:4,6,20 76:6
80:11,20 84:2
89:1,20 90:12
92:13
celebrations
  72:14 73:9
cell 20:25 22:16
certain 8:25
  38:6 104:22
certainly 66:11
  81:3
certificate 144:1
certify 144:6
chair 72:17
  74:15 86:9,12
  86:23 87:3,5
  87:17,22 88:12
chairs 86:10
change 54:7
  57:9 59:23
  60:4,6,9,19,24
  79:18,19,25
  80:5,14 92:25
  93:2 96:21
  102:10 105:22
changed 14:12
  14:13,15 40:9
  49:1 54:2
  55:14,19 56:2
  56:4 58:23
  60:2 80:16
  93:7 96:10
  102:5 105:2,7
  136:6 137:3,5
  137:6 141:14
  141:18
changes 101:25
  104:22
character
  135:12,18
charge 30:12
  51:1,3,12
  56:13
chatted 81:17
check 123:12
  136:16

checked 136:15
  136:17
chel 114:2
chelsea 43:5
  59:20 71:22
  74:14,17 76:4
  77:9,24 80:22
  81:1 82:16
  83:9,23 84:6
  87:9,11 88:4
  89:10,14,19
  90:4,5 91:1,14
  91:23 92:12
  93:4 94:2,21
  95:13,23,24,25
  96:4 98:13,14
  98:16 99:6
  100:4,18
  101:20,21
  102:2 103:1
  105:3,22 106:2
  106:10,18,23
  108:12 109:1,6
  109:14 110:21
  111:16 113:7
  113:16 114:3
  115:7 116:2,15
  116:22 117:6
  119:5,24
  120:24 121:1
  121:22 124:2
  125:17,21
  126:11,15
  127:11,16,22
  128:13,19
  129:5 131:1,6
  133:10,13,15
  134:1,4,18,19
  135:1,3,12,22
  139:20
chelseas 51:14
  86:9 101:5
  122:20 125:23
  139:20,22
chemke 81:4
cheri 1:21 29:25

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

144:6,22
**child** 16:16
**children** 7:2,8
  7:21 16:3,13
**childrens** 24:19
**chimed** 129:6
  130:6
**chitchat** 79:11
  79:21
**choma** 21:17,25
  31:14 39:20
  44:12 50:6
  51:1 52:18,20
  62:7 67:4,5
  68:18 87:22,23
  89:20,25 95:17
  113:24 115:8,8
  117:8,16 125:3
  139:14
**chomas** 118:15
**choose** 22:15
**chose** 105:6
**chris** 67:25
**christmas** 38:5
  102:14
**chronicle** 43:23
**church** 74:14
  87:12 93:10,12
  93:19
**circulate** 39:20
**circumventing**
  124:20
**claim** 14:4 15:11
  15:15 56:10
  57:7 69:2
  87:21 127:6,25
**claimed** 107:25
**claiming** 56:6
  127:16,19
**class** 99:11
**classes** 9:3 10:6
  10:18
**classification**
  13:25 14:6,10
  48:22 51:2
  55:14 60:24

61:10 67:3,18
  69:5 118:3
  119:7 141:6
**classified** 53:10
  61:8 67:14
**clay** 41:10,20
  50:3,20 51:5
  51:16,17,19
  52:2 55:25
  56:13 58:22
  59:3,21 67:9
  70:20 81:6,7
  96:8 97:11,19
  98:8,11,12,13
  98:22 100:4
  102:15 104:6
  106:2,6,7,8,16
  109:3,14
  110:21 112:2
  123:22 124:2
  127:11 132:19
  132:20 134:10
  134:11,14,18
  134:19,22,24
  135:21,21
  136:7,7,13,25
  137:25 141:5
  141:22 142:13
  143:5
**clays** 107:10
**clean** 35:12
**clear** 106:4,16
**cleared** 107:13
  125:19 126:18
**clearer** 108:25
**clearly** 49:2
  132:15 138:3
  143:6
**clears** 124:1,4
**client** 30:18
  41:21 49:16
  70:11 98:19
  99:5,7,12,19
  104:24 115:18
  115:20 120:5
  136:8 139:6

**clients** 70:23
  71:2,11 99:25
  107:23
**clipped** 137:12
  141:18
**clique** 78:24
  79:1,3
**cliques** 78:23
**close** 46:2 91:7
  114:9 120:21
  130:25
**closely** 140:3
**cold** 122:18
**colder** 79:9,10
**colleagues** 39:16
**college** 7:10,12
  8:7,9,11,14,21
  8:23 9:5,7,11
  28:24 71:14
**com** 2:6,12,13
  23:7 34:16
  65:8
**come** 53:4 70:5
  76:13 77:25
  78:2,4 89:13
  93:8 100:14
  101:5 110:18
  113:10 120:16
  120:23 126:3
  139:12 142:10
**comes** 7:13
  22:20,22 44:10
  77:9
**coming** 28:10
  78:9 126:14
**commencing**
  1:19
**commendable**
  95:21
**commended**
  142:5
**comment** 82:9
  82:25 84:7,11
  84:17 128:6
  129:8,9 134:1
**commented**

83:14
**comments** 84:17
  134:6
**commission**
  144:25
**common** 5:25
**communicate**
  24:20 123:25
  124:4
**communicating**
  5:18
**communication**
  20:17 58:7,20
**communicatio...**
  31:23 56:23
  57:15
**community** 8:14
  9:5,11 15:6,8
**companies**
  60:12,12
**company** 1:11
  60:15
**comparable**
  127:8 142:13
  143:4
**compensation**
  61:5
**complained**
  86:5 88:19,19
  89:9,10,13,19
  134:21
**complaint** 33:8
  42:3 60:8
  85:24 88:25
  99:16 107:20
  111:12 125:25
**complaints** 31:5
  31:12 96:19
  103:17 124:11
  124:12 125:16
  132:20 134:11
**complete** 8:23
  35:15 66:19
  127:4
**completed** 9:20
**compliment**

78:19
**compliments**
  78:7 81:22
**comprehend** 5:5
**comprehensive**
  38:9,12
**computer** 22:21
  23:18 26:17
  27:4 28:1
  33:17 44:4,20
  46:4 63:4,4
  68:12 86:22
  97:21 100:14
  101:7 122:13
  144:10
**computers** 38:9
**concerning** 4:24
  19:15 29:7
  33:4 36:3
  82:17
**concerted** 12:14
**concluded**
  143:16
**conclusions**
  121:14
**condition** 4:25
  16:4
**conference** 99:2
**confident** 37:25
**confirm** 133:12
**confirmation**
  114:10
**confirms** 56:15
**conflict** 106:5
  123:12 124:7
  125:18
**conflicts** 119:22
  123:21,24
  124:1,4,13,15
  125:19 126:18
**confronted**
  114:3
**confuse** 54:19
**confusion** 54:11
**connected** 21:10
  90:2

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

Page 149

**connecting** 93:20
**connection** 20:4 21:11,20,24 82:17
**consider** 47:20 127:7 139:23
**considered** 44:9 59:5 82:16 114:21 139:15 139:16
**consist** 4:17
**consistency** 135:14,17
**consistent** 135:15
**consists** 70:16
**constant** 128:2
**constantly** 43:10 97:15
**constraints** 124:3
**consult** 45:23
**consumer** 40:16 40:22,24
**contact** 12:5 18:3,10 107:23
**contacted** 64:4
**contacts** 111:2
**contains** 63:21
**contents** 3:1
**context** 128:13 129:8 130:3
**continually** 125:8
**continue** 90:11 106:1 115:12
**continuing** 142:15
**continuously** 10:17 24:12
**contract** 119:8,9
**contrasted** 73:17
**control** 48:4,9 48:12

**conversation** 22:3 51:23 67:8 80:4 83:22 90:8 97:24 113:24 128:14,18 129:9 131:4 140:25 141:4
**conversations** 22:5 39:7 41:25 103:21 130:21,22
**cookie** 77:25 81:4,4,15
**cookies** 72:15 77:4,5
**copied** 56:3 141:13
**copies** 37:2 38:13 107:4
**copy** 37:7 38:1 40:12 41:4,23 42:11 106:24 107:1,9,11 118:13
**copying** 122:18
**corbello** 79:4,13
**cordial** 97:4,6
**core** 100:2 106:21
**correct** 7:18,20 7:22 8:20,22 9:4,6,9 10:16 10:20,22 11:7 11:17 12:22 13:1,7,15 14:2 14:7 16:21 19:3 23:8 24:3 24:13,15,18,24 28:14 29:11,11 29:14 32:18 33:14 36:7 38:15 47:18 48:16,20 50:1 50:7,8,10 52:1 52:10,19 54:24

55:16 57:4,21 58:5,6 59:24 59:25 60:19 61:18,22 62:8 63:5,14,15,16 63:18 69:8 71:18 75:7,18 81:13 84:20 86:24 87:2,2,4 87:7 96:3 98:4 120:11 122:25 141:24 144:11
**corrections** 135:2,5
**corresponding** 23:1
**couldnt** 16:5 21:8,22 54:9 65:22 101:10 101:12,12 130:23
**counsel** 19:15 20:4,12 40:14 41:16 45:24 64:4 66:21,24 67:1 106:19 139:13 143:18 144:13
**counseling** 41:24 46:9 47:1 88:9
**county** 15:19 17:8 144:4,24
**couple** 9:3 74:22 139:2,4
**course** 10:10 141:20
**courses** 10:3
**court** 1:1 6:2 13:5 30:1 31:10
**cover** 95:8 123:23
**covering** 33:1 142:17
**coworker** 39:18

**coworkers** 39:11
**crack** 127:24
**craft** 43:3
**create** 16:12 27:16 43:18 97:23 115:5
**created** 28:20 63:25 64:23,25 65:3
**creating** 109:13 110:3
**credentials** 100:13 101:6
**credit** 10:6
**credits** 8:9,11,23 9:20,24
**crepe** 75:16 76:20
**criminal** 42:17
**critical** 4:24 135:22,24
**criticisms** 120:7 136:3
**cross** 40:15
**crossing** 41:17
**crown** 73:6
**crr** 1:21 144:22
**csr** 144:22
**csr5132** 1:21
**cubbies** 86:14
**cubicle** 86:16,21 86:25 87:3,6
**cupcakes** 77:3
**curious** 134:17 134:19,20
**current** 6:19 7:15
**currently** 4:25 8:19 12:24 13:6 20:18
**customer** 107:23,24 111:1
**cut** 122:18 123:2

**D**

**daily** 32:7
**damages** 99:22 99:22
**damn** 111:7
**darn** 130:25
**database** 107:8 107:12,18,23 107:24 108:2 109:16 110:10 120:5
**date** 7:25 8:2 20:13 41:8,21 48:18 97:20,22 139:12 144:7
**dates** 40:10 44:14 122:14
**daughter** 15:9 16:1,4,8,11 17:22,23 22:12 39:22 64:19
**daughters** 28:23
**dave** 70:20 81:3 141:12 142:19 142:21
**david** 1:9 2:9 36:24
**day** 22:7 23:6 39:22 40:21 42:5 44:16 80:22 82:22 84:5,13,14 85:2,9,17 97:19 101:10 103:10 116:1 116:19 122:20 124:9 143:15
**days** 99:14,19 114:14 120:22 123:8
**daytoday** 50:2 50:20 52:11 62:12
**deadpan** 98:1
**deaf** 114:4

EXHIBIT 1

KATHLEEN L.   LIEBAU Volume 1
March 09, 2022

Page 150

**deal** 46:18 92:10
124:13
**dealer** 108:19,19
108:22
**dealers** 108:20
**death** 18:12
**decade** 14:5,9
**decades** 142:3,4
**deceased** 18:5,7
18:9
**december** 101:9
**decency** 141:15
**decided** 115:22
**decision** 20:25
**decisions** 136:3
**declare** 8:17
**declared** 8:16
36:6
**decorate** 75:25
76:5
**decorated** 75:11
**decorations**
38:6
**dedicated** 23:16
**default** 64:15
**defendant** 1:12
2:8 14:22,25
16:23
**defendants**
62:21
**deficient** 83:24
130:23 131:23
131:24 132:2
**definition**
137:12
**degrading** 60:13
60:17
**degree** 8:5,7,15
8:18 9:16
13:13,19,20
31:21 53:14,17
53:18,21,24
55:4,8,11 69:7
69:9
**delete** 35:23
63:19 65:11,25

**deleted** 35:10
**delighted**
111:19,20
**dell** 81:3
**demean** 117:11
**demeaning**
117:7,17
**demeanor** 142:7
**demonstrated**
32:3
**demotion** 58:25
59:6
**departed** 25:5
**department**
58:10
**depict** 39:17
**deposed** 19:4
**deposition** 1:16
4:11,16,20
5:11 19:8,10
129:17 143:16
144:7
**depression**
46:19 47:13,20
**describe** 37:19
75:8 79:24
**description**
45:15
**descriptive**
96:24
**descriptor** 56:17
**desk** 21:6 40:12
41:13 42:12
74:5,6,12
75:11,12 76:1
76:6 80:21
82:20 83:1
86:7,10,11,22
95:7 96:14
122:6 125:23
**desks** 98:10
**desktop** 23:24
23:25 24:2,10
24:10 27:4
29:10 38:25
63:6,9 86:22

**detail** 44:8
**detailed** 45:19
**details** 140:4
**deteriorate**
96:17
**deteriorated**
96:14
**determine** 35:2
**determined** 35:4
112:23
**determining**
34:22
**devices** 20:16
24:11
**devoted** 51:8
**devoting** 10:10
**diagnosed** 47:7
**diane** 53:24 55:9
67:16 68:15,22
68:23 69:2
81:4
**diapers** 72:17
75:13 76:19
88:15 90:17
95:7
**diary** 43:19
**didnt** 11:3,17
18:17 28:9
29:1,5 32:11
33:3,13 35:8
39:15 40:3
41:20 42:7
43:6,15 45:13
45:13,20 53:14
54:18 58:15
59:7 61:7
65:18 66:24
68:17 70:2,2
74:2,5,7,8 76:8
76:13,17 78:15
79:20 82:6
85:23 91:1
95:17 100:5,6
101:6 102:3,4
102:11 103:11
105:7 106:23

107:1,1,9
108:5,10,15
109:23 111:2,6
111:24 113:14
114:5,11,14
115:5 119:23
120:1,3,4,6
123:5 126:11
127:12,15
131:20 132:13
136:17 137:24
138:2,7,8,10
139:4 140:15
142:21
**died** 17:9
**difference** 22:24
55:1
**different** 15:3
23:15 34:18
53:3 72:10,13
73:4 100:23
102:1 103:2
105:17 110:7,8
126:2 137:16
**differently**
78:21,25 95:9
95:11 123:17
126:11,22
127:7,16,20
**dig** 58:15
**digest** 32:12
67:7
**digs** 132:17
**dime** 96:12
**dinner** 21:4
**direct** 62:6
91:15 109:5
**directly** 124:21
**directory** 71:7
**disadvantaged**
96:7
**disagree** 72:6
**disagreement**
136:2
**disconnect**
25:14

**discovered**
137:4
**discovery** 4:11
14:5,9 30:14
40:9 41:8
49:15 115:22
139:3,6,7
140:7,10
141:13
**discrimination**
88:13 93:23
123:8 139:16
139:19
**discriminatory**
140:12
**discuss** 68:15
**discussed** 20:8
69:15 113:5,5
**discussing**
133:10
**discussion** 106:7
121:10
**disdain** 68:19
**dismissed** 15:14
15:24 16:20
106:6 121:10
121:12
**disparate**
124:25
**disparity** 94:20
**distinction**
57:11
**district** 1:1,2
**divided** 106:8
**division** 1:3
106:3
**divorce** 17:8
**doc** 30:15,16,18
35:11,13 40:13
41:14
**doctor** 46:16
47:9
**document** 26:14
26:23 32:1
33:5 37:23
38:2 41:18

KATHLEEN L.   LIEBAU Volume 1
March 09, 2022

Page 151

| | | | | |
|---|---|---|---|---|
| 49:18,18 62:21 | 25:12,15 29:24 | **dozens** 66:5 | **eat** 16:2,5,5,17 | 116:21,24 |
| 70:7,14 115:8 | 33:16 36:14,15 | **dporter** 2:13 | **eating** 15:9 | 119:14 120:20 |
| **documentation** | 36:20,21 39:13 | **dps6** 138:20 | **education** 13:15 | 134:2,4 137:4 |
| 56:15 115:3 | 44:3,13 49:4 | **draft** 28:13 46:3 | 137:14 | 137:11 141:16 |
| 133:22 140:4 | 50:11 51:10,11 | 59:13 | **educational** | 141:17 |
| **documented** | 51:11 52:24 | **drag** 34:13 | 12:23 13:6,10 | **emailed** 35:24 |
| 115:10 | 53:15 54:15 | **draw** 121:14 | **effect** 134:8 | 44:17 58:4 |
| **documents** | 55:9 57:11,11 | **drawer** 37:20 | **efficient** 110:2 | **emailing** 101:1 |
| 26:13 27:1,5 | 57:12 58:2 | **driving** 95:15 | **effort** 12:14 | **emails** 12:8,8 |
| 28:12 29:1,5,7 | 59:11 63:19 | **due** 16:2 40:10 | 62:19 | 24:16,16,20 |
| 29:16,19 30:2 | 65:10,24,24 | 40:19 41:7,11 | **ehardy** 2:12 | 29:19 30:2,8 |
| 30:22 31:4,11 | 66:6 68:22 | 41:20 | **eight** 8:25 10:3 | 30:21 31:4,11 |
| 31:23 32:13 | 69:21,24,24 | **duly** 4:7 | 11:20 62:2 | 31:22 33:6,12 |
| 33:6 36:5,15 | 72:5 73:2,23 | **dykema** 1:9 2:15 | 116:23 120:17 | 33:16,16,24 |
| 36:22 37:2,6 | 74:19 76:10 | 4:12,16 8:2 9:8 | **eightweek** 10:3 | 34:11 37:3 |
| 38:1,1,10,13 | 77:1 78:19 | 12:13,21 13:25 | **either** 7:8 13:25 | 42:21 43:11 |
| 38:16,24 40:11 | 80:17,18 82:12 | 19:13,16 20:5 | 19:4 27:4 | 44:25 54:14 |
| 41:16 42:15,16 | 82:22 83:2 | 21:23 25:23 | 31:22 41:22 | 56:20 58:11 |
| 42:21 43:4,12 | 84:14,16,18 | 26:10,14,23 | 61:22 108:22 | 62:22 63:13 |
| 43:12 62:20 | 85:7 88:12 | 27:10,13,16 | 131:12 144:13 | 64:7 65:2,5,11 |
| 63:24 66:17,20 | 89:3 90:4,25 | 28:8,25 29:7 | **electronic** 38:1 | 65:20,25 118:9 |
| 91:5 106:17 | 91:24 92:1 | 29:20 30:3,21 | 40:12 41:2 | 119:12 120:23 |
| 139:21 | 93:5,23 94:2 | 31:6,13,23 | 62:20 66:20 | 122:19,21 |
| **doesnt** 43:14 | 94:12,15 95:4 | 32:4 33:7,19 | **electronically** | 125:10 133:9 |
| 59:16 74:16 | 96:25 97:7 | 34:16 35:7,22 | 32:25 35:6 | 133:22 136:25 |
| 92:1 99:20 | 99:14 100:17 | 36:2 37:2,6 | 38:24 41:5,19 | **emotional** 46:9 |
| 110:22 | 100:21 104:14 | 39:7 40:5 42:8 | 41:23 64:12 | **employed** 59:5 |
| **doing** 10:1,2 | 106:15 107:5 | 43:21 46:14,20 | **eligible** 99:18 | **employees** 39:7 |
| 32:1 49:9,17 | 112:6,21 | 48:18 50:5 | **elizabeth** 2:9 | 52:17 72:8,21 |
| 49:17,18,21,21 | 113:19 114:23 | 53:10 60:24 | 4:15 | 95:9 |
| 49:22 56:17 | 115:10 118:13 | 61:21 64:20 | **elses** 128:4,5 | **employment** |
| 57:2 61:13 | 118:23 119:15 | 65:8,12,12,23 | **email** 22:20,25 | 13:17 19:15 |
| 69:24 97:15 | 126:1 129:1,15 | 66:18 71:1 | 23:3,4,9 24:17 | 20:5 26:7,10 |
| 102:6 106:11 | 129:20 130:8 | 72:21 | 24:21 29:12,13 | 46:20 48:17 |
| 106:18 107:14 | 130:24 131:4 | **dykemas** 13:21 | 29:21 30:3,20 | **empty** 86:19,20 |
| 109:3,5 110:8 | 131:14,20 | 54:17 | 31:5,12 32:17 | 87:6 |
| 110:20 114:23 | 133:16,17 | | 32:23 36:2 | **ended** 15:13 |
| 114:24 115:25 | 134:5 138:11 | **E** | 38:25 39:25 | 17:12 43:22 |
| 117:13,18 | 140:3,22 | **earlier** 89:7 | 40:2 44:1,12 | 74:5 122:22 |
| 121:2,23 122:6 | **doodles** 43:19 | 104:23 131:19 | 44:15,16,25 | 140:7 |
| 139:5,7,9 | **door** 126:5 | **early** 101:9 | 45:3,17 56:3 | **ends** 124:7 |
| 141:12 | **doughnuts** | 106:13 139:14 | 58:19 63:7,17 | **engine** 110:22 |
| **dont** 5:15,16 | 68:20 72:15 | **earn** 8:11 | 64:2 77:25 | 110:25 |
| 8:16 12:6,23 | **download** 39:21 | **ears** 114:4 | 97:23 100:22 | **enroll** 8:15 9:10 |
| 13:5,19 16:25 | **downstream** | **easily** 34:14 | 100:23,24 | **enrolled** 8:24 |
| 20:13 23:19 | 102:3 | **eastern** 1:2 | 114:8,20 | 9:7,12,16 |

KATHLEEN L. LIEBAU Volume 1
March 09, 2022

Page 152

enrollment 10:11
entertain 13:18
entire 65:14,17 65:18
entitled 16:2
entries 41:22
environment 129:16 138:11
erin 81:25 82:2
escorted 42:17
especially 83:23 90:17
estimated 10:13
estimation 66:14
estranged 18:1
event 73:11,15 75:9,20 80:20 89:1 116:11 122:17 128:3 144:13
events 14:14 39:17,20 41:3 41:23 45:11 88:15 115:6 116:15
eventually 10:8
everybody 98:14
eviction 12:6
evidence 28:1
evil 76:2,3 77:12 77:17
evolve 71:9
evolved 49:1
exact 20:13 54:21 97:20 138:10
exactly 26:18 87:24 90:10 142:7
examination 3:6 4:13
examined 4:9
example 43:5

109:15 110:18 134:23
excel 108:6,8
exception 72:1 141:25
exchange 77:20 88:6 97:18 121:15
excited 115:23
excluded 79:2
exclusively 12:20
exhibit 3:10
exhibited 96:6
exhibits 3:8,11
exhusband 17:9
existed 53:23
experience 13:8 105:17 137:14 137:15
expires 144:25
explain 92:4 99:10
express 136:2
expression 70:5
extent 88:6
external 57:10
extra 125:2,6
extremely 140:9

————————
F
face 126:6
facebook 25:2,3 25:11,14,16,22 26:1
facilitate 99:24
fact 13:19 59:18 71:10 73:24 85:8 96:18 130:9 141:5
factual 4:18
failed 15:14 54:4
failure 137:10
fair 6:8 120:8
fairies 76:2 77:13,17

fairy 76:3
fall 10:15 98:3 116:6
false 13:16 14:3 27:24 28:2,13 30:24 43:1,4 43:24 44:9 114:21 139:23 140:23
falsely 32:22 44:7
family 7:17 46:12,16 47:9
far 120:10,12
farrar 2:3 12:3 19:21,23 20:7 32:19 36:10,14 36:20,25 91:18 102:25 132:23 140:20
fast 99:23,23,23 124:23
faster 123:18,19 123:19
father 18:5,10
fault 83:5 114:13 115:20 115:23 140:16
february 8:3,3,4 11:11
feel 46:20 47:10 48:14 78:11 94:12 126:7,7 133:5
feeling 80:15
feelings 92:2 93:6
feeney 70:20
felt 16:7 19:15 49:6 60:12,16 62:23 90:20
figure 10:9
file 22:4 37:14 38:7 63:6,9,10 63:11,12,15,25 64:1,5,10,10

64:13,13,22,23 64:24 65:1,3,6 65:24 88:12 93:22 125:1
filed 15:18,20 17:20 18:8 19:1,2
files 64:17 99:16
final 108:6 109:10 111:3
finalizing 134:23
finally 93:24 101:12
find 11:1 12:14 22:8 44:5,21 59:3,15,17,18 64:7 84:22 137:7,9 142:1 142:23
fine 49:4 56:9 78:12,13 103:15 105:21 105:21,21 114:12
finish 5:24 6:7 45:20 133:7
finished 28:7 46:3 123:11
finishes 123:21 124:15
fired 17:18 112:9,24
firm 11:18 13:17 14:12 20:3,3 25:6 27:20,23 28:11,19 29:15 54:2,11,19 55:4 56:21,24 57:3,5,9 58:4,9 59:4 64:8 70:18 71:6,19 74:13,16 75:3 75:10 80:8,24 84:22 85:18 86:13 92:17

95:18 107:4 113:14 123:24 123:25 124:1,5 135:24 137:18 138:4 139:17 140:8 141:21 142:1 143:11
firms 12:16 20:5 29:12 60:2
first 4:7 8:11 9:14,24 11:23 17:4 19:14 20:12 21:11 41:7,20 64:3 67:19 72:16 75:6 87:17 88:24 92:18 104:5 111:11 112:1,7 114:3 123:10 124:12 130:13 137:4
five 62:15 104:20 115:21 116:20
fiveminute 132:25
florida 62:1
flowed 111:11 111:14
flowers 72:15 73:6,21 77:7
focus 129:24
focusing 13:12 19:13
folder 27:11,22 28:10,18,20 29:10,16,17 33:9,14,24 34:2,12,22,24 35:5 36:5 37:11,14,20,21 38:4 43:8 118:13 122:22
folders 27:9,12 27:16
follow 36:24,24

KATHLEEN L. LIEBAU Volume 1
March 09, 2022

38:19 141:14
**following** 22:6
88:10 89:2,23
141:21
**follows** 4:9
**food** 15:10
**foods** 16:5
**force** 95:15
**ford** 108:20
126:4
**foreclosure** 12:6
**foregoing** 144:8
**foreign** 49:13
**forever** 24:8
121:4
**forget** 19:5
**forgot** 19:6,7
**form** 12:3 32:19
46:22 48:6
91:18 123:7
140:20
**formal** 70:25
71:4,5
**forrest** 2:10
**forth** 91:9 144:8
**forward** 25:20
25:20 30:13
31:22 32:12
42:24 44:25
130:11 131:16
**forwarded**
26:16 29:12
31:16 33:24
34:17 42:22
**forwarding**
29:19 30:2,8
30:20 31:3,11
32:17 33:12
**found** 11:2,4
55:5,7 84:12
94:8 115:6
129:23
**four** 78:6,8
80:12 81:20,24
82:11,14
**fourmonth**

80:13
**frame** 33:13,23
41:1 47:16
55:25 99:15
**frequent** 128:2
**friend** 53:25
**friendly** 79:6
81:9,10 96:23
**friends** 67:20
92:14,22,24
94:8 96:11
**friendship** 80:6
**frigging** 125:23
**frowned** 97:13
98:2
**fuck** 121:16
**full** 41:11
144:11
**fulltime** 125:4,5
**fun** 72:2 73:8,12
**function** 22:10
49:7 140:19
**functioning** 12:2
**funny** 134:6
**furious** 113:4
**furloughed**
11:14,23
**furniture** 38:23
**furnitures** 38:5
**further** 104:12

―――――――――
**G**
**g6** 21:14
**gag** 84:6 85:5
88:16
**garage** 38:4,7,14
38:21,22 58:13
58:14
**garbage** 65:11
**gardener** 69:8
**gardening** 69:9
**gateway** 23:22
23:24 24:10
**gather** 42:15
75:19
**gathering** 77:22

**gauge** 104:25
**gears** 71:16
**gee** 85:18
**general** 15:22
61:3 79:5,14
**generalize** 128:8
**generally** 61:5
**genuinely** 92:17
**george** 1:8 70:21
141:12 142:19
142:21
**gerd** 16:4
**gesture** 136:23
**getgo** 102:13
**getting** 13:12
17:18,19 20:7
35:22 61:3
74:10 101:3
103:2 104:11
**gettogether**
39:12
**gettogethers**
39:18
**gifts** 84:6 88:16
**give** 10:6 15:22
29:24 31:24
35:2 54:2
59:10,12 65:21
80:4 98:17
99:6 101:6,11
112:6 113:14
120:4 122:13
139:21
**given** 12:16
19:10 54:21
111:19
**gives** 64:17
108:6,8
**giving** 8:17
35:14 103:18
**glare** 121:25
122:3
**gmail** 22:23 23:6
23:7 36:3 39:3
63:9,11,12,17
64:9,14,22

**go** 10:14 14:19
17:17 21:15,16
21:19 22:8,9
23:3 34:10,22
35:5 41:9
42:20 44:14
46:5 48:3,17
49:20 55:13
56:5 58:15
59:10,15,17,22
62:19 64:9,9
64:10 65:5
68:19,22 71:14
80:20 85:23
92:23 95:6
96:9 99:9
100:15 104:8
106:3 109:13
109:15,18
113:6 118:13
119:15,24
120:25 123:18
123:18,19
124:24 134:10
135:15 137:9
137:17 139:11
142:23
**god** 82:7
**goes** 58:6 64:19
68:4 101:2
113:22 126:2
**going** 4:16 5:12
6:6 9:21 13:14
17:21 21:18
29:22 31:16
38:19 40:16
44:15,20,21
45:22 48:3
49:20 54:9,14
59:4,10,12
72:1 76:5 78:9
78:14,16 82:19
82:25 83:3
84:7 88:12
90:16 92:19
94:13 98:15

99:12 100:25
101:8,14,15
102:11,16,18
102:22,24
104:8 105:18
107:16 109:18
110:11 112:13
116:22 120:16
124:9,23
125:14 126:3
135:18 137:5
139:11
**gonna** 100:9,19
100:19 103:15
**good** 4:15 6:9
7:25 12:17
45:23 54:6
61:14 66:4
77:16 78:12
85:10 89:8
90:16 111:18
115:24
**google** 22:14,17
22:24
**gosh** 69:24
122:8,12
131:15
**gossett** 1:9 2:15
4:12
**gotta** 15:21
50:25 87:11
96:9 105:4,16
114:18,18,18
114:19 134:25
143:6
**gotten** 12:7
137:22
**government**
83:10 131:2
**grab** 21:4
**grabbed** 81:4,4
**grand** 1:9
**gray** 55:23
137:20
**great** 74:4
102:21

KATHLEEN L.   LIEBAU Volume 1
March 09, 2022

Page 154

green 40:14
41:15
greenberg 107:4
greet 70:11
grid 110:19
grounds 36:16
36:22
group 12:8
40:17,22,24
51:6,7,9,17,20
67:10 70:4,6,8
70:8,15,19,25
71:2,4,8 78:4,6
81:20 142:19
growing 21:2
28:21,22
guerrero 53:24
67:16
guess 9:21 15:21
17:21 29:24
46:6 54:9
66:13 67:19
73:21 75:21
76:10 80:8
106:14,15
112:10,11,24
119:2 122:17
136:16 140:3
guessed 76:18
78:17,20 79:17
82:12
guessing 25:10
66:8 80:23
81:8
guide 47:4
guise 50:3 55:25
58:22 59:3,21
142:13 143:5
guises 141:22
guy 70:20
111:19
guys 26:15 28:3
44:5 45:1
54:16,22 100:4
103:23 108:19
115:20 140:5

**H**

ha 77:19,19,19
77:19
habit 40:7
hadnt 132:2
hagopian 49:17
49:20,23
half 18:22 83:11
83:14,16
128:11 129:7
130:20 131:3
halls 93:8
handle 25:13
handling 62:11
hands 104:7
handwriting
45:13
hangups 78:15
happen 72:14
117:20
happened 28:25
29:3 43:23
45:15 46:25
114:2 143:7
happening
62:24
happy 5:21
76:25 81:12
97:9
hard 37:2,7 38:1
40:12 41:4,23
42:11 90:9,9
121:19
harder 142:4,4
hardy 2:9,10 3:6
4:10,14,15
12:12 13:4,11
19:19,25 20:11
29:25 30:6
31:20 32:24
36:8,12,18,23
37:1 62:14,18
88:23 91:21
103:5 133:1,4
140:24 143:14

hate 117:6
hated 108:12
109:2
havent 12:17
48:13 94:15
139:17
headache 48:11
health 46:10
hear 13:3
129:18,22
heard 35:1,1
129:5 136:13
heated 132:9
hell 123:15
125:14
help 18:17 32:13
46:18 47:2
48:13 68:22,24
69:23 70:2
141:20
helps 48:2
hereinbefore
144:8
hereto 143:18
herman 2:15
hes 105:10
106:16 114:10
124:5
hi 93:8
hickey 103:23
130:8
hierarchy 136:9
high 8:5
highlight 40:13
highlighted
137:14
highly 49:13
highway 22:1
hills 2:4,5 49:25
50:7
hindsight
137:23
hints 91:10,12
hire 8:2 48:18
hired 48:24
118:19

history 46:8
108:25 112:13
hit 11:14 99:20
hoerchler 58:1
hold 82:10 84:1
home 7:12,13,17
23:25 26:16
27:4 29:10
30:15,16 31:16
31:23 32:9,10
32:12,17,23
33:7 35:18
36:2 37:7,9,11
42:16 43:3,3,4
43:17 44:4,25
63:4 79:8
125:9,12
hon 1:8
honestly 67:22
69:21 92:24
hopefully 83:12
83:21
horchler 56:11
57:5,23
horrible 97:25
115:12,15
hostile 51:15
hostility 45:22
hour 75:23
76:13,15
hourlong 73:10
hours 10:9,12
10:19,24 11:1
11:2,4,5 43:14
44:19,20
106:12 125:2,4
125:6
house 17:7
18:17 21:6
hows 102:16
hr 50:2 51:10
119:15
huhuh 40:4
human 14:8
116:8
humane 25:19

25:21 26:11
humiliating
78:8
hundred 89:14
hurry 123:18,18
123:18,18
hurt 79:4,16,18
80:3,13
husband 7:9,19
17:7 22:13
97:15
husbands 6:25
24:20

**I**

id 12:10 30:17
35:23,25 40:12
40:13,14 41:5
41:12 44:13
45:1 46:5 93:9
95:18 115:11
130:1
idea 55:10 74:20
94:23 102:17
143:12
identifiable
37:13
identified 34:14
105:23 126:15
identifies 139:18
identify 33:5
104:1 112:22
116:15
identifying 65:5
ignoring 96:13
ill 5:17,21 6:3
76:21 83:19
85:15 103:16
103:16,16
106:1 114:12
125:9,9,12,13
136:19
im 4:16 5:12 6:5
6:6 8:17,25
9:21,23 10:8
13:10 14:8

KATHLEEN L.   LIEBAU Volume 1
March 09, 2022

Page 155

17:17,19,21
20:24 21:25
22:14 23:1
25:10 27:9
32:6 35:4,14
36:10,12 38:6
41:17 43:7
44:17,17 49:20
50:2 51:10
54:9,14 59:10
66:8 72:1
76:21 78:12,13
80:23 81:7,8
82:6 83:3,8,11
84:1 85:11
86:14 88:4,12
88:21 89:8
90:15,16 91:5
92:20,20 93:3
93:14 96:20
98:15 100:9,10
100:19,19
101:3,8 102:9
102:17,18
103:15 104:7
108:14 111:7
112:24 113:4,4
114:1 116:8,8
117:19 118:5,9
119:15 120:16
120:21 121:18
123:9 124:16
124:22 125:8
125:25 126:21
131:2,3,18,22
131:23 132:24
143:10
**immediate**
40:22
**immediately**
40:19 90:15,16
**impacted** 96:5
**impartial**
139:24
**importance**
43:14,16

**important** 61:8
136:9
**impossible**
42:17,18
**impression** 57:8
117:3 138:17
**improper** 123:7
**inaccurate**
112:3,6
**inappropriate**
73:15,19
103:22
**inbox** 33:2,15,17
33:21 64:2,4,9
64:13,15,25
65:2,11,14,17
65:19,20,23
**incident** 46:24
**including** 53:24
55:9
**inclusion** 80:15
**incorrect** 113:15
141:8,9,19
**incredibly** 51:15
**independent**
64:24
**independently**
119:15
**indepth** 43:23
**indicated** 98:6
**indicative**
129:23
**individually**
65:2,15
**industry** 70:4,8
70:15 71:8,12
**inform** 141:10
**information**
26:7,10,20
32:17 33:1
35:14 97:21
108:4 109:12
112:3,6 113:15
**informed**
141:11
**inhibited** 59:14

**inhouse** 115:19
115:23
**initial** 104:13,16
107:15,17
108:11,23
109:4 110:24
111:3,10
126:10
**initially** 25:16
**initiated** 135:12
**injury** 126:1,2,4
**inquire** 53:9
**insisted** 21:17
**insistence**
118:15
**instance** 35:8
**instigated** 80:19
**instructor** 68:2
**insurance** 60:11
**intake** 101:3
106:4,5 119:21
127:11
**interaction** 80:6
**interactions**
39:19
**intercede** 137:1
**interested**
144:13
**interfere** 5:1
**interim** 13:12
**internal** 57:3
58:8
**internally** 60:1
**internist** 46:13
46:16 47:10
**introduce** 68:20
**introducing**
99:3
**intuited** 91:2
**investigate**
119:16
**invite** 42:4 102:3
102:11 120:3
**invited** 98:11,21
101:15 104:4
**invites** 98:9

**inviting** 103:3
103:18 104:8
**involved** 18:16
18:25 71:8
109:13 127:12
**ip** 49:11,12
**irrespective**
38:22
**isnt** 5:22 45:22
116:22
**issue** 5:1 19:6
35:13,15,22
45:11 69:15
110:2,14
125:18 133:10
133:23,25
**issues** 14:14
16:12 19:13,15
30:22 31:24
36:3 43:20
46:14,20 47:3
48:2,14 58:17
111:15 134:11
134:16
**items** 33:21
113:6
**ive** 10:1,2,2 12:5
12:7 21:3
22:13 26:11
33:15 35:20
42:25 48:1
50:23 62:2
85:23 95:21

---

**J**

**j** 2:3
**james** 2:15
**january** 9:14
10:11,18 30:24
35:17 43:12
62:22 63:21
64:8 66:1
70:10 102:19
106:1 107:2,3
107:10 109:6
112:1 114:24

117:24 123:23
**jeannie** 81:3
83:12,21 128:9
128:11 129:4
130:5
**jeez** 17:21
**jelly** 16:6
**jessica** 7:5
**jessie** 7:7
**jessies** 7:10
**jim** 70:20
**job** 11:1,2,4,6,11
11:12 12:14
13:1,6,9,14
14:6 48:22
49:22 52:24
104:10,11
107:12 112:16
115:24 127:8
137:18,22,24
138:9,12,18,25
139:2 140:15
140:15 142:1
142:11 143:3,7
143:7,10
**joe** 103:23,24
130:8
**joes** 104:2 129:1
**john** 110:11,12
**joined** 25:4,6
**joke** 20:24 85:11
85:22 131:19
132:16,17
**joking** 84:9
131:14,18
132:12,13
134:2
**jokingly** 84:7
**journal** 42:6
43:19 44:6
**jovial** 97:7,8,9
102:8 125:21
**judge** 1:9
**jumped** 14:18
**juncture** 117:14

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

Page 156

## K

**kate** 28:24 64:18
**katelyn** 7:5
**kates** 7:7
**kathleen** 1:5,16
  3:4 4:5 6:11,17
  56:11 57:5
**kathleens** 57:22
**kathy** 4:11
  25:12 26:5,18
  45:3,4,5 53:3
  70:12 98:15
  106:17,21
  107:11 109:3
  120:17,24
  125:6 138:20
**kathy1123456**
  23:6
**kathys** 94:10
  125:22
**katies** 7:10,12
**katz** 81:25
**keep** 30:12
  33:18 40:5,12
  41:13 42:11
  43:19 55:21
  65:10 69:1
  70:3 101:10
  102:22,24
  109:3,5 125:14
**keeps** 135:1
**kelley** 104:24
**kept** 17:18 37:15
  40:23 78:16
  122:15 125:10
**key** 116:15
**khvpf** 2:12,13
**kibitz** 79:22
**kibitzing** 79:23
  79:24,25 80:14
**kid** 39:23,24
**kids** 21:2,3
  83:10 92:23
  131:2
**kienbaum** 2:10

**kind** 16:10,21
  23:21 29:22
  39:12,18 40:16
  45:14 46:18
  47:1,22 48:4
  54:13 68:1
  73:7 76:6 77:2
  78:2,9,9 79:23
  80:5 82:14
  83:4 90:13
  96:18 98:15
  106:8 107:7
  115:5 122:12
  126:7 127:8
  129:24 130:13
  136:9 139:15
**kinds** 18:19
**king** 35:18
**kitchen** 92:22
**kliebau** 34:16
  65:8,12
**knew** 48:24,25
  52:20,21,22
  82:8 90:20
  91:1 92:21
  138:3,6 140:14
  142:20
**know** 5:16,21
  6:6,8 10:5 12:8
  12:9 14:15
  19:5 23:19
  26:18 27:1,4
  28:24 35:13
  39:17,18 40:14
  40:15,23 41:12
  41:15,18 45:14
  49:3 50:4,11
  50:21 51:11
  52:24 54:15,16
  54:22 55:9,20
  57:11,12,19
  59:12 60:1
  64:14,18 65:24
  65:24 66:6
  67:14,17,19
  69:10,22 71:5

  71:21,23 73:2
  73:6 74:19,20
  75:13 76:5,8,9
  76:17 77:23
  78:22,22,24
  79:6,6,7,7
  80:19,24 81:8
  81:23 82:15
  85:5,7,14,17
  86:13,14 87:8
  87:10,12,13
  90:1,1,2,7,25
  91:14,20,22,24
  93:3,4,5,9,19
  94:2,11,11,14
  94:14,20 95:4
  97:4,7 98:9,14
  98:15,16 99:20
  99:22,25 100:1
  100:3,7,10,11
  100:18,24
  101:4,17,18
  102:4,10
  103:25 105:4,6
  105:7,15,15
  106:3,3,4,6,7
  106:15,17,20
  106:24 107:6,7
  107:11 108:7
  108:18,20
  109:1,21
  111:13 115:1
  115:11 116:19
  116:20 118:19
  118:23 120:24
  121:1,22 123:3
  124:13,17
  125:24 127:24
  128:4 129:1,19
  130:11,24
  131:14,15,20
  133:16,17
  134:5,20 136:9
  138:11 139:24
  140:1,22 142:9
  142:19

**knowing** 105:6
**knowledge**
  46:23 47:14
  50:19 125:15
  126:11,16
  127:2,18
  134:14
**known** 6:18
  53:22
**kowalski** 117:25
  118:16

## L

**l** 1:5,21 144:6,22
**la** 41:12,12,12
  125:24,24,24
  125:24
**labeled** 27:14
  34:18 64:5,20
**lack** 79:24
**lacked** 13:15
**lally** 61:18 62:6
**lane** 7:16
**language** 132:6
**laptop** 22:22
  23:10,12,21,24
  24:2,11 27:5
**laptops** 23:15
**larsen** 59:20
  71:22 74:14,17
**late** 22:1 25:4
  101:9
**laugh** 125:25,25
  125:25 143:6
**laughed** 68:1,4
  71:24 92:20
**laughing** 126:6
**laughter** 125:22
  125:23
**launch** 40:24
  98:9,11,23,23
  98:25,25 99:1
  100:16 101:25
  103:3,19 104:4
  104:12,15,17
  104:23 120:3

  135:9
**law** 2:4 20:3
  27:14,20,23
  28:11,19 29:15
  99:10 107:25
  107:25 111:4
  116:1 119:4,18
  139:1 143:1
**lawsuit** 4:19
  18:25 30:23
  31:25 36:4
  88:13 93:23
  134:12
**lawsuits** 18:24
**lawyer** 57:20
**lawyers** 6:1
**lay** 11:16,25
**layoff** 11:21
**leading** 14:14
**leads** 94:7
**leave** 86:7 125:6
  133:19
**leaving** 10:25
  11:2 12:21
**led** 119:25
**left** 80:8
**legal** 6:10,14,16
  6:18,19 12:14
  12:17,19 13:13
  13:20 14:1,6
  14:11,15 15:11
  19:13,14 20:4
  20:12 53:13,13
  54:7,12,24,25
  55:1,2,6,7,14
  55:15,20,22
  59:8,23 60:5
  60:13,14 71:11
  119:10 136:12
  137:13
**legs** 44:18
**lemon** 99:10
  107:25,25
  111:4 116:1
  119:4,18 139:1
  143:1

KATHLEEN L.   LIEBAU Volume 1
March 09, 2022

Page 157

**lend** 128:3
**letter** 18:22
**liability** 1:11
**lie** 112:1,7 113:2
  114:3,15,22
  126:11
**liebau** 1:5,16 3:4
  4:5,11,12 6:11
  15:6 25:12
  26:5,18 45:3,4
  45:5 70:12
  138:20
**lied** 126:12,16
**lies** 139:20
**lieu** 86:12 87:5
**light** 13:18
  90:14,14 124:9
**likes** 95:7
**liking** 85:12
**limerick** 7:16
**limited** 1:10
  96:2 135:11
**line** 58:3 99:5,13
**link** 71:10,13
**linkedin** 25:2,6
  26:1,4,6,9
  94:24
**lisa** 119:3
  127:14 142:16
**list** 15:2 16:25
  95:23 103:24
  120:10
**listed** 120:1
**listen** 5:2,13
  105:19
**listening** 105:13
**litigation** 14:22
  16:23 18:16,18
  138:20
**little** 29:23
  40:21 50:19
  71:7 78:23
  83:8,22 92:22
  105:10 113:3
  122:16 124:6
  132:9,22 140:2

**live** 7:8
**lived** 7:23
**living** 7:12
**locate** 62:19
**located** 38:17
**locating** 34:10
**lodged** 120:7
  136:4
**log** 36:9,17
  100:12,14
  101:7
**long** 5:21 7:23
  11:13 15:24
  17:24 18:20
  24:7 25:3,17
  30:13 31:7
  53:15 74:13
  80:10 83:19
  86:20 95:18,19
  123:14 140:9
  140:10
**longer** 59:2,2
  93:17 102:7
  131:18
**look** 25:15 26:22
  33:17 38:21
  42:21 44:14
  66:24 71:24
  82:12 84:19
  90:13 105:14
  105:19 107:22
  108:1,5 109:23
  110:12,23
  111:2,3 112:13
  130:11 131:16
  143:8
**looked** 108:16
  108:17 109:21
  110:3,5,14
  113:13 140:2
**looking** 12:18,21
  57:12 84:12,22
  85:3 90:14
  91:5 114:10
  143:7
**loop** 102:18

**loosely** 70:22
**lori** 49:17,20,23
**lost** 35:20
**lot** 29:1,5 33:11
  33:11 60:10
  62:3 68:4 71:1
  94:12,17,17
  96:20 108:4,8
  111:8 113:11
  125:22
**lots** 125:21,23
  125:24
**love** 97:14,16
**lovely** 51:5
**luck** 74:10
**lumber** 60:12,14
**lunch** 15:10
  92:23 96:25
**luncheon** 98:22
**luther** 35:18
**lying** 111:22,25
**lynn** 6:11,13,17

**M**

**m** 1:19 4:3 62:16
  62:17 133:2,3
  143:16
**macomb** 8:14
  9:5,11 15:19
**mad** 131:23
**mag** 1:9
**mail** 27:10
**maintain** 18:10
**maison** 81:3
  83:12,21 128:9
  129:4 130:5
**making** 21:12
  21:21 34:11
  50:15 52:13
  76:10 117:19
  117:21,23
  135:19
**malware** 23:19
**manage** 10:5
**manageable**
  66:15

**managed** 94:16
**management**
  42:2 43:21
  85:21 87:18
  88:25 89:10
**manager** 52:20
  61:15,20
**managers** 62:8
  62:13
**managing** 50:21
**mandate** 30:11
**manual** 41:13
**march** 1:20 4:2
  43:12 113:10
  113:12 119:6
  137:25
**marching** 100:4
  102:1 111:18
  111:20
**mark** 112:4
  113:3 114:1
  115:1 130:2
**married** 6:21,23
**martin** 35:18
**master** 69:8,9
**matter** 92:1
**mattered** 135:12
**matters** 46:14
  119:22
**mean** 10:1,6
  18:20 25:18
  28:22 29:3
  35:12 37:15
  43:10 46:5
  50:11 58:15
  61:4 63:2,7
  65:22 66:4,10
  66:11 68:6
  71:6,25 73:9
  73:13 74:22
  76:2 77:16
  78:12,12 80:17
  80:23,25 81:3
  81:7 82:5
  85:10 86:11
  87:22 90:17,18

**91:5 93:8,15
  94:19 98:1
  115:20 117:22
  119:15 121:16
  122:4 127:5
  129:13 130:4,7
  131:9,16
  137:22 140:12
  142:1
**meant** 94:9
  117:11 140:14
  140:14
**media** 24:25
  25:25
**medical** 4:25 5:1
  46:8,13 47:2
**medication** 48:3
  48:6
**medications** 5:7
  5:9 46:18
**meditated**
  129:13
**meditation** 47:4
  48:2,15
**medley** 81:7
**meet** 70:10
  102:20
**meeting** 40:24
  70:10 88:9
  91:7 98:9,21
  102:4,10 105:1
  107:10 109:6
  112:2 123:23
  140:7
**meetings** 98:12
  98:22 99:1
  101:16,17,18
  103:3,19 104:4
  104:13,15,24
  120:3 135:9
**member** 70:18
**members** 42:2
**memorializati...**
  115:5
**memorialize**
  43:20 44:8

memorialized 45:11
memory 129:12 129:22
mental 46:10
mentioned 87:17,21 120:7 127:22 138:19 139:14
messed 15:13
met 97:7
methodology 34:21
mi 135:14,16,17
michigan 1:2,10 1:18 2:5,11 4:1 7:16 144:2,24
mid 103:9
middle 6:12 100:16
midland 17:8,14
mileage 135:13
miles 135:13,19
milestone 72:3 72:21
mind 35:14 44:10 69:1 70:3 80:3 88:4 126:14
mine 53:25 73:17 74:8 87:23 88:4 89:12 103:15 103:16 125:9 125:12 126:12 133:21
minimal 9:1,2
minute 22:1,5 78:19
minutes 62:15 81:17 139:12
miscellaneous 114:16
misinformation 115:9
misreporting

13:23
missed 33:22 109:24
misspoke 79:3
mistaken 56:20
misunderstood 34:25
mix 115:21
mobile 20:17,20
modify 5:17
moment 33:21 46:7 76:22 79:15 96:16 132:19
moments 116:6
monday 86:9
money 94:16
month 9:13 122:10
months 11:19 17:25 62:2 80:12 139:3,4 139:9
moot 80:9
moral 18:19
morning 40:19 75:21 86:10 120:16
mother 17:3 18:1,18 19:2
mothers 18:21
move 44:18 51:5 51:7,16 52:3,4 65:15 67:9 88:12 99:14 111:15
moved 33:20 34:12,15 51:19 63:12,24 64:6 65:4,13,19,23 87:3 93:24 138:25 142:12
moving 33:3 44:19 61:2
muddled 117:7
mulkeran 6:17

6:17
multiple 132:7
myers 119:3 127:14 142:16

**N**

nada 105:2,3,8
name 4:15 6:10 6:12,14,16,18 6:19,25 17:4 25:11 26:3,3 50:24 57:19,22 68:3,9 100:15 129:3
names 7:4 17:18 17:19 27:12 56:19 57:16 61:24 68:3 71:9
nasty 114:8
nastygram 51:23 116:18
national 49:15
need 5:12,20 6:2 49:4,5 58:14 60:25 61:1,6,7 62:19 66:3 68:17,24 70:2 70:2 85:17 89:13 92:9 106:9 107:7,21 107:21 109:12 114:8 116:13 116:18 120:21 121:1,22 125:11 129:22 132:21,23 142:1
needed 21:7 29:1,5 69:23 101:23 109:10 109:14 135:18 140:17 141:7 141:22 142:22 142:23
needs 68:22

negotiations 106:25
netflix 47:4
neutral 18:21
never 20:23 22:10 28:7 35:14 39:11 43:22 48:21 53:1,5 57:3 72:18 76:18 78:17,20 79:17 80:2 82:8,11 83:9 88:14,19 88:19 89:19 98:21 111:4 112:4,5 113:5 113:17,17 114:2 117:9 124:9 127:2 131:1 135:8 136:13 137:21 139:10 141:11 141:14
new 23:18 26:22 51:2 59:15,19 67:22 69:17 97:8,10 102:16 115:18,24 124:16 126:17 138:12,12,13 139:8 142:1
news 118:1,21
nonattorney 54:19 119:17
nonverbal 82:15
nope 18:4
normal 86:12 122:4
north 1:17 2:10
notary 144:1,23
note 110:5
notes 43:19 111:6 144:12
notice 103:23
noticed 68:13
notified 42:14

notion 119:9
november 101:9 103:9
nut 15:10
nystrom 138:23

**O**

oath 38:8
object 12:3
objected 138:5,6
objection 32:19 91:18 140:20
occasional 48:11
occasionally 25:18 92:23 96:25
occupy 86:19
occur 67:8 113:24
occurred 60:4 88:15 104:15 116:11
october 71:17 100:17,21 129:10 143:1,3
oddly 57:25
offended 82:2
offensive 82:16 84:13
offer 99:18
offered 3:11
office 49:24 50:6 50:7,18 52:20 61:15,20 62:8 62:13 68:20 78:22 86:9 87:14 98:7 103:24 104:2 106:2 120:25 125:24 129:1 135:4
oh 8:10 10:12 18:11 19:5 32:8 35:10 51:5 68:2,4 75:6,8 76:17

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

Page 159

82:7 93:12
94:10 100:9,19
102:7,16 103:1
104:8,21 105:2
116:20 123:22
**okay** 4:23 5:20
6:10,12,16,18
7:8,15,25 8:23
9:1,5,22 10:23
13:12 15:2,22
16:20,25 17:4
18:10,24 20:10
20:20 22:8,24
23:12 25:3,18
26:3,25 27:9
28:10,23 29:18
29:22 31:7,21
35:14 36:18,23
36:25 40:7
41:5,7,14
42:25 44:10
48:10 50:25
51:12,17 53:11
54:10 55:18
59:11,22 60:4
63:15,20 64:14
66:4 70:25
71:19,21 72:8
73:4 74:6,9,24
75:3,8 76:23
77:7,15,18
87:5,8 88:6,8
88:14 89:25
91:23 95:14,16
96:8,9,20,23
98:1,2,5,13
99:1,3,6
100:16,21
101:4,7,23,24
102:19,19,21
105:3 106:1
108:20 109:15
109:17,20
110:1,9,25
111:11,17
113:2 114:4

116:17 117:6
117:13 120:10
121:14,19
122:14,14
123:2,12,23
124:5,21,24
125:1,6 126:6
126:6,15
130:21 132:19
133:7 134:21
138:12 140:3
140:11 142:3
143:13
**old** 1:17 2:10
48:24 58:16,17
82:6,7,12,12
94:8,10,11,12
94:14 112:22
131:21,22
**older** 73:3 74:18
74:21,23
**once** 14:12,13
35:12,23 49:22
54:2 64:4
142:15 143:7
**ones** 68:5 86:14
124:8
**onstar** 21:10,11
21:20
**open** 143:5
**opening** 53:1,2
119:22 143:10
**operating** 49:2
**opinion** 13:21
93:5
**opposed** 51:21
56:16 57:9
91:16 119:10
**opposing** 40:14
41:16 106:19
**option** 138:8
**order** 44:15
99:24
**orders** 100:4
102:1 108:22
111:18,20

**organized** 27:9
29:18 71:21
122:15
**organizing**
110:7
**originally** 33:2
48:24 126:21
**outcome** 17:11
**outlook** 41:6
**outside** 54:11,18
56:21,23 58:4
58:20 113:14
123:25 124:5
125:21
**outsiders** 57:19
**overall** 80:15
85:10 88:14
89:20
**overthecounter**
48:12
**overtime** 35:16
126:22

**P**

**p** 1:19 2:4 4:3
62:16,17 133:2
133:3 143:16
**page** 3:3,10
18:22 25:16
**paid** 11:18,20
61:4 83:9
131:1
**painful** 81:21,23
**paint** 109:17
**pandemic** 11:14
**paper** 75:16
**paralegal** 9:19
12:19 13:13,16
13:19 49:2,7
51:2,21 52:6
53:1,2,6,6,10
53:16,18,22,24
54:8 55:4,8
59:18 61:9,9
61:13 67:3,6
67:15,24 69:3

69:11,16,19
70:12 117:2,3
117:4,5,25
118:6,17,20
119:8,10,18
137:13,18,24
138:9,12,17,20
138:25 139:2
142:16
**paralegals** 50:22
51:3,13 53:12
53:23 101:24
102:2 117:11
137:7
**paraphernalia**
86:8
**pardon** 98:24
**parkway** 2:4
**part** 17:8 75:20
80:21 81:23
92:25 95:11
100:23 117:7
130:21 139:16
**participating**
98:10
**particular** 14:22
37:15,20 62:10
67:17 70:7
78:15
**parties** 39:11,17
73:10 143:18
**partly** 17:16
**partner** 30:12
56:13 57:5
**party** 18:25 25:4
25:5 79:23
89:8,9,20
90:12 91:8
96:22 112:18
127:23 129:10
144:13
**passiveaggres...**
94:10 132:15
**passiveaggres...**
94:13
**patio** 38:4,23

**pattern** 30:7
89:24 112:20
112:21,22
114:5
**patty** 81:5
**paul** 138:23
**pauline** 17:5
**pay** 22:8 48:21
**paying** 49:13
**peanut** 15:10
16:5,11,17,17
**peanuts** 16:2
**peers** 117:9
**pelton** 2:10
**pen** 40:15 41:17
**pending** 5:22
15:24 17:13,24
**people** 16:17,17
16:19 21:4
24:20 32:4
49:22 55:8
56:23 58:4
59:11 61:23
62:9 70:22
71:1,5 75:19
76:15 77:22
78:2,9 80:25
81:8,10 83:1
89:11 92:8,9
93:4 95:10,23
105:13,18
107:5 115:21
119:16 125:17
142:4,18
**peoplewise**
70:17
**perceive** 47:25
**perception**
92:25 132:11
132:12
**perform** 140:19
**performance**
41:24,24 45:25
50:14 52:13
88:9 111:22,25
114:25 120:8

KATHLEEN L.   LIEBAU Volume 1
March 09, 2022

Page 160

126:12,16
139:21,22
**period** 80:13
142:18
**periodically**
12:7
**permanently**
11:22
**person** 20:24
23:1 48:1,2,4
50:17 82:13
115:22 122:4,5
125:5 127:19
139:25
**personal** 23:4,9
24:16 29:13,21
30:3,8,20 31:4
31:12
**personality**
112:16
**personally**
142:20
**personnel** 51:8
**perspective**
116:2
**ph** 68:3 81:4
**phased** 55:25
56:1 137:25
140:16,16
141:5
**phaseout** 58:21
141:21
**phone** 20:17,20
20:25 21:5,5,6
21:6,9,21,24
22:8,11,12,13
22:16 39:13
116:5 133:16
**photographs**
39:9,11
**photos** 39:16,21
73:25 85:5
**phrase** 26:22
**physically**
133:15
**physician** 46:12

46:17
**pick** 34:14 65:15
**picture** 39:24
108:25 129:14
**pictures** 39:23
**pill** 72:17 75:13
75:13 76:19
**pills** 75:14
**place** 27:22
63:12 90:9
130:6
**placed** 20:1
29:16
**places** 64:11
86:18
**plaintiff** 1:6 2:2
14:21,25 15:3
15:4 108:23
**plan** 76:6 121:6
122:1
**planned** 112:8
**platforms** 25:1
25:25
**plc** 2:10
**please** 5:15 7:4
31:9 45:2 88:5
132:25
**pllc** 1:9
**point** 5:20 6:5,8
14:25 21:20
23:18 39:6
42:15 43:18
46:8 56:18
60:3 77:22
80:9,21 86:3,4
86:5 88:11
91:9,10,15
93:2 103:6
118:18 119:4
127:10 131:18
138:3
**pointed** 69:23
88:17 125:18
**policies** 50:15
**policy** 52:14
54:3 123:24,25

124:1
**polite** 96:15
**poplin** 1:21
144:6,22
**porter** 2:9
**portion** 41:19
**pose** 5:12 6:4
**position** 59:4
125:4 131:16
141:11
**positions** 12:19
**positive** 48:1
116:6
**possibility** 38:3
**post** 26:7
**posted** 25:22
40:1 138:1
**posts** 25:20,21
**potentially**
33:11
**practice** 124:10
**practices** 52:15
**preceded** 128:21
**preceding** 92:15
**predated** 107:2
**prefers** 48:4
**pregnant** 79:7
**prepare** 28:4
30:14,16 31:17
36:13 40:18
45:14 109:10
**prepared** 35:24
132:2 138:22
**preparing** 27:24
107:15 114:16
**prescription**
48:6
**present** 2:14
113:24
**pressing** 18:22
**pretty** 43:23
45:18 63:7
78:7 90:18
95:15 106:16
126:13 130:25
**prevented**

104:10 115:25
**print** 41:5,6,12
**printed** 37:5
43:8
**prior** 13:12
18:25 19:10
23:20 27:23
28:10 87:21
89:4 96:25
140:15
**privilege** 19:18
36:8,16,17,22
**privileged** 36:6
**probably** 11:20
22:6,7 27:17
84:25 87:24
93:11 104:18
117:23 122:8
129:14
**probation** 20:1
20:14 42:19,23
42:24,25 46:1
46:2 51:13,24
67:11 87:18
88:10 89:2,23
91:6
**problem** 73:24
80:17,18 84:23
84:24 85:3,9
85:19 94:5,6
95:6 101:8
105:11 112:9
112:11,15,16
116:16
**problematic**
62:24 84:13
**problems** 46:14
105:23
**process** 33:4
**processes** 49:12
**produce** 13:14
33:6
**produced** 36:5
37:4 66:17,18
122:24
**producing** 67:1

**production**
49:19 66:19
**products** 79:5
79:14
**professional**
1:10 47:2,19
**program** 8:15
8:18,24 9:16
9:18
**progressively**
115:13
**project** 14:5,8
40:9,17,22,25
49:11,12 53:4
53:20 54:4,21
55:21,21,24
56:1,5,8 58:21
59:3,19,20
60:22 67:24
72:25 83:4
95:19 96:8
97:2,6,8,10,19
99:4,15 101:14
115:18,24
116:1 119:4,18
119:19 120:2
127:10 136:7
136:11 138:12
139:1,8 140:7
140:10 141:4
143:1
**projects** 53:3
61:2 73:13
**promotions**
64:16
**prop** 74:24
**properly** 15:14
**propose** 16:15
**protested** 55:20
**prove** 139:22
**proves** 107:18
**provide** 36:17
71:11
**provided** 36:8
**provider** 24:5,7
24:14

providing 71:13
public 144:23
pull 65:16
107:20
pulled 34:1
59:21
purchased
21:14,15
purpose 24:17
26:6
purposely 94:3
purposes 20:21
21:12,20 52:13
56:23 57:4,10
58:8,20
pursuant 26:14
130:17
put 22:4 28:24
32:3 36:4 42:7
86:8 87:8,13
87:14 93:18
95:7 111:9
112:3,25 113:2
113:2 130:1
putting 58:3
68:9,9 94:17

**Q**

qualifications
53:9
qualified 137:15
quasi 71:5
question 5:13,17
5:22,24 6:2,3,4
13:3 26:21,22
29:24 35:1,3
53:5,5 102:25
103:1 110:15
112:4 113:3
114:1 115:1
117:22 118:22
123:6 126:10
132:8 139:14
142:25
questions 4:18
4:24 5:2,5,12

5:15 14:20
110:17 111:1
118:5 134:6
144:8
quick 111:7
quickly 25:5
120:4
quite 32:16
60:15 80:24,25
130:10
quote 44:23,23
81:22,23

**R**

r 1:9
radio 122:20
123:10
raise 83:10 89:4
raised 88:8
131:1
raises 61:3
range 66:10
rare 25:18
reach 21:7
reached 142:18
reaching 106:19
read 13:4 26:25
29:25 31:8
46:5 88:21
real 48:2
realize 123:5
realized 89:24
really 31:7
41:20 58:2
78:6 79:4,15
80:13 81:20
82:7 95:18,19
97:1,13 98:1,5
114:7 115:18
116:4 118:4
122:14 132:24
realm 51:21
52:6
reason 58:15
118:16
reasonable

66:14
reasons 46:9
95:8
rebuttal 27:24
28:7,13 43:22
45:18,20,25
recall 20:13 22:2
36:14,15,20,21
58:2 66:7 75:9
76:10 77:21
82:23 84:14,16
84:21 85:2,4
90:10 104:6
109:16,16,17
109:24 110:18
116:9 129:10
129:18 130:3
131:4
recalling 76:21
recalls 108:1,2,3
108:15 109:15
110:12
receive 16:21
36:10 39:16
receiving 21:12
21:21
recess 62:16
133:2
reclassified
54:23
recognition
73:11 82:21
89:1
recognize 72:5
recognized
73:18
recognizes 58:8
recognizing
73:16 75:9
record 4:10 40:8
41:2 62:17
107:20 108:9
109:10 110:13
111:9 133:3
recorded 144:9
recording

133:17
recordings 39:5
39:6
records 35:19
54:17 108:18
110:3 111:13
red 37:21
reduced 30:10
30:12 144:10
redweld 37:21
reenroll 10:15
reference 91:8
referenced
129:11
referred 70:8
116:11
referring 59:20
70:22 71:3
79:16 130:16
reflect 4:10
refused 139:23
refute 28:5
31:18 32:14
43:4 44:23
regard 16:15
27:8
regular 5:9
64:15 122:5
regularity 31:21
regularly 72:14
reinstate 21:17
reinstated 22:2
reinvent 59:14
68:19 95:20,22
140:11 141:22
142:3,8,21
reiterate 64:3
related 15:10
27:12,16 28:11
28:23 30:22
31:5,12,24
33:7 35:22,23
37:6,23 42:9
46:9,14,20
52:14 64:20
65:12 70:23

144:12
relating 27:10
relationship
92:12 96:10,17
96:21 105:22
116:2
release 45:9
relevant 58:17
58:18 109:20
134:11
relocated
141:21
remain 59:4
remained 18:20
remember
39:13 44:13
67:22 69:22,25
78:1,5 83:12
83:21 87:24
110:11 113:3
113:19 118:13
128:7 130:4,24
137:6
remembers
128:10
remind 6:6
reminder 5:23
remove 16:16,17
91:25 133:13
removed 88:18
91:17 92:5
repair 108:18,22
108:25
repairs 107:22
110:20
repeat 5:16
88:24
repeated 91:24
96:13
repeatedly
125:11,12
rephrase 141:3
replaced 74:15
replacement
110:22,25
replacing 72:17

KATHLEEN L.   LIEBAU Volume 1
March 09, 2022

Page 162

reply 45:8
report 67:5
  69:17
reported 49:24
  50:2,9,11,20
  52:9 61:18,22
  67:4
reporter 6:3
  13:5 30:1
  31:10
reporting 13:22
  61:15 62:4
reports 67:6
represent 4:16
  75:14
represented
  17:15
representing
  15:16
reprimand
  44:13
reprimanded
  125:15
request 26:14,23
  26:25 30:17,18
  33:5 35:13
  37:23 38:2
  40:13 41:15
  55:17 62:21
requested 26:14
  54:23 55:3,13
  143:17
requests 27:6
  30:15 32:1
  35:11 49:19
  91:24
require 10:18
required 21:25
  55:4,11
requirement
  130:17
requires 125:4
research 113:6
reside 7:19
resolved 17:24
resolving 64:5

resources 14:8
respect 62:10
respective
  143:18
respond 5:2,5
  5:14 12:10,10
  96:18
responding
  26:21
response 5:25
  27:24 28:5
  33:5 43:4 51:5
  92:10 103:14
  118:22
responses 30:14
  31:17 49:18,21
  59:13
responsibilities
  49:1 127:9
responsibility
  52:18 60:16
  142:5
responsible
  49:25 50:13,21
  52:22,25 61:15
  62:9 70:13
responsive 27:5
  37:23 38:2,10
  62:20 126:9
rest 11:15 106:6
restate 13:2
restricting 15:9
restriction 16:2
result 22:3
retain 37:6 40:3
retained 28:18
  29:15 36:3,4
  37:3,7
retaining 27:20
  27:23
retire 82:19,25
  83:6,7,24 84:8
  92:19 94:15,16
  127:25 128:16
  130:15,23
  131:8,16 132:1

retirement 84:3
  84:4 112:19
  127:3,22,23
  129:11,23
  130:17 131:17
  133:25 134:2,6
retiring 112:24
  130:11 131:3
return 14:18
review 31:14,16
  41:24 43:6
  45:25 52:13
  66:17 107:19
  107:21,25
  111:12,12,13
  113:18,21
  115:1 124:12
reviewed 108:9
  108:9 109:11
reviewing 50:14
  52:15,15
  106:17 125:25
reviews 42:4
  50:14,18
  113:10
rid 35:25 44:2
  89:11,15 90:1
  93:24
ridiculous 43:6
  83:19
right 5:11,23
  6:10,21 7:13
  7:23 8:19 9:7
  10:17,25 11:4
  12:23 14:18
  16:15,23 17:19
  18:7 20:14
  21:10,19 22:6
  22:9 24:4,19
  24:25 25:11
  27:3,8 31:3
  32:1,3,16,25
  33:15,19 34:10
  34:21 36:23
  37:17,19,22
  38:4,12,19

42:7 43:18
45:10 46:2
47:16 48:13,17
48:21 49:6,24
52:9 55:13
56:10,22 57:22
58:19,25 59:22
60:8,21 61:18
61:21 62:14
63:3,6,19,21
63:24 64:3,7
65:11 66:23
67:1,11 68:11
68:11,11,11
69:2 70:1,22
71:16 72:5
74:18 75:8,19
76:14 77:12
78:1 81:12,14
81:14,16,18,20
82:6,9 83:3
84:5,11,17
85:2,8,11,22
85:23,25 86:2
86:25 87:1,15
87:17,19 88:18
89:17,19 90:18
90:24 91:12,12
91:14 93:20
94:19 95:8
96:2,4,16
97:17 99:16
100:1,5 101:8
102:7,13 103:2
103:4,17,24
104:2,3,12
105:4,9 110:9
111:19 112:8
115:11,16
116:10,23
117:1 118:22
119:1,13,24
122:7,15 123:1
123:2 124:6,8
124:16,25
125:16,20

126:14 127:6
128:8 129:1,16
129:21,21
130:17 132:11
133:5,7,15,22
133:25 134:10
134:23 140:19
141:1,20,23,25
142:2 143:14
rise 19:14 31:24
road 21:18
  110:15
robin 116:17,23
  117:25 118:12
  118:16 120:17
  120:24 123:17
  124:19,21,23
  125:8,11,24
  126:17 127:1,2
  127:12
robins 116:25
  117:14 126:12
  126:17 127:19
rocks 49:4 61:6
role 119:23
romeo 15:6,8,12
  19:1 24:8
room 7:13 16:18
  37:12 105:18
  108:7 118:14
roughly 10:25
royal 73:6
rpr 1:21 144:22
rude 21:5
rules 5:11
run 85:21
running 12:7,11
  13:23
runs 106:5

―――――――――
S
―――――――――
sadly 11:15
sanctions 99:14
  99:20
sandwiches
  16:11

KATHLEEN L.   LIEBAU Volume 1
March 09, 2022

Page 163

sara 79:3,11,12
  79:13,15 80:4
  80:5,14,17,18
  81:25 82:2,9
sarah 50:25 51:6
  51:16 52:5
  67:9
sarahs 51:20
sat 87:5 129:13
satisfied 61:5
save 39:21
  124:10
saw 56:3,4 60:21
  94:24 118:17
  141:12,14,16
  141:17
saying 29:17
  48:23 65:17
  76:17 82:4
  84:3 94:1
  116:22 125:12
  128:15 130:24
  131:15,24
  141:19
says 120:24
  138:20
scan 37:4
schedule 30:11
  30:12 52:16,17
schneider 53:14
school 8:5,18,19
  10:14 11:3,6
  13:10 16:9
schools 15:7,8
  19:1
science 9:19
screen 25:11
  26:3 43:8
screw 93:5
scroll 65:14
search 26:13,17
  27:3 33:4
  37:17 38:9,12
  65:9,16 107:15
searched 37:22
  37:25

searching 34:11
season 102:15
second 17:22
  125:2 130:14
  136:14
secondly 140:6
secretarial
  49:11,16 54:5
  137:8
secretaries
  50:16 60:5
  137:7
secretary 12:14
  12:17 13:22
  14:1,6,11
  48:25 55:14,20
  59:9,11,15,24
  60:14,15 72:24
  117:9,10,15,15
  119:10
secretarys 59:13
sector 12:6
securing 138:13
security 130:16
  130:18
see 21:2 23:17
  33:18 34:13
  40:21 46:13
  57:11 58:14
  66:24 68:22
  69:23 82:6
  95:7 97:16
  100:2 107:24
  112:20,21,21
  114:5 115:11
  119:23 124:9
  125:11 126:13
  131:20
seek 19:14 20:12
  143:8
seeking 142:4
seen 21:3 70:7
  118:24
segregate 29:7
segregated 29:2
  29:6

self 48:5
selling 17:12
semester 9:14
  9:24,25 10:4
  10:14
send 30:16,17
  30:17 32:9,14
  42:4 43:2 44:1
  77:24 114:17
  114:20 115:3
  124:23 126:3
sending 43:22
  62:22 124:19
  124:21
sends 43:12
  44:12,15
senior 13:16
sense 80:5 109:4
  132:2
sensitive 82:17
sent 26:17 27:25
  28:4 33:6
  35:19 36:1
  39:16,25 40:14
  41:16 43:10,11
  43:16 51:23
  64:7 65:25
  97:16 98:8
  113:6 114:6,25
  122:19,21
  134:5 137:4
  141:16
sentence 35:15
separated 11:24
  86:17
september
  11:16,22,23
  100:16 113:7
  113:13 143:2,3
series 4:17
served 26:23
service 13:23
  23:23 24:4
  95:21
services 71:11
  71:13

set 54:5 144:8
setting 137:10
settle 99:19
  106:19 114:18
settlement 16:21
  106:25 114:9
settling 106:22
  120:22
setup 21:9 85:5
  87:1
seven 80:1
severe 99:14
shannon 72:24
  73:16 76:4
  77:11 80:22
  81:2 86:18
  100:23 101:1
  106:2,4,6,10
  106:10 116:19
  119:20 120:23
  123:11,20
  124:10,15,19
  124:20,24
  127:11
shannons 73:4
  73:20 74:6,9
  74:18
shape 78:12
shared 41:9,21
  46:12
sharply 73:17
shed 130:11
sherry 81:7
shes 51:12 69:8
  73:2 74:21,22
  80:18 83:14
  93:12 94:11
  97:7 104:8
  107:4 108:12
  112:9 116:25
  117:2,3,4,5
  118:1,9,20
  119:8,9 121:6
  123:19 124:18
  124:20,21
  126:3 132:7,15

  133:15,16
shock 44:3,6
shocked 31:15
  32:8
shocking 44:9
short 44:16
  62:15
shorter 17:25
shortly 20:14,15
  80:8 90:24
  118:19
show 28:1 42:5
showered 81:22
  82:5,7
showering 78:7
shut 121:16,16
siblings 18:14
sick 142:17
side 51:14,15
  64:16 135:4
sign 67:23 68:6
  68:7
signature 58:3
  118:18,24
  143:17
signed 67:23,24
  67:25 68:18
significance
  116:10
significant 63:1
silence 122:20
  123:10
simply 57:9
sing 76:25
sit 33:2 44:19
sitting 37:12
  86:11 114:9
situation 130:5
six 11:20 17:25
  74:18 116:21
skillwise 140:18
skittles 75:14
  76:20
sleeplessness
  46:19
slightly 33:20

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

Page 164

60:13
slow 103:18
small 38:3 44:24
smith 110:11,12
smoothly 61:3
snappy 102:8
snarky 102:8
social 21:3 24:25
  25:25 130:16
  130:17
society 25:19,21
  26:11
sole 119:13
solid 142:22
somebody 46:13
  47:2 85:12
  106:25 128:3
  139:15
someones 86:18
  139:24
somewhat
  134:17
soon 112:1
  131:3
sorry 17:17
  88:21 96:20
  126:21
sort 47:3 48:13
sought 13:17
  20:4 46:9,17
  47:1,22
sounds 33:11
source 80:3
southern 1:3
space 135:11
spacing 135:18
speak 45:9
speaking 105:14
  121:13
specialist 54:7
  54:12,24 55:2
specialists 53:13
  53:13
specific 80:16
  84:16 129:14
  139:5,17

specifically
  68:21 85:13
  104:6 130:4
speculating
  87:15
spell 57:24
spelled 6:12
  57:25
spent 107:22
split 120:18,24
spoke 102:9
spoof 75:25
sport 77:16
  85:10 89:8
  90:16
spreadsheet
  108:6,10
  109:18 110:23
  135:15
spreadsheets
  135:11
spring 88:9,16
  89:1,23 142:12
  142:25
ss 144:3
staff 50:1 51:2
  51:12 52:14,23
  53:2,6,22,23
  61:9 67:3,6,14
  67:24 69:3,11
  69:16
stand 44:18
stared 105:12
staring 105:10
start 4:23 5:25
  6:5 15:2 29:19
  30:1,20 31:3
  31:11 33:3
  62:4 84:25,25
  90:13,14 95:10
  96:4 100:11
  106:11 110:3
  112:20 117:23
  123:20 124:3
  125:18 126:17
started 28:21

29:17 30:25
  33:19 49:6
  58:3 59:23
  62:22 83:4
  111:22,25
  114:15,23,24
  116:1 117:21
  122:6 128:15
  128:18,19
  131:5 138:25
starting 31:19
  62:22 63:2
  64:8
state 11:15
  15:14 144:2
statement 90:25
  91:4
states 1:1
status 107:7,19
statute 99:21
staup 50:25
stay 48:4 96:16
  135:21
stayed 64:3 74:6
staying 84:1
steady 32:16,21
stealing 93:17
steam 45:9
steeh 1:8
stenographic
  144:11
stenographica...
  144:9
step 6:7
sterling 2:4 20:3
  20:10 27:14,20
  27:23 28:11,19
  29:15 33:9,14
  33:24 34:12,22
  34:24 35:5
  36:5 63:25,25
  64:6,10,13,20
  64:23,24,25
  65:3,6 122:22
sterlingattorn...
  2:6

stewart 119:20
stewarts 73:16
stinks 85:14
stomached
  94:18
stomped 116:4
stone 126:5
stop 81:10
stopped 79:23
  80:25 81:12
store 32:25 63:6
  74:4,11 88:5
  89:5
stored 38:24
  63:3 64:11
story 18:20
  106:1 133:13
straight 86:21
stream 32:16,21
streamlined
  49:12
stress 44:7 46:19
stretching 124:5
strictly 42:9
strong 48:1
study 10:10
studying 10:21
stuff 28:24
  32:11 33:19
  58:13,14,16,17
  64:19 79:8
  99:10 100:23
  102:3 108:8
  115:19
stupid 89:9
subject 34:18
  45:7
submitted 18:22
subsequent
  105:1 128:4
substance 130:3
substantive
  45:14
subtle 88:11
  91:10,12 93:25
  96:18

success 47:6
  49:14
successful 49:14
  138:13
sudden 123:19
suddenly 17:9
sue 17:6 21:17
  21:25 31:14
  39:20 42:4
  44:12 50:6,18
  51:1,11,15,23
  52:7,8,9,18,20
  55:19,22 56:2
  58:10,23 59:1
  61:19,20,22
  62:7 67:4,5
  68:18 69:22
  87:22,23 88:6
  89:5,19,25
  95:17,24,25
  113:24,25,25
  114:1,3 115:7
  115:8,9 117:8
  117:16,21
  118:10,15
  125:3 133:13
  133:16,19,20
  136:6,15,21,24
  137:2,11,17
  138:16 139:14
  139:21 140:7
  140:25 141:4
  141:17
sued 17:10
sues 117:19
suffered 46:22
  47:13
suffering 47:11
suing 15:8
suite 1:17 2:5,11
summaries
  35:17,20,24
  106:11,18
  107:17 108:11
  109:4 111:10
summary

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

Page 165

107:15 108:23
110:24 111:3
**summer** 10:14
33:3 34:5
139:7
**superintendent**
16:18
**supervising**
52:19 62:9
**supervisor** 50:4
50:12 52:12
**supervisors** 62:6
**supply** 118:14
**support** 4:18
18:18,19,19
**supported** 28:12
**supposed** 91:22
102:9 132:16
132:16
**sure** 5:18,24
10:2 34:11,15
34:20 36:10
50:15 52:13,16
66:18 88:4
116:8,8 123:9
133:1
**surprised** 92:17
118:10 128:11
**switch** 71:16
102:15
**switched** 54:17
**sworn** 4:7
**sylvester** 67:25
**symptoms** 47:20
**system** 29:20
30:3,21 39:1
41:3 42:21
60:2 63:17,17
67:21,22 68:12
99:7,25 100:15
107:16 108:21
124:11
**systems** 98:19
108:21
——————
**T**

**t** 24:6,7,14
**table** 3:1 5:22
**take** 4:16 5:9,12
6:3 9:24 33:23
41:1 42:15,16
48:6 60:13
62:14 70:18
72:1 78:19
85:11,16 87:11
110:13 115:22
121:6,17 122:1
130:6 131:24
132:13,23,25
141:25 142:7
**taken** 1:17 62:16
91:11 133:2
144:7,12
**talk** 15:2 20:16
46:7 51:19
52:7 60:22
75:24 85:8
104:3 132:19
136:24 137:2
**talked** 20:9 47:9
47:12,19 68:23
88:14 98:13
115:7,7,8
**talking** 6:1
55:24 66:5
79:7 80:1,1
102:22 105:18
109:19 113:17
117:6 120:19
129:19 139:8
**tapped** 49:15
53:3
**tasked** 115:17
**taste** 90:18
**team** 126:2
138:20
**technologically**
22:15
**tell** 21:22 26:13
28:16 52:6
54:9 61:23
65:22 66:7

68:18 77:25
97:20 105:4
110:24 114:3,8
114:11,14
116:13,18
120:21 124:22
126:3 128:7
129:25 136:17
141:15
**telling** 56:2
95:22 139:20
**tells** 59:10
**ten** 94:22 107:5
130:1
**tend** 105:13
**tense** 102:12,12
**term** 61:9
104:17
**terminated** 29:4
49:23 110:10
**termination** 9:8
12:13 21:23
27:18 29:8,9
34:6 41:2
42:14,20 48:15
50:10 63:22
66:2 90:24
91:7 116:7
**terms** 10:19
30:7 40:7
52:18 60:18
66:19 77:20
127:8
**terrible** 102:17
102:18
**testified** 4:9
62:21 127:23
**testify** 4:7 38:8
**testimony** 36:1
141:23
**text** 22:10,14,25
97:14,16
**texted** 22:10
**texting** 22:17
97:15
**thank** 26:20

**thanks** 94:12
**thats** 7:17 12:20
13:10 15:13
19:17 23:10
26:12,20,21
28:4 29:17
37:23 44:20,22
52:24 53:5
55:11 58:18,25
63:17 69:17,19
71:2 75:16
78:1 89:3
90:18,20,25
92:20 93:16,17
102:2 104:9
106:20,20
108:2,12,21
109:18,19
112:25 116:17
117:16,22
118:20 119:13
120:10 121:10
122:21 124:12
124:24 126:9
126:14,14
128:17 130:7
130:13 132:5,6
132:10,11,16
136:20 137:17
138:10,24
140:23 141:16
141:18,23
142:25
**theodore** 7:1
**theory** 16:1
**theres** 32:16
33:11,21,22
38:16 49:4
58:16 59:8,9
60:10 62:23
71:1 78:22,23
86:13,14,25
122:8 124:7
133:12
**theyre** 10:5 12:8
12:11 24:8

37:14 40:19
44:4 48:3 69:6
73:9 82:1,21
86:17,17,17
105:19 109:18
**theyve** 84:6
**thing** 28:25 29:3
40:16 64:14
73:7 78:10
79:4,15 81:21
83:20 93:18
94:10,24
101:25 102:16
106:21 107:14
110:18 114:7
123:10 124:12
124:20 125:1
135:14 141:19
**things** 11:16
27:10 28:23
31:17 32:1,13
32:14 33:8
37:4 40:10
42:2,8 43:16
44:8,14 49:3
52:18 56:25
57:1 75:14
79:8 84:21
85:1 105:5
106:20 113:14
114:17 119:24
131:12 133:8
133:18
**think** 5:13 8:16
12:6 21:5
23:20 25:4,12
26:11,12 27:14
32:10 34:25
39:20 42:25
43:3 49:14
51:10,11 53:15
65:7 67:5
68:10 69:8
70:6,9,11,15
71:4,6 73:8,12
73:12,19,23

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

Page 166

76:12,21 77:1
77:4 78:3,5,9
78:25 79:3
81:1,3,25
85:15,16 88:2
88:2 89:3,6
90:10 91:1,23
92:1,15,18,20
94:2,6,12,22
95:2,11 96:6
97:1 98:6
99:21,22
100:22 101:23
107:17 112:8
112:11 113:10
114:16,23,25
117:16 118:7
118:17 119:7
119:17 120:1
120:16 123:4,9
127:5 129:15
130:9 131:9
134:5,14,21,24
136:23 138:1
138:19 140:13
**thinking** 10:25
94:2
**thought** 28:12
32:3 35:20
45:23 55:4,5
58:16 60:21
61:11,11,13
73:17 83:14
84:9 87:22
92:14,21,23
96:16 103:22
111:17 113:1
117:18 120:4,7
130:10
**three** 15:25
64:11 93:16
98:12 99:1
104:18,19,21
115:21 131:6
**thrived** 16:6
**throw** 124:8

**thrown** 70:6
**tiara** 73:6,21
**ticked** 83:8
**tidied** 64:5
**tidy** 33:19
**tight** 99:15,15
**till** 11:14 83:10
89:23 114:5
131:2
**time** 5:4,13 6:5
7:21,21 10:19
18:12 25:6
32:11 33:13,23
39:6 40:9,20
41:1 42:15,19
42:19,20 43:18
47:16 49:9
50:9,14 55:3
55:25 56:18
62:23,25 64:22
65:21,23 66:1
71:9 72:16
77:23 78:2,5
78:14 80:24
82:20 83:2,2
84:9 85:4,16
85:17 86:5,20
87:17 88:8,24
91:7,9 92:13
92:19 95:18,19
95:20 99:15
108:13,14
110:9,13,17,19
111:8,9 116:7
123:15 124:3
125:19 127:10
129:10 130:13
130:14,14
131:3 132:10
136:14 140:9
140:10,10,25
141:4,10
**timekeeping**
52:15
**times** 14:2,11
15:3 50:1

61:21 89:11,14
103:13 129:14
129:25 131:6
131:22 132:7
**timing** 54:21
**tip** 5:23
**tires** 109:17
110:4,14,16
**title** 12:15 13:25
14:4,8,12,13
14:15 28:18
53:18,21 54:2
54:3,7,20 55:5
55:11 56:2,7
56:10,16,22
57:3,9,10,14
58:4,8,19
59:11,13,22,23
60:1,5,19,23
68:1,10,16,16
68:17 69:4,5
69:11,16 70:12
118:7 136:5,6
136:8,11,24
137:2,6,9,16
138:3,7,15
140:17 141:18
**titles** 15:5 34:18
56:19 57:16,18
68:14
**today** 4:17 5:7
116:20,21
139:18
**todays** 19:11
**told** 22:7 56:16
59:1,17 68:19
70:3 85:18
95:17 112:4
113:17,25
114:1,2 132:9
133:21 135:8
135:19 137:9
137:17,21
**ton** 101:9 103:10
113:11 121:4
**tone** 77:15 102:7

102:8 103:3,19
103:22 120:6
126:25 132:6
**tonight** 125:9,13
**tons** 66:16
**top** 10:21 80:2,2
**topic** 128:1
**total** 107:21
**totally** 19:6 66:8
93:6
**tough** 78:14
**track** 43:20
114:12,12
**tracked** 40:10
**train** 35:20
**training** 13:8
67:21 68:7,8
137:14,15
**traits** 142:8,22
**transcript** 10:7
10:8 144:11
**transcription**
144:10
**transfer** 35:8
**transferred** 35:6
**transition** 139:6
139:9 142:16
**transmission**
109:19,24
110:2,14
**treat** 103:1
123:16
**treated** 60:18
78:21,25 85:22
95:9,11 123:17
125:17 126:10
126:19,22
127:7,16,20
135:25
**treatment** 31:6
31:13 46:17
47:22 117:8
**treats** 77:2
**tree** 15:10
**tried** 85:10
**trigger** 131:12

131:13
**triple** 99:22
**true** 33:18 55:5
55:12 87:16
89:3 90:25
108:25 113:23
120:9,10
144:11
**truly** 20:23
**truth** 4:7,8,8
**truthfully** 5:3
**try** 5:17 16:9
32:9 44:8
90:10 99:19
106:13
**trying** 10:2,9
32:6 77:16
89:8 93:17,21
105:19 141:20
**turkey** 122:18
**turn** 43:13 49:4
61:6 85:23
**turned** 49:5 61:7
66:23 79:1
94:25 95:1
97:2
**turns** 84:9
**two** 10:3 18:24
49:22 62:6
67:19 81:25
82:1,3 93:16
93:20 96:2
98:11,11,22
104:5,13,16,19
104:20 114:9
139:8
**twomethod**
40:16
**tykes** 92:22
**type** 12:20 13:1
13:6,14 61:13
111:6
**typical** 40:7
**typist** 111:7

———————
**U**

KATHLEEN L.   LIEBAU Volume 1
March 09, 2022

Page 167

ultimately 33:15
umhmm 22:18
un 28:20
unauthorized
  35:16
unaware 83:13
unbeknownst
  51:1
uncomfortable
  126:8
uncountable
  89:11
underlying 36:4
understand 5:15
  5:16 32:6 43:7
  43:14,15 50:12
  82:4 105:16,17
  129:20
understanding
  51:4 53:16
  67:2 69:10
  70:5,19 94:1
  138:24
understood 5:18
  5:19 30:11
  52:9,12
unhappy 98:6
unilaterally
  14:13 55:19
  56:2 58:23
  136:6
unique 68:1,5
  68:13
united 1:1
unpaid 11:21
unsavvy 22:15
update 107:8,11
  107:12
updating 107:18
upset 132:24
upsetting 91:16
  91:20 115:6
urgency 43:7
use 16:19 20:17
  20:20 22:14
  24:2,19 25:17

25:20 35:12
42:6 48:15
58:19 59:7
71:25 77:15
100:15 103:15
103:15 109:15
useful 109:1
user 26:3
usually 32:23
  72:15 81:9
  101:24 112:5
  116:20
utilize 27:9
uverse 24:6,7,14

**V**

vacation 22:13
  117:15 121:4
  121:24
value 105:2
values 104:25
various 40:10
  43:21
vehicle 35:19
  100:1,3 107:20
  111:12
verbal 133:16
verbally 5:14
  57:8
verbatim 80:3
  116:23 125:3
  128:17 130:25
  134:25
versus 4:12 15:6
  17:1 72:10
  73:4 79:24
victim 132:18
view 55:2
violating 124:6
violation 16:7
virtually 24:8
visavis 125:17
  127:1
visit 7:21
viviano 2:10
voice 22:14,17

22:24 77:15
voicemails
  133:19
volume 1:16
voluminous
  33:20 66:11,11
volunteer 25:19
  26:11
vs 1:7

**W**

wait 34:25,25,25
  76:13 78:19
  124:22
waiting 123:11
  125:18
waiving 19:18
walk 39:15 96:4
  132:21
walked 76:11
  90:17 98:7
  126:5
walking 135:4
want 11:3 13:2
  29:24 54:18
  57:13 64:2
  74:7,8 88:17
  90:11 99:8
  100:10 102:22
  106:23 107:1,5
  107:9,17
  127:12 129:20
  140:3
wanted 72:5
  92:4 99:12,16
  104:6,9,24
  108:9 109:20
  109:20 110:13
  114:11 115:18
  120:2 135:15
  135:17
wanting 91:17
  137:2
wants 61:4
  83:10 93:11
  131:2 135:6

warranty 99:25
  108:21 111:13
washington 7:16
wasnt 17:22,23
  33:10 35:2,21
  43:15 61:8,17
  64:4 72:2
  78:24 94:1
  97:25 101:13
  101:14,15
  102:5 105:5
  109:14 132:12
  133:21 135:10
waste 25:6 40:20
  108:12,14
water 125:12,14
way 5:1 21:2,3
  44:2 45:10
  73:17 79:22
  82:5 84:12
  85:19 86:13
  101:13 102:16
  104:9 105:6,23
  110:7,8 122:15
  123:16 125:10
  126:12 132:10
  132:14 141:2
wayne 144:4,24
ways 67:19
  123:16
web 137:12
wedge 10:3
wednesday 1:20
  4:2
week 10:9 11:4
  11:5 103:13
  124:18
weekend 35:18
weekends 7:13
weekly 32:7
  75:13 114:16
  114:17
weeks 10:4
  11:18,20
  114:10
weird 45:21

105:10,12,15
117:18 122:6
went 8:18 26:25
  27:10 33:9
  34:1 39:22
  49:12 53:16
  64:2,20 65:18
  67:20 68:23
  73:1 81:19
  85:9 90:17
  97:13 104:19
  113:13 116:4
  121:19 122:5
  123:14
weve 53:3 67:19
  68:4 73:13
whats 6:25 7:25
  17:4 22:24
  50:24 55:1
  57:22 68:2
  80:7 89:12
  92:8 94:15
  100:1,25
  102:18 105:11
  112:13 119:14
  126:10 141:9
wheelchair
  71:25 72:18
  73:25 74:4,13
  74:15,24,25
  75:15 76:20
  86:7 88:17
  89:5,7,13,15
  90:1 91:9,17
  91:25 92:4,9
  93:1,9,21
  96:13,19 97:5
  112:18 133:10
  133:14,19,23
wheeled 86:9
whiner 85:11
  90:15 104:7
whipped 43:9
whittle 97:22
whoa 83:17
whos 12:9 24:5

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

Page 168

70:18 79:12
105:14
**willing** 13:18
**winter** 9:25
10:14
**wipes** 13:22
**wish** 122:12
131:15
**withheld** 36:21
**withholding**
36:15
**witness** 3:3 4:6
19:17,22 20:6
31:8 88:21
103:23,25
132:24 143:17
**witnessed** 72:16
72:18
**witnesses** 6:1
103:21 128:25
**woman** 67:25
69:2 128:25
**womans** 129:3
**woodward** 1:17
2:10
**word** 72:1
**words** 59:7
140:8
**work** 10:4,12
11:1,2,3,18
12:10,18,20
13:14 16:9
21:18 22:19
26:12,17 27:25
30:13,17,21,22
32:11,11 33:18
35:8,23 39:22
39:25 40:2
42:9 49:15
53:25 57:2
59:2,10,15,17
59:19 60:11
61:2,13 62:11
62:24 67:19
70:23 71:1
75:11 79:8

81:19 83:10,18
93:7 94:18
106:3,8,15
108:19 109:13
111:21,23,24
112:7 115:4,20
116:19 119:3
120:23 121:1
121:23 124:8
124:15 125:2
125:19,22
126:17 131:2
137:5,8,9,10
137:24 138:10
138:13,25
139:3,6,7,9
141:12,13,22
142:5,5,13,16
142:21,23
143:4,8,9
**workday** 30:18
**worked** 30:10
35:17 54:6
55:25 58:21
73:13 104:9
119:17
**working** 11:5
35:16 53:8
54:1 56:18
79:4,13 100:11
111:10 119:19
124:3,14
125:23
**workrelated**
29:20 30:2,8
30:10,15,19
31:4,11,22
35:21
**works** 47:6
**worse** 115:13,13
115:13
**wouldnt** 22:12
53:20 63:20
88:4 98:17
102:2 106:14
128:2

**wow** 78:17
**wrap** 114:17
143:14
**write** 113:18
**writing** 57:7
133:12 135:13
**written** 58:7
133:22
**wrong** 17:18
59:8,9 89:12
92:8 94:15
**wrongfully** 29:4
**wrote** 112:2
113:20,22
114:1
**wtf** 44:1,11,18

_____
**X**
_____
**Y**
_____
**yeah** 7:14 18:13
22:14 35:21
37:14,16 45:6
56:3 58:15
59:7 62:1,1,1
63:2,20 66:15
66:15 68:13
71:6,13,25
73:2,7,14 74:8
74:22 77:6
78:8,24 80:17
82:19 83:18
84:25 86:13
90:9,18 91:3
92:1 93:5,6
94:13 95:4,5,6
95:20 96:1
99:8,9 100:9,9
100:9,12,12,12
100:19,19
101:22 102:12
105:2 115:2,12
116:13 117:16
118:1,9,14,20
119:15,16
121:5,7,25

123:14 131:9
131:12 132:9
132:24 133:21
136:12
**year** 9:12,12
119:6 127:15
**years** 7:24 15:25
46:24 48:24
49:1 53:12
62:2 67:20
74:18,22 75:3
80:1 81:9,9
82:10 83:5,7
83:19 92:18
93:10,16,16
94:16,22
115:21 122:16
128:16 130:12
130:24 131:25
**yell** 102:11
**yelled** 105:3
**yep** 119:5
126:23
**yesterday** 97:12
**youd** 45:17
107:19,20,20
107:22,25
108:1 110:13
143:5
**youll** 26:18
**younger** 78:6
81:21 82:1
**youre** 8:19
17:19 29:22
36:18 38:19
44:21 48:14,22
55:23,24 57:12
57:19 59:20
65:17 68:9
70:22 71:2
73:9 76:10
78:16,17,20
81:10 82:12
84:12,18 87:15
91:2,3,23 93:9
93:14,15

102:11 105:18
105:20 107:16
123:13 124:23
127:19 129:19
143:8
**youve** 4:19 5:24
10:17 12:20
13:17 15:3
16:23 19:10
22:10 23:12
24:10,11,16
25:1 37:3 41:8
46:17 47:10
53:15 66:6
86:22 96:9
97:7 105:15,23
120:1 121:3
126:15 127:23
134:25 137:6
142:13

_____
**Z**
_____
**zero** 55:3 125:7
**zeus** 23:24 24:11

_____
**0**
_____
**000** 33:16 65:10
65:17,18
110:10,25
**08** 1:19 4:3

_____
**1**
_____
**1** 1:16,19 4:3
**10** 8:1,1
**12** 130:1
**123456** 26:18
**14** 18:9
**15** 23:17,20
24:12 66:10
**17** 88:2 128:22
136:6
**18** 25:4,16 34:17
35:17 63:22
64:8 87:24
88:3 109:7
114:24 117:24

EXHIBIT 1

KATHLEEN L.  LIEBAU Volume 1
March 09, 2022

Page 169

122:11 123:14
123:23
**19** 7:7,24 34:17
43:6 48:24
67:12 116:7
119:6,6 123:13
**1965** 8:1
**1985** 48:19
53:11,11

---
**2**
**2** 62:16,17
110:10
**20** 10:12,19,24
11:1,3 33:16
33:21 65:22
66:8,10,12
67:20 70:10
101:10,12
103:10
**2000** 49:20
54:15
**2005** 12:18
25:10 30:5,7
49:3,6,10
57:25 58:3,20
**2006** 25:10
**2010** 15:23
**2012** 50:9
**2015** 21:19,23
23:4,13,15
24:10 41:1
71:17 80:1
82:10 92:12
129:10,19
**2017** 14:17
55:19 58:24
83:3 98:3
103:17 116:6
128:23 130:14
137:25 142:12
142:25 143:1
**2018** 30:24 31:1
31:3,10,14,19
33:1,12,23
62:22 66:1

88:1 89:25
90:7 112:1
113:12
**2019** 19:24
27:17 33:1,3
33:13 34:5
45:25 51:25
53:22 55:18
70:10 87:18
88:9,16 89:2
89:23 91:6
**2020** 9:14,25
10:11,18 11:11
11:22
**2022** 1:20 4:2
20:23 129:19
**2025** 144:25
**21** 144:25
**21cv11823** 1:7
**22** 66:10
**23** 133:2
**24** 43:14
**248** 2:6,12
**250** 2:5
**27** 7:7
**28** 62:16
**280** 1:17 2:10

---
**3**
**30** 92:18 94:16
99:14,19
106:11,12
130:12,23
133:3
**30th** 92:16
**33** 2:4
**34** 62:2

---
**4**
**4** 3:6 133:2,3
143:16
**40** 11:2,4 94:25
95:1
**400** 1:17 2:11
**40houraweek**
11:12

**44** 143:16
**48** 83:19
**48009** 2:11
**48095** 7:16
**48304** 2:5
**49** 62:17 92:20
92:21
**4th** 8:3,4

---
**5**
**5** 33:16 65:10,17
65:18 106:12
**50** 65:24 71:16
76:17,18 78:11
78:17,17,20
79:1,17 82:8
84:18,19 95:3
95:4
**50s** 83:25
**50th** 75:9 80:10
82:18 84:2,5
84:15,21 86:1
88:25 90:12
96:12,21 129:9
**5132** 144:22
**5th** 8:3,4

---
**6**
**60** 11:5 74:22
**60th** 73:1,3,16
**64341** 7:16
**6441500** 2:6
**6450000** 2:12
**65** 83:15
**67** 9:23 83:11,14
83:16 128:11
129:7 130:20
131:2

---
**7**

---
**8**
**8** 110:25
**85** 8:3
**88** 6:24

---
**9**
**9** 1:20 4:2 49:20
106:11
**90s** 8:12,16
**99** 17:23

**EXHIBIT 1**

KATHLEEN LIEBAU Volume II
April 07, 2022

Page 145

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


KATHLEEN L. LIEBAU,

         Plaintiff,

   vs.                Case No. 21-cv-11823

                      Hon. George Caram Steeh

DYKEMA GOSSETT, PLLC, a    Mag.  Judge David R. Grand

Michigan professional limited

liability company,

         Defendant.

_____/


    The Videotaped Deposition of KATHLEEN LIEBAU,

    Volume 2,

    Taken at 280 North Old Woodward Avenue, Suite 400,

    Birmingham, Michigan,

    Commencing at 1:13 p.m.,

    Thursday, April 7, 2022,

    Before Cheri L. Poplin, CSR-5132, RPR, CRR.

f772c6ff-d582-466c-a38f-dcb563fcdf87

**EXHIBIT 1**

KATHLEEN  LIEBAU Volume II
April 07, 2022

Page 146

```
APPEARANCES:


    FOR PLAINTIFF:

          BRIAN J. FARRAR
          Sterling Attorneys at Law, P.C.
          33 Bloomfield Hills Parkway
          Suite 250
          Bloomfield Hills, Michigan 48304
          (248) 644-1500
          bfarrar@sterlingattorneys.com


    FOR DEFENDANT:

          ELIZABETH HARDY
          DAVID PORTER
          Kienbaum, Hardy, Viviano, Pelton & Forrest, PLC
          280 North Old Woodward Avenue
          Suite 400
          Birmingham, Michigan 48009
          (248) 645-0000
          ehardy@khvpf.com
          dporter@khvpf.com


ALSO PRESENT:

    James Hermon, Dykema Gossett
    George Larkins, Video Technician
```

f772c6ff-d582-466c-a38f-dcb563fcdf87

**EXHIBIT 1**

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 147

1          TABLE OF CONTENTS
2
3     WITNESS                              PAGE
4     KATHLEEN LIEBAU
5
6     EXAMINATION BY MS. HARDY              149
7     EXAMINATION BY MR. FARRAR            312
8     RE-EXAMINATION BY MS. HARDY          315
9
10              EXHIBITS
11
12    EXHIBIT                              PAGE
13    (Exhibits attached to transcript.)
14    EXHIBIT 1                            150
15    EXHIBIT 2                            150
16    EXHIBIT 3                            157
17    EXHIBIT 6                            159
18    EXHIBIT 7                            162
19    EXHIBIT 4                            170
20    EXHIBIT 9                            194
21    EXHIBIT 10                           213
22    EXHIBIT 11                           240
23    EXHIBIT 12                           258
24    EXHIBIT 13                           267
25    EXHIBIT 15                           301

## Page 148

1     Birmingham, Michigan
2     Thursday, April 7, 2022
3     1:13 p.m.
4
5            VIDEO TECHNICIAN:  We are now on the
6     record.  The time is 1:13 p.m. on April 7th, 2022.
7     Audio and video recording will continue to take place
8     until all parties agree to go off the record.  Please
9     note that microphones are sensitive and may pick up
10    whispers or private conversations.  This is the video
11    recorded proceeding of Kathleen L. Liebau, Volume 2,
12    taken by counsel for the defendant in the matter of
13    Kathleen Liebau versus Dykema Gossett, PLLC, filed in
14    the United States District Court for the Eastern
15    District of Michigan, Southern Division.  This
16    proceeding is being held at Kienbaum Hardy Law Firm
17    located at 280 North Old Woodward Avenue, Birmingham,
18    Michigan.
19           My name is George Larkins, notary and
20    certified legal video specialist on behalf of US Legal
21    Support located at 28411 Northwestern Highway,
22    Southfield, Michigan.  I am not related to any party
23    in this action nor financially interested in the
24    outcome.  The court reporter today is Cheri Poplin on
25    behalf of US Legal Support.

## Page 149

1            Counsel, please state your appearances for
2     the record, after which the court reporter will swear
3     in the witness.
4            MR. FARRAR:  Brian Farrar on behalf of the
5     plaintiff.
6            MS. HARDY:  Elizabeth Hardy on behalf of
7     Dykema Gossett.
8            KATHLEEN LIEBAU,
9     was thereupon called as a witness herein, and after
10    having first been duly sworn to testify to the truth,
11    the whole truth and nothing but the truth, was
12    examined and testified as follows:
13            EXAMINATION
14    BY MS. HARDY:
15    Q.  Good afternoon, Ms. Liebau.  We're here to continue
16        with your deposition.  I would like to start by asking
17        you some questions about what you did to familiarize
18        yourself as an employee at Dykema Gossett with firm
19        policies, policies that pertain to timekeeping,
20        overtime hours, et cetera.  You're familiar with their
21        policy manual?
22    A.  Familiar with it.  Did not read it on any regular
23        basis.
24    Q.  You did take the time to read it at some point, didn't
25        you?

## Page 150

1     A.  Probably 35 years ago when I first got hired.
2     Q.  So you didn't keep abreast of at least on an annual
3         basis of what the firm policies were that applied to
4         you as an employee?
5     A.  Have you seen the firm manual?  It's inches thick.
6         And typically if there was some change, it would be
7         communicated to the staff.
8     Q.  But you had taken the time as an employee to read it
9         at some point in time and then to keep abreast of
10        changes as they occurred; is that fair?
11    A.  Yes.
12    Q.  Okay.  You knew it was posted on a firm website;
13        correct?
14    A.  Yes.
15    Q.  And if you had any questions about what the policy was
16        as it pertained to timekeeping or overtime or hours
17        worked or lunch breaks, you could always go to the
18        policy manual and refresh your memory; correct?
19    A.  Certainly.
20            (Marked EXHIBITS 1 AND 2 for
21            identification)
22    BY MS. HARDY:
23    Q.  Okay.  All right.  So I've marked as Deposition
24        Exhibit Number 1 excerpts from the document entitled
25        Standard Practice Manual that was posted on the firm

3 (Pages 147 to 150)

U.S. Legal Support | www.uslegalsupport.com

f772c6ff-d582-466c-a38f-dcb563fcdf87

**EXHIBIT 1**

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 151

1    website in 2018, and then I've also marked as
2    Deposition Exhibit Number 2 excerpts from the firm
3    manual from 2019, and this was also posted on the
4    website.
5         Can you take a moment and look through,
6    glance through the pages that are attached to
7    Exhibits 1 and 2?
8         And for the record, I'll indicate that the
9    language with respect to the attached policies is the
10   same for '18 and '19, so you don't need to look
11   through both of them, unless you choose to do so.
12   You'll see the first page attached, Number 2, is the
13   section "Attendance/Payroll," "Breaks and Lunch
14   Periods."  Then next there is a section attached on
15   "Overtime - Non-Exempt Employees."  There is a section
16   attached on "Timecard - Non-Exempt Staff," one
17   attached on "Late Arrival/Early Departure," one
18   attached on "Telecommuting/Work from Home Policy," and
19   then toward the end you'll see one attached on
20   "Confidential Firm Information."
21   A.  Fine.
22   Q.  Okay.  Have you looked at in 2018 this version of the
23   manual?
24   A.  No.
25   Q.  All right.  Do you have any reason to dispute that

## Page 152

1    this manual applied to you as an employee,
2    administrative employee at the firm?
3    A.  It applied to everyone in the firm.
4    Q.  Okay.  So if you had any question about what the
5    policy was, let's say, for instance, you had a dispute
6    with Sue Choma or Chelsea Larsen about whether they
7    were correctly stating the policy, you always had
8    access to Exhibits 1 in '18 and then Exhibit 2 in 2019
9    so that you could go to the firm website and check out
10   the policy to see whether it was being accurately
11   applied to you; correct?
12   A.  The potential was there.  I --
13   Q.  Did you ever resort to looking at the firm policy when
14   you had a dispute with your supervisor, Sue Choma, or
15   one of the attorneys about what the firm policy was on
16   the issues in dispute?
17   A.  On my day-to-day work I was not -- the firm manual was
18   not even in conscious thought.  It's not something
19   that you live in in a day-to-day doing your work kind
20   of job, so . . .
21   Q.  When you're having a dispute with Sue Choma about
22   whether or not overtime policy is being applied
23   correctly to you, working from home policy is being
24   applied correctly, timekeeping policy, you didn't go
25   back and look at the firm manual on those issues to

## Page 153

1    see what's stated on the website about the policy?
2    A.  No.  I did not go to the website to see.
3    Q.  Are you claiming special rules applied to you?
4    A.  I don't think I said that.
5    Q.  Okay.  So whatever's stated in Exhibit 1 and 2 in 2018
6    and '19 are the policies that applied to you along
7    with all other administrative employees; correct?
8    A.  It speaks for itself.  I can't say what's in it.
9    Q.  Okay.  All right.  So let's switch gears to the
10   documents that you produced this week, quite a
11   voluminous number.  There were 581 documents that were
12   Bates stamped and hundreds more that were not Bates
13   stamped.  Where were those documents prior to this
14   week?
15   A.  My garage.
16   Q.  They were, what, in hard copy in your garage?
17   A.  The work-related stuff I was directed to just produce
18   even if it was just work-rela -- like not
19   issue-related that we're discussing here, but anything
20   even work-related I -- I was told to just give them
21   everything, so I did.
22   Q.  Everything that was produced this week came from your
23   garage?
24   A.  Not the work-related stuff that was labeled all
25   confidential client documents, no.  Those were on my

## Page 154

1    computer.
2    Q.  All right.  So describe what was on your computer
3    versus in the garage.  And if the smaller number of
4    documents was on your computer, what did that consist
5    of?
6    A.  Okay.  You kind of asked me more than one question
7    here, so . . .  You want to know what was in my
8    garage --
9    Q.  No.  I want to know what was on your computer.
10   A.  Like I just said, the documents that were client that
11   was just me doing work, then I needed those documents
12   to do my work over than more than a decade, so those
13   were just for work.  And then there were some things
14   on my computer that I exchanged with the EEOC that I
15   didn't produce in the first batch because that was
16   with the EEOC, and I was under the assumption that you
17   guys also had access to the portal so didn't need
18   anything from the EEOC because you would have already
19   had it.
20   Q.  Where did you acquire that understanding that you
21   didn't have to produce documents if you thought we
22   might get them from the EEOC?
23   A.  Well, there's a EEOC portal that both Dykema and I had
24   access to, and in my work and the discovery work that
25   it's unduly burdensome for me to have to produce

4 (Pages 151 to 154)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 155

1    something you already have.
2    Q.  Was that just your own understanding that you brought
3      into play?
4    A.  No.  It's -- it's -- it's a pretty standard objection
5      when people ask for, you know, things they already
6      have.
7    Q.  Well, did you make that decision on your own or did
8      you do that at direction of counsel?
9          MR. FARRAR:  I'll instruct the witness not
10      to disclose any advice I may have given her.
11   BY MS. HARDY:
12   Q.  Did you make that decision on your own that you
13      weren't obligated to produce documents that you
14      thought we might find on the EEOC portal?
15   A.  I thought you had them from the EEOC portal.
16   Q.  All right.  So let's talk about what's in your garage.
17      Those were the documents that you gave to the EEOC?
18   A.  No.
19   Q.  What was in the garage?
20   A.  The 34 years of annual reviews and random things that
21      I had printed over the years.
22   Q.  All right.  So on your computer was all the documents
23      that you gave to the EEOC?
24   A.  Correct.
25   Q.  And what else was on -- did you find on your computer

## Page 156

1      after the last deposition?
2    A.  I think I answered that.  The things that I -- the
3      communications from the EEOC investigator, so . . .
4    Q.  Did you have other work-related documents on your
5      computer?
6    A.  No.
7    Q.  All right.  So the computer was strictly the EEOC
8      exchanges, documents you sent them and information you
9      received from them?
10   A.  Plus the client documents that I used over the years
11      to do work, and then there was issues relating to this
12      dispute with the EEOC, and so those included not only
13      what I had, you know, put into exhibit format but the
14      rough email that I had given myself, so you got them
15      both ways, both marked as Exhibit 2, for example, and
16      me sending it to myself, so you got them twice.
17   Q.  All right.  Have you produced as of today all
18      documents that you have in your possession that in any
19      way relate to your employment at Dykema Gossett?
20   A.  Yes.
21   Q.  So we have everything from your garage and we have a
22      copy of everything that is on your computer; is that
23      correct?
24   A.  Correct.
25   Q.  All right.  And that was the production that came this

## Page 157

1      week, the --
2    A.  And the original production.
3    Q.  All right.  So you have -- in the production that you
4      did this week, all of your work-related documents,
5      even if they don't pertain to this lawsuit itself, we
6      have those as well; is that correct?
7    A.  Yes.
8    Q.  All right.  And what remains on your computer today?
9    A.  Personal issues, my children's college, my taking care
10      of my mother-in-law.
11   Q.  Related to Dykema Gossett.
12   A.  Nothing.
13   Q.  Do you still have all the documents that you gave to
14      the EEOC on your computer?
15   A.  Yes.
16          (Marked EXHIBIT 3 for identification)
17   BY MS. HARDY:
18   Q.  So let me show you what's been marked as Deposition
19      Exhibit 3, which is an email that was sent to you by
20      Brian Moore on September 8, 2019.  Let me correct for
21      the record.  Originally the email was sent on
22      August 29, 2019, to you asking you to immediately
23      delete and purge all emails and documents related to
24      the firm that you had sent from the firm to your Gmail
25      account, and then, again, on September 8 he sends you

## Page 158

1      concerning the same topic asking you to confirm
2      receipt of his email below in compliance with his
3      instructions.  Have you read that document?
4    A.  (Nodding.)
5    Q.  Did you read that when you received it on August 29?
6    A.  And I basically gave him the finger in my mind and
7      deleted it because I knew we were coming to a lawsuit.
8      I'm not giving away every piece of evidence that I
9      have.
10   Q.  So you thought you had a right to take evidence from
11      the firm and take it into your personal possession for
12      use in a lawsuit to advance your interests?
13          MR. FARRAR:  Objection to form.
14          You can answer.
15   A.  And I'm not going to answer in that form.  I have a
16      right to defend myself against false allegations made
17      against me, and yes, I do believe I have a right to
18      defend myself.
19   BY MS. HARDY:
20   Q.  And that right in your view includes taking documents
21      without approval from the firm that you think,
22      irrespective of whether they're confidential
23      documents, that you can then use on your own behalf;
24      is that correct?
25   A.  They related to me, so yes.

5 (Pages 155 to 158)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 159

1          (Marked EXHIBIT 6 for identification)
2    BY MS. HARDY:
3    Q.  All right.  Let's go to Exhibit Number 6.
4          MR. FARRAR:  Are we skipping 4 and 5?
5          MS. HARDY:  Yep.  We're going to go back to
6    4 and 5.
7          MR. FARRAR:  Okay.
8          MS. HARDY:  So I am marking Exhibit
9    Number 6 for the record, which was an Exhibit 4 to a
10   submission made by the plaintiff to the EEOC, and it
11   has a Bates stamp from the FOIA response 0165 through
12   198.  The version that I am making a part of this
13   record is heavily redacted because of the confidential
14   information contained therein.  I'm going to provide a
15   copy for Ms. Liebau to look at that is not redacted
16   just for the purposes of my question and then I'm
17   going to want it back.  I'll provide a copy to counsel
18   as well.
19   BY MS. HARDY:
20   Q.  So Exhibit Number 4 appears to be time records;
21      correct?
22   A.  Correct.
23   Q.  All right.  Billed to the client; correct?
24   A.  Correct.
25   Q.  All right.  And they're records of the time that you

## Page 160

1      billed to a client; correct?
2    A.  Correct.
3    Q.  And they're records of Robin Kowalski and time she
4      billed to the client; correct?
5    A.  Correct.
6    Q.  And is Lisa Myers -- yeah, and Lisa Myers is included
7      in here as well, some of her time records; correct?
8    A.  Correct.
9    Q.  Where did you get the time records of Robin Kowalski
10     and Lisa Myers?
11   A.  Printed them off the system.
12   Q.  You went into the system and looked for another
13     employee's time records and printed them off?
14   A.  Chelsea Larsen because of her age bias was spreading
15     that I was slow.  She was telling our partner in
16     charge and others that I was slow in my work and that
17     she -- she made a false allegation that I was away
18     from my desk too much.  And so yes, this is to
19     defend -- if you look at these records, I did more
20     work in a shorter amount of time than either of the
21     other two paralegals.  So yes, I felt that I needed
22     this to defend myself against her allegations that I
23     was slow.
24   Q.  How did you manage to get the time records of other
25     employees?

## Page 161

1    A.  They're available.  You can search anyone.
2    Q.  You're not supposed to be looking at other people's
3      time records, are you?
4    A.  People aren't supposed to be spreading rumors and
5      false allegations about other people either.
6    Q.  So you thought -- the fact that you had an issue with
7      Chelsea Larsen, you thought that entitled you to take
8      from the firm the time records of other employees and
9      to give them to an outside third party --
10   A.  I think that I am entitled --
11   Q.  Let -- let -- let me finish my question.
12         MS. HARDY:  Can you please read it back?
13         COURT REPORTER:  So you thought that the
14   fact that you had an issue with Chelsea Larsen, you
15   thought that entitled you to take from the firm the
16   time records of other employees and to give them to an
17   outside third party --
18   BY MS. HARDY:
19   Q.  And I'm going to add to my question in unredacted
20      form.
21   A.  All right.  Well, that's three questions, so would you
22      like to break them down one at a time?
23   Q.  No.  It is not three questions.  Just respond.
24   A.  My answer -- my answer to all of them is that I was
25      being falsely accused of something and I needed some

## Page 162

1      way to prove the falsity of these rumors and
2      statements that Chelsea Larsen was spreading about me
3      and then repeated by Sue Choma.  This is proof that I
4      did more work faster than the other two paralegals.
5      So when it comes to defending myself against someone
6      as large as a law firm like -- and of course
7      everything's going to be protected.  We're -- we.  I'm
8      not we anymore.  They're a law firm.  So virtually we
9      can't talk about anything because we're a law firm.
10     But this happened to me and I needed a means to
11     protect myself.  And yes, I do feel that I was
12     entitled to do that.
13   Q.  Okay.
14   A.  I think a person has a right to defend themselves.
15   Q.  All right.  Can I have back the unredacted copies?
16     Thank you.
17         (Marked EXHIBIT 7 for identification)
18         MS. HARDY:  Let the record reflect I'm
19   showing the witness Exhibit Number 7, which is another
20   grouping of firm documents that she gave to the EEOC
21   or submitted to the EEOC in connection with her
22   submissions, and they have a Bates stamp at the bottom
23   EEOC FOIA Response 0199 through 0211.  Again, for the
24   record, I am making a heavily redacted copy the
25   exhibit, but I am providing to plaintiff and her

U.S. Legal Support | www.uslegalsupport.com

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 163

1    counsel a unredacted copy just for the purposes of
2    your testimony, but do not testify to any names of
3    clients or any of the details that are covered by the
4    protective order in this case.
5    BY MS. HARDY:
6    Q.  So let me -- okay.  And here's for you.  I'll ask for
7        these documents back prior to the completion of the
8        deposition.
9            So starting on Bates stamp 0201, this
10       appears to be a Summary of Case Evaluations and
11       Authority Requests marked "Privileged:
12       Attorney-Client Work Product."  That was a stamp that
13       was routinely on this document and placed on it by the
14       firm; correct?
15   A.  Yes.
16   Q.  Okay.  So do you understand what an attorney-client
17       privileged document is and the significance of not
18       revealing it to a third party?
19           MR. FARRAR:  Objection to form.
20   A.  I also want to say that these were submitted to the
21       EEOC with a confidential label.  So if they don't
22       respect confidential labels -- because clearly this
23       isn't going to prove anything, is it?  A fully
24       redacted blank piece of paper.  How is that going to
25       prove anything?  This, on the other hand, shows the

## Page 164

1    errors that I was correcting for Robin for well over a
2    year.  So a redacted, does that mean anything to
3    anybody?  Is that -- is that going to show anything?
4    No, it's not.  And I did believe the EEOC would hold
5    them in confidence.  I -- they're an administrative
6    agency.  I believed that they would hold them in
7    confidence, and they were marked confidential.
8    BY MS. HARDY:
9    Q.  So you again believed you had a right to take from the
10       firm without author -- without receiving authorization
11       documents that are stamped by the firm privileged
12       attorney-client work product and to use them for your
13       own purposes and to distribute them to third parties;
14       correct?
15   A.  I have a right to defend myself.
16   Q.  And that includes stealing from the firm documents
17       that are marked privileged attorney-client work
18       product; correct?
19           MR. FARRAR:  Objection to form.
20   A.  I will not admit to stealing anything.
21   BY MS. HARDY:
22   Q.  Well, how is it not stealing?
23   A.  I have a right to defend myself against false and
24       fraudulent allegations against my work, my reputation,
25       my character, and how else would I show it?  We work

## Page 165

1    for a law firm.  So virtually everything is protected.
2    So what?  I have no rights because I work for a law
3    firm and they can treat me any way they want and make
4    any false accusation that they want?  I don't believe
5    that's true.
6    Q.  Are there in your view any limits to firm property
7        that you couldn't just take and make your own decision
8        to take to advance your interests in this lawsuit?
9    A.  Did I post these on the internet?  No.  Did I give
10       them to a confidential investigator at the EEOC?  Yes,
11       I did.
12   Q.  You didn't have authorization to take Exhibit 6, did
13       you?  Those are the billing records.  No one gave you
14       authorization to take the billing records that have
15       been marked as Exhibit Number 6; correct?
16   A.  No.
17   Q.  And no one gave you authorization to take the Summary
18       of Case Evaluation and Authority Request which is
19       marked privileged attorney-client work product, did
20       they?
21   A.  No.
22   Q.  Now, the purpose of taking the attorney-client
23       document which has been marked as Exhibit Number 7 was
24       to just show that Robin Kowalski had typos in a report
25       she prepared?

## Page 166

1    A.  It was to show the differing treatment between -- I
2        would be criticized, harshly reprimanded for a typo,
3        one.  The big thing -- I mentioned in my last
4        deposition where she -- an acronym was supposed to be
5        in all caps and I was just initial capping it.  I took
6        a beating for that.  And yet -- and yet Robin, the
7        younger one, can do this for over a year and face zero
8        reprimand and zero criticism?  Yes.  That was
9        different treatment.
10   Q.  Do you have any physical evidence that you were given
11       a harsh reprimand or a severe beating for a typo?
12   A.  Yes.  They're in my -- starting 2018 my reviews
13       started tanking.  She's making typos, like one
14       occasionally here and there.  Not this.  Not that.
15   Q.  All right.  So --
16   A.  Yes.
17   Q.  So your 2018 performance review which reflects your
18       2017 performance is in your view a harsh reprimand and
19       a severe beating for typos?
20   A.  I do speak casually.  It was a harsh reprimand for
21       minor typos.  And the -- the -- the quantity of work
22       that we were pumping out, under normal circumstances
23       if Chelsea didn't have this age bias against me and
24       wasn't trying to get me fired, a minor typo would
25       never even be mentioned, you know.  Like, for example,

7 (Pages 163 to 166)

**EXHIBIT 1**

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 167

1     in your dep notice -- did you guys ever look at the
2     dep notice to me?
3     Q.   You're not here to ask --
4     A.   Well, you've got --
5     Q.   -- questions about -- of us --
6     A.   -- you've got Ford Motor Company is deposing me.
7     Q.   -- or about --
8     A.   I would get in such trouble for that, and yet you guys
9     let this typo go three times and nobody caught it.
10    For me, I would have gotten -- oh, I would have gotten
11    beat for that.  Again, beat, not literally.  Yeah.
12    Funny, isn't it?
13    Q.   Do you have any other examples of written harsh
14    reprimands or beatings that you took for typos other
15    than what you claim is in your 2018 performance
16    review?
17    A.   I think they mentioned typos in my '19.  They said
18    slow down enough to not make a typo, so which
19    basically says you're going like a racehorse, but, oh,
20    don't even make not even one typo.
21    Q.   Do you have any examples of written documentation on
22    harsh reprimands for typos other than your '18 and '19
23    performance reviews?
24    A.   Not off the top of my head.  I don't recall.  Or was
25    it in anything I gave you.  I don't know.

## Page 168

1     Q.   Now, you received a meets expectations on both of
2     those reviews; correct?
3     A.   Yes.
4     Q.   Okay.  And you think that's a harsh reprimand?
5     A.   That's another point.  When we switched to this new
6     format, Sue shouldn't have written anything under
7     needs improvement or learning.  That should have been
8     empty.  It should have been meets expectation, done.
9     But she took it upon herself to give this long
10    dissertation of criticisms even though I met
11    expectations.  Why did she put those on there?  Under
12    the -- again, under the new format it was supposed to
13    be if you met expectations, done.
14    Q.   All right.  So why did you not respond to Mr. Moore?
15    I know you said you gave him the equivalent of the
16    finger when you got the letter, but --
17    A.   Yes.
18    Q.   Why didn't you respond?
19    A.   It didn't require a response.
20    Q.   You gave the EEOC the documents that have been marked
21    Exhibits 6 and 7 after you received the email from
22    Mr. Moore advising you that you were required to
23    delete anything that you forwarded to yourself;
24    correct?
25    A.   Probably.  I don't know.  What are the dates?

## Page 169

1     Probably.
2     Q.   All right.
3     A.   But . . .
4     Q.   So you kept -- despite receiving that notification of
5     Mr. Moore, you didn't comply with it; correct?
6     A.   I have a right to defend myself.
7     Q.   Well, just answer the question.  You did not comply
8     with his request that you delete --
9     A.   I'm no longer employed by him or the firm.
10    Q.   Answer the question.
11    A.   Why would I comply?
12    Q.   Did you show the letter from Mr. Moore to your
13    attorney?
14    A.   No.
15    Q.   Had you already given your attorney copies of the
16    documents that you had transferred to your Gmail
17    account from the firm --
18    A.   Say that again.  I lost you.
19    Q.   Had you already given to your attorney copies of the
20    documents that you transferred from Dykema to your
21    Gmail account before you received the letter from
22    Mr. Moore?  And, again, the letter is dated -- the
23    initial letter is dated August -- or email is dated
24    August 29, 2019.
25    A.   I don't recall.

## Page 170

1     (Marked EXHIBIT 4 for identification)
2     BY MS. HARDY:
3     Q.   All right.  So I've marked as Exhibit Number 4 a
4     letter that you received from the investigator, Jamie
5     Dickinson, at the EEOC.  Is he the only investigator
6     you dealt with?
7     A.   Yes.
8     Q.   Okay.  And you had extensive communications with him;
9     is that fair to say?
10    A.   I -- I wouldn't call it extensive.  We work for law
11    firms.  Extensive is extensive.  There were -- there
12    were a few and you got them.
13    Q.   He gave you an opportunity to read the position
14    statement submitted by Dykema, you exchanged emails
15    with him, and then he told you you could file a
16    rebuttal; correct?
17    A.   Correct.  Correct.
18    Q.   And then you did file a rebuttal, which was 13 pages
19    and had 25 exhibits; correct?
20    A.   I believe so.
21    Q.   And after you got done answering all the questions
22    that Mr. Dickinson posed to you and submitting every
23    piece of evidence that you'd taken from the firm to
24    prove how bad Chelsea Larsen was and how bad Sue Choma
25    was, Mr. Dickinson told you that you still had not

8 (Pages 167 to 170)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 171

1    established in his mind that Dykema Gossett had either
2    engaged in age discrimination or retaliation in
3    connection with your employment; correct?
4    A.   Incorrect.  There's another one that's an email that
5        you have where he, I don't know if Jamie's a man or a
6        woman honestly, I always thought she was a woman but
7        maybe it's a man, they highlighted the EEOC cannot
8        solely find age discrimination and you will receive a
9        right to sue so that you can pursue this and other
10       matters that we don't have jurisdiction over.  So --
11   Q.   So let's -- let's look --
12   A.   -- yes.  He said solely and he highlighted it.
13   Q.   Let's look at Exhibit 4 and what Exhibit 4 states.
14       It's a letter to you; correct?
15   A.   Um-hmm.
16   Q.   Correct?
17   A.   Um-hmm.
18   Q.   Yes?  You have to answer verbally.
19   A.   Yes.
20   Q.   And it's from Jamie Dickinson, Federal Investigator
21       for the EEOC; correct?
22   A.   Yes.
23   Q.   And it's dated April 22, 2021; correct?
24   A.   April 22, 2021.  Yep.
25   Q.   And this is after you had submitted your rebuttal with

## Page 172

1        all your exhibits; correct?
2    A.   I actually -- it's very small for me.  All right.  So
3        are we reading this?  Let me read it.
4    Q.   Take a moment and read it if you'd like.
5    A.   Okay.
6    Q.   Let's look at Paragraph 2.  I'm going to read it into
7        the record.  "On or about 9 March 2021, a copy of the
8        Employer's Position Statement and non-confidential
9        attachments that outlined the employer's primary
10       defenses against your allegations of discrimination,
11       was sent to you.  Although you have presented a
12       rebuttal response to the Commission, the evidence did
13       not support a conclusion that the statutes you
14       complained of were violated.  The EEOC has terminated
15       the processing of your case as the direct evidence or
16       evidence failed to meet a 'more likely than not'
17       standard."
18           Did I read that correctly?
19   A.   Yep.
20   Q.   All right.  So you understood that the EEOC did not
21       find sufficient evidence to conclude there was merit
22       to your age discrimination claim?
23   A.   That's what they wrote on this letter.
24   Q.   Okay.  You can go ahead and sue because that's what
25       federal law allows, but the EEOC read everything you

## Page 173

1        gave it and said we're done, we're going to stop
2        processing your claim, we're going to give you a right
3        to sue letter because we don't find that from what
4        we've seen and everything you've submitted that
5        there's merit.  You understood that to be the message;
6        correct?
7    A.   I don't think they said it had no merit.  They said in
8        their opinion failed to meet the more likely than not
9        standard.
10   Q.   You didn't --
11   A.   So it didn't say no merit.
12   Q.   They -- you didn't present proof to convince them that
13       there was merit?
14   A.   And I don't know why you're asking me to testify on
15       what the EEOC determined.  It's written.
16   Q.   Did you -- I mean, did that cause you to pause at all
17       on proceeding with an age claim after you had -- had
18       submitted significant amounts of material and you were
19       not able to convince the EEOC of the merits of your
20       claim?
21   A.   No.
22   Q.   Why not?
23   A.   I am still under the impression that it is very common
24       for them to just issue the right to sue letter.
25   Q.   Well, it is common to issue the right to sue letter

## Page 174

1        because that's standard.  It is very uncommon to have
2        the EEOC write a letter to a charging party and tell
3        them that despite everything they've submitted that
4        they're going to not proceed any further because they
5        have not been convinced that there's merit.
6           MR. FARRAR:  Objection.
7    A.   I've never seen anybody else's letter.  I -- this
8        looked standard to me.  I mean, I -- I don't know.
9    BY MS. HARDY:
10   Q.   Okay.  In July 2017 you were assigned to a position in
11       the Detroit office on a temporary basis because there
12       was no other work available for you in the Bloomfield
13       Hills office; correct?
14   A.   No.
15   Q.   What are you disagreeing with about that statement?
16   A.   We were still doing transition work for the discovery,
17       so I actually was still very busy.  Sue Choma came to
18       my desk at 5:15, 5:20 on a Monday and told me that I
19       would be reporting to Detroit the next morning, so --
20   Q.   What --
21   A.   -- her motives, her whatever, I don't know.
22   Q.   What transition work were you doing as of July 2017
23       related to discovery?  What are you referring to?  And
24       leave out client names.  But what work were you doing?
25   A.   Recall and fire discovery work.

9 (Pages 171 to 174)

KATHLEEN  LIEBAU Volume II
April 07, 2022

### Page 175

1  Q.  For what attorney or paralegal were you assisting?
2  A.  Still under Clay's umbrella but Lisa Myers and -- what
3      was the guy's name that started to go inhouse with the
4      client?  I keep thinking Charles Berkley, but he's a
5      basketball player; right?  Something like that.  I
6      forget his name.
7  Q.  So Lisa Myers is a --
8  A.  Paralegal.
9  Q.  Paralegal.  And you were assisting her as of July 2017
10     with some discovery?
11 A.  Yes.
12 Q.  And one lawyer?
13 A.  Well, two.
14 Q.  How many hours were you billing a week on --
15 A.  You can check my records.  I don't recall.
16 Q.  Okay.  Are you claiming that you were fully occupied
17     as of July 2017 assisting this one lawyer and Lisa
18     Myers with discovery matters?
19 A.  Again, you'd have to check my time.  I --
20 Q.  Well, what's your recall?
21 A.  I --
22 Q.  Were you doing a small smattering of work or did you
23     have enough work to -- to legitimately bill four days
24     a week?
25 A.  I -- work was certainly declining, but I am not a

### Page 176

1      person to just sit there, so I can confidently say I
2      was never just sitting there doing nothing.  This may
3      or may not have been when I reached out and was
4      helping another paralegal do some charting on a case
5      that she had coming up for trial.  I might have been
6      doing some of that.  But, again, check my time
7      records.  You can see what I was spending on discovery
8      and the other time I was trying to help out where I
9      could.
10 Q.  All right.  So you were looking day by day for
11     something to do?
12 A.  Well, to fill the day because, again, I'm not one to
13     just sit there, yes.
14 Q.  So you didn't have a project that you were assigned
15     to, you didn't have a specific matter that you were
16     working on that you knew every day I go in I'm going
17     to have a day's work related to this matter or
18     project?
19 A.  I mean, correct.  I think we talked about that.  There
20     was about a two-month period where there was a flux,
21     yes.
22 Q.  Okay.  So during this we'll call it, I'll use your
23     term, a flux period, Sue Choma found you a job in
24     Detroit that you could be assigned to where someone
25     was actually needed to perform real work and you were

### Page 177

1      asked to go to Detroit; correct?
2  A.  Correct.
3  Q.  All right.  And did you object to that?
4  A.  I was shocked.
5  Q.  Why were you shocked?
6  A.  Because it was 5:15 and she's telling me I'm going to
7      report to Detroit the next morning.  Kind of treated
8      me like a piece of furniture, even a bad piece of
9      furniture.  And I live in Romeo.  So Romeo to
10     Detroit's a truck [sic].
11 Q.  How long is -- from Romeo to Dykema is the Detroit
12     office?
13 A.  I actually Googled it after Sue left and it projected
14     Romeo to Detroit would be like 46 minutes, so I was
15     like okay.  No, hour and 50 minutes.  I saw Sue in her
16     note wrote 15.  Hour, 50 minutes.  So about two hours
17     a day to go from Romeo to Detroit during rush hour.
18 Q.  So you thought you should remain in Bloomfield without
19     any committed assignment in lieu of commuting to
20     Detroit when they had work that needed to be done?
21 A.  I would find a new project, as I did.
22 Q.  But did you think the firm was supposed to just keep
23     paying you day by day when you didn't have work to
24     do, --
25 A.  Well, there --

### Page 178

1  Q.  -- a full plate of work at least?
2  A.  There have been other instances where a project ended
3      or a person was -- you know, no longer had a duty and
4      then there was a change, and yes, over the years the
5      firm would, you know, work with you to find -- find
6      some valuable work to be done, and that was the way
7      the firm always was.
8  Q.  Right.  So they found you valuable work to do in
9      Detroit; correct?  I mean, you may not have liked it,
10     but it was real work; right?
11 A.  So shall we go on about that?  So the hour and
12     50 minutes -- okay.  So that's two -- I'll give you
13     50 minutes to come here to Bloomfield, but it wasn't
14     even that.  But after two hours a day back and forth,
15     more gas, I would need a phone, because I don't have a
16     cell phone, so I said let me go down there for a
17     couple of weeks to train and let me do the work out
18     here.  It's a very mobile, very technologically world
19     that we live in today.  And the answer was just a flat
20     out no.  And so I said, well, then let me come in
21     here, do what I can and then drive down there when
22     it's not rush hour, like maybe I'll use my lunch hour
23     to drive down there and do it sort of a split thing,
24     and the answer was a flat out no.  And so I said,
25     well, this is -- you're putting all the burden on me.

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 179

1    It's too much to ask.
2    Q.   So you said no?
3    A.   I did.
4    Q.   Okay.  Did you go to Detroit at all?
5    A.   Twice.
6    Q.   Twice.
7    A.   Well, because I did it the second time to see if it
8         was going to be an hour and 50 minutes the next time
9         and it was.
10   Q.   So you're supposed to be there three months; correct?
11        That was the assignment?
12   A.   That was Sue's -- Sue's idea, yes.
13   Q.   And you went only twice?
14   A.   They didn't fire me at that point, did they?  No.
15   Q.   So how -- did you just stop going?
16   A.   No.  I called a meeting with the second day Sue and
17        Mary and I had a meeting in Mary's office and I said
18        exactly what I just told you.  This is -- this is all
19        on me, you know, two more hours a day, gas, phone, all
20        these different things, and it's -- it's -- it's not
21        equitable.  It's not -- it's not fair.  And I guess I
22        got to mention to you, too, that Sue assured me that I
23        would remain a Bloomfield employee so I wouldn't have
24        to pay the Detroit taxes, so I was, in fact, to remain
25        a Bloomfield employee, so . . .  Okay.  I wouldn't

## Page 180

1    have to pay the taxes, but I had all those other
2    expenses and two hours every day.
3    Q.   All right.  So you just -- you told them you --
4         despite the fact that you'd been assigned to that job
5         and you didn't have another job in Bloomfield Hills,
6         you just weren't going?
7    A.   I said it was -- it was unfair and it put all the
8         burden on me.
9    Q.   So then what did you do for July, August, and
10        September up until the time that the lemon law project
11        started?
12   A.   I continued to do discovery work, and I certainly
13        during that time was charting the stuff for Cheri for
14        her trial.
15   Q.   Sherry Medley you're talking about?
16   A.   Yes.
17   Q.   She's a paralegal; right?
18   A.   Yes.  And I actually would send Sue, and you have them
19        in -- I don't know if -- I had copies of all of them,
20        but I would send Sue status updates, you know, this,
21        I'm doing this, I'm doing this, I'm staying busy, I'm
22        doing this.  So yeah, I don't think -- because I sent
23        her more -- I think I only had a printout of one or
24        two in my stuff, but Sue got one like I would say
25        weekly, and I didn't see those in your guys's

## Page 181

1    production, so I don't know where those are.
2    Q.   What was the job that you were assigned to fill for a
3         three-month period in Detroit?  It was for an employee
4         who was absent?
5    A.   She was having cancer surgery, I believe.
6    Q.   Okay.  And what was the job?
7    A.   Asbestos group.
8    Q.   Administrative assistant work in the asbestos group?
9    A.   I -- Evelyn had some extra duties, and so the first
10        day I went down there she was going over all the
11        special procedures for the asbestos group.
12   Q.   And when you bailed on Detroit, do you know how they
13        filled that job?
14   A.   They -- I think they pulled somebody from Detroit to
15        do it.
16   Q.   All right.  So let's talk for a moment about paralegal
17        work.  What do you believe you did that fell in the
18        paralegal category?
19   A.   Reviewing things, analyzing things, bringing important
20        issues to the attorney's attention, drafting things
21        for ultimate attorney review, document production, so
22        assembling.  I would send those out under my own
23        cover.
24   Q.   When you worked on the project for Clay Guise, what
25        was the name of that project?  The one that phased out

## Page 182

1    in the spring of 2017.
2    A.   The switch work or SCDS?
3    Q.   Is that -- what was the order of the different
4         projects?  S --
5    A.   SCDS was the first.  It was at the time the largest
6         automotive recall in history with over 3.6 million
7         vehicles.
8    Q.   And what was the time frame of the SCDS project?
9    A.   I think they launched the recall in autumn of 2005 and
10        I got involved in the spring of 2006.
11   Q.   2006 up until when?
12   A.   Up un -- I was still doing little bits of it until the
13        day I died.
14   Q.   What -- is that the -- is that the work that phased
15        out in the spring of 2017?
16   A.   Correct.
17   Q.   Okay.  And was that different from the switch work,
18        the switch project?
19   A.   No.  It's the same.
20   Q.   Oh, it's the same.  Okay.  All right.  So then you
21        went from the SCDS project to this limbo period from
22        July --
23   A.   No.  No.  Then I did ABS recall work, and then I did
24        some general fire work, and then we got door latch and
25        general products work from the client in about 2013,

11 (Pages 179 to 182)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 183

1    so I worked on that.  So yeah.  A lot of different
2    discovery projects.
3    Q.   So was the ABS work and the general fire work during
4    the same time period as the SCDS work?
5    A.   Yes.
6    Q.   Was it all Clay Guise?
7    A.   And Brittany Schultz.
8    Q.   So from 2006 to 2017 in the spring you did work to
9    support Clay Guise and Brittany Schultz?
10   A.   And when Brittany went to the client -- should we not
11   use her name?  I don't know.  But, anyway, when she
12   went to the client, then Lisa Brown took over for
13   Brittany, and then the general products work actually
14   left before the fire work left.
15   Q.   And what was the nature of the work that you did on
16   the SCDS project?
17   A.   Responding to discovery and production.
18   Q.   What did you do in that regard?
19   A.   I would prepare the draft responses, communicate with
20   the attorn -- Clay to finalize them, get the
21   verifications from the client and then sent -- local
22   counsel would do the service.
23   Q.   Were you supporting a paralegal during that time
24   frame?
25   A.   No.  I was the paralegal during that time frame.

## Page 184

1    Q.   You were never a paralegal by title; correct?  We've
2    been through that.
3    A.   Right.  But Clay also several times called me a
4    paralegal, so that's what I was doing.
5    Q.   Did he have a paralegal assigned to that project in
6    addition to you?
7    A.   No.  Well, Lori Hagopian, but she got fired in 2009,
8    and then I did both Lori's job and my job, so I was
9    doing two people's jobs.
10   Q.   All right.  But during the 2006 to 2017 time frame,
11   you worked -- what percentage of your time was on
12   SCDS?
13   A.   Well, it fluctuated.  It fluctuated.
14   Q.   Give me a ballpark.
15   A.   So -- all right.  Well, from 2006 to getting the extra
16   fire work in 2010 I was a hundred percent switch.
17   When we got in 2010, when we got the fire work, I did
18   all the ABS stuff because it was recall related like
19   my other work so it made sense for me to do all that,
20   where Lisa got the general fire work, but then I would
21   also assist her.  If she got, you know, overwhelmed, I
22   would take a general fire case.  So from 2010 until we
23   got the general products door latch work in about '13
24   I was still probably 60 percent switch and the rest
25   was ABS or fire, guessing.  That's rough.  Hard to

## Page 185

1    say.  Right?  You'd have to look at the records and
2    see -- see which one was hot.  When we got the general
3    products and door latch work, we were overwhelmed.  So
4    Brittany asked not only me to help with that, she
5    asked Lisa to help with that, she asked Sherry to help
6    with that, and there was -- the volume was way higher
7    than the client initially represented and we were
8    going crazy with so much work to do.  So in that time
9    frame from '13 until Brittany left in -- I don't know.
10   When did Brittany leave?  I'm going to have to guess.
11   '14?  Early '15.  So we only had that year and a
12   half -- I don't know.  Not that long.  It was crazy.
13   It was -- it was crazy.  So yes, extra overtime hours
14   were needed during that time and it was -- it was a
15   lot of work.
16   Q.   Do you know -- do you have any sense of how many
17   different projects a paralegal, someone who actually
18   is in a paralegal position, how many different
19   projects they work on throughout the course of the
20   year and the range of work that they do?
21   A.   I think it varies and I think it varies a lot.  I
22   mean, there's -- you know, Lisa I know just worked on
23   fire cases for a long time and then general products
24   and door latch, so she was very much doing the same as
25   I did.  But, then again, you've also got to consider

## Page 186

1    the volume that we had in this discovery work.  It
2    didn't leave a whole lot of room for other things.  I
3    mean, it was -- it was busy.  So . . .  But then other
4    people like, you know, there was -- you know, like
5    trial paralegals.  They -- they're -- they're kind of
6    different.  They did -- you know, they help whoever is
7    getting ready for a trial do what they -- you know,
8    and I was not involved in that, so . . .
9    Q.   All right.  Well, let's talk about Robin Kowalski.
10   She's the one person you've identified as a
11   comparable.  Do you know what the mix of work was that
12   she did in 2018?
13   A.   I do not.
14   Q.   All right.  So you don't have any idea what kind of
15   work she was doing, who she was working for, how many
16   different projects she was working on?
17   A.   I only know that she was doing the lemon law work as
18   well.
19   Q.   All right.  Do you have any idea how much time she was
20   spending on the lemon law work in 2018?
21   A.   Not -- not other than what I printed off here.
22   Q.   You were working full time on it; correct?
23   A.   Um-hmm.
24   Q.   Yes?
25   A.   Yes.

12 (Pages 183 to 186)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 187

1    Q.   Okay.  And would it surprise you that Robin Kowalski
2         spent a very minimal amount of time on it?
3    A.   So when -- which -- when Chelsea would make comments
4         like Robin's going to get more done, I was
5         incredulous.  I'm like what?  So, again, it's
6         Chelsea's age bias where she would -- you know, Robin
7         was golden child and was getting all this more work
8         done than me, which is incorrect.  It's just false.
9    Q.   That's not at all responsive to my question.  Would it
10        surprise you that --
11   A.   Well, it doesn't surprise me.  She wasn't --
12   Q.   Let --
13   A.   -- doing as much work as me.
14   Q.   Can I ask my question, please?
15   A.   Sure.
16   Q.   All right.  Would it surprise you that in 2018 that
17        Robin Kowalski spent a fraction of the time that you
18        spent working on the lemon law project?
19   A.   I have no knowledge or anything about what else Robin
20        did.
21   Q.   All right.  Let's talk about 2019.  Was Robin Kowalski
22        even working on the lemon law project in 2019?
23   A.   Yes.  I believe so.  There's some emails in what I
24        gave you where, you know -- well, like where I asked
25        Robin am I supposed to keep correcting your stuff?

## Page 188

1    Q.   Do you know how many --
2    A.   So that was in '19.
3    Q.   Do you know how many hours she put in?
4    A.   Again, I do not.
5    Q.   Well, you know, I mean, if it were five or ten or 15,
6         would you be surprised?
7    A.   I do not know.
8    Q.   All right.  So you just have no sense at all?
9    A.   All I know is the comparisons that were being made
10        where I was inferior and Robin was golden, so
11        that's --
12   Q.   Do you know what Robin's reputation was as a paralegal
13        with the attorneys generally that she supported on a
14        variety of different projects?
15   A.   I do not.
16        MR. FARRAR:  Objection to form.
17   BY MS. HARDY:
18   Q.   Do you know whether Chelsea Larsen spoke more
19        favorably of her than other attorneys did in terms
20        of --
21   A.   Chelsea Larsen certainly spoke more favorably of Robin
22        to me as she also would put me down and then that's
23        all I know.
24   Q.   All right.  But you have no idea whether Chelsea
25        Larsen was more favorable about Robin's quality of

## Page 189

1         work than other attorneys' work?
2    A.   I have no idea.
3    Q.   All right.  So let's go through everything that you
4         claim constitutes favored treatment of Robin vis-a-vis
5         you in connection with the lemon law project.  How are
6         you claiming she was favored?
7    A.   I think I mentioned a couple already.  The -- that she
8         was getting more done and faster, which is -- prompted
9         me to print the time records to prove that that was
10        inaccurate.  She would -- so what was the question?
11        More --
12   Q.   How was she --
13   A.   Other ways?
14   Q.   How was she favored in comparison to you by Chelsea
15        Larsen?
16   A.   Tone of -- certainly tone of voice both in verbal
17        speaking and in emails where, you know, I was spoken
18        to -- again, I'm going to use some colorful language.
19        Like I was the bad dog or something where, you know,
20        Robin is like, oh, Robin (nonverbal sounds), you know,
21        and they'd sit in the office and giggle and chat and
22        laugh, so that -- you know, there's work to do,
23        but . . .  So a lot of different treatment and the
24        verbal and then the written and the emails.  She
25        falsely says I didn't get any done from -- that came

## Page 190

1         in the night before, which was false, where she says,
2         oh, poor Robin, get over that nasty pneumonia and
3         we'll talk in the morning.  Totally different tones.
4         Like polar opposites.
5    Q.   Anything else that's responsive?
6    A.   I mean, that's all I can recall at the moment, but it
7         was pretty constant.
8    Q.   Have you produced every email in your possession that
9         you believe demonstrates that Chelsea Larsen used a
10        different tone in emails or said anything that
11        constitutes favored treatment of Robin vis-a-vis you?
12   A.   I produced everything in my possession.
13   Q.   All right.  So you've produced -- have you actually
14        seen an email that states that Chelsea thought Robin
15        was getting things done faster than you?
16   A.   Yes.  And you have it.  She said during the -- when
17        I -- when we got in like six new cases and it was
18        1:30 in the afternoon and I sent this exasperated
19        email to Sue and Chelsea, "I don't know what to do
20        anymore.  Do you want me to work through lunch or do
21        you want me -- or should I go to lunch or do you want
22        me to do these cases?"
23        And Chelsea emails back, "Robin should be
24        helping you and doing half and probably more."
25        Like so what is that?  And Robin actually

13 (Pages 187 to 190)

**EXHIBIT 1**

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 191

1    hadn't responded, so it was all on me.  And there was
2    a point where Chel -- when I told Chelsea, not this
3    particular time, but when I said -- I said, you know,
4    sometimes Lisa and Robin don't respond, she's like,
5    "Well, go tell them."
6           And I'm like, "I'm not their supervisor."
7    I'm like, "Are you giving me a supervisory role?"
8           And Chelsea just glared at me.  So it's
9    like, you know, I can't tell the other paralegals what
10   to do.  So I was --
11   Q.  What's your objection to the email that you just
12      described that Chelsea sent suggesting that, you know,
13      Robin could do half?
14   A.  And maybe more.
15   Q.  Oh, so what did you read into that?
16   A.  That she's faster, that, you know, I think it
17      insinuates that, you know, Robin gets them done
18      faster, which is incorrect.
19   Q.  Okay.  Can you think of any other email in which
20      she's, Chelsea, that is, has made a reference to Robin
21      being faster than you?
22   A.  I believe if we had access to the emails that I could
23      pull some out.  I gave you everything I have.  But
24      yes.  It was -- it was fairly a constant tone, you
25      know, just overhanging thing that, you know, I was

## Page 192

1    inferior and, you know, Robin's golden.
2    Q.  Well, you kept all those emails, though; right?
3    A.  No.  No.
4    Q.  Why not?  You said you were keeping as of 2018
5       everything that demonstrated that Chelsea was --
6    A.  I didn't say I kept --
7    Q.  -- mistreating you.
8    A.  -- everything.  I said sometimes in my anger and
9       dismay I would collect things to prove my innocence on
10      false accusations, but emails are a daily back and
11      forth.  No, I could not save or print every email.  So
12      access to the email systems would be very helpful.
13   Q.  All right.  So just for the record I want to clear up
14      when you started on the California warranty project.
15      That was late September; correct?
16   A.  I -- I would have to look at the documents.  I believe
17      it was -- I believe it was mid.
18   Q.  Well, you sent an email to Sue Choma on September 28th
19      in which you announced that you picked up a new
20      assignment that you were going to be starting on?
21   A.  Okay.  So we probably got it a week before or
22      something.
23   Q.  But you didn't start on the project until the very end
24      of September; correct?
25   A.  I don't think so.  I think I -- like the first launch

## Page 193

1    meeting I did a short memo to the file, which you
2    have, so whatever date that was was the first launch
3    meeting.
4    Q.  Well, this email of September 28 announces at the very
5       end that you're excited to get to work.
6    A.  Yes, I was.
7    Q.  Yes.  All right.  And it's dated September 28.  Does
8       that refresh your memory that you didn't get started
9       until then?
10   A.  We might have done -- like I said, I think the launch
11      meeting was before that, but you have it, so . . .  I
12      don't have it in front of me.  If I had it in front of
13      me, I could tell you.
14   Q.  All right.  You don't have any basis -- you don't have
15      any specific information to suggest that you were
16      working on that project before September 28th, do you?
17   A.  I don't have any information except for --
18   Q.  You don't have any -- any document that demonstrates
19      that you had actually started working on it before
20      September 28th?
21   A.  Except for that brief email to the file during the
22      first launch meeting that I believe was like -- I'm
23      going to guess here, but I think it was the 25th.
24   Q.  Of September?
25   A.  Yes.

## Page 194

1    Q.  Okay.  Last week.
2    A.  Okay.  Yes.
3    Q.  All right.  Let's turn to your coaching that you
4       received in January 2018 about punctuality as well as
5       working from home and overtime.  Do you recall that?
6    A.  You call that coaching?
7    Q.  Certainly it was coaching and suggesting that you
8       needed to be in compliance with policy.
9    A.  I call it a harsh reprimand.  I do remember that.
10          (Marked EXHIBIT 9 for identification)
11   BY MS. HARDY:
12   Q.  Okay.  All right.  So I've marked as Exhibit Number 9
13      the memorandum that you received from Sue Choma dated
14      February 5, 2018, "RE: Punctuality," and it is
15      confirming a discussion that occurred on January 19,
16      2017, and it attaches numerous policies from the
17      policy manuals that we marked as Exhibit 1 and 2 to
18      refresh your memory about what the firm policies were
19      on the issues addressed in the memo.  And it has been
20      Bates stamped 2000 -- or 215 through 222.  Why don't
21      you take a moment and review the memo.  Unless you've
22      read it recently and you don't need to --
23   A.  It angers the heck out of me and I do remember it.
24      What are your questions?
25   Q.  Well, do you need to take time to review it again or

14 (Pages 191 to 194)

KATHLEEN LIEBAU Volume II
April 07, 2022

## Page 195

1    have you reviewed it recently enough that you're
2    familiar with it?
3    A.  I guess I could read it again.
4    Q.  Do you agree that Exhibit 9, which is the February 5,
5    2018, memo, accurately describes the conversation that
6    Ms. Choma had with you on January 19, 2018?
7    A.  No.  No.
8    Q.  Okay.  So let's go, then, back to the January 19
9    conversation that you had with Ms. Choma.  What --
10    what do you claim she told you in that meeting that
11    differs from the content of this memo?
12    A.  She didn't accuse me of stealing back then.  So the
13    firm in practice had what was informally called the
14    six-minute rule, so if you were -- you know, if you
15    got in within those six minutes you weren't
16    technically late, you were just supposed to make up
17    the time, either shorten your lunch or stay after.
18    And so at the January 19th meeting Sue showed me a
19    printout where it was one minute, two minutes, you
20    know, three minutes, one minute, and -- and then she
21    said I'm using it too much, and I said okay, you know.
22    I didn't know until then that the six-minute rule was
23    no more, so --
24    Q.  Where did the six-minute rule come from from your
25    perspective?

## Page 196

1    A.  It used to be the nine-minute rule back in the day --
2    Q.  Well --
3    A.  -- when --
4    Q.  -- was this in writing?
5    A.  I actually when I was going through that stuff in my
6    garage did find a reference to it, and you have it
7    now, so when we went to the new timekeeping system
8    that rounded, it was no more -- no longer a
9    nine-minute rule, it was a six-minute rule.
10    Q.  When do you claim the six-minute rule went into
11    effect?
12    A.  When they got a new timekeeping system that rounded.
13    Q.  Was that the Kronos system?
14    A.  It was even before that.
15    Q.  What year are you referring to?
16    A.  Again, I ran across the document when I was going
17    through the stuff in my garage that you now have, and
18    I don't recall the date.  It was I think -- I don't
19    know.  I would have to guess.  I'm going to say
20    2000 -- I would have to guess, so . . .
21    Q.  So what did you understand you had a right to do under
22    the so-called six-minute rule?
23    A.  As long as you were there within that six minutes you
24    weren't late.  You just had to either shorten your
25    lunch or work after so that you made it up.

## Page 197

1    Q.  All right.  So if your -- your start time was -- in
2    2018 was 9:30 a.m.; correct?
3    A.  Um-hmm.
4    Q.  Same in 2019?
5    A.  Correct.
6    Q.  Okay.  So you thought you could arrive at 9:36 and put
7    down 9:30?
8    A.  It would -- it would round, so you weren't really
9    late.
10    Q.  What do you mean it would round?  I don't understand
11    what you mean.
12    A.  The time -- if you put 9:36 in there, the system just
13    rounds it to 9:30.
14    Q.  All right.  And you believe that was in effect in 2018
15    and '19?
16    A.  I believe it's still in effect if you're not on
17    someone's shit list.
18    Q.  So it -- you're claiming that if you put 9:36 on your
19    time records that for the purposes of payroll it would
20    round to 9:30?
21    A.  Correct.
22    Q.  Now, where did you get the understanding that that
23    meant that's okay to come in at 9:36 as opposed to
24    9:30?
25    A.  It was practice.

## Page 198

1    Q.  Who said it was practice?
2    A.  Again, it goes way back to when we had a nine-minute
3    rule.  You could -- you could do that rounding for up
4    to nine minutes back in the day as long as you made up
5    those, you know, up to nine minutes, but when they
6    went to the new program in whatever year it was, that
7    system rounded, and so then -- and I think Rex had
8    something to do with that too.  He thought nine
9    minutes was too much, and so . . .
10    Q.  Well, so the firm is allowing, if what you're saying
11    is correct, to pay you for time you're not there
12    within the six minutes or the nine minutes, but it's
13    not authorizing you or suggesting that coming in that
14    late is acceptable conduct; correct?
15    A.  But you'd always make up the time either by shortening
16    your lunch or -- or staying late.
17    Q.  Was that in writing somewhere?
18    A.  It was part of the nine-minute, six-minute rule
19    situation.
20    Q.  In writing or just --
21    A.  Like I said, there -- there -- I found something in my
22    garage that you now have for reference to that.  It
23    was an email between me and Carol Lally, and it
24    discusses it a little bit.
25    Q.  Well, she was gone as of 2012; right?

15 (Pages 195 to 198)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 199

1     A.  So it was definitely prior to that, yes.
2     Q.  And so you assumed, even if that had been the case
3         prior to 2012, that you were entitled to just come in
4         six minutes late and then make that up at some point
5         during the course of the day and that that was
6         acceptable pursuant to firm policy?
7     A.  Acceptable I like better than entitled.  It was
8         acceptable, yes, under firm practice.
9     Q.  But you -- but you -- other than this one document
10        that you claim you produced this week, you don't know
11        of any place in -- in the firm manual that's on the
12        website where it states --
13    A.  I wouldn't.  No.  No.
14    Q.  All right.  And the document that you claim you
15        produced that refers to this is an email between you
16        and Sue Choma sometime --
17    A.  Carol Lally.
18    Q.  Carol Lally.  Sometime 2012 or earlier; correct?
19    A.  Definitely earlier than '12, yes.
20    Q.  And that's the only thing in writing you've ever seen
21        that confirms this understanding that you've described
22        on the record of the six-minute rule?
23    A.  It was never an issue until here really.
24    Q.  All right.  So what, if anything, is inaccurate from
25        your point of view about Exhibit 9?

## Page 200

1     A.  My unauthorized use of overtime.
2     Q.  What's inaccurate about that?
3     A.  It wasn't unauthorized.
4     Q.  Who authorized it?
5     A.  My mandate was to get work done, and I always did my
6         best and gave it my all to ensure that the work was
7         always done and --
8     Q.  So you thought that that general directive to get work
9         done gave you the right to charge overtime without
10        specific approval --
11    A.  Okay.  Well, this --
12    Q.  -- having been obtained?
13    A.  Here.  Let me -- let me show you something.  Here we
14        go.  If it's in here.
15    Q.  Page 21 of Exhibit 1 addresses overtime for non-exempt
16        employees.  You were non-exempt; correct?
17    A.  Right.  Right.
18    Q.  Okay.
19    A.  Okay.  So all overtime work must be verbally approved
20        by the attorney, paralegal, or supervisor requesting
21        the work.  I was a paralegal.  So my mandate from my
22        partner in charge was to get the work done.  So like
23        I -- so I approved it myself.
24    Q.  All right.
25    A.  Because I had to get the work done.  That's what my

## Page 201

1         attorney, my partner in charge always wanted me to do
2         was get the work done.
3     Q.  So you thought you had a right, an entitlement to
4         charge overtime without getting any specific approval
5         simply because you were supposed to, quote, get the
6         work done?
7     A.  Correct.  And it was always billed to the client, so I
8         am actually earning money for the client more than I
9         am compensated --
10    Q.  And you thought you had the right to make that
11        decision?
12    A.  I did for over a decade.
13    Q.  So you just --
14    A.  Yes.
15    Q.  For over a decade you approved your own overtime?
16    A.  I got the work done as my boss, Clay Guise, expected
17        the work to be done.
18    Q.  All right.  You didn't bother to ask for approval from
19        the attorney; you just assumed you had the right to
20        charge the overtime?
21    A.  Clay and I would discuss it periodically and he wanted
22        me to get the work done.
23    Q.  All right.  So that's your explanation on overtime.
24        What about working from home?
25    A.  I was never told I couldn't work from home anymore.

## Page 202

1         They actually -- when I got involved in this project
2         right in the very beginning, there was so much that I
3         was asked by Kathleen Horchler if I would consider
4         doing some work at home to help keep it going, and
5         from that time on I had worked from home.
6     Q.  So you just worked from home when you felt like
7         working from home?
8     A.  When the work needed to be done.
9     Q.  Okay.  And you --
10    A.  And I always had billable time to go along with it.
11    Q.  All right.  And you did not seek approval to do that,
12        you just chose to do it and made your own decision;
13        correct?
14    A.  I -- can we object to her phrasing?  I got the work
15        done that needed to get done.
16    Q.  That's not my question.  My question is you didn't
17        seek approval from an attorney to work from home --
18    A.  False.  False.  I always had their approval.
19    Q.  You mean just -- you just assumed you had it as a
20        general matter?
21    A.  You can look at my reviews.  They -- they sang my
22        praises on how I -- I was such a team player, I got so
23        much work done, I was willing to work from home for
24        the good of the project, and -- yes.
25    Q.  So you just assumed you could work from home when you

16 (Pages 199 to 202)

f772c6ff-d582-466c-a38f-dcb563fcdf87

KATHLEEN LIEBAU Volume II
April 07, 2022

## Page 203

1    determined that it was necessary without seeking
2    approval; is that correct?
3    A.  I think I already answered that.  I had approval.
4    They wanted me to do it.  I -- I have good judgment.
5    I always billed corresponding time for the work.
6    Q.  So you didn't seek approval to work from home on a
7    particular Monday or Tuesday or Thursday?  You just
8    assumed you had that approval and you could then make
9    your own decisions?  As a general matter you had
10   approval?
11   A.  Yes.
12   Q.  Okay.  So what else, if anything, is inaccurate about
13   Exhibit 9 in your view?
14   A.  Well, excessive tardies.  They were -- the vast
15   majority was under the six-minute rule, so I always
16   did work it over, so her definition of tardies, I
17   wasn't yet aware that they were being monitored under
18   the six-minute rule until this came up.  And then when
19   she accuses me of stealing -- where is it?  It's in
20   here somewhere.
21   Q.  Is the word "stealing" in here?
22   A.  Oh, she might have used that verbally.  So yeah, I
23   took -- I took huge exception to that because not only
24   did I always make up the one or two minutes, I
25   consistently went past that.  Like didn't leave until

## Page 204

1    quarter to six often.  If it got to be six, then I
2    would put in some overtime, but, you know, there was a
3    lot of quarter to sixes that -- that -- so yeah, they
4    got free work, so . . .
5    Q.  So did you just assume because you thought the
6    six-minute rule was in place and it allowed you to
7    come in six minutes and collect the money but, you
8    know, not worry about it that -- I mean, did that just
9    become habit to do that?
10   A.  Collect the money.
11   Q.  Get paid for it.
12   A.  And I always stayed after 5:30, so yes, I got paid for
13   my seven hours and I worked my seven hours.
14   Q.  You understood you were supposed to call if you were
15   going to be late; correct?
16   A.  So that particular thing has been on the books back in
17   1985.  There were not cell phones back in 1985.  So
18   what that meant was that if you were home and knew you
19   were going to be late, you were supposed to call.  I
20   know that.  Right?  It did not include one or two
21   minutes because of traffic or -- because cell phones
22   didn't even exist.  So just because times have
23   changed.  I don't have a cell phone.  So yeah, if I
24   was a minute late, I didn't have the ability to call
25   Sue.  I was never told that it was required that I get

## Page 205

1    a cell phone until she told me I was required to get
2    one and then I reactivated my OnStar, but I was never
3    told that there was a requirement that you have a cell
4    phone.
5    Q.  You were late more than six minutes frequently in 2018
6    and '19; correct?
7    A.  And I also wrote on there check the weather.  We had
8    had some of the most horrendous weather that --
9    because this is January, February.  It was -- it was
10   horrible.
11   Q.  Well, the weather affects everybody; correct?
12   A.  And let's see who else was late those days.  I bet you
13   there were a ton.
14   Q.  Can you identify any other employee who had the
15   tardiness pattern that you had?
16   A.  I'm -- I'm not HR.  And again, I disagree with the
17   tardiness.  I always worked -- I always worked the
18   time, so . . .
19   Q.  Well, do you understand the importance of if your
20   start time is 9:30 and people expect to see you at
21   9:30 and be available to do work that it's a problem
22   for the firm when you're not there even if you stay
23   late to make it up?
24   A.  I don't -- no.  I don't see that to be a problem at
25   all.  Matter of fact, most of them liked it that I was

## Page 206

1    there past 5:30.  More -- more work is time sensitive
2    and get it out, get it out between five and six than
3    it is between when most people are getting their
4    coffees and everything in the morning.  So no, I did
5    not see it as any problem or a deficiency in getting
6    my work done that I was a minute late.  Most people
7    don't care.
8    Q.  But then let's talk about when you were ten minutes
9    late or 15 minutes late.  Do you understand that when
10   someone expects you to be there at 9:30 and
11   functioning that it's a problem when you're not there?
12   A.  If I was --
13   Q.  A reliability issue?
14   A.  If I was that late, it was because of some issue
15   between Romeo and Bloomfield Hills.  If I was that
16   late.  And during February 2018, if we go back, you
17   will see we had some of the worst weather.  So there
18   was nothing I could do about it.  I don't know what to
19   tell you.  I -- once this became an issue, I started
20   leaving 15 minutes early, but it didn't fix it
21   because, as you can see, I was still late, so then I
22   started getting there crazy early.  I was there like
23   by 9:00 every morning.  So yeah, I wasn't going to let
24   this petty thing, you know, ruin my job.  I generally
25   liked my job.  So yeah, I got there at like 9:00 every

17 (Pages 203 to 206)

f772c6ff-d582-466c-a38f-dcb563fcdf87

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 207

1    morning.
2    Q.   So you think it's petty to expect an employee to show
3         up on time?
4    A.   Minutes, yes.  Maybe not if you're a McDonald's or
5         something like that, but at a law firm I think it's
6         very petty to bicker about a minute.
7    Q.   Well, is it petty to bicker about six minutes or --
8    A.   Not when the time's made up.
9              MR. FARRAR:  Objection to form.
10   A.   Not when it's worked.
11   BY MS. HARDY:
12   Q.   Is it petty to bicker about eight minutes?
13             MR. FARRAR:  Objection.
14   BY MS. HARDY:
15   Q.   What -- is it?  You have to answer.
16   A.   Under the nine-minute rule it would have been,
17        so . . . that, again --
18   Q.   When does it stop becoming petty?  How late can you be
19        before it falls outside the petty category for your
20        employer to be concerned about it?
21             MR. FARRAR:  Objection.
22   A.   For me personally, I would say you shouldn't get
23        worked up about it for like 15 minutes because people
24        come from all different parts of the state.  You know,
25        some downriver, me Romeo, and you never know what's

## Page 208

1    going to -- you're going to encounter on those
2    commutes.
3    BY MS. HARDY:
4    Q.   What do you mean for me personally they shouldn't get
5         worked up about it for --
6    A.   No.  I personally wouldn't get worked up about anybody
7         being late unless it was like 15 minutes and then I'd
8         probably be more concerned, but . . .
9    Q.   Look at the handwriting on Exhibit 9.  Is that your
10        handwriting?
11   A.   Yes, ma'am.
12   Q.   All right.  And did you place it -- your handwriting
13        and objections on this document, then turn it back in
14        to Sue Choma?
15   A.   No.  When she presented it to me and wanted me to sign
16        it, I'm like, well, I'm not signing it the way you
17        have it written here because you're -- you're missing
18        so many points, and so, again, these notes are on the
19        fly.  I didn't have time to digest it or -- or, you
20        know, craft a -- a real good response.  I -- on the
21        fly I had to make some notes, and so that's what these
22        are.
23   Q.   Well, if you had something more to say than the notes
24        that are reflected on Exhibit 9, you always could have
25        submitted that after the fact; correct?

## Page 209

1    A.   I -- I just started getting there a half hour early
2         every day.
3    Q.   All right.  So let's read into the record your notes.
4         Start with the first line.  "Must disagree with the
5         term"?  Is that what it says?
6    A.   Yeah.  Unauthorized.
7    Q.   Unauthorized.  Okay.  The next one is addressing "The
8         2 to 6 minutes has not been fixed by leaving" --
9         "leaving early"?
10   A.   Yep.
11   Q.   What does that mean?
12   A.   I started leaving 15 minutes early, but it was
13        February, and actually leaving 15 minutes early, I got
14        there at like virtually the same time.  Traffic was
15        more.  I could get stuck behind a school bus.  So
16        15 minutes didn't work.  You sure would think
17        15 minutes would work when you're only a minute or two
18        late, but it didn't work.
19   Q.   All right.
20   A.   So then I started leaving a half hour early.
21   Q.   Then it states, "Will make further adjustment"?
22   A.   Which I did.  I started getting there at nine.
23   Q.   All right.  So after this February 5, 2018, memo -- or
24        strike that
25              After your January 19, 2018, session with

## Page 210

1    Sue in which she went over these issues of tardiness
2    and overtime and working from home, did you comply at
3    all times with firm policy thereafter?
4    A.   I believe so.  I'm not sure what you're referring to.
5         But I believe so.  I was getting there at 9:00 every
6         morning.
7    Q.   So after January 19, 2018, you were no longer tardy
8         anymore?
9    A.   I think that there -- I got stuck in an accident, but
10        by then I had my OnStar, so I called her and said I'm
11        stuck in an accident or -- so yes.  I believe I was
12        compliant.
13   Q.   Okay.  And after January 19, 2018, were you fully
14        compliant with the firm policy on working from home?
15   A.   Yes.  I believe so.  Let me -- I think so.
16   Q.   And after 2000 -- or January 19, 2018, did you stop
17        charging overtime without express approval to do so?
18   A.   Where I sought that express approval, that one where
19        it's labeled I don't know what to do anymore, I
20        actually ended up getting reprimanded for that because
21        they didn't answer me and it was -- but we discussed
22        it, so I did have to work through my lunch to get the
23        stuff done, but then I ended up getting reprimanded
24        for it.  Even though Chelsea said "I take full
25        responsibility," somehow I still ended up getting

18 (Pages 207 to 210)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 211

1    reprimanded for that.
2    Q.   What are you referring to?
3    A.   I worked through my lunch to get the stuff done.
4    Q.   When?  When are you referring to and what specific
5         project are you referring to?
6    A.   I don't have -- I don't have the date in front of me,
7         but it was -- okay.  So after this memo, I had
8         mentioned it earlier in our discussions here, we got
9         like six cases in, it was like 1:30 in the afternoon,
10        they take roughly an hour to do, so if you count it
11        out, 1:30, 2:30, 3:30, 4:30, 5:30, 6:30, 7:30, there's
12        no way I was going to be able to take an hour lunch
13        and get six of these things done.  So I sent the
14        email.  I don't know what to do anymore.  Do you want
15        me to work through lunch or do you want me to get
16        these done for you?  And this is the whole cutting
17        corners thing.
18             So Sue says, "Well, how long do they take?"
19        And I said, "Well, even cutting corners
20        they take about an hour."
21             And then whoa, cutting corners.  Shoo.
22        Huge blowup.  It's like I don't cut corners, sorry I
23        used that term, but, oh, it was all about the
24        semantics of using the term "cutting corners."  So
25        they focused all on that.  I still got these six new

## Page 212

1    cases to do.  So, you know, while they're having a
2    little issue over that, I'm still trying to get the
3    work done.  I did, in fact, get the work done, but I
4    had to work through my lunch hour to get it done.  And
5    then when Chelsea got the overtime report for that
6    hour, she said, "I didn't know you were going to work
7    that hour."  I guess I should have been more specific.
8    Like answer me would have been nice.  Again, I got the
9    work done.  I thought that's what they wanted.  I was
10   wrong apparently.
11   Q.   All right.  Let's just finish the handwritten comments
12        that you put on Exhibit 9.  So the second paragraph,
13        read what you wrote in the margin.
14   A.   "Those late minutes accumulated for a total of
15        4.75 hours of not working."  And I wrote, "Without
16        accounting for the extended time stayed after 5:30."
17   Q.   All right.  Go down to the bottom of the page Bates
18        stamped 215.
19   A.   "You did not call . . ."  I have no cell phone.  You
20        cannot call.  And then I also said, "Please check
21        weather (storms) and accidents.  Please confirm."  And
22        then I attempt -- I said, "It's a series of trial to
23        see what works with Michigan weather."
24   Q.   All right.  So --
25   A.   You know, can we take a little break?

## Page 213

1    Q.   Sure.
2    Q.   What time is it?
3    Q.   It is 2:41.  Yes.
4         MR. FARRAR:  Okay.
5         VIDEO TECHNICIAN:  Going off the record.
6    This marks the end of Media Unit Number 1.  The time
7    is 2:42 p.m.
8         (Recess taken at 2:42 p.m.)
9         (Back on the record at 2:52 p.m.)
10        VIDEO TECHNICIAN:  Here marks the beginning
11   of Media Unit Number 2 in the deposition of Kathleen
12   Liebau.  The time is 2:52 p.m. on record.
13        (Marked EXHIBIT 10 for identification)
14        MS. HARDY:  Let the record reflect that
15   I've marked as Exhibit Number 10 a grouping of
16   documents produced in this case that reflect
17   timekeeping and attendance issues that were discussed
18   with Ms. Liebau, and they're all Bates stamped.
19   BY MS. HARDY:
20   Q.   I'd like to go over a number of them with you.  Please
21        look at 433.  It's the top one.  That is an email from
22        Sue Choma to you on May 7, 2012, and it puts you on
23        notice that you need to minimize your overtime now
24        that you are part-time; otherwise, the benefit of you
25        being off on Wednesdays will not be realized."

## Page 214

1    A.   That's what it says.
2    Q.   Yeah.  And did you do that?
3    A.   We had a further discussion that there's work to do,
4         and Sue also did not understand that I billed in DTE,
5         so I remember seeing a series in your deposition, and
6         so Clay -- I think she actually checked with Clay.
7         Clay agreed we had things going on.  And so I was
8         instructed by Clay to keep getting the work done.
9    Q.   All right.  So if I understand your testimony, you did
10        not believe you needed to comply with the directive
11        that you were given on May 7, 2012, as reflected in
12        433?
13   A.   It was clarified.
14   Q.   And it was clarified that you could work overtime
15        whenever you felt you needed to get the work done?
16   A.   Not in those words.  She confirmed with Clay that we
17        had things that we were -- needed to get done,
18        so . . .
19   Q.   What does that mean about overtime?  What overtime you
20        were authorized to work or not work?
21   A.   Well, Clay's the partner.  He's the equity partner.
22   Q.   I know.  But you understood you had just -- you were
23        generally entitled to work overtime whenever you felt
24        there was work that needed to get done?
25   A.   You love to use that word "entitled."  I didn't feel

19 (Pages 211 to 214)

f772c6ff-d582-466c-a38f-dcb563fcdf87

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 215

1     entitled to anything.  I was being the good employee
2     that is willing to put in what it takes to get the job
3     done, so it has nothing to do with my entitlement.
4   Q.  All right.
5   A.  It has to do with getting the --
6   Q.  Let's take the word "entitlement" out of it.  You
7     believed that after you got this directive on May 7,
8     2012, Clay Guise gave you authorization to work
9     overtime whenever you felt it was needed without
10    getting specific authorization to do so?
11  A.  I would be in contact with Clay often.
12  Q.  Answer the question.
13  A.  The way you phrased that is just -- it's just not the
14    way work works.  I would -- I'd be working with Clay
15    on something.  He wants it done.  I think he
16    appreciated that I was willing to ensure that the work
17    got done.  And I think he clarified with Sue that --
18    that there was work to do.
19  Q.  Well, work to do.  Just like so whenever you thought
20    there was work to do you could work overtime?
21  A.  Whenever there was, in fact, work to do, I got the
22    work done.
23  Q.  And if that required you to work overtime or entailed
24    you working overtime, you thought you just had
25    approval to do it without getting someone to tell you

## Page 216

1     or agree on that particular occasion that that was
2     authorized; correct?
3   A.  Again, that's not the way work works.
4   Q.  Look, I understand how work works.  I'm a lawyer too.
5     But -- or I am a lawyer.  You're not.  But the
6     question for you is, was it up to you in your view,
7     despite the directives that you had from Sue Choma, to
8     make your own decision about when it was appropriate
9     to work overtime?
10  A.  I can't answer that question the way you phrased it.
11    Okay.  I did not think it was only up to me, no.  I
12    would get directive from the equity partner that
13    something had to be done by a certain time and I would
14    ensure that he had what he needed.
15  Q.  All right.  Answer the following question.  After
16    May 7, 2012, did you get express approval to work
17    overtime before doing so?
18  A.  That was -- no.  That was virtually impossible most of
19    the time.
20  Q.  All right.  Did Sue Choma tell you at any point in
21    time that the directive provided to you on May 7,
22    2012, did not apply because Clay Guise had given her a
23    different direction?
24  A.  We had some verbal that things were going on, and we
25    expected, you know, once we got through the current

## Page 217

1     push that, yes, I would settle back in to just
2     28 hours, so there was -- there was some verbal
3     discussion on that.
4   Q.  When do you claim that discussion occurred?
5   A.  You know, this is '12.  So it would -- it would
6     resurface periodically, but --
7   Q.  You don't have any dates?
8   A.  I do not off the top of my head.
9   Q.  Do you have any documents to substantiate that?
10  A.  Well, we could look through this because I think I saw
11    some things in your production that I never saw
12    before.  Shall we go through it?  Or maybe you picked
13    and chose here.
14  Q.  No.  I want to know if you have any documents that
15    you've produced that -- that back up your story that
16    Sue Choma told you that the directive provided I'm
17    getting approval for overtime and minimizing overtime
18    would not apply whenever you were busy and thought you
19    needed to --
20  A.  Not -- not from --
21  Q.  -- to work additional --
22  A.  Not from Sue Choma.  But in my reviews it was
23    repeatedly pointed out that I get a full-time job done
24    with reduced hours and that my work was exemplary.  So
25    that is -- is a repeated theme year after year after

## Page 218

1     year after year after year.
2   Q.  Let's look at Bates stamp 400.  It's the second page
3     in Exhibit Number 10.  You are informed via this email
4     from Sue Choma dated July 27, 2015, that -- that you
5     are not supposed to be working through the lunch hour
6     and compensating for time by doing so; correct?
7   A.  And compensating for time by doing so.
8   Q.  You're not supposed to flex your time on a regular
9     basis by making up by working through lunch hour and
10    then either billing more time or making up for other
11    time.
12  A.  Okay.  This, however, was during -- if you see the
13    date, that's '15, so this is during the Brittany
14    years, so when we got that influx of general products
15    and door latch work, we were crazy busy, and my extra
16    hours did, again, become an issue, but Brittany always
17    wanted everything right now, so what I would do is get
18    it to her right now rather than making her wait that
19    extra hour while I went to lunch because that's what
20    Brittany wanted, and so then my work at 4:30 I'm at seven.
21  Q.  All right.  So you did not comply with the directive
22    that you received on July 27, 2015, from Sue Choma;
23    correct?
24  A.  No.  What -- no.  What are you saying?  I did not
25    comply?  Yes, I did.

20 (Pages 215 to 218)

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 219

1  Q.  She told you you could not just work through your
2    lunch hour and bill additional time by doing so, and
3    you just kept doing it whenever you thought it was
4    necessary; right?
5  A.  That is incorrect.
6  Q.  What's incorrect about that?
7  A.  I didn't just do it whenever I thought it was
8    necessary.  That is -- that is a -- that's not an
9    accurate characterization of what I did.
10  Q.  Well, did you -- did you -- if you -- if you felt that
11    it was necessary on a given day to work through lunch
12    and bill that extra time, did you advise Sue Choma
13    that Brittany has asked me to do something that's
14    going to require me to work through lunch and
15    therefore I'm going to not -- not do as you instructed
16    in your July 2015 email?
17  A.  That never happened.
18  Q.  Well, why didn't that happen?
19  A.  But yeah.  I'm -- when it -- that's the email.  I
20    don't know what to do anymore.  We've got all this
21    work.  You want it done.  It's lunchtime.  What do you
22    want me to do?  And so that's coming up in this stack
23    because I saw it one second ago.
24  Q.  That email was from 2019; correct?  The one that
25    you're referring to now?

## Page 220

1  A.  Right.
2  Q.  Four years after this email from Sue Choma in July of
3    2015.
4  A.  Yes.  It was four years after that.
5  Q.  So just answer this question.  We're going to be here
6    forever if we keep going like this because you're not
7    responding to questions.
8  A.  Well, you're not phrasing them correctly.  You're
9    phrasing them very accusatory and throwing in some,
10    you know, words that, no, that's not the
11    characterization of what -- what happens.
12  Q.  You got a directive in July 2015 from Sue Choma that
13    you couldn't flex your time on a regular basis.  Did
14    you comply with that or not?
15  A.  Yes.  I complied with that.
16  Q.  All right.  And did you inform her when you did flex
17    your time because you thought it was necessary to get
18    work done that you had done so with an explanation of
19    why you'd done so?
20  A.  Again, I wasn't directly under Sue for the most part,
21    but I would coordinate with Brittany, you know, you
22    want this right now, so I'm not going to go to lunch.
23  Q.  Sue was your supervisor; right?
24  A.  My -- she was the office manager, and my supervisors
25    were the attorneys that give me the work and expect me

## Page 221

1    to give them the work back.
2  Q.  Sue Choma did your performance reviews every year;
3    right?
4  A.  She conducted the meeting.
5  Q.  She signed your performance reviews?
6  A.  She actually really did not know the work that I did.
7  Q.  She signed your performance --
8  A.  She wasn't -- she wasn't --
9  Q.  Answer the question.
10  A.  She wasn't my -- she wasn't my supervisor.  My
11    supervisors, Clay Guise, Brittany Schultz, Lisa Brown
12    for a while.  That is who supervised my work and who
13    if I was going to work I would mention to that.
14  Q.  Are you contending that Sue Choma did not have
15    authority to tell you that you needed to comply with
16    firm policy on attendance, on timekeeping, on
17    punctuality, et cetera?
18  A.  It is Sue Choma's prerogative to quote me on policy
19    whenever she wants.
20  Q.  All right.  And to issue disciplinary or coaching
21    memos when you fail to comply with policy; correct?
22    You understood --
23  A.  Okay.
24  Q.  -- she had that authority; correct?
25  A.  As -- as you see, I didn't fail in her -- she says

## Page 222

1    that I failed.  You need to tell me first before you
2    write me up on something like this.  So once I am
3    told, yes, I do what they demand that I do.
4  Q.  All right.  So you receive a email on flex time
5    telling you what the limits are in July 2015, and then
6    you get another one in May 2016, which has been Bates
7    stamped 396, in which Choma again has to remind you
8    that you cannot flex your time the way you have been
9    doing it on a regular basis.  Do you see that?
10  A.  Okay.
11  Q.  All right.  You didn't comply with the 2016 directive
12    from Sue Choma either, did you?
13  A.  There is work.  I did not -- human resources -- I
14    mean, it's kind of been an education.  They live in a
15    different world than those that work in providing
16    services for the client.  They're different worlds.  I
17    always complied with my attorney requests to get work
18    done.
19  Q.  All right.  I've heard that enough and I don't need to
20    go over that territory again.
21        So let's go to 358.  You'll have to flip
22    through this document till you reach 358.  For the
23    record, this is an email from Clay Guise to Sue Choma
24    regarding overtime for Kathy Liebau, and it reads,
25    "Sue, We had a team meeting a few weeks ago.  I told

21 (Pages 219 to 222)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 223

1   Kathy she needs to do this job without overtime and,
2   if she can't, we need to discuss."  It is dated
3   February 3, 2018.
4   A.  Correct.
5   Q.  All right.
6   A.  Okay.  What's your question?
7   Q.  Right.  So you were told by Clay Guise that your sense
8       that there's work to do was not justification to bill
9       overtime without approval?
10  A.  Incorrect.  Okay.  So did you approve overtime working
11      1/12 and 1/13?  And so -- and then I had this with Sue
12      on 19 where Sue told me if this job takes extra hours,
13      we'll get a full-time person to do it and then where
14      would that leave you?  I told Clay about -- and
15      Chelsea about that, so that's when we discussed this.
16      So -- so by February 5th and February 3rd it was two
17      weeks ago, but it all relates to the same situation.
18      And in that situation, when I first told them exactly
19      what Sue said, if this job takes extra we'll get a
20      full-time person to do it and where would that leave
21      you, I then paraphrased that into if I work overtime,
22      Sue says I'm fired.  So Clay was like that's not
23      right, but we did say we want to keep the overtime to
24      a minimum.  Okay.  But he also said, "That's not
25      right.  Let me talk to her."

## Page 224

1           And Chelsea piped up, "Oh, I'll talk to
2       her.  I gotta talk to her about something else
3       anyway."
4           At which time our verbal January 19th
5       became a written reprimand.  So Chelsea really fixed
6       that, didn't she?  She made sure I got the written
7       reprimand.  So -- so these dates here, it's not after
8       this.  It's all the same.  Okay?
9   Q.  Put the dates aside.  When you were working on the
10      lemon law project, Clay Guise told you that job needed
11      to be done without overtime; correct?
12  A.  Not in those words.  It was as I just said.  I was
13      threatened.  We discussed that we don't want overtime
14      on this, and I was like okay.
15  Q.  That came from Clay Guise; correct?
16  A.  Yes.
17  Q.  All right.  So he said we do not want overtime on
18      this.  Did you understand that that meant --
19  A.  He didn't --
20  Q.  -- you are not to bill overtime?
21  A.  He didn't say it in those words.
22  Q.  You just used those words.  Those are your words.
23  A.  Because he said we're not on a regular basis going to,
24      but never any overtime?  No.  He was against that.
25  Q.  Did you understand after he told you that we do not

## Page 225

1       want overtime on this project that if you were to work
2       overtime you needed express approval in advance?
3   A.  Those words were never spoken.
4   Q.  You didn't think that that logically followed from the
5       directive from an equity partner, do not work overtime
6       and if you're going to do so, you better talk to me
7       and get approval before billing it?
8   A.  He never said that.
9   Q.  And so you just assumed you had a right to work
10      overtime without his approval?
11  A.  Hence -- hence the subject line when we got those
12      cases, which I think is the next time overtime came
13      up, I don't know what to do anymore.  It's lunchtime.
14      We got six of these.  What do you want me to do?  And
15      I didn't get an answer.  So, you know, in hindsight
16      are they pressuring me to just work for free?  I'm
17      kind of getting that's the feeling, that, you know,
18      let's give her all this -- this about working but we
19      still want the work done, so maybe she just works and
20      doesn't get paid for it.  Maybe that's it.
21  Q.  Did you ever consider the possibility that they
22      expected you to get the work done within your
23      regularly scheduled time?
24  A.  Not humanly possible.
25  Q.  And that's your view?

## Page 226

1   A.  I -- I am a fast everything.
2   Q.  Let's look at 361 through 362.
3   A.  And it makes it slightly difficult because these are
4       out of . . .
5   Q.  I'm sure you'll be able to find it.
6   A.  Is it before or after 358?
7           MR. FARRAR:  Looks like it's around the
8       middle.
9   BY MS. HARDY:
10  Q.  All right.  So you received an email from Sue Choma on
11      February 12, 2018.  She's rejected your time sheet
12      because her records show that you arrived late one day
13      which was not reflected in the time sheet, and this is
14      after the punctuality session that you had with her in
15      which she formally counseled you for being -- for
16      being tardy.  And you responded --
17  A.  Wait.  What number are we on?
18  Q.  361 and 362.
19  A.  Oh, I was on 561.  I'm sorry.  Oh.
20  Q.  All right.  So let me ask my question.  Are you on 361
21      and 362?
22  A.  Yes.
23  Q.  All right.  So you had an exchange in the February
24      time frame after the punctuality counseling session
25      with Sue Choma in which she's told you she's rejecting

EXHIBIT 1

KATHLEEN LIEBAU Volume II
April 07, 2022

## Page 227

1   your time sheet because it's not accurate.  You -- she
2   knows from your entry when you entered the door to the
3   firm that you arrived later than your time sheet
4   reflected, and your explanation was that you were
5   chatting with coworkers and you did not consider that
6   to be inappropriate to have recorded your time in that
7   fashion; correct?
8   A.  Incorrect.
9   Q.  What's incorrect?
10  A.  All of it.  So this actually related to -- here we go.
11  2/5/18, 9:51.  You did not notify me.  So it's over
12  here.  Why this is after February 5th.  How the heck
13  did she do that?  This is for February 5th.  Yes.
14  Your time sheet 2/5.  So the date of this reprimand
15  she had written that I came in at 9:51.  So the reason
16  that this -- she is incorrect is because I walked in
17  with Carl that day, and I keep -- because I bill my
18  time, I keep a sheet next to my desk on when I come,
19  when I go, so I can bill my time, and I had written on
20  mine 4:51 -- or -- 9:44, and so when she challenged me
21  on it, I said I know that you wrote that because I
22  remembered seeing it there, but when I got back to my
23  desk I saw I got in at 9:44, and I came in with Carl
24  that day, so I asked her check the camera.  Your
25  little checking of the comings and goings is

## Page 228

1   incorrect.  Check the camera.  So I'd like to know did
2   she check the camera?  Because I did come in with Carl
3   that day.
4           And chatting with coworkers is incorrect.
5   Chelsea was standing at my desk because I had got
6   caught behind an accident this day and she was ready
7   with questions.  What's this?  What's this?  What's
8   this?  So I immediately start rattling off her
9   questions ba da da.  Why I came back through the door
10  at 9:51 I don't recall.  I might have had to use the
11  bathroom, as I said here.  I don't remember.  But Sue
12  was incorrect.  So apparently this is insubordinate of
13  me to not just accept anything Sue says when there is
14  clear evidence that it was different.
15  Q.  What are you claiming Sue was incorrect about?
16  A.  That I came in at 4:51.  My card might have clicked at
17  4 -- 9:51, but I came in with Carl that day.  And I
18  told her to check the camera.  I would like to know if
19  she did, because I didn't get an apology.  Instead I
20  got an unbelievable sent to my personnel file.  So
21  what?  Is it the job of a person who works for Dykema
22  now to just go, you know, oh, yes, ma'am, even if
23  she's incorrect?  So that is one and the same that she
24  has written down over here.
25  Q.  One and the same with what?

## Page 229

1   A.  2/5, 9:51.  This dated '12 is still 2/5, 9:51.
2   Q.  Your --
3   A.  So it wasn't an additional.  It was the same one.  And
4   now we're arguing about 9:44 and 9:51.
5   Q.  Well, the point she's making, and this is after you
6   were counseled on January 19, that not only did you
7   come in late but you didn't accurately record your
8   time card.
9   A.  I accurately recorded it.  She made me falsify it, to
10  use her word.  She made me falsify it.  I say that.  I
11  said, okay, if you're going to make me, but it won't
12  be accurate.
13  Q.  She was basing it off of the time that --
14  A.  Here.  I'll change it if you insist.
15  Q.  -- your card showed entry into the building, and you
16  claim you don't -- you don't know why your card shows
17  entry at that time?
18  A.  She could check the camera.  I came in with Carl.  Why
19  I went back out into the hall I don't remember.  I
20  didn't remember then and I still don't remember.
21  Don't recall.  But I came in with Carl.  That I do
22  remember.  And I told her to check the camera.  We
23  have a camera.  And so --
24  Q.  All right.  Let's go to 499 and 501.  Through 501.
25          MR. FARRAR:  I'm sorry.  What numbers?

## Page 230

1           MS. HARDY:  499 through 501.
2           THE WITNESS:  499.  It's just a couple of
3   pages past.
4           MR. FARRAR:  Okay.  Thank you.
5   BY MS. HARDY:
6   Q.  Did you read through them?
7   A.  Yes.  And this is the one where Chelsea takes full
8   responsibility for the miscommunication and
9   misunderstanding, because she didn't answer me when I
10  said I don't know what to do anymore, so I worked and
11  got her the work.  So she says right there she'll take
12  full -- but I got reprimanded again.  I got called
13  into Sue's office and reprimanded again.
14  Q.  You did not seek prior approval to bill overtime;
15  correct?
16  A.  I sent them a direct email.  How much more could I
17  seek?
18  Q.  What in the email do you think expressly addresses the
19  issue of whether overtime is approved for a particular
20  project?
21  A.  Where's my email to them?  Here you go.  In the middle
22  of 500 at 1:29 in the afternoon, so lunchtime,
23  "Subject: I don't know what to do Anymore.
24  Forwarding: New Cases.  Do I keep working or go to
25  lunch?"  Pretty simple question.  To comply with

23 (Pages 227 to 230)

f772c6ff-d582-466c-a38f-dcb563fcdf87

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 231

1    getting the prior approval.  Do they answer me?
2    Again, I'm thinking they wanted me to work for free,
3    and isn't that against the law?
4    Q.  And that's -- that's what you consider asking for
5    approval to work overtime?
6    A.  Yes.
7    Q.  Okay.  All right.  Let's move on.  All right.  Let's
8    look at 493 to 495.  It's beyond the 501.  Following
9    it.
10              This series of emails addresses your
11   failure to properly record your time; correct?
12   A.  Not my failure.  But go ahead.
13   Q.  What's inaccurate about that?
14   A.  Okay.  So you only got part of it right here.  So this
15   was when I went on vacation, and when I got back from
16   vacation I had gotten the email from Jessica Williams
17   that my time card wasn't completed, and by the time I
18   got back from vacation I like forgot all about it.  So
19   Sue, you know, says, you know, my time card's not all
20   set, blah blah blah.  There's an earlier email where
21   Sue emails Chelsea and me and says -- oh, when Chelsea
22   gave approval for the 15 minutes of overtime.  Sue
23   says something, I've gotta do this, paraphrasing from
24   memory, says something like Kathy hasn't filled in her
25   time card from last week, we'll have to clear this up

## Page 232

1    when she gets back from vacation.  Okay.  So right
2    there Sue caused the problem because a time card
3    reviewer is supposed to fill it in so that the person
4    gets paid and then do any adjustments the following
5    week.  Okay.  That was procedure, and I know that
6    because I was a time card reviewer for years.
7    Q.  Do you know of any written policy to that effect?
8    A.  I was a time card -- again, I don't live in policy.
9    That's an HR thing.  I was a time card reviewer for
10   years, and what I was instructed to do by Carol Lally
11   was if someone's not there, you fill in their regular
12   hours and we make adjustments when they are available
13   again.  So Sue purposely let that go even though she
14   knew I worked that week.  She knew I had 15 minutes of
15   overtime.  So she purposely created this problem by
16   not doing her job as a time card reviewer.  And I
17   didn't even remember this until it showed up on my
18   review six months later, and I was like, oh, my gosh,
19   this is on my review that -- that I didn't fill in my
20   time card for a thing?
21              And so then in addition to that, I also
22   remembered the six months later that Kronos was down,
23   and so that's why in the stuff I produced, and this is
24   why I remembered so well, going through it to produce
25   it to you, Kronos was down, so I'm leaving for

## Page 233

1    vacation.  It's spinning and spinning.  It's down.  I
2    leave.  And it's 5:30, so most people are gone.  I
3    can't exactly get assistance at that time because I'm
4    there later than everybody else.  So not only was
5    Kronos down, I couldn't enter it, but Sue failed to do
6    the time card reviewer job of putting it in.
7    Q.  All right.  And your understanding of her
8    responsibilities as a time card reviewer comes from
9    something that you did in the pre 2012 time frame?
10   A.  Correct.  For years.
11   Q.  But you can't identify any policy that states that she
12   had that obligation?
13   A.  Just the years of experience doing it.
14   Q.  Okay.  Let's go to 561 to 562.
15   A.  This one makes me laugh too.
16   Q.  They all seem to make you laugh; right?
17   A.  Because.  Right.  This -- this is -- if you -- if you
18   notice, Sue's -- yes.  Yes.  The tones.  The -- let's
19   quote policy here.  Okay.  That's not the way we
20   generally work, but this is what it became.  But go
21   ahead.  What's your question?
22   Q.  You think referring to policy and expecting compliance
23   with policy --
24   A.  Go ahead.
25   Q.  -- is -- is what a -- that she's being unreasonable?

## Page 234

1    A.  It's -- it's not the way that work worked.  Work is --
2    again, for the millionth time is work is you deliver
3    the services to the client and -- and that is work.
4    Q.  And --
5    A.  Okay.  Go ahead.  Go ahead.
6    Q.  -- policy doesn't matter?
7    A.  Go ahead.
8    Q.  Complying with policy as part of your job does not
9    matter?  Is that your position?
10   A.  Interpretations of policy can vary from person to
11   person I might suggest.  But go ahead with your
12   question.
13   Q.  All right.  So this particular email chain concerns
14   the fact that you identify Shannon Stewart as your out
15   of office contact even though you knew she was not in
16   the office for two of the days when you were out;
17   correct?
18   A.  Do we have all of it here?
19   Q.  Look at 561 through 562.
20   A.  Yeah.  Where's my email to Shannon?
21   Q.  Just respond to my question.  You were out of the
22   office --
23   A.  My email to Shannon's not here.
24   Q.  You're required to leave an out of the office message
25   as to who clients or other attorneys can contact when

24 (Pages 231 to 234)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 235

1    you're away.  You identified Shannon Stewart.  In two
2    of the days that you were out she was also out.  You
3    knew that, yet you did not bother to correct the
4    message.
5    A.  Can I object as to form and accusatory statements?
6         MR. FARRAR:  If you don't -- if you
7    understand the question, you answer.
8    A.  The way you characterize it is not the way it goes.
9    In my original email to Shannon, which is not included
10   here, I say to her I don't get many direct emails
11   these days because Chelsea virtually cut me off from
12   everything but can I use you, and she said yes but
13   she'd be out, but I don't get any emails anyway.  So
14   who -- I mean, she did suggest using Chelsea or Sue,
15   but Chelsea would get anything on the lemon law
16   already because I only get stuff from Chelsea, and if
17   I got something on a switch case, neither Chelsea nor
18   Sue would know what to do with it.  So leaving Shannon
19   there for the Thursday and Friday when I don't get any
20   direct emails anyway was like the lowest priority on
21   the mountain of things to be accomplished that day.
22   So very low priority for me.  Clearly not for human
23   resources.  We have different priorities.  Very low
24   priority for me.
25   BY MS. HARDY:

## Page 236

1    Q.  I understand firm policy is that you are to leave a
2    contact person --
3    A.  And I did.
4    Q.  But you left a contact person who you knew wasn't
5    going to be there.
6    A.  Um-hmm.
7    Q.  Assuming that you wouldn't get any emails on those
8    days.
9    A.  And I didn't get any, so the point is moot.  Sue's
10   email was relating to a fourth quarter PTO worksheet.
11   Not exactly high priority stuff.  So I actually didn't
12   get any client emails during that week.  It's a moot
13   point.  It wasn't a problem until Sue made it a
14   problem.  But I would like to point out something to
15   you.  You know how she likes to quote policy?
16   Q.  You know, you're here to respond to questions, not to
17   just give speeches, so let's move on.  All right.
18   Look at 755 to 757.
19   A.  This is the same one.  755.  It's the same one; right?
20   Q.  This concerns your failure to comply with firm policy
21   in terms of entering time.
22   A.  It's the same one we just looked at.  Right.  So, look
23   it --
24   Q.  No, it's not.  We looked at 561 and 562 before.  Now
25   we are on 755 through 757.

## Page 237

1    A.  All right.  You're right.  You're right.  Sorry.
2    Okay.  So go ahead.
3    Q.  All right.  So you were advised that you had not
4    entered time in accordance with firm policy?
5    A.  May I read?
6    Q.  You may read.
7    A.  "Billable Time.  As it should be," --
8    Q.  No.  No.
9    A.  -- "most of the time expended --
10   Q.  Excuse me.
11   A.  -- "by attorneys and" --
12   Q.  Ms. --
13   A.  -- "legal specialists" --
14   Q.  Stop.  Stop.
15   A.  -- "is spent servicing the client" --
16   Q.  Read it to yourself.
17   A.  My point is that she's making me adhere to policies
18   for a legal specialist on the one hand and on the
19   other hand denies that I'm a legal specialist.  So do
20   you see how I had two sets of rules to live by?  So I
21   could get -- I could get slammed on the legal
22   specialist policies and then I could also get slammed
23   on the no one- or two-minute policies, so I got to be
24   slammed on both sides.
25   Q.  What are you claiming the difference was in policies

## Page 238

1    between the AA, which you were, versus a legal
2    specialist?
3    A.  She would have never clipped this billable time
4    requirement that I get it in.  If I'm -- if I -- this
5    is only for attorneys and legal specialists have to
6    get it in.
7    Q.  It's for people who are billing time; correct?
8    A.  It says legal special -- does it say legal specialist?
9    Q.  So that's why you thought you could just skip it?
10   Because you -- while you claim you're a legal
11   specialist, you weren't really a legal specialist, so
12   you just didn't have to comply with the policy for
13   entering time in the system that's being billed to a
14   client?
15   A.  I was just too busy.  And so -- and I think, as many
16   timekeepers at the firm can attest to, is that you
17   often get so busy that doing your time when it's
18   pulled certain days of the week will fall on that
19   priority ladder when you are so busy that you can't do
20   it.  But I think the interesting thing here is that
21   I'm being held to a policy for legal specialist.  To
22   me that's interesting.
23   Q.  You're being held to a policy for people who bill time
24   to a client.
25   A.  Does it say that?

25 (Pages 235 to 238)

U.S. Legal Support | www.uslegalsupport.com

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 239

1    Q.  That's what you understood; correct?
2    A.  I understood myself to be a paralegal for well over a
3    decade.
4    Q.  So if you truly understood yourself to be a paralegal,
5    you just thought you could not comply with the time
6    requirements applicable to paralegals?
7    A.  I -- I -- I just answered that.  It would fall down on
8    the priority ladder when there is an exceptional
9    amount of work to do, which there almost always was.
10   Q.  Let's go to 548 through 550.  It's later in the stack.
11    You are advised on August 9, 2019, by Sue Choma that
12    you have not completed your time in Kronos for the
13    previous day or start time that day; correct?
14   A.  Well, this is between Sue and Ayanna.  That's not to
15    me.
16   Q.  She advised you of that; correct?
17   A.  We're at 548; right?
18   Q.  548 through 550.
19   A.  I wasn't addressed on this.
20   Q.  All right.  So let's just take the underlying facts.
21    You did not complete your time in Kronos for that
22    particular day; correct?
23   A.  According to Sue, apparently not.
24   Q.  You don't have a basis for disputing that, do you?
25   A.  I don't.

## Page 240

1    Q.  Okay.  All right.  Let's go to 545 through 547.  On
2    August 20, 2019, you again had failed to enter your
3    time and be compliant with policy; correct?
4   A.  Again, I was not addressed on this email.  I did -- I
5    was not privy to it.
6   Q.  Are you disputing that you failed to enter your
7    time --
8   A.  Well, she's got --
9   Q.  -- for August 20, 2019?
10   A.  She's got clips in there, so . . .
11   Q.  That -- that substantiate the fact that you did not
12    enter your time; correct?
13   A.  I don't recall if I did it or not.  This appears to
14    show that.  Again, we gotta talk about priorities
15    here.  They're pulled on Mondays.  So there's that.
16    (Marked EXHIBIT 11 for identification.)
17   BY MS. HARDY:
18   Q.  All right.  Let's move on.  I'm going to show you
19    what's been marked as Exhibit Number 11, which is your
20    2018 Staff Performance Evaluation.  The evaluator is
21    Sue Choma, your supervisor.  And it has been Bates
22    stamped 24 through 28. I want you to review this
23    document and tell me what you take such objection to
24    in this document that you previously described as
25    harsh reprimands and severe beatings.

## Page 241

1    A.  Okay.  "Ms. Larsen states there was an incident where
2    Kathy included opposing counsel on an email response
3    where she should not have."  That is a false
4    accusation.  "Kathy failed to communicate" --
5   Q.  Slow down.  Where -- where is that particular entry?
6   A.  The last sentence in the first paragraph.
7   Q.  Are you on 24, Page 24?
8   A.  Yes.  In the last sentence of the first paragraph.  It
9    says, "Ms. Larsen states there was an incident where
10    Kathy included opposing counsel on an email response
11    when she should not have."  That is a false
12    accusation.
13   Q.  All right.
14   A.  "Kathy failed to communicate to me per policy by not
15    notifying me of when she was running late in an
16    ongoing basis."  So that is Sue's interpretation of
17    this apparently.  And so this is supposed to be for
18    year 2017, but she included 2018 issues and work
19    that's supposed to be for 2017, and she already made
20    her -- her point of view clear but felt she had to say
21    it again.  "Kathy's active listening skills need
22    improvement as in a previous discussion with me she
23    shared information with others that I allegedly said
24    which was not accurate."  And "She also
25    inappropriately shared our confidential meeting with

## Page 242

1    others."  And then she goes on.
2    So this was when she said, "If this job
3    takes more hours to do it, we'll get a full-time
4    person and where would that leave you?"  Which I
5    paraphrased into if I work extra hours I'm fired.  And
6    I told this to Chelsea and Clay, the people I work
7    for, because they have a right to know the
8    restrictions that Sue is placing on my availability
9    because, as I said, I'm not working these extra hours
10    for me.  I am working these extra hours for them.  And
11    so if Sue is putting this on me, they had a right to
12    know it.  And so all of that is inaccurate.
13    And harsh and I was confrontational.  Yeah.
14    The February 12th when I told her to check the camera
15    about Carl.  Easy enough.  I would like to know if she
16    checked that camera.  Then we would know who's not
17    telling the truth here.
18    Seemingly needed to have the last word.
19    Okay.  So all of that.
20   Q.  It was at your request that you work part time;
21    correct?
22   A.  Yes.
23   Q.  And you worked four days a week; correct?
24   A.  Correct.
25   Q.  In 2018 and '19?

26 (Pages 239 to 242)

f772c6ff-d582-466c-a38f-dcb563fcdf87

EXHIBIT 1

KATHLEEN LIEBAU Volume II
April 07, 2022

## Page 243

1    A.  Correct.
2    Q.  You worked Monday, Tuesday, Thursday, Friday?
3    A.  Correct.
4    Q.  All right.  But you disagree with the notion that if
5        you are working on a project where overtime is not
6        acceptable and you can't get your work done within
7        four days that they might have to look for a full-time
8        employee to do the job if it can't be done in the four
9        days that you wanted to work without overtime?
10   A.  I mean, if it came to that, they could have asked me
11       to come back full time.  I mean, I worked full time
12       before.  But in this -- in this case it wasn't that I
13       couldn't get the work done in four days; it was that
14       Chelsea wanted them now.  So the fact that I could get
15       them all done by Friday was not the issue.  The issue
16       was her calls I believe were on Tuesday, they moved
17       around, but I believe they were on Tuesday at this
18       point, so if we got eight new cases in on Monday, she
19       wanted those eight new cases Monday.  She didn't want
20       them Friday.  So whether I was full time or part time,
21       doing eight new cases would necessitate at least eight
22       hours because they're about an hour each if you don't
23       cut corners or even cutting corners.  So right.  It
24       would have -- because of her demands on when she
25       wanted them, it was a day thing, not a week thing.

## Page 244

1    Q.  Why didn't you seek approval each and every time you
2        needed to do overtime in light of the fact that you
3        knew that overtime was as a general rule not allowed?
4    A.  Once this happened I did.
5    Q.  You pointed out one example of when you claim you
6        sought approval to work overtime.
7    A.  And then the one where Sue didn't do my time card and
8        Chelsea said, "Yeah, I asked Kathy to work 15 minutes
9        today," which Chelsea did ask me.  Well, and I'd have
10       to -- because Chelsea used to like to talk at 5:30, so
11       I'd go, "You know, Chelsea, I'd be on overtime.  Do
12       you want me to do this?"  And so that one time she
13       did.  So yes, after that this I always sought
14       approval.
15   Q.  Well, always sought approval and two times in two
16       years is a different -- very -- very different
17       situation.
18   A.  My overtime went way down after this.  Right?
19   Q.  After -- after -- what are you pointing to?
20   A.  After this -- this reprimand.  My overtime hours went
21       way down.
22   Q.  After the January 19 reprimand?
23   A.  Right.
24   Q.  2018 -- January 29, 2018?
25   A.  Correct.

## Page 245

1    Q.  All right.  And what do you mean it went way down?
2    A.  I didn't work the hours that were required to get them
3        done.
4    Q.  Right.  After you were told you couldn't work overtime
5        without preapproval, did you always seek preapproval?
6    A.  I believe so.
7    Q.  After January 29, 2018, you always sought preapproval
8        for overtime?
9    A.  When was Martin Luther King Day?  Because that was the
10       whole issue -- that was the whole issue was that I
11       worked over Martin Luther King holiday, and I actually
12       did send an email to Chelsea to which she didn't
13       respond, so -- and, again, calls are on Tuesday.
14   Q.  We've got two instances where you claim you sought
15       approval:  The one email you've referred to and the
16       15 minutes where you claim she approved it.
17   A.  I am pretty sure.  I would have to like go through all
18       my time records, which I always kept them in my drawer
19       down there, all the old written ones.  I believe since
20       this became an issue and after the
21       I-don't-know-what-to-do-anymore email, I always sought
22       approval before being paid for any extra hours.  I was
23       somewhat coerced into working extra hours because I
24       got there at 9:00 in the morning and the emails would
25       come -- start flying, but I didn't put in for the time

## Page 246

1        because I'm coerced into working for free.
2    Q.  What do you mean you were coerced into working for
3        free?
4    A.  Answer this email, I see you sitting there, I'm going
5        to come talk to you, it's only 9:15 but you're here at
6        9:00 in the morning so I assume that you're here to
7        work.
8    Q.  Why didn't you go sit in the lunchroom, have a cup of
9        coffee if you got there early and you weren't ready to
10       work yet?
11   A.  That could have been an option you would choose.  I
12       don't know.
13   Q.  Okay.
14   A.  I chose to read the news, you know.
15   Q.  Let's go back to Exhibit 11.  What -- what else do you
16       take objection to as being harsh reprimands or severe
17       beatings in Exhibit 11?
18   A.  All right.  So we touched on this.  "Work product for
19       Ms. Larsen is generally good but some
20       typos/inconsistencies have been noticed.  Some
21       difficulties in establishing priorities have been
22       observed and Ms. Larsen is working with Kathy to
23       provide feedback to improve this."  So all of that.
24   Q.  All right.  So this is referring to the California
25       warranty project, otherwise known as the lemon law

27 (Pages 243 to 246)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

---

## Page 247

1    project; right?
2    A.  Correct.
3    Q.  All right.  So at -- and this is referring to your
4    2017 performance; correct?
5    A.  Theoretically.  But Sue did not limit it to that.
6    Q.  Well, all right.  Let's say it's even, you know, late
7    September when you started on that up until the time
8    it's -- it's signed, which is in March 2018.  So let's
9    not quibble over whether it stopped immediately at the
10   turn of the -- at the beginning of the new year or
11   whether it covered up until March.  You were new to
12   that project; correct?
13   A.  It was new to the firm.
14   Q.  Yeah.  It was very different than the other project
15   you'd worked on for Clay; correct?
16   A.  Yes.
17   Q.  All right.  It's very fast-paced and time-sensitive;
18   correct?
19   A.  So was my old project.
20   Q.  Well, more so than your prior project?
21   A.  Actually no.  They were both intense.
22   Q.  Would you agree with the general proposition that
23   there's always a learning curve on a new project?
24   A.  I would.  And I would also agree that team members who
25   actually want to make it work and don't have age bias

---

## Page 248

1    against me, we would work as a team to make it work,
2    not pick out and poke at any small indiscrepancy [sic]
3    while these processes are being developed.  We would
4    have each other's back, so to speak, rather than wait
5    for the opportunity to throw somebody under the bus.
6    Q.  Do you think you were thrown under the bus in Exhibit
7    Number 11?
8    A.  Well, we're -- I've read how many paragraphs and the
9    majority are inaccurate.  So right.
10   Q.  You receive a meets expectation rating in this review.
11   A.  And she should not have -- wait.  Is this the one
12   where it says -- or is it '19?  Okay.  It was in '19,
13   then, we went to the new form, so never mind.
14   Q.  Do you think it's throwing you under the bus to
15   suggest that when you're on a new project and you have
16   a learning curve that there are some things that you
17   need to focus on to be even better than meets
18   expectations?
19   A.  I think worded like that would have been absolutely
20   right on.  Worded like this, accusing me, first of
21   all, of sending something that I didn't do, "but some
22   typos/inconsistencies have been noticed.  Some
23   difficulties in establishing priorities have been
24   observed and Ms. Larsen is working with Kathy . . ."
25   So --

---

## Page 249

1    Q.  So what is so terrible about that reference?
2    A.  I have actually been very, very strong about
3    establishing priorities, as had been noted in all my
4    reviews prior to this.  I had huge amounts of
5    deadlines.  I had three different discovery cases
6    going.
7    Q.  We're not talking about history.
8    A.  Right.
9    Q.  We're talking about the new project that you're
10   working on as of --
11   A.  So the prior --
12   Q.  -- the end of September 2017.
13   A.  So the priorities that she's talking about here was I
14   was doing the work on each case and finishing it and
15   moving to the next.  Okay.  I think she says it down
16   here in some non-value added stuff, but . . .  So to
17   me that is the most efficient way to do something.
18   You finish it.  The more you touch something, the more
19   you're wasting time.  So you try to touch something
20   once, you finish it, and you move to the next.  She
21   didn't want me to do the database and the numbers that
22   we're going to need for month end.  She wanted me to
23   just whip through it, get the summaries to her, and
24   circle back and do the rest of the work later, so she
25   called that a problem with prioritizing, which I

---

## Page 250

1    paraphrased into cutting corners.  So --
2    Q.  But she's the attorney that's assigning you the
3    work --
4    A.  And I did it her way, didn't I?
5    Q.  All right.  All right.  So, but can you accept the
6    fact that she gets to make the judgment as to what the
7    priorities are?
8    A.  And I -- and I did follow her directives, but she
9    didn't have to write it in my review.  That's not what
10   team members do to each other.  Right?  I mean, you
11   want to have a good working team, you got each other's
12   backs.  You don't, you know, nitpick about -- but I
13   did do her priorities.  It was more work for me
14   because she also wouldn't let me save anything, so I
15   had to repull the records to finish the job.  That's
16   more work for me.
17   Q.  All right.  What else do you take exception to as
18   being unduly harsh in Exhibit 11, if anything?
19   A.  Actually the response from last year, I don't have to
20   read that, but did you -- you know, she writes, "Kathy
21   is great at organizing, prioritizing and using her
22   time well to manage," you know, but then you see
23   Larsen's where I'm having these difficulties.  But,
24   anyway, let's not do the response from last year.
25       Well, so why did Sue even -- "I was

---

28 (Pages 247 to 250)

KATHLEEN LIEBAU Volume II
April 07, 2022

## Page 251

1 disappointed that Kathy was ultimately unwilling to
2 work in our Detroit office last July for a temporary
3 period (up to 3 months) to assist with administrative
4 coverage, especially in light of the fact that her
5 switch work had ended and she did not have substantive
6 work to do. This definitely detracted from the
7 successful functioning of the firm." She didn't note
8 there that it was two more hours out of my day, that
9 it would have cost me more gas, that I'd need to get a
10 cell phone. So she didn't mention any of those
11 things.
12 She asked me to reinvent myself. I think
13 we talked about this last time. And refresh myself on
14 AA work, which basically proves that I wasn't been
15 doing AA work. Right? So I could continue to make a
16 valuable contribution. "This did not happen to any
17 significant degree." Well, what did happen was I got
18 a new substantive project. That's what did happen. I
19 didn't have to reinvent myself because I was already
20 accurate, fast, timely, did what it took, enthusiastic
21 about getting the work done. So I got myself a
22 brand-new project, yet she puts a negative spin on
23 that I didn't, you know, refresh myself on AA work and
24 reinvent myself. She actually told me to go around
25 the office and bring doughnuts. So --

## Page 252

1 Q. It's a true statement what she put in your review
2 about the Detroit office?
3 A. From a one-sided perspective. It should have said we
4 asked Kathy to work two more hours a day without pay
5 and have extra gas and need a cell phone to go to the
6 Detroit office for up to three months. And what if
7 Evelyn didn't make it? I could be stuck down there
8 forever. I already worked down there for ten years.
9 That was -- I don't want to go back to Detroit.
10 Q. Why?
11 A. Two-hour commute.
12 Q. All right. So have you covered everything in the
13 document that you consider unduly harsh?
14 A. So pretty much I'm hating it; right?
15 Q. Do you recognize that Chelsea said complimentary
16 things about you as well as the constructive criticism
17 about areas where she thought you could improve?
18 A. I wouldn't call it constructive criticism, and I see a
19 lot more false statements in here than I -- than I see
20 of any person wanting to be -- to make a team work,
21 so . . . So . . . Yeah. I mean, why is she -- you
22 know, here we had a documented discussion in
23 February '18. Well, this is 4/18, so what's it
24 doing -- why is that in here? Because it's supposed
25 to be for '17. But she chose to put it in here again.

## Page 253

1 But I do note that she writes all have been corrected
2 and I am confident she will adhere moving forward,
3 which I did because I got there a half hour early
4 every day from then on out for the next two years.
5 Q. All right. So have you covered everything that --
6 A. I got this last page here. Okay. Again, the typos.
7 These were typos. These are typos. My typos were
8 one, two. This is actually just not caring. So yes.
9 I am being called out twice for typos.
10 Q. If you thought that Robin's alleged typos were so
11 problematic, why didn't you bring them to Chelsea's
12 attention?
13 A. I did.
14 Q. June 14, 2019.
15 A. That's when she says that I did, but I had mentioned
16 it to her frequently, and she wanted them in client
17 ready position, so that meant that I had to fix it and
18 I had to fix Lisa's too.
19 Q. When did you inform Chelsea that Robin had typos
20 in her work product that you had to correct?
21 A. Frequently.
22 Q. When?
23 A. I -- I can't recall the dates.
24 Q. Do you have --
25 A. But as I --

## Page 254

1 Q. Do you have any notes that reflect when you allegedly
2 brought that to her attention?
3 A. I think right from the get-go. Because we would each
4 send them to Chelsea, our portions, and then Chelsea
5 would tell me to put them together and -- and so I
6 think right from the get-go. I said, you know,
7 there's a lot of typos in here, and she's like, "Well,
8 get it client ready." So she was fully aware that I
9 was doing it. And then when she brought --
10 Q. How was she supposed to know what typos you considered
11 to be Robin's?
12 A. She's the attorney on the project and she's supposed
13 to be looking at stuff that people send her, and she
14 told me to get them client ready. So how -- how is
15 she not understanding that I'm fixing Robin's typos?
16 But if I happened to miss Robin's typo, then it's my
17 typo; right? So . . .
18 Q. You can't recall any specific conversation with
19 Chelsea in which you made her specifically aware of
20 Robin's typos?
21 A. When I had been getting this rapid fire harassment,
22 criticisms constantly and yet I'm -- and then we're
23 doing one and here I am again faced with fixing
24 Robin's work. It was a little bit too much for me to
25 continue to absorb without a little emotion.

29 (Pages 251 to 254)

f772c6ff-d582-466c-a38f-dcb563fcdf87

**EXHIBIT 1**

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 255

1  Q.  What are you referring to with the rapid fire
2      harassment, criticisms?
3  A.  Oh, my gosh.
4  Q.  I mean --
5  A.  This is wrong.  That's wrong.  This is the policy.
6      Let's go with this, go with that.  It was rapid.  I
7      mean, I actually planned to do -- was going to do a
8      timeline and never did, but it was like I was being
9      threatened with termination once a week.  You will be
10     terminated.  You will be terminated.  Can you imagine
11     being --
12 Q.  Who are you claiming said that to you once a week?
13 A.  Sue Choma.  Sue Choma.
14 Q.  Said once a week you will be terminated.
15 A.  Pretty much.
16 Q.  Over what period of time?
17 A.  During -- certainly during 2019.
18 Q.  Starting when?
19 A.  I -- I would say 2019.  All of it.
20 Q.  From January through --
21 A.  Yeah.
22 Q.  -- August --
23 A.  I mean, doesn't she threaten with me termination here
24     too?  Okay.  Yeah.  She hadn't started threatening me
25     with termination yet.  It was a weekly basis at least.

## Page 256

1  Q.  At least.  So in conversations she said --
2  A.  In conversations.  In emails.
3  Q.  Oh, in emails?  Do you have those emails?
4  A.  If I -- the ones I do, you have.
5  Q.  You've given me every email --
6  A.  I've given you everything.
7  Q.  -- in which she once or more than once a week said you
8      will be terminated, you will be terminated?
9  A.  Pretty much.
10 Q.  And how many emails were there to that effect?
11 A.  It sure seemed like a lot.  So, yeah, was I paranoid?
12     Heck yeah.
13 Q.  You kept those emails; correct?
14 A.  Some.  Whatever I gave you.  What I -- also, though, I
15     had some things because as I went through, there were
16     things that I remember that I didn't have, so
17     sometimes I would print them and put them in my drawer
18     on the left, and when I was escorted out of the office
19     like a criminal, I was not allowed to take anything,
20     so whatever was in that left-hand drawer of printed
21     out things, there might be some more stuff right
22     there.  I don't know.  I don't recall what was there.
23     But that is where I would set things.
24 Q.  Well, you kept a lot of material from the firm;
25     correct?

## Page 257

1  A.  I kept things to defend myself.
2  Q.  Right.  So, but you didn't keep all the emails where
3      Sue Choma was saying once or twice a week that she was
4      going to terminate you?
5  A.  I just said they're probably in that -- my left-hand
6      drawer right there.
7  Q.  Well, in a drawer at home or in the drawer at the
8      office?
9  A.  At the office.
10 Q.  Why on earth would you have kept a thousand or more
11     documents from the firm that you then turn over to the
12     EEOC but you didn't keep the emails in your personal
13     possession where the office manager and your
14     supervisor is threatening to terminate you more than
15     once a week?
16 A.  Because those were not directly to disprove a false
17     allegation against my performance.  I mostly kept
18     things when a false allegation was made against my
19     performance.  I wanted documents to show this couldn't
20     be true, this is false and this is false.
21 Q.  You kept a lot more than what you call false
22     allegations, because you turned -- certainly turned a
23     lot more over to the EEOC.
24 A.  They support that the allegations against me were
25     false.  You know, like the time records.  I was

## Page 258

1      accused of being slow and not getting enough done.
2      Well, according to the time records, I'm doing them
3      quicker than anyone else.  If I get six of them done
4      in two hours and Robin took 1.8 to do one, who's doing
5      them faster?  You know.  Or Lisa Myers took 2.2 hours
6      to do one.  You know, but I'm getting --
7  Q.  They're not all equal, are they?
8  A.  No, they're not.  That's why I printed a variety, so
9      you'll kind of get the gist.
10 Q.  All right.  So are you done with your testimony on the
11     issues that you have with Exhibit 11, which is your
12     2018 evaluation?
13 A.  I don't like the overall because "Kathy should
14     demonstrate more flexibility and be more receptive to
15     how others view her work and communications" is, well,
16     if you're making false allegations against this
17     employee, am I supposed to embrace these allegations
18     with like open arms?  I think not.  So I don't like
19     that either.  I think that was also not nice.
20 Q.  Okay.  Are you done?
21 A.  Yep.
22     (Marked EXHIBIT 12 for identification)
23 BY MS. HARDY:
24 Q.  All right.  So let's turn to Exhibit Number 12, which
25     is your probation memo dated May 9, 2019, with the

30 (Pages 255 to 258)

f772c6ff-d582-466c-a38f-dcb563fcdf87

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 259

1    attached emails concerning the conflict issue that is
2    the subject of the probation, one of the subjects of
3    the probation memo.
4        All right.  So let's talk about the
5    assignment you received from Sue -- from Chelsea
6    Larsen to run a conflict check on April 29, 2019.
7    That did not concern the lemon law project; correct?
8    A.  Correct.
9    Q.  It concerned another client and another project;
10   correct?
11   A.  Correct.
12   Q.  And the reason you were asked to run this conflict
13   check is because Shannon Stewart, who otherwise would
14   run it, was out that week on vacation; correct?
15   A.  Actually that is not correct.  Chelsea Larsen had an
16   administrative assistant assigned to cover Shannon's
17   regular work, which would include this conflict.
18   Shannon only asked me to do the lemon laws because we
19   gotta do them -- we gotta -- we gotta do them right
20   away because, you know, they gotta get in that
21   spreadsheet by the end of the day, so I was asked
22   specifically to do the lemon law stuff.  And then
23   Shannon sent me the required information so that I
24   could do them, and so that was what we were gonna do.
25   For this one, Chelsea got it on this Monday morning,

## Page 260

1    and we were walking over to Clay to go over some of
2    the assessments, and she tells this story about how
3    opposing counsel --
4    Q.  We don't need to go into all of that.  She asked
5    you --
6    A.  It does have some bearing.
7    Q.  She told you to do the conflict check.
8    A.  And I said sure.
9    Q.  Okay.  She told you on April 29 to do the conflict
10   check.
11   A.  And I said sure.
12   Q.  All right.  It was not on the lemon law project, but
13   it, nevertheless, was an express directive from
14   Chelsea Larsen?
15   A.  Yes, ma'am.
16   Q.  All right.  And you did not do the conflict check that
17   week, did you?
18   A.  I did not have the information to complete the
19   conflict check.
20   Q.  You did not do it, did you?
21   A.  I did not have the information to complete the
22   conflict check.
23   Q.  Just answer the question.
24   A.  I did.
25   Q.  You did not do it, did you?

## Page 261

1    A.  I'm not going to let you pull that out all by itself.
2    I did not have the information to complete on this
3    thing because Shannon did not give it to me, so I did
4    not have the information required.
5    Q.  Chelsea Larsen told you to go to Clay Guise to get the
6    information; correct?
7    A.  She did not.
8    Q.  You had a conversation with her, according to your
9    submission to the EEOC, in which you acknowledged that
10   she -- you and she had a conversation on the afternoon
11   of Thursday, which would have been May 2, I believe,
12   and she told you that you should go talk to Clay Guise
13   to get the information?
14   A.  The actual way it went down was I said we're going to
15   the printer and I said, "Chelsea, I don't have the
16   information for the switch case.  I don't even know
17   who the billing attorney is."
18        And she said, "I think it's Clay on all the
19   switch stuff.  Go ask him."
20        So is she talking about who the billing
21   attorney is?  Because there's a whole lot more to it
22   than just who's the billing -- it's four -- four
23   screens of things.  You gotta know billing codes.  You
24   gotta know all this different stuff.  So I took that
25   offhanded remark, which, again, she said in a very

## Page 262

1    snarky tone as "I think it's Clay on the switch stuff
2    for a billing attorney.  Go ask him."  Okay.  Well,
3    you know, I worked with Clay on switch stuff for well
4    over a decade.  I know he's involved.  But that won't
5    answer the four screens of questions that need to be
6    completed for a conflict check.  So I didn't have the
7    information.
8    Q.  So you just stopped right there and didn't do anything
9    further?
10   A.  I continued on with other work.
11   Q.  You didn't go talk to Clay to ask whether he could
12   provide the information that you needed to complete
13   the conflict check; correct?
14   A.  I -- again, I took her --
15   Q.  You did not go to Clay to --
16   A.  I didn't.
17   Q.  -- ask him; correct?
18   A.  I did not.
19   Q.  All right.  And you did not go back to Chelsea and say
20   I need further direction as to where I get this
21   information so that I can complete the conflict check
22   per your instructions; correct?
23   A.  I did not quote what you said.  No.  I never said
24   that.
25   Q.  All right.  And you instead waited until 4:26 on

31 (Pages 259 to 262)

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 263

1     Friday, May 3 and sent an email to Shannon Stewart
2     putting it back on her plate for Monday morning when
3     she returned from vacation?
4    A.  And that's why I did it so late, so it would be at the
5     top of her mailbox.
6    Q.  All right.  So you had been told to get it done that
7     week on Monday the 29th.  You were told to go talk to
8     Clay Guise.  You didn't do either of those, did you?
9    A.  I was told to do it on Monday.  I didn't realize that
10    I didn't have the information until Thursday.  Because
11    I don't normally do these.  I hadn't done one since we
12    got the new system.  So --
13    Q.  You'd been training on the new system on
14    January 10th; correct?
15    A.  Correct.  Correct.  But I had never done one because
16    it's not within my normal scope of the work that I
17    did.  So I communicated with -- to Chelsea at that
18    printer.  I told her the status.  I can't do this.  I
19    don't have the information.  I don't even know who the
20    billing attorney is.  So I did communicate with her
21    that I couldn't do it, that I didn't have the
22    information, and I waited, like I said, until the very
23    end of Friday so it would be at the top of Shannon's
24    box.
25    Q.  When Chelsea Larsen saw your email putting it back on

## Page 264

1     Shannon's plate for the following Monday, she sent you
2     an email expressing her dissatisfaction with your
3     course of action; correct?
4    A.  Woo-hoo.  Yes.
5    Q.  Okay.  And that was on May 3; correct?
6    A.  Yes.
7    Q.  All right.  And you didn't respond to that email on
8     May 6, 7, or 8; correct?
9    A.  Wait.  May 3, 4, 5.  6 I was -- I had a scheduled
10    vacation day.
11    Q.  Okay.  What about May 7?  You didn't --
12    A.  7th I got it and I went, oh, my God, and just like was
13    flabbergasted, and, again, we are a very busy, busy
14    project, so . . .
15    Q.  You're getting way beyond the scope of my question.
16    A.  Well, I went to work.  I went to work.  I set that
17    aside.
18    Q.  Answer my question.  You got the email on May 3.  You
19    said you were out on May 6 but you were in on May 7 --
20    A.  And I got it.
21    Q.  All right.  And you did not respond to Chelsea's when
22    she's -- she's the person that you're reporting to for
23    the purposes of that particular project or, you know,
24    the attorney --
25    A.  Well, not this one.  Not the conflict check one.

## Page 265

1    Q.  Well, but she's the one that gave you the assignment.
2     You get an email.  She is upset because you have not
3     followed the directive that she gave you, and you
4     don't bother to respond to her on the 7th, 8th, or
5     9th?
6    A.  I disagree with your characterization.
7    Q.  But you didn't respond to her, did you?
8    A.  Because it wouldn't be a one-sentence response.
9    Q.  Okay.  So this is your excuse.  Let's first answer my
10    question, which is you did not respond to her on
11    May 7, 8, or 9; correct?
12    A.  Well, the 8th is a Wednesday, so I'm not there.  And
13    by the 9th, I was already presented with the written
14    reprimand.  So she gave me one day, the 7th.  And
15    it's not a one-word response.  I was flabbergasted and
16    taken aback by the tone, the allegations.  What I did
17    do, though -- wait.  No.  I didn't do that yet.  It
18    wasn't until on the 9th when I got the written
19    reprimand.  I needed -- I needed to digest that
20    because it was whoa.  And really when you think about
21    it, that email that I sent to Shannon, if I was trying
22    to pull some sort of fast one, why would I copy
23    Chelsea?  Like why would I do that?  And she allegedly
24    gave me directives exactly almost verbatim of my email
25    to Shannon.  Why would I do that?  So no.  What

## Page 266

1     happened first was that my email to Shannon came first
2     and Chelsea made up the conversation second.  And it
3     was false.  We never had this alleged conversation.
4     It consisted of I don't even know who the billing
5     attorney is, I think it's Clay in switch stuff, go ask
6     him.  End.  And we both went back because we were
7     busy.  In my production you'll see emails, things are
8     really hopping today, and it was month end, so we had
9     the numbers to run.  Hugely busy.  Did I have time to
10    deal with responding to this horrendous accusation?
11    No, I did not.  And by the time I was back in the
12    office on Monday, the written, I think you guys call
13    them PIPs, but I never knew that word, but the writ --
14    I was already presented with the written PIP, so . . .
15    Q.  All right.  Let's move on.  Let's turn to your 2019
16    performance evaluation which covers your 2018
17    performance.  This is the performance --
18         THE WITNESS:  How much more time do they
19    get?
20         MR. FARRAR:  How long have we been on the
21    record for?
22         VIDEO TECHNICIAN:  Two hours 46 minutes.
23         MR. FARRAR:  Okay.
24    BY MS. HARDY:
25    Q.  Do you need to take a break?

32 (Pages 263 to 266)

**EXHIBIT 1**

KATHLEEN  LIEBAU Volume II
April 07, 2022

Page 267

1    A.   I -- I have been -- anyway, you guys get seven hours,
2         so we're going to get done; right?
3    Q.   You know, it's not for you to tell me how long my
4         client gets for your deposition.  I'll discuss that
5         with your attorney.  But you're just here to answer
6         questions.  You're not like giving me directives or
7         anyone in this room directives.
8    A.   My blood pressure is kind of going through the roof.
9         So let's get through this.
10   Q.   Well, if you need to take a break, I will accommodate
11        a break.  If you have a medical issue that needs
12        attention --
13   A.   It's not a medical issue, but I'm -- I'm -- I'm
14        distressed.  Let's -- let's go.
15   Q.   Okay.
16             (Marked EXHIBIT 13 for identification)
17   BY MS. HARDY:
18   Q.   Review Exhibit 13, which is your, as I indicated, your
19        2019 performance evaluation, and let me know what it
20        is that you found so horrendous about this evaluation
21        that you went to Chelsea Larsen and told her it was
22        the worst review of your life and that you were
23        considering -- or wanted to know whether you should
24        get an attorney.
25   A.   I heard her say that during her deposition, and I do

Page 268

1         not recall ever telling Chelsea I was going to get an
2         attorney.  So that's a separate issue.  I don't recall
3         ever telling her that.  So . . .  Anyway, what I find
4         horrendous was actually her personal review.  Is that
5         here?  No.  Okay.  So this is Sue's paraphrasing.
6         I'll see if I can tell you.
7    Q.   This is another meets expectation overall rating;
8         correct?
9    A.   Oh.  So this is when we changed forms, okay, in 2019.
10        So it's at -- so if you meet expectations, none of
11        this should have even been here.  "If Improvement
12        Needed or Unsatisfactory, please explain."  So none of
13        this should have even been there.  Ayanna wanted to
14        simplify the process, but apparently Sue wanted to use
15        this as an opportunity to, you know, further paper my
16        file or something.  I have no idea.
17   Q.   This goes back to the same point we discussed earlier
18        that even a meets expectation employee can still
19        improve performance; correct?
20   A.   The categories were meets expecta -- exceeds, meets,
21        unsatisfactory, improvement needed.
22   Q.   So you think if you get a meets expectation that
23        Dykema cannot put any suggestions in the review about
24        improvement needed?
25   A.   They certainly can.  But when this -- because this new

Page 269

1         form went out, firm-wide memo, from Ayanna.  That's
2         why I'm aware that we're not -- that we -- everyone
3         was informed that there was going to be a streamlined
4         process and these were only to be there if you got an
5         improvement needed or unsatisfactory check mark.
6    Q.   Well, that's not what it says.  It says, "If
7         Improvement Needed or Unsatisfactory, please explain."
8    A.   Yeah.  You see how they're initial caps?  So there
9         were four check boxes, exceeds, meets, improvement
10        needed, unsatisfactory.  So if you had an initial caps
11        improvement needed or an initial cap unsatisfactory,
12        please explain.  But if you got meets expectations,
13        that's it.  It was supposed to be a simplified form.
14   Q.   And where did you obtain that understanding?
15   A.   They sent out a firm-wide --
16   Q.   And that's something drafted by Ayanna Clinton?
17   A.   From my recollection or someone in HR.  This is -- you
18        know, Ayanna's the new head, so . . .  So right.  So
19        technically none of this should even be there
20        according to policy, so . . .  Let's see.  Okay.  This
21        one.  Meets expectations.  ". . . however, managing
22        her time to meet time-sensitive deadlines and being
23        able to achieve a balance of slowing down enough to
24        reduce errors has affected the quality of her work."
25        So from my perspective, I am a racehorse that is

Page 270

1         continually flogged and go fast, go fast, but don't
2         you not even make not even one typo.  So it's like why
3         would you even write something like that?  Slow down
4         enough, but then your -- but then your quantity is
5         going to be lacking if you slow down, but don't make
6         any typos.  So to me that's -- you know, you want a
7         machine?  Apparently.  But I'm actually a real human
8         being.  So that -- that is -- affected the quality of
9         my work.  So I think that's why I printed out these
10        quality of work things.  So there's Robin's quality.
11        Where's my quality?  See how they're all nice and
12        lined up.  But, oh, if there was a typo in there,
13        let's make sure we write it on her review.
14   Q.   When did you print off what has been marked as Exhibit
15        Number, I believe that's 6?
16   A.   Sometime after getting this for sure.  As I mentioned
17        before, when there would be --
18   Q.   No.  It's -- it's -- for the record, it's 7.  When did
19        you print off Exhibit Number 7?
20   A.   I can't tell you exactly when.  I don't recall.  But
21        it was when I would get a false accusation against my
22        work, I would get something to prove to the best that
23        I could show and document that it's false.
24   Q.   Now, how is one to tell, looking at Exhibit Number 7,
25        that that's Robin's work product?

33 (Pages 267 to 270)

**EXHIBIT 1**

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 271

1   A.  I don't know.  Let's see.  You could go back to the
2       emails in our Outlook and see which ones Robin sent to
3       Chelsea and which ones I sent to Chelsea.
4   Q.  We can't tell from Exhibit Number 7 that this is
5       Robin's work product, can we?
6   A.  You'd have to go to the emails.
7   Q.  And do you have those emails?
8   A.  You do.  I don't.  No, I don't.
9   Q.  All right.  And so you also can't tell from Exhibit
10      Number 7 that this was actually sent by Robin to
11      Chelsea without some further evidence of that;
12      correct?
13  A.  Well, I printed it out from the -- I don't know if --
14      if Robin would copy me and Chelsea or if when Chelsea
15      would send them back to me saying combine them, get
16      them client ready, but that's how I knew they were
17      Robin's.
18  Q.  But there's way to tell from the document itself that
19      this was sent as a final work product by Robin to
20      Chelsea; correct?
21  A.  There is.  Those emails.  Those emails.
22  Q.  But you don't have those emails.
23  A.  But you do.
24  Q.  You don't know that they're still retained at the
25      firm.

## Page 272

1   A.  They should be.
2   Q.  What do you base that?
3   A.  Well, if you guys knew I was getting an attorney back
4       in -- you know, before I was even terminated, you
5       should have retained everything; right?
6   Q.  Well, how do we even know the date of this work
7       product?
8   A.  I don't know.  We'd have to examine that separately;
9       right?
10  Q.  Well, how would you determine at this point in time
11      what the date is of Exhibit Number 7 when it was
12      created --
13  A.  Okay.  Here I go.
14  Q.  -- created by Robin, if created by Robin, and when it
15      was --
16  A.  Oh, here we go.
17  Q.  -- conveyed by Robin?
18  A.  Oh, wait.  I was on vacation in December '18, and so
19      this is what went out to the client when I was on
20      vacation.  So that's --
21  Q.  Where in the document does it indicate that -- the
22      date of it?
23  A.  I can't put something there that's not there.
24  Q.  Okay.  So the bottom line is that you can't tell from
25      Exhibit Number 7 that it's Robin's work product, when

## Page 273

1       it was generated, or whether it was sent to Chelsea as
2       a final work product; correct?
3   A.  I can tell from when I printed it and -- and all that
4       on the system would verify that it was her work
5       product.
6   Q.  Where is the print date?
7   A.  I mean, I'm not going to quibble about this.  I mean,
8       if you're going to use this and we need to
9       substantiate it, then we'll have to -- it is what it
10      is.  Okay?
11  Q.  Well, we can't tell what it is the problem.
12          MR. FARRAR:  Objection.
13  BY MS. HARDY:
14  Q.  All right.  So let's go back to 13.  Are you done with
15      your testimony about everything in Exhibit 13 that you
16      find so objectionable?
17  A.  Okay.  So the second paragra --
18  Q.  Despite the meets satisfaction rating.
19  A.  Well, meets expectations.  So problem with the first
20      one about, you know, faster, faster, faster but don't
21      make a darn mistake.  And then the last sentence of
22      that, "Mr. Guise is concerned about the amount of time
23      Kathy is away from her desk taking breaks; this may be
24      impeding productivity re: quantity of output."  So I
25      have a huge problem with that.  First of all, I was

## Page 274

1       like never away from my desk.  I was chained to the
2       desk.  I don't see Mr. Guise ever saying that.  He
3       doesn't spy on me.  And may be impeding productivity
4       and quantity of output.  So like in the first sentence
5       you're telling me to slow down and then this he's
6       allegedly saying that my quantity, so, again, those
7       time records --
8   Q.  Do you think somebody falsely attributed that comment
9       to Mr. Guise?
10  A.  I absolutely do.
11  Q.  Okay.  You heard him testify, didn't you, in his
12      deposition?
13  A.  I did, but the audio kept going in and out and I
14      missed a lot of it.  Did you guys discuss that?
15  Q.  Did you -- did you hear his criticisms of you in his
16      deposition testimony?
17  A.  That I'm excitable.
18  Q.  Resistant, creates friction on the team.
19  A.  I think Chelsea created the friction on the team with
20      her bias.
21  Q.  But you -- Mr. Guise testified under oath that he
22      found you resistant to directions and was very
23      frustrated by your refusal to cooperate with the
24      directions that you were given and that you created
25      friction on the team.

34 (Pages 271 to 274)

f772c6ff-d582-466c-a38f-dcb563fcdf87

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 275

1    A.  Mr. Guise and I enjoyed a very good relationship
2        together.  I believe that he was totally unaware for
3        at least a huge time of the way that Chelsea was
4        treating me, because I didn't cry to him about things.
5        I endured a lot of Chelsea's discrimination before I
6        alerted Mr. Guise of the fact.  And so when he says I
7        was a resistant part of the team, I don't think he has
8        all the facts as to exactly who was making this team
9        not work.  I was enthusiastic about it.  I -- I was
10       ready to go.  So . . .  And he's also an equity
11       partner of the firm I'm suing, so, you know, you gotta
12       consider that.
13   Q.  So you think he was being untruthful?
14   A.  I don't think he's untruthful.  I have respect for
15       Clay very much.
16   Q.  All right.  So any other issues that --
17   A.  Okay.
18   Q.  -- you want to identify with Exhibit 13?
19   A.  "There have been a couple of miscommunication issues
20       with Ms. Larsen working through lunch, using
21       inappropriate terminology like 'cutting corners,' and
22       not understanding that overtime is not an option on
23       these cases."  Well, from the reprimands going
24       forward, those were corrected.  And the cutting
25       corners was a huge issue all in its own, which we've

## Page 276

1        been over now.  It was Chelsea's directive to cut
2        corners.  She just didn't like the semantics of using
3        that phrase.  So yeah, I think that's negative.
4        Again, though, I meet expectations, so none of that
5        should even been there.
6            The next one, again, meets expectations, so
7        none of this should be there.
8            I'm still learning/understanding how my
9        role fits into the larger picture of these cases.
10       Well, if I'm getting it wrong, isn't it one of the
11       supervisors' job to tell me?  Or am I supposed to just
12       guess so that whatever I guess is going to be the
13       wrong thing so that I can be reprimanded yet again?
14       So the whole -- like what is the basis of that
15       sentence?  "Learning/understanding how her role fits
16       into the larger picture of these cases."  What does
17       that mean?
18   Q.  You're not asking me questions, are you?
19   A.  I don't know what that means.
20   Q.  Because that's not your role here.
21   A.  Okay.  I don't know what that means.
22   Q.  All right.  So is there anything further you need to
23       point out in 13 so -- so that it's understood why you
24       thought this was the worst review of your life and
25       horrendous and --

## Page 277

1    A.  I think the fact that Sue --
2    Q.  -- severe, et cetera?
3    A.  I think the fact that Sue made me, you know, support
4        my peers as -- as a secretary was meant to demean me.
5        She never had me do attorneys.  She would have me do my
6        peers.  I think that was mentioned to me --
7    Q.  But you were supporting Sue Medley, who is a
8        paralegal, correct, in the fall of '17?
9    A.  I was helping her chart.
10   Q.  Isn't that assisting another para -- assisting a
11       paralegal?
12   A.  But that's different.  That's teamwork.  That's
13       helping.  This was -- I had to, you know, go get a
14       binder and folders from the supply room, which could
15       be taking me away from my desk; right?  Or for another
16       one, a paralegal was in another office and "Go to my
17       office and get this out of the -- from interoffice
18       mail."  It wasn't there.  "Go to the mail room.  See
19       if it's come in yet."  It wasn't there.  You know, "Go
20       back to my office.  See if they delivered it."
21       When -- so I'm doing this stuff when I have billable
22       work to do, and then my, you know, my quantity might
23       be lacking.
24   Q.  Just stay with my question because this is taking an
25       exceedingly long period of time because you just don't

## Page 278

1        respond to the questions.
2    A.  Can you feel my -- my pain?  I hope you're starting to
3        feel the pain.  Because it was painful.
4    Q.  You don't think that your reaction to the 2019 review
5        was an overreaction?
6    A.  We need to see Chelsea's as well.
7    Q.  See Chelsea's what?
8    A.  Her review.  Because this is Sue paraphrasing --
9    Q.  The timekeeper review for the administrative
10       assistants?
11   A.  Let's see.  So, again, "Work on improving accuracy and
12       timeliness with repurchase calculations for
13       Ms. Larsen."  So that's why I had to print out all the
14       calculations, because in Chelsea's review she said I
15       didn't understand the urgency of doing the
16       calculations.  So I had to print out my stuff where --
17       okay.  Because remember I was only allowed to do what
18       Chelsea sent to me to do, so she would send me
19       financial information that she got, for example, in
20       January.  She'd send it to me in March and say do the
21       repurchase.  I'd turn it around typically within
22       24 hours.  Lot of times less.  So, you know, she had
23       this from January, giving it to me in March.
24   Q.  All right.  You're still -- you're just rambling --
25   A.  Well, I'm not rambling because it says right here

35 (Pages 275 to 278)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

Page 279

1    "Work on improving accuracy and timeliness with
2    repurchase figures calculations."  Okay.
3    Q.  Let's just stay with the wording of the review.  Do
4    you really think that that this is a inappropriate review?
5    A.  I do.
6    Q.  And you don't think that your description of it as a
7    harsh reprimand is an overstatement, an overreaction?
8    A.  I do -- I do not.  I do not.
9    Q.  All right.  All right.  So unless there's something in
10   particular that you need to point out, let's move on.
11   A.  Oh.  The Kronos thing, which is when I ended up going
12   back and realizing that Sue let it go through, so
13   that's on there as well.
14   Q.  All right.  So after you were put on probation on
15   May 9th, 2019, you had a conversation with Chelsea
16   Larsen dated June 14, over a month later, 2019, in
17   which you told her that you were on probation because
18   of a falsehood that she told Sue Choma; correct?  You
19   called it a fake conversation.
20   A.  I don't think it was during that meeting, but it was
21   when she approached my desk right after it happened,
22   and I was incredibly angry that I was being falsely
23   accused so harshly and put on probation for something
24   that never happened.  So --
25   Q.  So your --

Page 280

1    A.  -- that was earlier.  The reason we had the June is
2    because I said that to her.
3    Q.  No.  Let's try to refresh your memory here.  You had a
4    June 14 conversation with Chelsea at your work
5    station.  You then had a June 18 meeting with Sue
6    Choma and Chelsea Larsen about the June 14
7    conversation from your work station.
8    A.  Oh.  For timing I'll defer that if that's --
9    Q.  All right.  So let's go back to the June 14
10   conversation at your work station when you told
11   Chelsea that you were on probation because of a fake
12   conversation that she made up.  All right.  So -- and
13   that's also the same conversation where you told her
14   that Robin had typos in her work product that you had
15   to correct.
16   A.  I actually don't recall if they were the same.  It
17   could have been.  I don't recall if they were the
18   same.  It was not a pleasant period.
19   Q.  All right.  Looking back on it, do you think it was
20   inappropriate of you to accuse the attorney of lying
21   in a public workspace with other employees around?
22   A.  More appropriate than her lying to Sue Choma about a
23   conversation that never happened that had serious
24   repercussions for me and got me put on probation, so
25   defending myself again from a false accusation, I

Page 281

1    think I am entitled to do that.  And I had asked at
2    the meeting why don't we get Chelsea up here and
3    straighten out this conversation right now, and Sue
4    said, "We're not going to get Chelsea involved."
5        I'm like, "She's already involved.  She's
6    accusing."  So I said, "Can I send her an email?"
7        And Sue said that would be perfectly fine.
8    So this was soon after Sue denied that she told me I
9    could send an email.
10   Q.  You could have sent an email on your own --
11   A.  I would have got --
12   Q.  -- on May 7, 8, or 9 --
13   A.  That would --
14   Q.  -- before the probation meeting; correct?
15   A.  That would have -- actually no.
16   Q.  Why not?
17   A.  7 I got it.  Shock.  8 is a Wednesday.  I am not in
18   the --
19   Q.  No.  It's sent on May 3.  You're in on the 7th.  You
20   don't do anything on the 7th, you don't do anything to
21   respond on the 8th, --
22   A.  I'm home.
23   Q.  -- and you don't do anything to respond before the
24   probation meeting with Sue Choma.
25   A.  Right.  I -- I was -- right.  I was in on the 7th.

Page 282

1    Couldn't respond.  Shock.  I'm not in the office on
2    Wednesdays.  And by the Thursday, I don't remember
3    what time that meeting was with Sue.  So I -- but, no,
4    there was no time to respond.
5    Q.  All right.  So let's go back to your manner of talking
6    to -- the way you talked to Chelsea on June 14th.  On
7    reflection, do you agree that it was unprofessional to
8    accuse her of lying in a fake conversation sitting at
9    your work station in the firm?
10   A.  But she did lie in a fake conversation, and if I was
11   prevented from sending her an email --
12   Q.  What about going into her office and closing the door
13   and talking to her?  What about asking Sue Choma can
14   we meet with Chelsea?
15   A.  I did do that.  Okay.  I did ask Sue if we could meet
16   with Chelsea.  So --
17   Q.  What about sending her an email?
18   A.  What -- what -- what -- what is -- I -- I couldn't
19   send her an email.
20   Q.  Well, you could have sent an email prior to the
21   probation meeting.
22   A.  On the one day, the 7th, that I actually got it and
23   was shocked and we were busy, I could not craft a
24   coherent response with all that going down, with all
25   this work going on to her that very day.  That wasn't

36 (Pages 279 to 282)

## Page 283

1  gonna happen.
2  Q.  All right.  So what is the falsehood that you claim
3      Chelsea told?
4  A.  The whole thing about having any directive.  There was
5      no directive.  We never -- like she claims that she
6      specifically told me not to save it for Shannon.
7      Whoa.  Where did that come from other than --
8  Q.  She told you to do it on April 29.
9  A.  But she didn't give me the necessary information to do
10     it.
11 Q.  You knew it was a switch case; right?
12 A.  Yes.
13 Q.  You'd worked for, as you said, ten years with Clay
14     Guise on switch cases?
15 A.  Correct.  Correct.
16 Q.  You could have just gone of your own initiative to
17     Clay?
18 A.  No.  No.  It's four pages of con -- I don't know.  Do
19     you guys have them in your firm?  You probably do.
20     It's four pages.  And so not only are there general
21     conflicts, is this person already a client, there's
22     also what's the billing code?  What's -- you know, are
23     they E-billed or are they billed monthly?  Are they --
24     you know, are they against a retainer?  All those
25     kinds of billing type questions.  I don't know because

## Page 284

1      I don't do conflicts.  Clay likely isn't going to know
2      the billing codes and stuff anyway.
3  Q.  But you didn't ask him, did you?
4  A.  That wasn't the way that I interpreted the exchange at
5      the printer.  I interpreted the exchange at the
6      printer that she thought it was Clay that was the
7      billing attorney, go ask him.
8  Q.  All right.  So let's -- let's assume there was a
9      misinterpretation at the printer on May 2 between you
10     and Chelsea.  Do you think that warrants you calling
11     her a liar and making up false stories and being
12     responsible for you being on probation?
13            MR. FARRAR:  Objection to form.
14 A.  Who is making the false story?  Chelsea made the false
15     story against me.  I am defending myself.
16 BY MS. HARDY:
17 Q.  But you have described it as there could have been a
18     misinterpretation of what he was saying.  So she's
19     entitled to believe as well, right, that she clearly
20     communicated to you that you should go to Clay Guise?
21 A.  The reason that she -- okay.  If by her -- by her
22     saying go ahead, I think it's Clay on the switch
23     stuff, go ask him, if by chance she meant all four
24     pages of information, that is not what she wrote down
25     in her disciplinary memo.  She wrote down that I

## Page 285

1      specifically told Kathy not to send it to Shannon.  I
2      specifically told her that if she had questions go ask
3      Attorney Clay Guise.  That's fabricated.  All of those
4      extra words, which really only just tracked my email
5      to Shannon, which came first, she made up an alleged
6      directive that tracked my email to Shannon saying she
7      specifically told me not to do these things or to do
8      these things where they couldn't possibly be true,
9      and, again, if -- why would I copy her on it, then?
10     Like that makes no sense.
11 Q.  All right.  Let's go to your June '18 meeting with
12     Ms. Choma and Ms. Larsen in which they wanted to
13     discuss your behavior on June 14.  Throughout that
14     meeting you accused Chelsea of being a liar; correct?
15 A.  She is.
16 Q.  Okay.  And you didn't see any problem with that in
17     terms of how you were handling the issue?
18 A.  I don't think I called her a liar, you know, a li --
19     or I think I said things like "You know this didn't
20     happen.  You fabricated these -- you know, this
21     alleged conversation."  And so also we started that
22     out because remember I was -- couldn't really
23     communicate with her about the fact of this, so I
24     said, "You know, where were we when -- when we had
25     this alleged conversation?"

## Page 286

1      And she's like, "Right here in my office."
2      So I was like, "Well, when was that?"
3      And she's like, "Monday."
4      And I was like, "Well, it couldn't have
5      been Monday."  And I reminded her that we, you know,
6      spent a good deal of time with Clay, we came back, we
7      finalized stuff.
8      And then she said, "Well, Tuesday, then."
9      And so then I said, "Well, it couldn't have
10     been Tuesday because I sent you this email in the
11     morning, you know, when we got the new cases that I
12     couldn't, you know, I couldn't do the conflicts and
13     stuff.  Do you want me to get going on the cases?"
14     Which she never answered, but she always wanted me to
15     get going on the --
16 Q.  But --
17 A.  So, anyway --
18 Q.  Stop.  Stop.  Stop.
19 A.  So then --
20 Q.  It was Monday that she told you to do the conflict
21     check because there's the email that you've got,
22     April 29.
23 A.  Oh.  But the alleged conversation.
24 Q.  All right.  So let's not get into that --
25 A.  Okay.  Well, but --

37 (Pages 283 to 286)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 287

1    Q.   You knew she'd given you the assignment on Monday the
2         29th.
3    A.   And neither of us knew that I didn't have the
4         information.
5    Q.   All right.  So in the meeting on June 18 you refer to
6         Sue Choma as honey in a sarcastic tone, you refer to
7         Chelsea as Choma; correct?
8    A.   I wouldn't say a sarcastic tone.  And you'd have to
9         have the, you know, context of how it came up.  I
10        can tell you verbatim if you want to hear another
11        story, but you seem to be getting irritated --
12   Q.   I don't want to hear a long story.  Can you -- I
13        mean, --
14   A.   So after --
15   Q.   -- can you get to the point?
16   A.   After we whittled down that the -- this alleged
17        conversation couldn't have been Monday, couldn't have
18        been Tuesday, she said Wednesday.  I said, "Chelsea,
19        I'm out on Wednesday."
20             And she said, "Thursday, then."
21             And I said, "Well, Thursday is when I
22        realized I couldn't do it.  So it wasn't until
23        Thursday that I even realized I couldn't do it.  This
24        whole time I planned to do them with -- with all
25        the -- you know, lemon law ones.

## Page 288

1             And so she -- she said, "Well, it must have
2         been because I distinctly remember talking to Clay
3         about it."
4             And I said, "Well, you might have talked to
5         Clay, but you didn't talk to me, honey."  And so that
6         is verbatim the way the honey came out.
7    Q.   Do you think that was appropriate?
8    A.   I -- I -- it's the way I talk.  So . . .
9    Q.   All right.  At that point in time Ms. Choma advised
10        you that she thought you were acting in a
11        disrespectful and inconsiderate manner and asked you
12        to cease; correct?
13   A.   Those are Sue's favorite terms, yes.
14   Q.   All right.  And you continued throughout the remainder
15        of the meeting to lob accusations about Chelsea being
16        untruthful and just arguing about everything; correct?
17   A.   No.
18   Q.   What's incorrect about that?
19   A.   I am not lobbing.  I'm not being difficult.  This is
20        the first time we ever had both parties involved in
21        the dispute being able to face one another and
22        actually work out what the heck happened here.  So
23        I -- I disagree with all of what you said.  It was
24        a -- we were discussing and trying to get to the
25        bottom of what's going on here.

## Page 289

1    Q.   How would you describe your demeanor in that meeting?
2    A.   Defensive.
3    Q.   Like -- like you're --
4    A.   Yeah.  I'm very defensive right now, yes.
5    Q.   Yeah.  Same manner and demeanor as you've been
6         displaying in your testimony here?
7    A.   Probably.  Probably.  Yes.
8    Q.   All right.
9    A.   I feel very accused and very -- yeah.
10   Q.   Do you understand that that is not the way to engage
11        if you want to have a productive conversation?
12             MR. FARRAR:  Objection.
13   A.   People shouldn't make false accusations against
14        another person.  That's not a way to behave.
15   BY MS. HARDY:
16   Q.   All right.  So let's -- let's turn to the issue of
17        retaliation.  Who do you claim retaliated against you
18        and for what?
19   A.   I -- well, Chelsea's age bias was evident for a long
20        time, but it seemed that Sue rather than -- I would
21        say as a office manager she would have some sort of
22        duty to prevent discrimination in the workplace, where
23        she appeared to more facilitate it and push me out the
24        door and -- and so yes.  I think Sue has --
25   Q.   So Sue is the person you're accusing of retaliation?

## Page 290

1    A.   Firm generally.  They let it happen.
2    Q.   Anyone in particular other than Sue?
3    A.   No.
4    Q.   What do you claim Sue was retaliating against you
5         about?  What did you do that you believe led to her
6         retaliation?
7    A.   That she, you know, perhaps knew that I was concerned
8         that Chelsea's bias was leading Chelsea to lie about
9         my performance, and so I -- I raised that I think age
10        might be an issue and the wheelchair sitting there and
11        Chelsea wouldn't move it.  So I think Sue recognized
12        that maybe I might be making an age claim.  I don't
13        know.
14   Q.   Sue -- Sue had no idea, as we covered in your last
15        deposition, that you were of the view that Chelsea was
16        discriminating against you on the basis of your age
17        until after you had been placed on probation on May 9,
18        2019?
19             MR. FARRAR:  Objection.
20   A.   I -- I don't recall saying that.
21   BY MS. HARDY:
22   Q.   Well, she didn't have any knowledge of your age claim
23        until after May 9, 2019; correct?
24             MR. FARRAR:  Objection.
25   A.   And I can't comment on Sue's knowledge of -- I don't

38 (Pages 287 to 290)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 291

1   know.
2   BY MS. HARDY:
3   Q.   So you didn't tell Sue that you thought Chelsea Larsen
4       was discriminating against you on the basis of your
5       age until after May 9, 2019?
6   A.   I only put a point on it after May 9th.  I had said
7       about the wheelchair I want it stored somewhere else.
8   Q.   That's what you told Chelsea?
9   A.   And Sue.  Sue called to borrow it.  She thought it was
10      mine, like everybody else, and I said it's not mine.
11  Q.   When do you claim Sue called to borrow it?
12  A.   I really don't recall, but quite -- quite a bit before
13      the rapid fire reprimands, and so I can't recall
14      exactly.
15  Q.   Okay.  So how is -- just because Sue wants to borrow
16      the wheelchair, what does that have to do with her
17      being aware that you think that Chelsea Larsen harbors
18      some age bias towards you?
19  A.   Because I -- I said the wheelchair's not mine, it
20      belonged to Chelsea Larsen, I don't like it there,
21      people think there's something wrong with me, please
22      store it somewhere else, so I said that -- that might
23      have not been verbatim to Sue, but it was along the
24      lines that people think it's mine, they think there's
25      something wrong with me, please store it somewhere

## Page 292

1       else.  So Sue knew about this.
2   Q.   When do you claim retaliation started by Sue Choma?
3   A.   I would say with all these rapid fires and -- and
4       constant threats of termination.  I -- I would say
5       that's -- and then ultimately firing me.
6   Q.   But when did it start and what was it reacting to?
7   A.   I think -- well, I think Chelsea's age bias and
8       telling falsehoods against my performance began with
9       the 2018 review.
10  Q.   No.  I'm focused on Sue Choma.
11  A.   I don't know when Sue Choma's brain got around.  I
12      don't know.
13  Q.   Well, what are you claiming was the beginning of her
14      retaliatory acts?
15  A.   I would have to -- I would -- I don't know.  I don't
16      know.
17  Q.   All right.
18  A.   I . . . I think I answered that a bunch times.
19  Q.   All right.  So in your submission to the EEOC, you
20      don't ever accuse Sue Choma of having age bias, do
21      you?
22  A.   It was Chelsea Larsen that had the age bias.
23  Q.   Yeah.  Not Sue Choma; correct?
24  A.   Correct.
25  Q.   All right.  And in your submission to the EEOC you

## Page 293

1       don't identify any acts of retaliation carried out by
2       Sue Choma, do you?
3   A.   I'm not an attorney and I don't work in employment
4       law, so I -- I -- I didn't, I guess.
5   Q.   And in your lengthy submissions to the EEOC you don't
6       identify what you did that provoked retaliation, do
7       you?
8   A.   What do you mean what I did?  You mean my age?
9   Q.   What you did or -- what you did or said.  I mean,
10      retaliation has to be in response to something.  It's
11      called protected activity.  And you don't identify
12      what you did or said that provoked retaliation.
13          MR. FARRAR:  Objection.
14  A.   And I would have to read my EEOC submission against
15      because I can't remember every single thing I said in
16      there, so I'm going to have to read that again.
17  BY MS. HARDY:
18  Q.   Well, you can't -- sitting here right now, you can't
19      identify what it is you said or did that caused Sue
20      Choma to retaliate against you, can you?
21  A.   Well, I just testified a moment ago that I did tell
22      her about the wheelchair, so did that -- did that
23      spark it for her?  I don't know.  Ultimately I feel I
24      was illegally fired, so . . .
25  Q.   And you can't identify when you told her about the

## Page 294

1       wheelchair; correct?
2   A.   No.  Not at this time.
3   Q.   All right.
4           MS. HARDY:  We have to go off the record so
5       that the tape can be changed and . . .
6           VIDEO TECHNICIAN:  Okay.  This marks the
7       end of Media Unit Number 2.  We are off record at
8       4:46.
9           (Recess taken at 4:46 p.m.)
10          (Back on the record at 4:47 p.m.)
11          VIDEO TECHNICIAN:  This marks the beginning
12      of Media Unit Number 3 in the deposition of Kathleen
13      Liebau.  The time -- Volume 2.  The time is 4:47 p.m.
14  BY MS. HARDY:
15  Q.   You knew Shannon Stewart for a number of years and
16      worked with her; correct?
17  A.   Yes.
18  Q.   She was Chelsea Larsen's support person?
19  A.   Administrative assistant.
20  Q.   Administrative assistant.  Correct?
21  A.   Correct.
22  Q.   All right.  Did you observe Chelsea and Shannon
23      interacting throughout the course of the workday?
24  A.   Sometimes.
25  Q.   Had you ever heard Chelsea say anything critical of

U.S. Legal Support | www.uslegalsupport.com

f772c6ff-d582-466c-a38f-dcb563fcdf87

KATHLEEN LIEBAU Volume II
April 07, 2022

## Page 295

1 Shannon?
2 A. No.
3 Q. Would you be surprised that Chelsea had a very high
4 opinion of Shannon Stewart as an employee at Dykema?
5 A. I can't attest to anybody else's feelings about
6 anybody else, so . . .
7 Q. Would it surprise you?
8 A. No.
9 Q. Okay. You didn't see anything inconsistent with
10 Chelsea Larsen holding the point of view that Shannon
11 was an excellent employee?
12 A. I didn't find anything contrary, no.
13 Q. You don't think that Chelsea was disrespectful to
14 Shannon?
15 A. I don't know.
16 Q. But you never observed anything to suggest that;
17 correct?
18 A. Not that I recall.
19 Q. And you never observed anything that would suggest
20 that she was critical of Shannon and of her work
21 product?
22 A. Again, I don't know.
23 Q. Okay. And Shannon's older than you; correct?
24 A. I believe so.
25 Q. Okay. So if you think she has an inherent bias

## Page 296

1 towards employees because of their age, why would she
2 have a positive view of Shannon and a negative view of
3 you if age is the determining issue?
4 A. I don't know.
5 MR. FARRAR: Objection.
6 BY MS. HARDY:
7 Q. You recall an incident back in July of 2015 with a
8 woman named Brittany, we don't need a last name, but
9 you know who I'm talking about; correct?
10 A. Yep.
11 Q. She's an attorney who used to be at Dykema; correct?
12 A. Yep.
13 Q. And she went to work for a very significant client of
14 Dykema Gossett; correct?
15 A. Correct.
16 Q. All right. And you had an email exchange with her
17 which was both unprofessional and very critical of
18 her; correct?
19 A. Not critical of her. Brittany and I had a very good
20 and candid relationship when she was with the firm.
21 I -- when she became a client, I will admit that that
22 candor should have ceased, and she definitely took
23 offense to it.
24 Q. Okay. And there was concern expressed that your
25 conduct, your inappropriate conduct, that is, in terms

## Page 297

1 of how you interacted with her and the nature of your
2 email exchange with her, could have jeopardized the
3 client relationship for Dykema; correct?
4 A. I don't remember those words, but there was a
5 reprimand and it's written.
6 Q. Okay. And you apologized to Brittany; correct?
7 A. I did.
8 Q. Because it was indeed very inappropriate what you said
9 to her in an email; correct?
10 A. Yes.
11 Q. Okay. So 2018, '19 isn't the first time that you had
12 a problem at the firm with inappropriate
13 communications and in -- in that instance it was even
14 with a client; correct?
15 A. Who used to -- who I used to work with, so, again,
16 it's not like I was saying it to someone I did not
17 directly work with. We had a candid relationship, and
18 I did apologize, and Brittany agreed that we would,
19 you know, continue -- you know, turn a new leaf and go
20 on, and so that should have been the end of it, so
21 2015, '16, '17, '18, so three years, I've been there
22 almost 35, so if I had two incidences in 35 years,
23 sometimes that happens.
24 Q. Well, you had a -- you had friction with Brittany when
25 she still worked at the firm?

## Page 298

1 A. She was -- she is a difficult individual.
2 Q. But despite knowing her style, you continued to push
3 and engage in -- in -- in communications with her that
4 she took objection to?
5 A. One. One communication.
6 Q. When she was still at the firm, you had friction with
7 her because of the way you interacted with her;
8 correct?
9 A. I'm not going to agree to that, no. I mean,
10 Chelsea --
11 Q. You wouldn't -- you wouldn't be surprised if that was
12 her point of view, would you?
13 A. It depends on when. She also in one of my reviews
14 called me the ultimate professional, loved my
15 communications. So, you know, events can happen and
16 some people move on and some hold a grudge.
17 Q. All right. I'm going to show the witness a document
18 that I'm not marking as an exhibit, but I just want
19 you to identify it for the record. It came from the
20 EEOC submissions, and this particular document is
21 Bates stamped 224 through 229, and it says to human
22 resources from Kathy Choma, response to Sue Choma's
23 May 9, 2019, memorandum, and it's May 2019. I want
24 you to identify is this the rebuttal to the
25 probationary memo that you drafted but never submitted

40 (Pages 295 to 298)

KATHLEEN  LIEBAU Volume II
April 07, 2022

| Page 299 | Page 301 |
|---|---|
| 1     to the firm? | 1     refused to go to the Detroit office, did you? |
| 2   A.  It looks like it.  It's quite lengthy.  So right. | 2   A.  No. |
| 3        This is -- this is a draft that . . .  Yeah. | 3   Q.  But that's what you told Orlans; correct? |
| 4   Q.  So that's -- that's your draft rebuttal that you never | 4   A.  I don't know. |
| 5        submitted to the firm; correct? | 5        (Marked EXHIBIT 15 for identification) |
| 6   A.  Correct.  At least I think it is.  It's quite lengthy, | 6  BY MS. HARDY: |
| 7        but . . . | 7   Q.  All right.  So let me show you Deposition Exhibit -- |
| 8   Q.  You went to work for a period of time with The Orlan | 8        MR. PORTER:  15. |
| 9        Company? | 9  BY MS. HARDY: |
| 10  A.  Orlans. | 10  Q.  This just was received today in response to a |
| 11  Q.  Orlans?  Right.  And that's a law firm or . . .? | 11       subpoena.  And it is an Application for Employment |
| 12  A.  Yes.  They do like financial services, so foreclosures | 12       from The Orlans Company -- Companies.  And on the |
| 13       and evictions, so not everyone that works there is -- | 13       second page -- |
| 14       is legal.  Like they've got a lot of processors.  But | 14  A.  Okay.  Like I said, I -- |
| 15       I was in the legal department. | 15  Q.  -- at the bottom -- |
| 16  Q.  Okay.  When -- in the process of seeking employment, | 16  A.  I see it. |
| 17       did you disclose why you'd left Dykema? | 17  Q.  -- it has "Employment Dates" and it has "Reason For |
| 18  A.  It's always asked.  I think at that point -- because I | 18       Leaving" and it says "Involuntary separation," and |
| 19       tried explaining.  I tried the truth.  Tried saying | 19       then it reads, "I declined an assignment in downtown |
| 20       early retirement.  I -- I can't remember -- | 20       Detroit due to the 1 hour 50 minute commute from my |
| 21  Q.  What are you referring to?  I'm not -- I'm not | 21       home - which would be even longer in the winter; this |
| 22       tracking it. | 22       apparently angered the office manager."  That's what |
| 23  A.  Well, it's just very difficult to find a new | 23       you represented in your Application for Employment |
| 24       employment when you guys are misreporting the work I | 24       with Orlans as your reason for departure. |
| 25       did and -- I can't remember what I specifically said. | 25  A.  You gotta say something. |

| Page 300 | Page 302 |
|---|---|
| 1   Q.  So when you say you tried the truth, you mean when you | 1   Q.  So you just made that up? |
| 2        were filling out applications with various employers? | 2        MR. FARRAR:  Objection. |
| 3   A.  Very soon I got a call from a headhunter and they're | 3   A.  You've gotta say something. |
| 4        like, "Well, why did you leave Dykema?" | 4  BY MS. HARDY: |
| 5        And I'm like, "Well, I think it was age | 5   Q.  It's not true, is it? |
| 6        discrimination." | 6   A.  Age discrimination is true and that didn't work well, |
| 7        And he dropped me like a hot potato.  So | 7        so . . . |
| 8   I'm like, okay, well, I can't try that anymore.  May | 8   Q.  What you disclosed is not true, is it? |
| 9        have to try something else. | 9   A.  Well, actually it's true that I didn't want to do the |
| 10  Q.  So what -- what explanations did you offer to | 10       hour and 50-minute commute, so . . . |
| 11       prospective employers? | 11  Q.  That had nothing to do with your termination, did it? |
| 12  A.  Early retirement. | 12       MR. FARRAR:  Objection. |
| 13  Q.  So you lied? | 13  A.  Yeah.  I don't know what you want me to say. |
| 14  A.  Well, I was forced into a sense of early retirement, | 14  BY MS. HARDY: |
| 15       wasn't I?  What -- I'm at a loss to know -- I'm trying | 15  Q.  And -- well, I want you to answer the question.  It |
| 16       to move on, but like it's very difficult to move on | 16       had nothing to do with the reasons for your |
| 17       from this blow of trashing my character and reputation | 17       termination, did it? |
| 18       and my livelihood. | 18       MR. FARRAR:  Objection. |
| 19  Q.  Well, what did -- what did you tell Orlans as to why | 19  A.  I don't know.  I don't know. |
| 20       you'd left? | 20  BY MS. HARDY: |
| 21  A.  I honestly don't remember.  I did say termination, and | 21  Q.  In fact, that occurred, the -- your refusal to work in |
| 22       I think they didn't really push it because somebody at | 22       Detroit, two years prior to your termination; correct? |
| 23       that firm personally knew someone at Dykema and they | 23  A.  Correct. |
| 24       had already talked to them, so I got the job. | 24  Q.  And you have no basis to believe that there's any |
| 25  Q.  All right.  You didn't leave Dykema because you | 25       connection between your refusing to go to Detroit and |

41 (Pages 299 to 302)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 303

1      your termination on August 23, 2019; correct?
2   A.  I have no idea.
3   Q.  No one ever suggested that to you, did they?  Answer
4      the question.
5   A.  Well --
6   Q.  Just --
7   A.  -- Sue wrote it in my -- my thing.
8   Q.  No one suggested to you there's any connection between
9      what happened in 2017 with respect to your refusal to
10     go to Detroit and your termination two years later?
11     Just answer --
12  A.  I'm sticking with my answer that I have to tell them
13     something, and age discrimination didn't work.
14  Q.  Just answer my question.  We already know that you
15     lied and why you lied, but that -- no one ever
16     suggested to you that not going to Detroit was
17     connected in any fashion to the decision to terminate
18     you; correct?
19         MR. FARRAR:  Objection.
20  A.  No one ever communicated that to me.  Correct.
21  BY MS. HARDY:
22  Q.  Okay.  Thank you.
23         MS. HARDY:  Let's take a break for a
24     moment.
25         VIDEO TECHNICIAN:  Going off the record.

## Page 304

1      The time is five p.m.
2         (Recess taken at 5:00 p.m.)
3         (Back on the record at 5:14 p.m.)
4         VIDEO TECHNICIAN:  We are back on the video
5      record at 5:14 p.m.
6   BY MS. HARDY:
7   Q.  You approached the Dykema firm after you were placed
8      on probation about wanting to be reclassified to a
9      legal assistant job from your administrative assistant
10     job so that you could get out from under the
11     supervision of Sue Choma; correct?
12  A.  Not as phrased.  I sought to get the correct
13     classification for the work that I was doing and get
14     moved out of Sue Choma's supervision because of this
15     harassment that was -- she was continually throwing at
16     me, so . . .
17  Q.  Well, did you think that was a reasonable request when
18     you're on probation in your current job
19     classification, which is -- was administrative
20     assistant, to request that you be moved to a different
21     classification so that you could get out from under
22     the supervision of your current supervisor?
23  A.  Of the one that was retaliating against me and -- I
24     was being crushed, so it was -- yes, I needed to get
25     out of there.  It was a cry for help.

## Page 305

1   Q.  But you didn't put in an application for a legal
2      assistant job, did you?
3   A.  No.
4   Q.  All right.  So you make in the EEOC submission the
5      allegation that employees were pressured to retire at
6      Dykema Gossett.  What were you referring to?
7   A.  We were hearing that a lot of long-term employees were
8      being pressured to retire.
9   Q.  That's just rumor?
10  A.  Pretty much.
11  Q.  Do you have anything other than rumor?
12  A.  Not really.
13  Q.  All right.  You also make the allegation in your EEOC
14     submission that new firm management did not value long
15     service employees.  What were you referring to?
16  A.  It appeared to refer to the rumors that so many
17     long-term employees had been pressured to retire and
18     then -- read my whole sentence or --
19  Q.  New -- new firm management did not value long service
20     employees.
21  A.  Did I say something like it appears they didn't or
22     something?  I don't know.
23  Q.  It could have been.
24  A.  That's what it appeared, that they didn't value --
25  Q.  Again, just based on rumors?

## Page 306

1   A.  Of a lot of people leaving and that they were
2      pressured, yes.
3   Q.  Did anyone share that point of view with you who
4      actually left the firm, that they were pressured to
5      leave or they felt that firm management did not value
6      long service employees?
7   A.  Two-part question.  I'm scanning to see if I directly
8      talked --
9   Q.  It's not -- it's not a two-part question.  My -- my
10     question -- one question is did anyone who left the
11     firm share that point of view with you that they felt
12     pressured to leave?
13  A.  I believe they did and I'm trying to recall who I was
14     talking with.  I can't recall at this moment.
15  Q.  All right.  So I have one last document I want to show
16     you.  It was produced this week by -- by your
17     attorney, and it doesn't have a Bates number on it,
18     but it's -- says "Gmail" up at the top left corner, so
19     I presume this is something you sent to yourself and
20     the firm, but I don't -- I want you to identify it for
21     the record.  It's -- it's got a date of June 20th,
22     2019, at 4:37 p.m. on one of the emails and -- I think
23     that's the only date.
24  A.  Oh, okay.  So I remember this.  Yes.
25  Q.  What does that concern?

42 (Pages 303 to 306)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 307

1    A.  So at the meeting where Chelsea and Sue and I
2    discussed when could this alleged directive from
3    Chelsea possibly have taken place and when we
4    confirmed it couldn't have been the Monday, couldn't
5    have been the Tuesday, couldn't have been the
6    Wednesday, Chelsea said, "Well, it was Thursday or
7    Friday, then."
8         And I said, "I don't recall any conference
9    with you on Thursday and Friday, and it was just
10   Thursday that I realized I couldn't do it, and we had
11   that exchange at the printer, and we didn't have
12   anything on Friday."  And so these are my time records
13   showing that I did not have any conference with
14   Chelsea Larsen about any switch conflict on either
15   Thursday or Friday.
16   Q.  All right.  Have you ever talked to Donna Crumit about
17   why she left the firm?
18   A.  No.
19   Q.  Have you ever talked to Janet Burke about why she left
20   the firm?  Or Jane Burke.  I'm sorry.
21   A.  No.
22   Q.  All right.  Have you ever talked to Steve Tupper about
23   why he left the firm?
24   A.  Yeah.  He set up his own shingle.
25   Q.  He said what?

## Page 308

1    A.  Set up his own shingle.  He started his own consulting
2    firm.
3    Q.  He didn't say that he felt pressured to leave or left
4    because --
5    A.  Yeah.  I think you're quoting people that commented
6    that it was inappropriate that the wheelchair was next
7    to me, so I think you're reading the wrong list of
8    people.
9    Q.  Well, let's put aside your concern.  Have you ever --
10   just respond to the questions.  Did you ever talk to
11   Steve Tupper about why he left the firm?
12   A.  Before he left, yeah.
13   Q.  Okay.  And that was because he was going into his
14   own --
15   A.  Yes.
16   Q.  -- own practice?
17   A.  Right.
18   Q.  He didn't say anything about being pressured to leave
19   because of --
20   A.  Yeah.
21   Q.  -- the firm didn't value long service employees and
22   being pressured to retire?
23   A.  To my knowledge, Donna and Jane are still there, so I
24   don't even think they're gone, to my knowledge,
25   so . . .

## Page 309

1    Q.  All right.  What about Patty Vign -- Vign --
2    A.  Vigneau?
3    Q.  Vigneau?
4    A.  To my knowledge, she's still there.
5    Q.  All right.  And Denise Shiemke?
6    A.  To my knowledge, she's still there.
7    Q.  All right.  Did you ever talk to them about the
8    wheelchair, any of those people?
9    A.  Yes.  Those are the people that I recall, you know,
10   that made some comment to me about what's with the
11   wheelchair, why do you have a wheelchair, and then
12   when I said it was Chelsea's and -- I -- and we'd
13   have a conversation.  I believe they all agreed, yeah,
14   I wouldn't want it next to me either and -- you know,
15   not all at the same time.  This is, you know . . .
16   So, yes, we all talked about the wheelchair.
17   Q.  None of them said anything that suggested that they
18   thought Chelsea was -- had put the wheelchair in the
19   mix for the birthday celebration because she had some
20   kind of age bias?
21   A.  This was more of leaving that wheelchair next to me
22   for over three and a half years.
23   Q.  But none -- none of these people, Donna, Jane, Steve,
24   Patty, or Denise, ever suggested that they thought
25   Chelsea had any age bias, did they?

## Page 310

1    A.  We -- well, by them agreeing they wouldn't want it
2    next to theirs either because it makes you look old or
3    something's wrong with you, they agreed they wouldn't
4    want it by them.
5    Q.  All right.  There's not anybody at Dykema Gossett
6    that's ever shared with you in writing or verbally a
7    concern about Chelsea Larsen having an age bias, is
8    there?
9    A.  Not that I recall.  Yeah.
10   Q.  Or any concern about Sue Choma behaving
11   inappropriately?
12   A.  Those I -- there's a lot of those.
13   Q.  You mean administrative assistants who don't like
14   the -- her being a tough taskmaster?
15   A.  That and among other things, so yeah.
16   Q.  Like what?
17   A.  Gosh, I'm getting into another dissertation.  That --
18   that Sue would say or write un -- you know,
19   unaccurate [sic] things to them.
20   Q.  Who are you talking about?
21   A.  You know, various people at the firm.  So --
22   Q.  Do you have a name?
23   A.  I don't want to throw any of my old friends under the
24   bus.
25   Q.  Well, I'm asking you --

43 (Pages 307 to 310)

f772c6ff-d582-466c-a38f-dcb563fcdf87

**EXHIBIT 1**

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 311

1   A.  I don't recall.
2   Q.  -- who -- you don't recall?
3   A.  No.
4   Q.  All right.  Have you done anything since your last
5       deposition to find employment?
6   A.  Yes.
7   Q.  What?
8   A.  I applied for a family law paralegal position.
9   Q.  Where was that?
10  A.  You're going to subpoena them.  I don't recall the
11      name of the firm.
12  Q.  Are you just saying that because you don't want to
13      disclose it?
14  A.  I actually don't.
15  Q.  Well, how recently did you apply for this job?
16  A.  It was through school.  Somebody got -- they
17      approached the -- the professors.
18  Q.  How recently did you apply?
19  A.  I believe it was just a couple weeks ago.
20  Q.  And you don't recall the name of the firm?
21  A.  Po --
22  Q.  You'll be obligated --
23  A.  Polizzi.
24  Q.  -- to identify it in discovery, so there's --
25  A.  Yeah.  I --

## Page 312

1   Q.  Holding it back now is not going to accomplish
2       anything.
3   A.  It was an Italian name.  Palooza something.
4   Q.  Have you heard from them?
5   A.  No.
6   Q.  What did you tell them as to the reason you left
7       Dykema?
8   A.  I actually was honest again, and they received it
9       somewhat -- I didn't think it totally took me out of
10      the running, but then I was ghosted, so I guess it
11      did.
12  Q.  Is there anything else you've done to look for
13      employment other than apply with that one firm?
14  A.  No.
15          MS. HARDY:  All right.  We're completed for
16      now.
17          MR. FARRAR:  I have a few questions.
18          MS. HARDY:  All right.
19              EXAMINATION
20  BY MR. FARRAR:
21  Q.  You were asked about a discussion you had with Sue
22      Choma about the wheelchair.  Do you recall being asked
23      about that?
24  A.  Yes.
25  Q.  Okay.  And what did you tell Sue Choma at that time

## Page 313

1       about the wheelchair and how it made you feel?
2   A.  That it doesn't belong to me, it's Chelsea's, that,
3       you know, people ask me about it, makes me look old,
4       please store it somewhere else.
5   Q.  Do you recall the exact date when you had that
6       discussion with Sue?
7   A.  I don't.
8   Q.  Was it before your probation or your PIP --
9   A.  Oh, definitely.
10  Q.  And after you mentioned the wheelchair to Sue before
11      your PIP or your probation, did Sue's treatment of you
12      change in any way?
13  A.  I think def -- definitely.  I mean, it kept speeding
14      up; right?  More and more and more.  So yes.
15  Q.  What kept speeding up?
16  A.  The reprimands, the emails, the threaten to fire you.
17      So yes.
18  Q.  And you were asked about a June 2019 meeting you had
19      with Chelsea Larsen and Sue.  Do you recall being
20      asked that?
21  A.  Yes.
22  Q.  And at that meeting did you discuss with them your
23      complaints of age discrimination?
24          MS. HARDY:  Objection.  Leading.
25  A.  Well, yes.  That's where I -- I put the point on it

## Page 314

1       and I said, "If you don't move that wheelchair, I'm
2       going to file an age discrimination lawsuit."
3   BY MR. FARRAR:
4   Q.  And did Sue's treatment of you change after you had
5       that June 2019 meeting?
6   A.  I'd say --
7           MS. HARDY:  Objection.  Leading.
8   A.  Well, I'd say yes.  I mean, that's when she started
9       picking on -- you know, wanting four entries a day
10      and -- so like a lot of -- just anything.  So yes, I
11      would say so.
12  BY MR. FARRAR:
13  Q.  Okay.  In what ways did Sue's treatment of you change?
14  A.  You know, started picking on the entering four times a
15      day.  Just any movement.  She, you know, again,
16      accused me of -- incorrectly accused me of taking
17      breaks.  She's, like, "Well, you smoke."  Yeah.  At
18      home.  So yeah.  She was -- yeah.  Just constant.  She
19      was always on me.
20  Q.  Did Chelsea's treatment of you change after the
21      June 2019 meeting?
22          MS. HARDY:  Objection.  Leading.
23  A.  Yes.
24  BY MR. FARRAR:
25  Q.  In what ways did her treatment of you change?

44 (Pages 311 to 314)

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

## Page 315

1  A.  It seemed like any little minor infraction would be
2      documented and then go through Sue and . . .  So yes.
3          MR. FARRAR:  I don't have anything further.
4          MS. HARDY:  I have one question.
5          RE-EXAMINATION
6  BY MS. HARDY:
7  Q.  You don't recall an exact date of when you told Sue
8      Choma you objected to the wheelchair?  In fact, you
9      don't recall what year that was or what month in a
10     year, do you?
11 A.  Oh, I don't know about the year.  It was -- gosh.
12     When was it?
13 Q.  Are you guessing?
14 A.  I would be.
15 Q.  All right.  Do you have any notes to re -- to look to
16     to refresh your memory?
17 A.  Not on that specific Sue asking me about the
18     wheelchair thing I do not.
19 Q.  Or you mentioning to Sue the wheelchair.  That's what
20     I'm referring to.
21 A.  She called me asking about the wheelchair.  She
22     thought it was mine too.  I -- I don't.  I would say
23     things to prove my innocence on false allegations, so
24     no, I didn't save anything there.
25 Q.  Okay.  So the bottom line is that you don't know when

## Page 316

1      that was and you have no way of establishing at this
2      point when that conversation occurred?
3  .   Yeah.  I just don't recall.  I mean, I might -- it
4      might come back to me.  I don't know.
5          MS. HARDY:  All right.  Nothing further.
6          MR. FARRAR:  Thank you.
7          VIDEO TECHNICIAN:  This marks the end of
8      the deposition of Kathleen Liebau.  The time is
9      5:28 p.m.
10         (The deposition was concluded at 5:28 p.m.
11     Signature of the witness was not requested by
12     counsel for the respective parties hereto.)
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 317

CERTIFICATE OF NOTARY
STATE OF MICHIGAN )
              ) SS
COUNTY OF WAYNE   )

        I, Cheri L. Poplin, certify that this
deposition was taken before me on the date
hereinbefore set forth; that the foregoing questions
and answers were recorded by me stenographically and
reduced to computer transcription; that this is a
true, full and correct transcript of my stenographic
notes so taken; and that I am not related to, nor of
counsel to either party nor interested in the event of
this cause.




        Cheri L. Poplin, CSR 5132, RPR, CRR
        Notary Public,
        Wayne County, Michigan
My Commission expires:  August 21, 2025

KATHLEEN   LIEBAU Volume II
April 07, 2022

Page 318

**A**
aa 238:1 251:14
    251:15,23
aback 265:16
ability 204:24
able 173:19
    211:12 226:5
    269:23 288:21
abreast 150:2,9
abs 182:23
    183:3 184:18
    184:25
absent 181:4
absolutely
    248:19 274:10
absorb 254:25
accept 228:13
    250:5
acceptable
    198:14 199:6,7
    199:8 243:6
access 152:8
    154:17,24
    191:22 192:12
accident 210:9
    210:11 228:6
accidents
    212:21
accommodate
    267:10
accomplish
    312:1
accomplished
    235:21
account 157:25
    169:17,21
accounting
    212:16
accumulated
    212:14
accuracy 278:11
    279:1
accurate 219:9
    227:1 229:12
    241:24 251:20

accurately
    152:10 195:5
    229:7,9
accusation
    165:4 241:4,12
    266:10 270:21
    280:25
accusations
    192:10 288:15
    289:13
accusatory
    220:9 235:5
accuse 195:12
    280:20 282:8
    292:20
accused 161:25
    258:1 279:23
    285:14 289:9
    314:16,16
accuses 203:19
accusing 248:20
    281:6 289:25
achieve 269:23
acknowledged
    261:9
acquire 154:20
acronym 166:4
acting 288:10
action 148:23
    264:3
active 241:21
activity 293:11
acts 292:14
    293:1
actual 261:14
add 161:19
added 249:16
addition 184:6
    232:21
additional
    217:21 219:2
    229:3
addressed
    194:19 239:19
    240:4
addresses

200:15 230:18
    231:10
addressing
    209:7
adhere 237:17
    253:2
adjustment
    209:21
adjustments
    232:4,12
administrative
    152:2 153:7
    164:5 181:8
    251:3 259:16
    278:9 294:19
    294:20 304:9
    304:19 310:13
admit 164:20
    296:21
advance 158:12
    165:8 225:2
advice 155:10
advise 219:12
advised 237:3
    239:11,16
    288:9
advising 168:22
afternoon
    149:15 190:18
    211:9 230:22
    261:10
age 160:14
    166:23 171:2,8
    172:22 173:17
    187:6 247:25
    289:19 290:9
    290:12,16,22
    291:5,18 292:7
    292:20,22
    293:8 296:1,3
    300:5 302:6
    303:13 309:20
    309:25 310:7
    313:23 314:2
agency 164:6
ago 150:1

219:23 222:25
    223:17 293:21
    311:19
agree 148:8
    195:4 216:1
    247:22,24
    282:7 298:9
agreed 214:7
    297:18 309:13
    310:3
agreeing 310:1
ahead 172:24
    231:12 233:21
    233:24 234:5,5
    234:7,11 237:2
    284:22
alerted 275:6
allegation
    160:17 257:17
    257:18 305:5
    305:13
allegations
    158:16 160:22
    161:5 164:24
    172:10 257:22
    257:24 258:16
    258:17 265:16
    315:23
alleged 253:10
    266:3 285:5,21
    285:25 286:23
    287:16 307:2
allegedly 241:23
    254:1 265:23
    274:6
allowed 204:6
    244:3 256:19
    278:17
allowing 198:10
allows 172:25
amount 160:20
    187:2 239:9
    273:22
amounts 173:18
    249:4
analyzing

181:19
anger 192:8
angered 301:22
angers 194:23
angry 279:22
announced
    192:19
announces
    193:4
annual 150:2
    155:20
answer 158:14
    158:15 161:24
    161:24 169:7
    169:10 171:18
    178:19,24
    207:15 210:21
    212:8 215:12
    216:10,15
    220:5 221:9
    225:15 230:9
    231:1 235:7
    246:4 260:23
    262:5 264:18
    265:9 267:5
    302:15 303:3
    303:11,12,14
answered 156:2
    203:3 239:7
    286:14 292:18
answering
    170:21
answers 317:9
anybody 164:3
    174:7 208:6
    295:5,6 310:5
anymore 162:8
    190:20 201:25
    210:8,19
    211:14 219:20
    225:13 230:10
    230:23 300:8
anyway 183:11
    224:3 235:13
    235:20 250:24
    267:1 268:3

KATHLEEN   LIEBAU Volume II
April 07, 2022

Page 319

284:2 286:17
**apologize**
297:18
**apologized**
297:6
**apology** 228:19
**apparently**
212:10 228:12
239:23 241:17
268:14 270:7
301:22
**appearances**
146:1 149:1
**appeared**
289:23 305:16
305:24
**appears** 159:20
163:10 240:13
305:21
**applicable** 239:6
**application**
301:11,23
305:1
**applications**
300:2
**applied** 150:3
152:1,3,11,22
152:24 153:3,6
311:8
**apply** 216:22
217:18 311:15
311:18 312:13
**appreciated**
215:16
**approached**
279:21 304:7
311:17
**appropriate**
216:8 280:22
288:7
**approval** 158:21
200:10 201:4
201:18 202:11
202:17,18
203:2,3,6,8,10
210:17,18

215:25 216:16
217:17 223:9
225:2,7,10
230:14 231:1,5
231:22 244:1,6
244:14,15
245:15,22
**approve** 223:10
**approved**
200:19,23
201:15 230:19
245:16
**april** 145:20
148:2,6 171:23
171:24 259:6
260:9 283:8
286:22
**areas** 252:17
**arent** 161:4
**arguing** 229:4
288:16
**arms** 258:18
**arrival** 151:17
**arrive** 197:6
**arrived** 226:12
227:3
**asbestos** 181:7,8
181:11
**aside** 224:9
264:17 308:9
**asked** 154:6
177:1 185:4,5
185:5 187:24
202:3 219:13
227:24 243:10
244:8 251:12
252:4 259:12
259:18,21
260:4 281:1
288:11 299:18
312:21,22
313:18,20
**asking** 149:16
157:22 158:1
173:14 231:4
276:18 282:13

310:25 315:17
315:21
**assembling**
181:22
**assessments**
260:2
**assigned** 174:10
176:14,24
180:4 181:2
184:5 259:16
**assigning** 250:2
**assignment**
177:19 179:11
192:20 259:5
265:1 287:1
301:19
**assist** 184:21
251:3
**assistance** 233:3
**assistant** 181:8
259:16 294:19
294:20 304:9,9
304:20 305:2
**assistants**
278:10 310:13
**assisting** 175:1,9
175:17 277:10
277:10
**assume** 204:5
246:6 284:8
**assumed** 199:2
201:19 202:19
202:25 203:8
225:9
**assuming** 236:7
**assumption**
154:16
**assured** 179:22
**attached** 147:13
151:6,9,12,14
151:16,17,18
151:19 259:1
**attaches** 194:16
**attachments**
172:9
**attempt** 212:22

**attendance**
151:13 213:17
221:16
**attention** 181:20
253:12 254:2
267:12
**attest** 238:16
295:5
**attorn** 183:20
**attorney** 169:13
169:15,19
175:1 181:21
200:20 201:1
201:19 202:17
222:17 250:2
254:12 261:17
261:21 262:2
263:20 264:24
266:5 267:5,24
268:2 272:3
280:20 284:7
285:3 293:3
296:11 306:17
**attorneyclient**
163:12,16
164:12,17
165:19,22
**attorneys** 146:4
152:15 181:20
188:13,19
189:1 220:25
234:25 237:11
238:5 277:5
**attributed** 274:8
**audio** 148:7
274:13
**august** 157:22
158:5 169:23
169:24 180:9
239:11 240:2,9
255:22 303:1
317:25
**author** 164:10
**authority**
163:11 165:18
221:15,24

**authorization**
164:10 165:12
165:14,17
215:8,10
**authorized**
200:4 214:20
216:2
**authorizing**
198:13
**automotive**
182:6
**autumn** 182:9
**availability**
242:8
**available** 161:1
174:12 205:21
232:12
**avenue** 145:17
146:10 148:17
**aware** 203:17
254:8,19 269:2
291:17
**ayanna** 239:14
268:13 269:1
269:16
**ayannas** 269:18

**B**
**ba** 228:9
**back** 152:25
159:5,17
161:12 162:15
163:7 178:14
190:23 192:10
195:8,12 196:1
198:2,4 204:16
204:17 206:16
208:13 213:9
217:1,15 221:1
227:22 228:9
229:19 231:15
231:18 232:1
243:11 246:15
248:4 249:24
252:9 262:19
263:2,25 266:6

266:11 268:17
271:1,15 272:3
273:14 277:20
279:12 280:9
280:19 282:5
286:6 294:10
296:7 304:3,4
312:1 316:4
**backs** 250:12
**bad** 170:24,24
177:8 189:19
**bailed** 181:12
**balance** 269:23
**ballpark** 184:14
**base** 272:2
**based** 305:25
**basically** 158:6
167:19 251:14
**basing** 229:13
**basis** 149:23
150:3 174:11
193:14 218:9
220:13 222:9
224:23 239:24
241:16 276:14
290:16 291:4
302:24
**basketball** 175:5
**batch** 154:15
**bates** 153:12,12
159:11 162:22
163:9 194:20
212:17 213:18
218:2 222:6
240:21 298:21
306:17
**bathroom**
228:11
**bearing** 260:6
**beat** 167:11,11
**beating** 166:6,11
166:19
**beatings** 167:14
240:25 246:17
**becoming**
207:18

**began** 292:8
**beginning** 202:2
213:10 247:10
292:13 294:11
**behalf** 148:20,25
149:4,6 158:23
**behave** 289:14
**behaving** 310:10
**behavior** 285:13
**believe** 158:17
164:4 165:4
170:20 181:5
181:17 187:23
190:9 191:22
192:16,17
193:22 197:14
197:16 210:4,5
210:11,15
214:10 243:16
243:17 245:6
245:19 261:11
270:15 275:2
284:19 290:5
295:24 302:24
306:13 309:13
311:19
**believed** 164:6,9
215:7
**belong** 313:2
**belonged** 291:20
**benefit** 213:24
**berkley** 175:4
**best** 200:6
270:22
**bet** 205:12
**better** 199:7
225:6 248:17
**beyond** 231:8
264:15
**bfarrar** 146:6
**bias** 160:14
166:23 187:6
247:25 274:20
289:19 290:8
291:18 292:7
292:20,22

295:25 309:20
309:25 310:7
**bicker** 207:6,7
207:12
**big** 166:3
**bill** 175:23 219:2
219:12 223:8
224:20 227:17
227:19 230:14
238:23
**billable** 202:10
237:7 238:3
277:21
**billed** 159:23
160:1,4 201:7
203:5 214:4
238:13 283:23
**billing** 165:13
165:14 175:14
218:10 225:7
238:7 261:17
261:20,22,23
262:2 263:20
266:4 283:22
283:25 284:2,7
**binder** 277:14
**birmingham**
145:18 146:11
148:1,17
**birthday** 309:19
**bit** 198:24
254:24 291:12
**bits** 182:12
**blah** 231:20,20
231:20
**blank** 163:24
**blood** 267:8
**bloomfield**
146:4,5 174:12
177:18 178:13
179:23,25
180:5 206:15
**blow** 300:17
**blowup** 211:22
**books** 204:16
**borrow** 291:9,11

**bus** 209:15
**291**:15
**boss** 201:16
**bother** 201:18
235:3 265:4
**bottom** 162:22
212:17 272:24
288:25 301:15
315:25
**box** 263:24
**boxes** 269:9
**brain** 292:11
**brandnew**
251:22
**break** 161:22
212:25 266:25
267:10,11
303:23
**breaks** 150:17
151:13 273:23
314:17
**brian** 146:3
149:4 157:20
**brief** 193:21
**bring** 251:25
253:11
**bringing** 181:19
**brittany** 183:7,9
183:10,13
185:4,9,10
218:13,16,20
219:13 220:21
221:11 296:8
296:19 297:6
297:18,24
**brought** 155:2
254:2,9
**brown** 183:12
221:11
**building** 229:15
**bunch** 292:18
**burden** 178:25
180:8
**burdensome**
154:25
**burke** 307:19,20

248:5,6,14
310:24
**busy** 174:17
180:21 186:3
217:18 218:15
238:15,17,19
264:13,13
266:7,9 282:23

**C**

**c** 146:4
**calculations**
278:12,14,16
279:2
**california**
192:14 246:24
**call** 170:10
176:22 194:6,9
204:14,19,24
212:19,20
252:18 257:21
266:12 300:3
**called** 149:9
179:16 184:3
195:13 210:10
230:12 249:25
253:9 279:19
285:18 291:9
291:11 293:11
298:14 315:21
**calling** 284:10
**calls** 243:16
245:13
**camera** 227:24
228:1,2,18
229:18,22,23
242:14,16
**cancer** 181:5
**candid** 296:20
297:17
**candor** 296:22
**cant** 153:8 162:9
191:9 216:10
223:2 233:3,11
238:19 243:6,8
253:23 254:18

263:18 270:20
271:4,9 272:23
272:24 273:11
290:25 291:13
293:15,18,18
293:25 295:5
299:20,25
300:8 306:14
cap 269:11
capping 166:5
caps 166:5 269:8
269:10
caram 145:8
card 228:16
229:8,15,16
231:17,25
232:2,6,8,9,16
232:20 233:6,8
244:7
cards 231:19
care 157:9 206:7
caring 253:8
carl 227:17,23
228:2,17
229:18,21
242:15
carol 198:23
199:17,18
232:10
carried 293:1
case 145:7 163:4
163:10 165:18
172:15 176:4
184:22 199:2
213:16 235:17
243:12 249:14
261:16 283:11
cases 185:23
190:17,22
211:9 212:1
225:12 230:24
243:18,19,21
249:5 275:23
276:9,16
283:14 286:11
286:13

casually 166:20
categories
268:20
category 181:18
207:19
caught 167:9
228:6
cause 173:16
317:14
caused 232:2
293:19
cease 288:12
ceased 296:22
celebration
309:19
cell 178:16
204:17,21,23
205:1,3 212:19
251:10 252:5
certain 216:13
238:18
certainly 150:19
175:25 180:12
188:21 189:16
194:7 255:17
257:22 268:25
certificate 317:1
certified 148:20
certify 317:6
cetera 149:20
221:17 277:2
chain 234:13
chained 274:1
challenged
227:20
chance 284:23
change 150:6
178:4 229:14
313:12 314:4
314:13,20,25
changed 204:23
268:9 294:5
changes 150:10
character
164:25 300:17
characterizati...

219:9 220:11
265:6
characterize
235:8
charge 160:16
200:9,22 201:1
201:4,20
charging 174:2
210:17
charles 175:4
chart 277:9
charting 176:4
180:13
chat 189:21
chatting 227:5
228:4
check 152:9
175:15,19
176:6 205:7
212:20 227:24
228:1,2,18
229:18,22
242:14 259:6
259:13 260:7
260:10,16,19
260:22 262:6
262:13,21
264:25 269:5,9
286:21
checked 214:6
242:16
checking 227:25
chel 191:2
chelsea 152:6
160:14 161:7
161:14 162:2
166:23 170:24
187:3 188:18
188:21,24
189:14 190:9
190:14,19,23
191:2,8,12,20
192:5 210:24
212:5 223:15
224:1,5 228:5
230:7 231:21

231:21 235:11
235:14,15,16
235:17 242:6
243:14 244:8,9
244:10,11
245:12 252:15
253:19 254:4,4
254:19 259:5
259:15,25
260:14 261:5
261:15 262:19
263:17,25
265:23 266:2
267:21 268:1
271:3,3,11,14
271:14,20
273:1 274:19
275:3 278:18
279:15 280:4,6
280:11 281:2,4
282:6,14,16
283:3 284:10
284:14 285:14
287:7,18
288:15 290:8
290:11,15
291:3,8,17,20
292:22 294:18
294:22,25
295:3,10,13
298:10 307:1,3
307:6,14
309:18,25
310:7 313:19
chelseas 187:6
253:11 264:21
275:5 276:1
278:6,7,14
289:19 290:8
292:7 309:12
313:2 314:20
cheri 145:21
148:24 180:13
317:6,22
child 187:7
childrens 157:9

choma 152:6,14
152:21 162:3
170:24 174:17
176:23 192:18
194:13 195:6,9
199:16 208:14
213:22 216:7
216:20 217:16
217:22 218:4
218:22 219:12
220:2,12 221:2
221:14 222:7
222:12,23
226:10,25
239:11 240:21
255:13,13
257:3 279:18
280:6,22
281:24 282:13
285:12 287:6,7
288:9 292:2,10
292:20,23
293:2,20
304:11 310:10
312:22,25
315:8
chomas 221:18
292:11 298:22
304:14
choose 151:11
246:11
chose 202:12
217:13 246:14
252:25
circle 249:24
circumstances
166:22
claim 167:15
172:22 173:2
173:17,20
189:4 195:10
196:10 199:10
199:14 217:4
229:16 238:10
244:5 245:14
245:16 283:2

KATHLEEN  LIEBAU Volume II
April 07, 2022

289:17 290:4
290:12,22
291:11 292:2
**claiming** 153:3
175:16 189:6
197:18 228:15
237:25 255:12
292:13
**claims** 283:5
**clarified** 214:13
214:14 215:17
**classification**
304:13,19,21
**clay** 181:24
183:6,9,20
184:3 201:16
201:21 214:6,6
214:7,8,16
215:8,11,14
216:22 221:11
222:23 223:7
223:14,22
224:10,15
242:6 247:15
260:1 261:5,12
261:18 262:1,3
262:11,15
263:8 266:5
275:15 283:13
283:17 284:1,6
284:20,22
285:3 286:6
288:2,5
**clays** 175:2
214:21
**clear** 192:13
228:14 231:25
241:20
**clearly** 163:22
235:22 284:19
**clicked** 228:16
**client** 153:25
154:10 156:10
159:23 160:1,4
174:24 175:4
182:25 183:10

183:12,21
185:7 201:7,8
222:16 234:3
236:12 237:15
238:14,24
253:16 254:8
254:14 259:9
267:4 271:16
272:19 283:21
296:13,21
297:3,14
**clients** 163:3
234:25
**clinton** 269:16
**clipped** 238:3
**clips** 240:10
**closing** 282:12
**coaching** 194:3
194:6,7 221:20
**code** 283:22
**codes** 261:23
284:2
**coerced** 245:23
246:1,2
**coffee** 246:9
**coffees** 206:4
**coherent** 282:24
**collect** 192:9
204:7,10
**college** 157:9
**colorful** 189:18
**com** 146:6,12,13
**combine** 271:15
**come** 178:13,20
195:24 197:23
199:3 204:7
207:24 227:18
228:2 229:7
243:11 245:25
246:5 277:19
283:7 316:4
**comes** 162:5
233:8
**coming** 158:7
176:5 198:13
219:22

**comings** 227:25
**commencing**
145:19
**comment** 274:8
290:25 309:10
**commented**
308:5
**comments** 187:3
212:11
**commission**
172:12 317:25
**committed**
177:19
**common** 173:23
173:25
**communicate**
183:19 241:4
241:14 263:20
285:23
**communicated**
150:7 263:17
284:20 303:20
**communication**
298:5
**communicatio...**
156:3 170:8
258:15 297:13
298:3,15
**commute**
252:11 301:20
302:10
**commutes** 208:2
**commuting**
177:19
**companies**
301:12
**company** 145:11
167:6 299:9
301:12
**comparable**
186:11
**comparison**
189:14
**comparisons**
188:9
**compensated**

201:9
**compensating**
218:6,7
**complained**
172:14
**complaints**
313:23
**complete** 239:21
260:18,21
261:2 262:12
262:21
**completed**
231:17 239:12
262:6 312:15
**completion**
163:7
**compliance**
158:2 194:8
233:22
**compliant**
210:12,14
240:3
**complied** 220:15
222:17
**complimentary**
252:15
**comply** 169:5,7
169:11 210:2
214:10 218:21
218:25 220:14
221:15,21
222:11 230:25
236:20 238:12
239:5
**complying**
234:8
**computer** 154:1
154:2,4,9,14
155:22,25
156:5,7,22
157:8,14
317:10
**con** 283:18
**concern** 259:7
296:24 306:25
308:9 310:7,10

**concerned**
207:20 208:8
259:9 273:22
290:7
**concerning**
158:1 259:1
**concerns** 234:13
236:20
**conclude** 172:21
**concluded**
316:10
**conclusion**
172:13
**conduct** 198:14
296:25,25
**conducted** 221:4
**conference**
307:8,13
**confidence**
164:5,7
**confident** 253:2
**confidential**
151:20 153:25
158:22 159:13
163:21,22
164:7 165:10
241:25
**confidently**
176:1
**confirm** 158:1
212:21
**confirmed**
214:16 307:4
**confirming**
194:15
**confirms** 199:21
**conflict** 259:1,6
259:12,17
260:7,9,16,19
260:22 262:6
262:13,21
264:25 286:20
307:14
**conflicts** 283:21
284:1 286:12
**confrontational**

KATHLEEN   LIEBAU Volume II
April 07, 2022

242:13
connected
    303:17
connection
    162:21 171:3
    189:5 302:25
    303:8
conscious
    152:18
consider 185:25
    202:3 225:21
    227:5 231:4
    252:13 275:12
considered
    254:10
considering
    267:23
consist 154:4
consisted 266:4
consistently
    203:25
constant 190:7
    191:24 292:4
    314:18
constantly
    254:22
constitutes
    189:4 190:11
constructive
    252:16,18
consulting 308:1
contact 215:11
    234:15,25
    236:2,4
contained
    159:14
contending
    221:14
content 195:11
contents 147:1
context 287:9
continually
    270:1 304:15
continue 148:7
    149:15 251:15
    254:25 297:19

continued
    180:12 262:10
    288:14 298:2
contrary 295:12
contribution
    251:16
conversation
    195:5,9 254:18
    261:8,10 266:2
    266:3 279:15
    279:19 280:4,7
    280:10,12,13
    280:23 281:3
    282:8,10
    285:21,25
    286:23 287:17
    289:11 309:13
    316:2
conversations
    148:10 256:1,2
conveyed
    272:17
convince 173:12
    173:19
convinced 174:5
cooperate
    274:23
coordinate
    220:21
copies 162:15
    169:15,19
    180:19
copy 153:16
    156:22 159:15
    159:17 162:24
    163:1 172:7
    265:22 271:14
    285:9
corner 306:18
corners 211:17
    211:19,21,22
    211:24 243:23
    243:23 250:1
    275:21,23
    276:2
correct 150:13

150:18 152:11
153:7 155:24
156:23,24
157:6,20
158:24 159:21
159:22,23,24
160:1,2,4,5,7,8
163:14 164:14
164:18 165:15
168:2,24 169:5
170:16,17,17
170:19 171:3
171:14,16,21
171:23 172:1
173:6 174:13
176:19 177:1,2
178:9 179:10
182:16 184:1
186:22 192:15
192:24 197:2,5
197:21 198:11
198:14 199:18
200:16 201:7
202:13 203:2
204:15 205:6
205:11 208:25
216:2 218:6,23
219:24 221:21
221:24 223:4
224:11,15
227:7 230:15
231:11 233:10
234:17 235:3
238:7 239:1,13
239:16,22
240:3,12
242:21,23,24
243:1,3 244:25
247:2,4,12,15
247:18 253:20
256:13,25
259:7,8,10,11
259:14,15
261:6 262:13
262:17,22
263:14,15,15

264:3,5,8
265:11 268:8
268:19 271:12
271:20 273:2
277:8 279:18
280:15 281:14
283:15,15
285:14 287:7
288:12,16
290:23 292:23
292:24 294:1
294:16,20,21
295:17,23
296:9,11,14,15
296:18 297:3,6
297:9,14 298:8
299:5,6 301:3
302:22,23
303:1,18,20
304:11,12
317:11
corrected 253:1
    275:24
correcting 164:1
    187:25
correctly 152:7
    152:23,24
    172:18 220:8
corresponding
    203:5
cost 251:9
couldnt 165:7
    201:25 220:13
    233:5 243:13
    245:4 257:19
    263:21 282:1
    282:18 285:8
    285:22 286:4,9
    286:12,12
    287:17,17,22
    287:23 307:4,4
    307:5,10
counsel 148:12
    149:1 155:8
    159:17 163:1
    183:22 241:2

241:10 260:3
316:12 317:13
counseled
    226:15 229:6
counseling
    226:24
count 211:10
county 317:4,24
couple 178:17
    189:7 230:2
    275:19 311:19
course 162:6
    185:19 199:5
    264:3 294:23
court 145:1
    148:14,24
    149:2 161:13
cover 181:23
    259:16
coverage 251:4
covered 163:3
    247:11 252:12
    253:5 290:14
covers 266:16
coworkers
    227:5 228:4
craft 208:20
    282:23
crazy 185:8,12
    185:13 206:22
    218:15
created 232:15
    272:12,14,14
    274:19,24
creates 274:18
criminal 256:19
critical 294:25
    295:20 296:17
    296:19
criticism 166:8
    252:16,18
criticisms
    168:10 254:22
    255:2 274:15
criticized 166:2
crr 145:21

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

crumit 307:16
crushed 304:24
cry 275:4 304:25
csr 317:22
csr5132 145:21
cup 246:8
current 216:25
304:18,22
curve 247:23
248:16
cut 211:22
235:11 243:23
276:1
cutting 211:16
211:19,21,24
243:23 250:1
275:21,24

**D**
da 228:9,9
daily 192:10
darn 273:21
database 249:21
date 193:2
196:11 211:6
218:13 227:14
272:6,11,22
273:6 306:21
306:23 313:5
315:7 317:7
dated 169:22,23
169:23 171:23
193:7 194:13
218:4 223:2
229:1 258:25
279:16
dates 168:25
217:7 224:7,9
253:23 301:17
david 145:9
146:9
day 176:10,10
176:12,16
177:17,23,23
178:14 179:16
179:19 180:2

181:10 182:13
196:1 198:4
199:5 209:2
219:11 226:12
227:17,24
228:3,6,17
235:21 239:13
239:13,22
243:25 245:9
251:8 252:4
253:4 259:21
264:10 265:14
282:22,25
314:9,15
days 175:23
176:17 205:12
234:16 235:2
235:11 236:8
238:18 242:23
243:7,9,13
daytoday
152:17,19
deadlines 249:5
269:22
deal 266:10
286:6
dealt 170:6
decade 154:12
201:12,15
239:3 262:4
december
272:18
decision 155:7
155:12 165:7
201:11 202:12
216:8 303:17
decisions 203:9
declined 301:19
declining 175:25
def 313:13
defend 158:16
158:18 160:19
160:22 162:14
164:15,23
169:6 257:1
defendant

145:12 146:8
148:12
defending 162:5
280:25 284:15
defenses 172:10
defensive 289:2
289:4
defer 280:8
deficiency 206:5
definitely 199:1
199:19 251:6
296:22 313:9
313:13
definition
203:16
degree 251:17
delete 157:23
168:23 169:8
deleted 158:7
deliver 234:2
delivered
277:20
demand 222:3
demands 243:24
demean 277:4
demeanor 289:1
289:5
demonstrate
258:14
demonstrated
192:5
demonstrates
190:9 193:18
denied 281:8
denies 237:19
denise 309:5,24
dep 167:1,2
department
299:15
departure
151:17 301:24
depends 298:13
deposing 167:6
deposition
145:15 149:16
150:23 151:2

156:1 157:18
163:8 166:4
213:11 267:4
267:25 274:12
274:16 290:15
294:12 301:7
311:5 316:8,10
317:7
describe 154:2
289:1
described
191:12 199:21
240:24 284:17
317:7
describes 195:5
description
279:6
desk 160:18
174:18 227:18
227:23 228:5
273:23 274:1,2
277:15 279:21
despite 169:4
174:3 180:4
216:7 273:18
298:2
details 163:3
determine
272:10
determined
173:15 203:1
determining
296:3
detracted 251:6
detroit 174:11
174:19 176:24
177:1,7,11,14
177:17,20
178:9 179:4,24
181:3,12,14
251:2 252:2,6
252:9 301:1,20
302:22,25
303:10,16
detroits 177:10
developed 248:3
dickinson 170:5

170:22,25
171:20
didnt 149:24
150:2 152:24
154:15,17,21
165:12 166:23
168:18,19
169:5 173:10
173:11,12
176:14,15
177:23 179:14
180:5,25 186:2
189:25 192:6
192:23 193:8
195:12,22
201:18 202:16
203:6,25
204:22,24
206:20 208:19
209:16,18
210:21 212:6
214:25 219:7
219:18 221:25
222:11 224:6
224:19,21
225:4,15
228:19 229:7
229:20 230:9
232:17,19
236:9,11
238:12 243:19
244:1,7 245:2
245:12,25
246:8 248:21
249:21 250:4,9
251:7,10,19,23
252:7 253:11
256:16 257:2
257:12 262:6,8
262:11,16
263:8,9,10,21
264:7,11 265:7
265:17 274:11
275:4 276:2
278:15 283:9
284:3 285:16

KATHLEEN  LIEBAU Volume II
April 07, 2022

Page 325

285:19 287:3
288:5 290:22
291:3 293:4
295:9,12
300:22,25
302:6,9 303:13
305:1,21,24
307:11 308:3
308:18,21
312:9 315:24
**died** 182:13
**difference**
237:25
**different** 166:9
179:20 182:3
182:17 183:1
185:17,18
186:6,16
188:14 189:23
190:3,10
207:24 216:23
222:15,16
228:14 235:23
244:16,16
247:14 249:5
261:24 277:12
304:20
**differing** 166:1
**differs** 195:11
**difficult** 226:3
288:19 298:1
299:23 300:16
**difficulties**
246:21 248:23
250:23
**digest** 208:19
265:19
**direct** 172:15
230:16 235:10
235:20
**directed** 153:17
**direction** 155:8
216:23 262:20
**directions**
274:22,24
**directive** 200:8

214:10 215:7
216:12,21
217:16 218:21
220:12 222:11
225:5 260:13
265:3 276:1
283:4,5 285:6
307:2
**directives** 216:7
250:8 265:24
267:6,7
**directly** 220:20
257:16 297:17
306:7
**disagree** 205:16
209:4 243:4
265:6 288:23
**disagreeing**
174:15
**disappointed**
251:1
**disciplinary**
221:20 284:25
**disclose** 155:10
299:17 311:13
**disclosed** 302:8
**discovery**
154:24 174:16
174:23,25
175:10,18
176:7 180:12
183:2,17 186:1
249:5 311:24
**discriminating**
290:16 291:4
**discrimination**
171:2,8 172:10
172:22 275:5
289:22 300:6
302:6 303:13
313:23 314:2
**discuss** 201:21
223:2 267:4
274:14 285:13
313:22
**discussed**

210:21 213:17
223:15 224:13
268:17 307:2
**discusses** 198:24
**discussing**
153:19 288:24
**discussion**
194:15 214:3
217:3,4 241:22
252:22 312:21
313:6
**discussions**
211:8
**dismay** 192:9
**displaying** 289:6
**disprove** 257:16
**dispute** 151:25
152:5,14,16,21
156:12 288:21
**disputing**
239:24 240:6
**disrespectful**
288:11 295:13
**dissatisfaction**
264:2
**dissertation**
168:10 310:17
**distinctly** 288:2
**distressed**
267:14
**distribute**
164:13
**district** 145:1,2
148:14,15
**division** 145:3
148:15
**document**
150:24 158:3
163:13,17
165:23 181:21
193:18 196:16
199:9,14
208:13 222:22
240:23,24
252:13 270:23
271:18 272:21

298:17,20
306:15
**documentation**
167:21
**documented**
252:22 315:2
**documents**
153:10,11,13
153:25 154:4
154:10,11,21
155:13,17,22
156:4,8,10,18
157:4,13,23
158:20,23
162:20 163:7
164:11,16
168:20 169:16
169:20 192:16
213:16 217:9
217:14 257:11
257:19
**doesnt** 187:11
225:20 234:6
255:23 274:3
306:17 313:2
**dog** 189:19
**doing** 152:19
154:11 174:16
174:22,24
175:22 176:2,6
180:20,21,21
180:22 182:12
184:4,9 185:24
186:15,17
187:13 190:24
202:4 216:17
218:6,7 219:2
219:3 222:9
232:16 233:13
238:17 243:21
249:14 251:15
252:24 254:9
254:23 258:2,4
277:21 278:15
304:13
**donna** 307:16

308:23 309:23
**dont** 151:10
153:4 157:5
163:21 165:4
167:20,24,25
168:25 169:25
171:5,10 173:3
173:7,14 174:8
174:21 175:15
178:15 180:19
180:22 181:1
183:11 185:9
185:12 186:14
190:19 191:4
192:25 193:12
193:14,14,17
193:18 194:20
194:22 196:18
196:18 197:10
199:10 204:23
205:24,24
206:7,18
210:19 211:6,6
211:14,22
217:7 219:20
222:19 224:13
225:13 228:10
228:11 229:16
229:16,19,20
229:21 230:10
230:23 232:8
235:6,10,13,19
239:24,25
240:13 243:22
246:12 247:25
250:12,19
252:9 256:22
256:22 258:13
258:18 260:4
261:15,16
263:11,19,19
265:4 266:4
268:2 270:1,5
270:20 271:1,8
271:8,13,22,24
272:8 273:20

KATHLEEN   LIEBAU Volume II
April 07, 2022

274:2 275:7,14
276:19,21
277:25 278:4
279:6,20
280:16,17
281:2,20,20,23
282:2 283:18
283:25 284:1
285:18 287:12
290:12,20,25
291:12,20
292:11,12,15
292:15,20
293:1,3,5,11
293:23 295:13
295:15,22
296:4,8 297:4
300:21 301:4
302:13,19,19
305:22 306:20
307:8 308:24
310:13,23
311:1,2,10,12
311:14,20
313:7 314:1
315:3,7,9,11
315:22,25
316:3,4
**door** 182:24
184:23 185:3
185:24 218:15
227:2 228:9
282:12 289:24
**doughnuts**
251:25
**downriver**
207:25
**downtown**
301:19
**dporter** 146:13
**draft** 183:19
299:3,4
**drafted** 269:16
298:25
**drafting** 181:20
**drawer** 245:18

256:17,20
257:6,7,7
**drive** 178:21,23
**dropped** 300:7
**dte** 214:4
**due** 301:20
**duly** 149:10
**duties** 181:9
**duty** 178:3
289:22
**dykema** 145:9
146:15 148:13
149:7,18
154:23 156:19
157:11 169:20
170:14 171:1
177:11 228:21
268:23 295:4
296:11,14
297:3 299:17
300:4,23,25
304:7 305:6
310:5 312:7

———— **E** ————
**earlier** 199:18
199:19 211:8
231:20 268:17
280:1
**early** 151:17
185:11 206:20
206:22 209:1,9
209:12,13,20
246:9 253:3
299:20 300:12
300:14
**earning** 201:8
**earth** 257:10
**eastern** 145:2
148:14
**easy** 242:15
**ebilled** 283:23
**education**
222:14
**eeoc** 154:14,16
154:18,22,23

155:14,15,17
155:23 156:3,7
156:12 157:14
159:10 162:20
162:21,23
163:21 164:4
165:10 168:20
170:5 171:7,21
172:14,20,25
173:15,19
174:2 257:12
257:23 261:9
292:19,25
293:5,14
298:20 305:4
305:13
**effect** 196:11
197:14,16
232:7 256:10
**efficient** 249:17
**ehardy** 146:12
**eight** 207:12
243:18,19,21
243:21
**either** 160:20
161:5 171:1
195:17 196:24
198:15 218:10
222:12 258:19
263:8 307:14
309:14 310:2
317:13
**elizabeth** 146:9
149:6
**elses** 174:7
295:5
**email** 156:14
157:19,21
158:2 168:21
169:23 171:4
190:8,14,19
191:11,19
192:11,12,18
193:4,21
198:23 199:15
211:14 213:21

218:3 219:16
219:19,24
220:2 222:4,23
226:10 230:16
230:18,21
231:16,20
234:13,20,23
235:9 236:10
240:4 241:2,10
245:12,15,21
246:4 256:5
263:1,25 264:2
264:7,18 265:2
265:21,24
266:1 281:6,9
281:10 282:11
282:17,19,20
285:4,6 286:10
286:21 296:16
297:2,9
**emails** 157:23
157:25 170:14
187:23 189:17
189:24 190:10
190:23 191:22
192:2,10
231:10,21
235:10,13,20
236:7,12
245:24 256:2,3
256:3,10,13
257:2,12 259:1
266:7 271:2,6
271:7,21,21,22
306:22 313:16
**embrace** 258:17
**emotion** 254:25
**employed** 169:9
**employee**
149:18 150:4,8
152:1,2 179:23
179:25 181:3
205:14 207:2
215:1 243:8
258:17 268:18
295:4,11

**employees**
151:15 153:7
160:13,25
161:8,16
200:16 280:21
296:1 305:5,7
305:15,17,20
306:6 308:21
**employer**
207:20
**employers** 172:8
172:9 300:2,11
**employment**
156:19 171:3
293:3 299:16
299:24 301:11
301:17,23
311:5 312:13
**empty** 168:8
**encounter** 208:1
**ended** 178:2
210:20,23,25
251:5 279:11
**endured** 275:5
**engage** 289:10
298:3
**engaged** 171:2
**enjoyed** 275:1
**ensure** 200:6
215:16 216:14
**entailed** 215:23
**enter** 233:5
240:2,6,12
**entered** 227:2
237:4
**entering** 236:21
238:13 314:14
**enthusiastic**
251:20 275:9
**entitled** 150:24
161:7,10,15
162:12 199:3,7
214:23,25
215:1 281:1
284:19
**entitlement**

KATHLEEN  LIEBAU Volume II
April 07, 2022

201:3 215:3,6
**entries** 314:9
**entry** 227:2
  229:15,17
  241:5
**equal** 258:7
**equitable**
  179:21
**equity** 214:21
  216:12 225:5
  275:10
**equivalent**
  168:15
**errors** 164:1
  269:24
**escorted** 256:18
**especially** 251:4
**established**
  171:1
**establishing**
  246:21 248:23
  249:3 316:1
**et** 149:20 221:17
  277:2
**evaluation**
  165:18 240:20
  258:12 266:16
  267:19,20
**evaluations**
  163:10
**evaluator**
  240:20
**evelyn** 181:9
  252:7
**event** 317:13
**events** 298:15
**everybody**
  205:11 233:4
  291:10
**everythings**
  162:7
**evictions** 299:13
**evidence** 158:8
  158:10 166:10
  170:23 172:12
  172:15,16,21

**228:14 271:11**
**evident** 289:19
**exact** 313:5
  315:7
**exactly** 179:18
  223:18 233:3
  236:11 265:24
  270:20 275:8
  291:14
**examination**
  147:6,7 149:13
  312:19
**examine** 272:8
**examined**
  149:12
**example** 156:15
  166:25 244:5
  278:19
**examples**
  167:13,21
**exasperated**
  190:18
**exceedingly**
  277:25
**exceeds** 268:20
  269:9
**excellent** 295:11
**exception**
  203:23 250:17
**exceptional**
  239:8
**excerpts** 150:24
  151:2
**excessive** 203:14
**exchange**
  226:23 284:4,5
  296:16 297:2
  307:11
**exchanged**
  154:14 170:14
**exchanges** 156:8
**excitable** 274:17
**excited** 193:5
**excuse** 237:10
  265:9
**exemplary**

217:24
**exhibit** 147:12
  147:14,15,16
  147:17,18,19
  147:20,21,22
  147:23,24,25
  150:24 151:2
  152:8 153:5
  156:13,15
  157:16,19
  159:1,3,8,9,20
  162:17,19,25
  165:12,15,23
  170:1,3 171:13
  171:13 194:10
  194:12,17
  195:4 199:25
  200:15 203:13
  208:9,24
  212:12 213:13
  213:15 218:3
  240:16,19
  246:15,17
  248:6 250:18
  258:11,22,24
  267:16,18
  270:14,19,24
  271:4,9 272:11
  272:25 273:15
  275:18 298:18
  301:5,7
**exhibits** 147:10
  147:13 150:20
  151:7 152:8
  168:21 170:19
  172:1
**exist** 204:22
**expect** 205:20
  207:2 220:25
**expecta** 268:20
**expectation**
  168:8 248:10
**expectations**
  168:1,11,13
  248:18 268:10

269:12,21
  273:19 276:4,6
**expected** 201:16
  216:25 225:22
**expecting**
  233:22
**expects** 206:10
**expended** 237:9
**expenses** 180:2
**experience**
  233:13
**expires** 317:25
**explain** 268:12
  269:7,12
**explanation**
  201:23 220:18
  227:4
**explanations**
  300:10
**express** 210:17
  210:18 216:16
  225:2 260:13
**expressed**
  296:24
**expressing**
  264:2
**expressly**
  230:18
**extended** 212:16
**extensive** 170:8
  170:10,11,11
**extra** 181:9
  184:15 185:13
  218:15,19
  219:12 223:12
  223:19 242:5,9
  242:10 245:22
  245:23 252:5
  285:4

———— F ————
**fabricated** 285:3
  285:20
**face** 166:7
  288:21
**faced** 254:23

**facilitate** 289:23
**fact** 161:6,14
  179:24 180:4
  205:25 208:25
  212:3 215:21
  234:14 240:11
  243:14 244:2
  250:6 251:4
  275:6 277:1,3
  285:23 302:21
  315:8
**facts** 239:20
  275:8
**fail** 221:21,25
**failed** 172:16
  173:8 222:1
  233:5 240:2,6
  241:4,14
**failure** 231:11
  231:12 236:20
**fair** 150:10
  170:9 179:21
**fairly** 191:24
**fake** 279:19
  280:11 282:8
  282:10
**fall** 238:18 239:7
  277:8
**falls** 207:19
**false** 158:16
  160:17 161:5
  164:23 165:4
  187:8 190:1
  192:10 202:18
  202:18 241:3
  241:11 252:19
  257:16,18,20
  257:20,21,25
  258:16 266:3
  270:21,23
  280:25 284:11
  284:14,14
  289:13 315:23
**falsehood**
  279:18 283:2
**falsehoods**

KATHLEEN   LIEBAU Volume II
April 07, 2022

292:8
**falsely** 161:25
189:25 274:8
279:22
**falsify** 229:9,10
**falsity** 162:1
**familiar** 149:20
149:22 195:2
**familiarize**
149:17
**family** 311:8
**farrar** 146:3
147:7 149:4,4
155:9 158:13
159:4,7 163:19
164:19 174:6
188:16 207:9
207:13,21
213:4 226:7
229:25 230:4
235:6 266:20
266:23 273:12
284:13 289:12
290:19,24
293:13 296:5
302:2,12,18
303:19 312:17
312:20 314:3
314:12,24
315:3 316:6
**fashion** 227:7
303:17
**fast** 226:1
251:20 265:22
270:1,1
**faster** 162:4
189:8 190:15
191:16,18,21
258:5 273:20
273:20,20
**fastpaced**
247:17
**favorable**
188:25
**favorably**
188:19,21

**favored** 189:4,6
189:14 190:11
**favorite** 288:13
**february** 194:14
195:4 205:9
206:16 209:13
209:23 223:3
223:16,16
226:11,23
227:12,13
242:14 252:23
**federal** 171:20
172:25
**feedback** 246:23
**feel** 162:11
214:25 278:2,3
289:9 293:23
313:1
**feeling** 225:17
**feelings** 295:5
**fell** 181:17
**felt** 160:21 202:6
214:15,23
215:9 219:10
241:20 306:5
306:11 308:3
**figures** 279:2
**file** 170:15,18
193:1,21
228:20 268:16
314:2
**filed** 148:13
**fill** 176:12 181:2
232:3,11,19
**filled** 181:13
231:24
**filling** 300:2
**final** 271:19
273:2
**finalize** 183:20
**finalized** 286:7
**financial** 278:19
299:12
**financially**
148:23
**find** 155:14,25

171:8 172:21
173:3 177:21
178:5,5 196:6
226:5 268:3
273:16 295:12
299:23 311:5
**fine** 151:21
281:7
**finger** 158:6
168:16
**finish** 161:11
212:11 249:18
249:20 250:15
**finishing** 249:14
313:16
**fire** 174:25
179:14 182:24
183:3,14
184:16,17,20
184:22,25
185:23 254:21
255:1 291:13
313:16
**fired** 166:24
184:7 223:22
242:5 293:24
**fires** 292:3
**firing** 292:5
**firm** 148:16
149:18 150:3,5
150:12,25
151:2,3,20
152:2,3,9,13
152:15,17,25
157:24,24
158:11,21
161:8,15 162:6
162:8,9,20
163:14 164:10
164:11,16
165:1,3,6
169:9,17
170:23 177:22
178:5,7 194:18
195:13 198:10
199:6,8,11
205:22 207:5

210:3,14
221:16 227:3
236:1,20 237:4
238:16 247:13
251:7 256:24
257:11 271:25
275:11 282:9
283:19 290:1
296:20 297:12
297:25 298:6
299:1,5,11
300:23 304:7
305:14,19
306:4,5,11,20
307:17,20,23
308:2,11,21
310:21 311:11
311:20 312:13
**firms** 170:11
**firmwide** 269:1
269:15
**first** 149:10
150:1 151:12
154:15 181:9
182:5 192:25
193:2,22 209:4
222:1 223:18
241:6,8 248:20
265:9 266:1,1
273:19,25
274:4 285:5
288:20 297:11
**fits** 276:9,15
**five** 188:5 206:2
304:1
**fix** 206:20
253:17,18
**fixed** 209:8
224:5
**fixing** 254:15,23
**flabbergasted**
264:13 265:15
**flat** 178:19,24
**flex** 218:8
220:13,16
222:4,8

**flexibility**
258:14
**flip** 222:21
**flogged** 270:1
**fluctuated**
184:13,13
**flux** 176:20,23
**fly** 208:19,21
**flying** 245:25
**focus** 248:17
**focused** 211:25
292:10
**foia** 159:11
162:23
**folders** 277:14
**follow** 250:8
**followed** 225:4
265:3
**following**
216:15 231:8
232:4 264:1
**follows** 149:12
**forced** 300:14
**ford** 167:6
**foreclosures**
299:12
**foregoing** 317:8
**forever** 220:6
252:8
**forget** 175:6
**forgot** 231:18
**form** 158:13,15
161:20 163:19
164:19 188:16
207:9 235:5
248:13 269:1
269:13 284:13
**formally** 226:15
**format** 156:13
168:6,12
**forms** 268:9
**forrest** 146:10
**forth** 178:14
192:11 317:8
**forward** 253:2
275:24

KATHLEEN   LIEBAU Volume II
April 07, 2022

168:23
**forwarding**
230:24
**found** 176:23
178:8 198:21
267:20 274:22
**four** 175:23
220:2,4 242:23
243:7,8,13
261:22,22
262:5 269:9
283:18,20
284:23 314:9
314:14
**fourth** 236:10
**fraction** 187:17
**frame** 182:8
183:24,25
184:10 185:9
226:24 233:9
**fraudulent**
164:24
**free** 204:4
225:16 231:2
246:1,3
**frequently**
205:5 253:16
253:21
**friction** 274:18
274:19,25
297:24 298:6
**friday** 235:19
243:2,15,20
263:1,23 307:7
307:9,12,15
**friends** 310:23
**front** 193:12,12
211:6
**frustrated**
274:23
**full** 178:1
186:22 210:24
230:7,12
243:11,11,20
317:11
**fulltime** 217:23

223:13,20
242:3 243:7
**fully** 163:23
175:16 210:13
254:8
**functioning**
206:11 251:7
**funny** 167:12
**furniture** 177:8
177:9
**further** 174:4
209:21 214:3
262:9,20
268:15 271:11
276:22 315:3
316:5

──────────
**G**
──────────
**garage** 153:15
153:16,23
154:3,8 155:16
155:19 156:21
196:6,17
198:22
**gas** 178:15
179:19 251:9
252:5
**gears** 153:9
**general** 182:24
182:25 183:3
183:13 184:20
184:22,23
185:2,23 200:8
202:20 203:9
218:14 244:3
247:22 283:20
**generally**
188:13 206:24
214:23 233:20
246:19 290:1
**generated** 273:1
**george** 145:8
146:16 148:19
**getgo** 254:3,6
**getting** 184:15
186:7 187:7

189:8 190:15
201:4 206:3,5
206:22 209:1
209:22 210:5
210:20,23,25
214:8 215:5,10
215:25 217:17
225:17 231:1
251:21 254:21
258:1,6 264:15
270:16 272:3
276:10 287:11
310:17
**ghosted** 312:10
**giggle** 189:21
**gist** 258:9
**give** 153:20
161:9,16 165:9
168:9 173:2
178:12 184:14
220:25 221:1
225:18 236:17
261:3 283:9
**given** 155:10
156:14 166:10
169:15,19
214:11 216:22
219:11 256:5,6
274:24 287:1
**giving** 158:8
191:7 267:6
278:23
**glance** 151:6
**glared** 191:8
**gmail** 157:24
169:16,21
306:18
**go** 148:8 150:17
152:9,24 153:2
159:3,5 167:9
172:24 175:3
176:16 177:1
177:17 178:11
178:16 179:4
189:3 190:21
191:5 195:8

200:14 202:10
206:16 212:17
213:20 217:12
220:22 222:20
222:21 227:10
227:19 228:22
229:24 230:21
230:24 231:12
232:13 233:14
233:20,24
234:5,5,7,11
237:2 239:10
240:1 244:11
245:17 246:8
246:15 251:24
252:5,9 255:6
255:6 260:1,4
261:5,12,19
262:2,11,15,19
263:7 266:5
267:14 270:1,1
271:1,6 272:13
272:16 273:14
275:10 277:13
277:16,18,19
279:12 280:9
282:5 284:7,20
284:22,23
285:2,11 294:4
297:19 301:1
302:25 303:10
315:2
**god** 264:12
**goes** 198:2 235:8
242:1 268:17
**going** 158:15
159:5,14,17
161:19 162:7
163:23,24
164:3 167:19
172:6 173:1,2
174:4 176:16
177:6 179:8,15
180:6 181:10
185:8,10 187:4
189:18 192:20

193:23 196:5
196:16,19
202:4 204:15
204:19 206:23
208:1,1 211:12
212:6 213:5
214:7 216:24
219:14,15
220:5,6,22
221:13 224:23
225:6 229:11
232:24 236:5
240:18 246:4
249:6,22 255:7
257:4 261:1,14
267:2,8 268:1
269:3 270:5
273:7,8 274:13
275:23 276:12
279:11 281:8
282:12,24,25
284:1 286:13
286:15 288:25
293:16 298:9
298:17 303:16
303:25 308:13
311:10 312:1
314:2
**goings** 227:25
**golden** 187:7
188:10 192:1
**gonna** 259:24
283:1
**good** 149:15
202:24 203:4
208:20 215:1
246:19 250:11
275:1 286:6
296:19
**googled** 177:13
**gosh** 232:18
255:3 310:17
315:11
**gossett** 145:9
146:15 148:13
149:7,18

KATHLEEN   LIEBAU Volume II
April 07, 2022

Page 330

171:1 296:14
305:6 310:5
**gotta** 224:2
231:23 240:14
259:19,19,19
259:20 261:23
261:24 275:11
301:25 302:3
**gotten** 167:10,10
231:16
**grand** 145:9
**great** 250:21
**group** 181:7,8
181:11
**grouping** 162:20
213:15
**grudge** 298:16
**guess** 179:21
185:10 193:23
195:3 196:19
196:20 212:7
276:12,12
293:4 312:10
**guessing** 184:25
315:13
**guise** 181:24
183:6,9 201:16
215:8 216:22
221:11 222:23
223:7 224:10
224:15 261:5
261:12 263:8
273:22 274:2,9
274:21 275:1,6
283:14 284:20
285:3
**guys** 154:17
167:1,8 175:3
266:12 267:1
272:3 274:14
283:19 299:24
**guyss** 180:25

**H**

**habit** 204:9
**hadnt** 191:1

251:14 255:24
263:11
**hagopian** 184:7
**half** 185:12
190:24 191:13
209:1,20 253:3
309:22
**hall** 229:19
**hand** 163:25
237:18,19
**handling** 285:17
**handwriting**
208:9,10,12
**handwritten**
212:11
**happen** 219:18
251:16,17,18
283:1 285:20
290:1 298:15
**happened**
162:10 219:17
244:4 254:16
266:1 279:21
279:24 280:23
288:22 303:9
**happens** 220:11
297:23
**harassment**
254:21 255:2
304:15
**harbors** 291:17
**hard** 153:16
184:25
**hardy** 146:9,10
147:6,8 148:16
149:6,6,14
150:22 155:11
157:17 158:19
159:2,5,8,19
161:12,18
162:18 163:5
164:8,21 170:2
174:9 188:17
194:11 207:11
207:14 208:3
213:14,19

226:9 230:1,5
235:25 240:17
258:23 266:24
267:17 273:13
284:16 289:15
290:21 291:2
293:17 294:4
294:14 296:6
301:6,9 302:4
302:14,20
303:21,23
304:6 312:15
312:18 313:24
314:7,22 315:4
315:6 316:5
**harsh** 166:11,18
166:20 167:13
167:22 168:4
194:9 240:25
242:13 246:16
250:18 252:13
279:7
**harshly** 166:2
279:23
**hasnt** 231:24
**hating** 252:14
**head** 167:24
217:8 269:18
**headhunter**
300:3
**hear** 274:15
287:10,12
**heard** 222:19
267:25 274:11
294:25 312:4
**hearing** 305:7
**heavily** 159:13
162:24
**heck** 194:23
227:12 256:12
288:22
**held** 148:16
238:21,23
**help** 176:8 185:4
185:5,5 186:6
202:4 304:25

**helpful** 192:12
**helping** 176:4
190:24 277:9
277:13
**hereinbefore**
317:8
**heres** 163:6
**hereto** 316:12
**hermon** 146:15
**hes** 175:4 214:21
262:4 274:5
275:10,14
**high** 236:11
295:3
**higher** 185:6
**highlighted**
171:7,12
**highway** 148:21
**hills** 146:4,5
174:13 180:5
206:15
**hindsight**
225:15
**hired** 150:1
**history** 182:6
249:7
**hold** 164:4,6
298:16
**holding** 295:10
312:1
**holiday** 245:11
**home** 151:18
152:23 194:5
201:24,25
202:4,5,6,7,17
202:23,25
203:6 204:18
210:2,14 257:7
281:22 301:21
314:18
**hon** 145:8
**honest** 312:8
**honestly** 171:6
300:21
**honey** 287:6
288:5,6

**hope** 278:2
**hopping** 266:8
**horchler** 202:3
**horrendous**
205:8 266:10
267:20 268:4
276:25
**horrible** 205:10
**hot** 185:2 300:7
**hour** 177:15,16
177:17 178:11
178:22,22
179:8 209:1,20
211:10,12,20
212:4,6,7
218:5,9,19
219:2 243:22
253:3 301:20
302:10
**hours** 149:20
150:16 175:14
177:16 178:14
179:19 180:2
185:13 188:3
204:13,13
212:15 217:2
217:24 218:16
223:12 232:12
242:3,5,9,10
243:22 244:20
245:2,22,23
251:8 252:4
258:4,5 266:22
267:1 278:22
**hr** 205:16 232:9
269:17
**huge** 203:23
211:22 249:4
273:25 275:3
275:25
**hugely** 266:9
**human** 222:13
235:22 270:7
298:21
**humanly** 225:24
**hundred** 184:16

KATHLEEN   LIEBAU Volume II
April 07, 2022

Page 331

**hundreds**
153:12

**I**

**id** 208:7 213:20
215:14 228:1
244:9,11,11
251:9 278:21
314:6,8
**idea** 179:12
186:14,19
188:24 189:2
268:16 290:14
303:2
**identification**
150:21 157:16
159:1 162:17
170:1 194:10
213:13 240:16
258:22 267:16
301:5
**identified**
186:10 235:1
**identify** 205:14
233:11 234:14
275:18 293:1,6
293:11,19,25
298:19,24
306:20 311:24
**idontknowwh...**
245:21
**ill** 151:8 155:9
159:17 163:6
176:22 178:12
178:22 224:1
229:14 267:4
268:6 280:8
**illegally** 293:24
**im** 158:8,15
159:14,16
161:19 162:7
162:18 169:9
172:6 176:12
176:16 177:6
180:20,21,21
180:21,21

185:10 187:5
189:18 191:6,6
191:7 193:22
195:21 196:19
205:16,16
208:16,16
210:4,10 212:2
216:4 217:16
218:20 219:15
219:19 220:22
223:22 225:16
226:5,19
229:25 231:2
232:25 233:3
237:19 238:4
238:21 240:18
242:5,9 246:1
246:4 250:23
252:14 254:15
254:22 258:2,6
261:1 265:12
267:13,13,13
269:2 270:7
273:7 274:17
275:11 276:8
276:10 277:21
278:25 281:5
281:22 282:1
287:19 288:19
289:4 292:10
293:3,16 296:9
298:9,17,18
299:21,21
300:5,8,15,15
303:12 306:7
306:13 307:20
310:17,25
314:1 315:20
**imagine** 255:10
**immediately**
157:22 228:8
247:9
**impeding**
273:24 274:3
**importance**
205:19

**important**
181:19
**impossible**
216:18
**impression**
173:23
**improve** 246:23
252:17 268:19
**improvement**
168:7 241:22
268:11,21,24
269:5,7,9,11
**improving**
278:11 279:1
**inaccurate**
189:10 199:24
200:2 203:12
231:13 242:12
248:9
**inappropriate**
227:6 275:21
279:4 280:20
296:25 297:8
297:12 308:6
**inappropriately**
241:25 310:11
**inches** 150:5
**incidences**
297:22
**incident** 241:1,9
296:7
**include** 204:20
259:17
**included** 156:12
160:6 235:9
241:2,10,18
**includes** 158:20
164:16
**inconsiderate**
288:11
**inconsistencies**
246:20 248:22
**inconsistent**
295:9
**incorrect** 171:4
187:8 191:18

219:5,6 223:10
227:8,9,16
228:1,4,12,15
228:23 288:18
**incorrectly**
314:16
**incredibly**
279:22
**incredulous**
187:5
**indicate** 151:8
272:21
**indicated**
267:18
**indiscrepancy**
248:2
**individual** 298:1
**inferior** 188:10
192:1
**influx** 218:14
**inform** 220:16
253:19
**informally**
195:13
**information**
151:20 156:8
159:14 193:15
193:17 241:23
259:23 260:18
260:21 261:2,4
261:6,13,16
262:7,12,21
263:10,19,22
278:19 283:9
284:24 287:4
**informed** 218:3
269:3
**infraction** 315:1
**inherent** 295:25
**inhouse** 175:3
**initial** 166:5
169:23 269:8
269:10,11
**initially** 185:7
**initiative** 283:16
**innocence** 192:9

315:23
**insinuates**
191:17
**insist** 229:14
**instance** 152:5
297:13
**instances** 178:2
245:14
**instruct** 155:9
**instructed** 214:8
219:15 232:10
**instructions**
158:3 262:22
**insubordinate**
228:12
**intense** 247:21
**interacted** 297:1
298:7
**interacting**
294:23
**interested**
148:23 317:13
**interesting**
238:20,22
**interests** 158:12
165:8
**internet** 165:9
**interoffice**
277:17
**interpretation**
241:16
**interpretations**
234:10
**interpreted**
284:4,5
**investigator**
156:3 165:10
170:4,5 171:20
**involuntary**
301:18
**involved** 182:10
186:8 202:1
262:4 281:4,5
288:20
**irrespective**
158:22

**irritated** 287:11
**isnt** 163:23
  167:12 231:3
  276:10 277:10
  284:1 297:11
**issue** 161:6,14
  173:24,25
  199:23 206:13
  206:14,19
  212:2 218:16
  221:20 230:19
  243:15,15
  245:10,10,20
  259:1 267:11
  267:13 268:2
  275:25 285:17
  289:16 290:10
  296:3
**issuerelated**
  153:19
**issues** 152:16,25
  156:11 157:9
  181:20 194:15
  210:1 213:17
  241:18 258:11
  275:16,19
**italian** 312:3
**ive** 150:23 151:1
  170:3 174:7
  194:12 213:15
  222:19 231:23
  248:8 256:6
  297:21

**J**
**j** 146:3
**james** 146:15
**jamie** 170:4
  171:20
**jamies** 171:5
**jane** 307:20
  308:23 309:23
**janet** 307:19
**january** 194:4
  194:15 195:6,8
  195:18 205:9

209:25 210:7
210:13,16
224:4 229:6
244:22,24
245:7 255:20
263:14 278:20
278:23
**jeopardized**
  297:2
**jessica** 231:16
**job** 152:20
  176:23 180:4,5
  181:2,6,13
  184:8,8 206:24
  206:25 215:2
  217:23 223:1
  223:12,19
  224:10 228:21
  232:16 233:6
  234:8 242:2
  243:8 250:15
  276:11 300:24
  304:9,10,18
  305:2 311:15
**jobs** 184:9
**judge** 145:9
**judgment** 203:4
  250:6
**july** 174:10,22
  175:9,17 180:9
  182:22 218:4
  218:22 219:16
  220:2,12 222:5
  251:2 296:7
**june** 253:14
  279:16 280:1,4
  280:5,6,9
  282:6 285:11
  285:13 287:5
  306:21 313:18
  314:5,21
**jurisdiction**
  171:10
**justification**
  223:8

**K**
**kathleen** 145:5
  145:15 147:4
  148:11,13
  149:8 202:3
  213:11 294:12
  316:8
**kathy** 222:24
  223:1 231:24
  241:2,4,10,14
  244:8 246:22
  248:24 250:20
  251:1 252:4
  258:13 273:23
  285:1 298:22
**kathys** 241:21
**keep** 150:2,9
  175:4 177:22
  187:25 202:4
  214:8 220:6
  223:23 227:17
  227:18 230:24
  257:2,12
**keeping** 192:4
**kept** 169:4 192:2
  192:6 219:3
  245:18 256:13
  256:24 257:1
  257:10,17,21
  274:13 313:13
  313:15
**khvpf** 146:12,13
**kienbaum**
  146:10 148:16
**kind** 152:19
  154:6 177:7
  186:5,14
  222:14 225:17
  258:9 267:8
  309:20
**kinds** 283:25
**king** 245:9,11
**knew** 150:12
  158:7 176:16
  204:18 232:14

232:14 234:15
235:3 236:4
244:3 266:13
271:16 272:3
283:11 287:1,3
290:7 292:1
294:15 300:23
**know** 154:7,9
  155:5 156:13
  166:25 167:25
  168:15,25
  171:5 173:14
  174:8,21 178:3
  178:5 179:19
  180:19 181:1
  181:12 183:11
  184:21 185:9
  185:12,16,22
  185:22 186:4,4
  186:6,7,11,17
  187:6,24 188:1
  188:3,5,7,9,12
  188:18,23
  189:17,19,20
  189:22 190:19
  191:3,9,12,16
  191:17,25,25
  192:1 195:14
  195:20,21,22
  196:19 198:5
  199:10 204:2,8
  204:20 206:18
  206:24 207:24
  207:25 208:20
  210:19 211:14
  212:1,6,25
  214:22 216:25
  217:5,14
  219:20 220:10
  220:21 221:6
  225:13,15,17
  227:21 228:1
  228:18,22
  229:16 230:10
  230:23 231:19
  231:19 232:5,7

235:18 236:15
236:16 242:7
242:12,15,16
244:11 246:12
246:14 247:6
250:12,20,22
251:23 252:22
254:6,10
256:22 257:25
258:5,6 259:20
261:16,23,24
262:3,4 263:19
264:23 266:4
267:3,19,23
268:15 269:18
270:6 271:1,13
271:24 272:4,6
272:8 273:20
275:11 276:19
276:21 277:3
277:13,19,22
278:22 283:18
283:22,24,25
284:1 285:18
285:19,20,24
286:5,11,12
287:9,25 290:7
290:13 291:1
292:11,12,15
292:16 293:23
295:15,22
296:4,9 297:19
297:19 298:15
300:15 301:4
302:13,19,19
303:14 305:22
309:9,14,15
310:18,21
313:3 314:9,14
314:15 315:11
315:25 316:4
**knowing** 298:2
**knowledge**
  187:19 290:22
  290:25 308:23
  308:24 309:4,6

KATHLEEN   LIEBAU Volume II
April 07, 2022

**known** 246:25
**knows** 227:2
**kowalski** 160:3
160:9 165:24
186:9 187:1,17
187:21
**kronos** 196:13
232:22,25
233:5 239:12
239:21 279:11

**L**

**l** 145:5,21
148:11 317:6
317:22
**label** 163:21
**labeled** 153:24
210:19
**labels** 163:22
**lacking** 270:5
277:23
**ladder** 238:19
239:8
**lally** 198:23
199:17,18
232:10
**language** 151:9
189:18
**large** 162:6
**larger** 276:9,16
**largest** 182:5
**larkins** 146:16
148:19
**larsen** 152:6
160:14 161:7
161:14 162:2
170:24 188:18
188:21,25
189:15 190:9
241:1,9 246:19
246:22 248:24
259:6,15
260:14 261:5
263:25 267:21
275:20 278:13
279:16 280:6

285:12 291:3
291:17,20
292:22 295:10
307:14 310:7
313:19
**larsens** 250:23
294:18
**latch** 182:24
184:23 185:3
185:24 218:15
**late** 151:17
192:15 195:16
196:24 197:9
198:14,16
199:4 204:15
204:19,24
205:5,12,23
206:6,9,9,14
206:16,21
207:18 208:7
209:18 212:14
226:12 229:7
241:15 247:6
263:4
**laugh** 189:22
233:15,16
**launch** 192:25
193:2,10,22
**launched** 182:9
**law** 146:4
148:16 162:6,8
162:9 165:1,2
170:10 172:25
180:10 186:17
186:20 187:18
187:22 189:5
207:5 224:10
231:3 235:15
246:25 259:7
259:22 260:12
287:25 293:4
299:11 311:8
**laws** 259:18
**lawsuit** 157:5
158:7,12 165:8
314:2

**lawyer** 175:12
175:17 216:4,5
**leading** 290:8
313:24 314:7
314:22
**leaf** 297:19
**learning** 168:7
247:23 248:16
276:8,15
**leave** 174:24
185:10 186:2
203:25 223:14
223:20 233:2
234:24 236:1
242:4 300:4,25
306:5,12 308:3
308:18
**leaving** 206:20
209:8,9,12,13
209:20 232:25
235:18 301:18
306:1 309:21
**led** 290:5
**left** 177:13
183:14,14
185:9 236:4
256:18 299:17
300:20 306:4
306:10,18
307:17,19,23
308:3,11,12
312:6
**lefthand** 256:20
257:5
**legal** 148:20,20
148:25 237:13
237:18,19,21
238:1,5,8,8,10
238:11,21
299:14,15
304:9 305:1
**legitimately**
175:23
**lemon** 180:10
186:17,20
187:18,22

189:5 224:10
235:15 246:25
259:7,18,22
260:12 287:25
**lengthy** 293:5
299:2,6
**letter** 168:16
169:12,21,22
169:23 170:4
171:14 172:23
173:3,24,25
174:2,7
**li** 285:18
**liability** 145:11
**liar** 284:11
285:14,18
**lie** 282:10 290:8
**liebau** 145:5,15
147:4 148:11
148:13 149:8
149:15 159:15
213:12,18
222:24 294:13
298:22 316:8
**lied** 300:13
303:15,15
**lieu** 177:19
**life** 267:22
276:24
**light** 244:2
251:4
**liked** 178:9
205:25 206:25
**likes** 236:15
**limbo** 182:21
**limit** 247:5
**limited** 145:10
**limits** 165:6
222:5
**line** 209:4
225:11 272:24
315:25
**lined** 270:12
**lines** 291:24
**lisa** 160:6,6,10
175:2,7,17

183:12 184:20
185:5,22 191:4
221:11 258:5
**lisas** 253:18
**list** 197:17 308:7
**listening** 241:21
**literally** 167:11
**little** 182:12
198:24 212:2
212:25 227:25
254:24,25
315:1
**live** 152:19
177:9 178:19
222:14 232:8
237:20
**livelihood**
300:18
**lob** 288:15
**lobbing** 288:19
**local** 183:21
**located** 148:17
148:21
**logically** 225:4
**long** 168:9
177:11 185:12
185:23 196:23
198:4 211:18
266:20 267:3
277:25 287:12
289:19 305:14
305:19 306:6
308:21
**longer** 169:9
178:3 196:8
210:7 301:21
**longterm** 305:7
305:17
**look** 151:5,10
152:25 159:15
160:19 167:1
171:11,13
172:6 185:1
192:16 202:21
208:9 213:21
216:4 217:10

EXHIBIT 1

KATHLEEN   LIEBAU Volume II
April 07, 2022

Page 334

218:2 226:2
231:8 234:19
236:18,22
243:7 310:2
312:12 313:3
315:15
**looked** 151:22
160:12 174:8
236:22,24
**looking** 152:13
161:2 176:10
254:13 270:24
280:19
**looks** 226:7
299:2
**lori** 184:7
**loris** 184:8
**loss** 300:15
**lost** 169:18
**lot** 183:1 185:15
185:21 186:2
189:23 204:3
252:19 254:7
256:11,24
257:21,23
261:21 274:14
275:5 278:22
299:14 305:7
306:1 310:12
314:10
**love** 214:25
**loved** 298:14
**low** 235:22,23
**lowest** 235:20
**lunch** 150:17
151:13 178:22
190:20,21
195:17 196:25
198:16 210:22
211:3,12,15
212:4 218:5,9
218:19 219:2
219:11,14
220:22 230:25
275:20
**lunchroom**

246:8
**lunchtime**
219:21 225:13
230:22
**luther** 245:9,11
**lying** 280:20,22
282:8

**M**

**m** 145:19 148:3
148:6 197:2
213:7,8,9,12
294:9,10,13
304:1,2,3,5
306:22 316:9
316:10
**maam** 208:11
228:22 260:15
**machine** 270:7
**mag** 145:9
**mail** 277:18,18
**mailbox** 263:5
**majority** 203:15
248:9
**making** 159:12
162:24 166:13
218:9,10,18
229:5 237:17
258:16 275:8
284:11,14
290:12
**man** 171:5,7
**manage** 160:24
250:22
**management**
305:14,19
306:5
**manager** 220:24
257:13 289:21
301:22
**managing**
269:21
**mandate** 200:5
200:21
**manner** 282:5
288:11 289:5

**manual** 149:21
150:5,18,25
151:3,23 152:1
152:17,25
199:11
**manuals** 194:17
**march** 172:7
247:8,11
278:20,23
**margin** 212:13
**mark** 269:5
**marked** 150:20
150:23 151:1
156:15 157:16
157:18 159:1
162:17 163:11
164:7,17
165:15,19,23
168:20 170:1,3
194:10,12,17
213:13,15
240:16,19
258:22 267:16
270:14 301:5
**marking** 159:8
298:18
**marks** 213:6,10
294:6,11 316:7
**martin** 245:9,11
**mary** 179:17
**marys** 179:17
**material** 173:18
256:24
**matter** 148:12
176:15,17
202:20 203:9
205:25 234:6,9
**matters** 171:10
175:18
**mcdonalds**
207:4
**mean** 164:2
173:16 174:8
176:19 178:9
185:22 186:3
188:5 190:6

197:10,11
202:19 204:8
208:4 209:11
214:19 222:14
235:14 243:10
243:11 245:1
246:2 250:10
252:21 255:4,7
255:23 273:7,7
276:17 287:13
293:8,8,9
298:9 300:1
310:13 313:13
314:8 316:3
**means** 162:10
276:19,21
**meant** 197:23
204:18 224:18
253:17 277:4
284:23
**media** 213:6,11
294:7,12
**medical** 267:11
267:13
**medley** 180:15
277:7
**meet** 168:13
172:16 173:8
268:10 269:22
276:4 282:14
282:15
**meeting** 179:16
179:17 193:1,3
193:11,22
195:10,18
221:4 222:25
241:25 279:20
280:5 281:2,14
281:24 282:3
282:21 285:11
285:14 287:5
288:15 289:1
307:1 313:18
313:22 314:5
314:21
**meets** 168:1,8

248:10,17
268:7,18,20,20
268:22 269:9
269:12,21
273:18,19
276:6
**members**
247:24 250:10
**memo** 193:1
194:19,21
195:5,11
209:23 211:7
258:25 259:3
269:1 284:25
298:25
**memorandum**
194:13 298:23
**memory** 150:18
193:8 194:18
231:24 280:3
315:16
**memos** 221:21
**mention** 179:22
221:13 251:10
**mentioned**
166:3,25
167:17 189:7
211:8 253:15
270:16 277:6
313:10
**mentioning**
315:19
**merit** 172:21
173:5,7,11,13
174:5
**merits** 173:19
**message** 173:5
234:24 235:4
**met** 168:10
**michigan** 145:2
145:10,18
146:5,11 148:1
148:15,18,22
212:23 317:2
317:24
**microphones**

KATHLEEN   LIEBAU Volume II
April 07, 2022

148:9
mid 192:17
middle 226:8
 230:21
million 182:6
millionth 234:2
mind 158:6
 171:1 248:13
mine 227:20
 291:10,10,19
 291:24 315:22
minimal 187:2
minimize
 213:23
minimizing
 217:17
minimum
 223:24
minor 166:21,24
 315:1
minute 195:19
 195:20 204:24
 206:6 207:6
 209:17 301:20
minutes 177:14
 177:15,16
 178:12,13
 179:8 195:15
 195:19,20
 196:23 198:4,5
 198:9,12,12
 199:4 203:24
 204:7,21 205:5
 206:8,9,20
 207:4,7,12,23
 208:7 209:8,12
 209:13,16,17
 212:14 231:22
 232:14 244:8
 245:16 266:22
miscommunic...
 230:8 275:19
misinterpreta...
 284:9,18
misreporting
 299:24

missed 274:14
missing 208:17
mistake 273:21
mistreating
 192:7
misunderstan...
 230:9
mix 186:11
 309:19
mobile 178:18
moment 151:5
 172:4 181:16
 190:6 194:21
 293:21 303:24
 306:14
monday 174:18
 203:7 243:2,18
 243:19 259:25
 263:2,7,9
 264:1 266:12
 286:3,5,20
 287:1,17 307:4
mondays 240:15
money 201:8
 204:7,10
monitored
 203:17
month 249:22
 266:8 279:16
 315:9
monthly 283:23
months 179:10
 232:18,22
 251:3 252:6
moore 157:20
 168:14,22
 169:5,12,22
moot 236:9,12
morning 174:19
 177:7 190:3
 206:4,23 207:1
 210:6 245:24
 246:6 259:25
 263:2 286:11
motherinlaw
 157:10

motives 174:21
motor 167:6
mountain
 235:21
move 231:7
 236:17 240:18
 249:20 266:15
 279:10 290:11
 298:16 300:16
 300:16 314:1
moved 243:16
 304:14,20
movement
 314:15
moving 249:15
 253:2
myers 160:6,6
 160:10 175:2,7
 175:18 258:5

————————
         N
————————
name 148:19
 175:3,6 181:25
 183:11 296:8
 310:22 311:11
 311:20 312:3
named 296:8
names 163:2
 174:24
nasty 190:2
nature 183:15
 297:1
necessary 203:1
 219:4,8,11
 220:17 283:9
necessitate
 243:21
need 151:10
 154:17 178:15
 194:22,25
 213:23 222:1
 222:19 223:2
 241:21 248:17
 249:22 251:9
 252:5 260:4
 262:5,20

266:25 267:10
 273:8 276:22
 278:6 279:10
 296:8
needed 154:11
 160:21 161:25
 162:10 176:25
 177:20 185:14
 194:8 202:8,15
 214:10,15,17
 214:24 215:9
 216:14 217:19
 221:15 224:10
 225:2 242:18
 244:2 262:12
 265:19,19
 268:12,21,24
 269:5,7,10,11
 304:24
needs 168:7
 223:1 267:11
negative 251:22
 276:3 296:2
neither 235:17
 287:3
never 166:25
 174:7 176:2
 184:1 199:23
 201:25 204:25
 205:2 207:25
 217:11 219:17
 224:24 225:3,8
 238:3 248:13
 255:8 262:23
 263:15 266:3
 266:13 274:1
 277:5 279:24
 280:23 283:5
 286:14 295:16
 295:19 298:25
 299:4
nevertheless
 260:13
new 168:5,12
 177:21 190:17
 192:19 196:7

196:12 198:6
 211:25 230:24
 243:18,19,21
 247:10,11,13
 247:23 248:13
 248:15 249:9
 251:18 263:12
 263:13 268:25
 269:18 286:11
 297:19 299:23
 305:14,19,19
news 246:14
nice 212:8
 258:19 270:11
night 190:1
nine 198:4,5,8
 198:12 209:22
nineminute
 196:1,9 198:2
 198:18 207:16
nitpick 250:12
nodding 158:4
nonconfidential
 172:8
nonexempt
 151:15,16
 200:15,16
nonvalue 249:16
nonverbal
 189:20
normal 166:22
 263:16
normally 263:11
north 145:17
 146:10 148:17
northwestern
 148:21
notary 148:19
 317:1,23
note 148:9
 177:16 251:7
 253:1
noted 249:3
notes 208:18,21
 208:23 209:3
 254:1 315:15

KATHLEEN   LIEBAU Volume II
April 07, 2022

Page 336

317:12
**notice** 167:1,2
213:23 233:18
**noticed** 246:20
248:22
**notification**
169:4
**notify** 227:11
**notifying** 241:15
**notion** 243:4
**number** 150:24
151:2,12
153:11 154:3
159:3,9,20
162:19 165:15
165:23 170:3
194:12 213:6
213:11,15,20
218:3 226:17
240:19 248:7
258:24 270:15
270:19,24
271:4,10
272:11,25
294:7,12,15
306:17
**numbers** 229:25
249:21 266:9
**numerous**
194:16

**O**

**oath** 274:21
**object** 177:3
202:14 235:5
**objected** 315:8
**objection** 155:4
158:13 163:19
164:19 174:6
188:16 191:11
207:9,13,21
240:23 246:16
273:12 284:13
289:12 290:19
290:24 293:13
296:5 298:4

302:2,12,18
303:19 313:24
314:7,22
**objectionable**
273:16
**objections**
208:13
**obligated**
155:13 311:22
**obligation**
233:12
**observe** 294:22
**observed** 246:22
248:24 295:16
295:19
**obtain** 269:14
**obtained** 200:12
**occasion** 216:1
**occasionally**
166:14
**occupied** 175:16
**occurred** 150:10
194:15 217:4
302:21 316:2
**offense** 296:23
**offer** 300:10
**offhanded**
261:25
**office** 174:11,13
177:12 179:17
189:21 220:24
230:13 234:15
234:16,22,24
251:2,25 252:2
252:6 256:18
257:8,9,13
266:12 277:16
277:17,20
282:1,12 286:1
289:21 301:1
301:22
**oh** 167:10,19
182:20 189:20
190:2 191:15
203:22 211:23
224:1 226:19

226:19 228:22
231:21 232:18
255:3 256:3
264:12 268:9
270:12 272:16
272:18 279:11
280:8 286:23
306:24 313:9
315:11
**okay** 150:12,23
151:22 152:4
153:5,9 154:6
159:7 162:13
163:6,16 168:4
170:8 172:5,24
174:10 175:16
176:22 177:15
178:12 179:4
179:25 181:6
182:17,20
187:1 191:19
192:21 194:1,2
194:12 195:8
195:21 197:6
197:23 200:11
200:18,19
202:9 203:12
209:7 210:13
211:7 213:4
216:11 218:12
221:23 222:10
223:6,10,24
224:8,14
229:11 230:4
231:7,14 232:1
232:5 233:14
233:19 234:5
237:2 240:1
241:1 242:19
246:13 248:12
249:15 253:6
255:24 258:20
260:9 262:2
264:5,11 265:9
266:23 267:15
268:5,9 269:20

272:13,24
273:10,17
274:11 275:17
276:21 278:17
279:2 282:15
284:21 285:16
286:25 291:15
294:6 295:9,23
295:25 296:24
297:6,11
299:16 300:8
301:14 303:22
306:24 308:13
312:25 314:13
315:25
**old** 145:17
146:10 148:17
245:19 247:19
310:2,23 313:3
**older** 295:23
**once** 206:19
216:25 222:2
244:4 249:20
255:9,12,14
256:7,7 257:3
257:15
**ones** 245:19
256:4 271:2,3
287:25
**onesentence**
265:8
**onesided** 252:3
**oneword** 265:15
**ongoing** 241:16
**onstar** 205:2
210:10
**open** 258:18
**opinion** 173:8
295:4
**opportunity**
170:13 248:5
268:15
**opposed** 197:23
**opposing** 241:2
241:10 260:3
**opposites** 190:4

**option** 246:11
275:22
**order** 163:4
182:3
**organizing**
250:21
**original** 157:2
235:9
**originally**
157:21
**orlan** 299:8
**orlans** 299:10,11
300:19 301:3
301:12,24
**outcome** 148:24
**outlined** 172:9
**outlook** 271:2
**output** 273:24
274:4
**outside** 161:9,17
207:19
**overall** 258:13
268:7
**overhanging**
191:25
**overreaction**
278:5 279:7
**overstatement**
279:7
**overtime** 149:20
150:16 151:15
152:22 185:13
194:5 200:1,9
200:15,19
201:4,15,20,23
204:2 210:2,17
212:5 213:23
214:14,19,19
214:23 215:9
215:20,23,24
216:9,17
217:17,17
222:24 223:1,9
223:10,21,23
224:11,13,17
224:20,24

KATHLEEN   LIEBAU Volume II
April 07, 2022

225:1,2,5,10
225:12 230:14
230:19 231:5
231:22 232:15
243:5,9 244:2
244:3,6,11,18
244:20 245:4,8
275:22
**overwhelmed**
184:21 185:3

**P**

**p** 145:19 146:4
148:3,6 213:7
213:8,9,12
294:9,10,13
304:1,2,3,5
306:22 316:9
316:10
**page** 147:3,12
151:12 200:15
212:17 218:2
241:7 253:6
301:13
**pages** 151:6
170:18 230:3
283:18,20
284:24
**paid** 204:11,12
225:20 232:4
245:22
**pain** 278:2,3
**painful** 278:3
**palooza** 312:3
**paper** 163:24
268:15
**para** 277:10
**paragra** 273:17
**paragraph**
172:6 212:12
241:6,8
**paragraphs**
248:8
**paralegal** 175:1
175:8,9 176:4
180:17 181:16

181:18 183:23
183:25 184:1,4
184:5 185:17
185:18 188:12
200:20,21
239:2,4 277:8
277:11,16
311:8
**paralegals**
160:21 162:4
186:5 191:9
239:6
**paranoid** 256:11
**paraphrased**
223:21 242:5
250:1
**paraphrasing**
231:23 268:5
278:8
**parkway** 146:4
**part** 159:12
198:18 220:20
231:14 234:8
242:20 243:20
275:7
**particular** 191:3
203:7 204:16
216:1 230:19
234:13 239:22
241:5 264:23
279:10 290:2
298:20
**parties** 148:8
164:13 288:20
316:12
**partner** 160:15
200:22 201:1
214:21,21
216:12 225:5
275:11
**parts** 207:24
**parttime** 213:24
**party** 148:22
161:9,17
163:18 174:2
317:13

**pattern** 205:15
**patty** 309:1,24
**pause** 173:16
**pay** 179:24
180:1 198:11
252:4
**paying** 177:23
**payroll** 151:13
197:19
**peers** 277:4,6
**pelton** 146:10
**people** 155:5
161:4,5 186:4
205:20 206:3,6
207:23 233:2
238:7,23 242:6
254:13 289:13
291:21,24
298:16 306:1
308:5,8 309:8
309:9,23
310:21 313:3
**peoples** 161:2
184:9
**percent** 184:16
184:24
**percentage**
184:11
**perfectly** 281:7
**perform** 176:25
**performance**
166:17,18
167:15,23
221:2,5,7
240:20 247:4
257:17,19
266:16,17,17
267:19 268:19
290:9 292:8
**period** 176:20
176:23 181:3
182:21 183:4
251:3 255:16
277:25 280:18
299:8
**periodically**

201:21 217:6
**periods** 151:14
**person** 162:14
176:1 178:3
186:10 223:13
223:20 228:21
232:3 234:10
234:11 236:2,4
242:4 252:20
264:22 283:21
289:14,25
294:18
**personal** 157:9
158:11 257:12
268:4
**personally**
207:22 208:4,6
300:23
**personnel**
228:20
**perspective**
195:25 252:3
269:25
**pertain** 149:19
157:5
**pertained**
150:16
**petty** 206:24
207:2,6,7,12
207:18,19
**phased** 181:25
182:14
**phone** 178:15,16
179:19 204:23
205:1,4 212:19
251:10 252:5
**phones** 204:17
204:21
**phrase** 276:3
**phrased** 215:13
216:10 304:12
**phrasing** 202:14
220:8,9
**physical** 166:10
**pick** 148:9 248:2
**picked** 192:19

217:12
**picking** 314:9,14
**picture** 276:9,16
**piece** 158:8
163:24 170:23
177:8,8
**pip** 266:14 313:8
313:11
**piped** 224:1
**pips** 266:13
**place** 148:7
199:11 204:6
208:12 307:3
**placed** 163:13
290:17 304:7
**placing** 242:8
**plaintiff** 145:6
146:2 149:5
159:10 162:25
**planned** 255:7
287:24
**plate** 178:1
263:2 264:1
**play** 155:3
**player** 175:5
202:22
**plc** 146:10
**pleasant** 280:18
**please** 148:8
149:1 161:12
187:14 212:20
212:21 213:20
268:12 269:7
269:12 291:21
291:25 313:4
**pllc** 145:9
148:13
**plus** 156:10
**pneumonia**
190:2
**po** 311:21
**point** 149:24
150:9 168:5
179:14 191:2
199:4,25
216:20 229:5

KATHLEEN  LIEBAU Volume II
April 07, 2022

Page 338

236:9,13,14
237:17 241:20
243:18 268:17
272:10 276:23
279:10 287:15
288:9 291:6
295:10 298:12
299:18 306:3
306:11 313:25
316:2
**pointed** 217:23
244:5
**pointing** 244:19
**points** 208:18
**poke** 248:2
**polar** 190:4
**policies** 149:19
149:19 150:3
151:9 153:6
194:16,18
237:17,22,23
237:25
**policy** 149:21
150:15,18
151:18 152:5,7
152:10,13,15
152:22,23,24
153:1 194:8,17
199:6 210:3,14
221:16,18,21
232:7,8 233:11
233:19,22,23
234:6,8,10
236:1,15,20
237:4 238:12
238:21,23
240:3 241:14
255:5 269:20
**polizzi** 311:23
**poor** 190:2
**poplin** 145:21
148:24 317:6
317:22
**portal** 154:17,23
155:14,15
**porter** 146:9

301:8
**portions** 254:4
**posed** 170:22
**position** 174:10
172:8 174:10
185:18 234:9
253:17 311:8
**positive** 296:2
**possession**
156:18 158:11
190:8,12
257:13
**possibility**
225:21
**possible** 225:24
**possibly** 285:8
307:3
**post** 165:9
**posted** 150:12
150:25 151:3
**potato** 300:7
**potential** 152:12
**practice** 150:25
195:13 197:25
198:1 199:8
308:16
**praises** 202:22
**pre** 233:9
**preapproval**
245:5,5,7
**prepare** 183:19
**prepared**
165:25
**prerogative**
221:18
**present** 146:14
173:12
**presented**
172:11 208:15
265:13 266:14
**pressure** 267:8
**pressured** 305:5
305:8,17 306:2
306:4,12 308:3
308:18,22
**pressuring**

225:16
**presume** 306:19
**pretty** 155:4
190:7 230:25
245:17 252:14
255:15 256:9
305:10
**prevent** 289:22
**prevented**
282:11
**previous** 239:13
241:22
**previously**
240:24
**primary** 172:9
**print** 189:9
192:11 256:17
270:14,19
273:6 278:13
278:16
**printed** 155:21
160:11,13
186:21 256:20
258:8 270:9
271:13 273:3
**printer** 261:15
263:18 284:5,6
284:9 307:11
**printout** 180:23
195:19
**prior** 153:13
163:7 199:1,3
230:14 231:1
247:20 249:4
249:11 282:20
302:22
**priorities**
235:23 240:14
246:21 248:23
249:3,13 250:7
250:13
**prioritizing**
249:25 250:21
**priority** 235:20
235:22,24
236:11 238:19

239:8
**private** 148:10
**privileged**
163:11,17
164:11,17
165:19
**privy** 240:5
**probably** 150:1
168:25 169:1
184:24 190:24
192:21 208:8
257:5 283:19
289:7,7
**probation**
258:25 259:2,3
279:14,17,23
280:11,24
281:14,24
282:21 284:12
290:17 304:8
304:18 313:8
313:11
**probationary**
298:25
**problem** 205:21
205:24 206:5
206:11 232:2
232:15 236:13
236:14 249:25
273:11,19,25
285:16 297:12
**problematic**
253:11
**procedure** 232:5
**procedures**
181:11
**proceed** 174:4
**proceeding**
148:11,16
173:17
**process** 268:14
269:4 299:16
**processes** 248:3
**processing**
172:15 173:2
**processors**

299:14
**produce** 153:17
154:15,21,25
155:13 232:24
**produced**
153:10,22
156:17 190:8
190:12,13
199:10,15
213:16 217:15
232:23 306:16
**product** 163:12
164:12,18
165:19 246:18
253:20 270:25
271:5,19 272:7
272:25 273:2,5
280:14 295:21
**production**
156:25 157:2,3
181:1,21
183:17 214:5
217:11 266:7
**productive**
289:11
**productivity**
273:24 274:3
**products** 182:25
183:13 184:23
185:3,23
218:14
**professional**
145:10 298:14
**professors**
311:17
**program** 198:6
**project** 176:14
176:18 177:21
178:2 180:10
181:24,25
182:8,18,21
183:16 184:5
187:18,22
189:5 192:14
192:23 193:16
202:1,24 211:5

EXHIBIT 1

KATHLEEN   LIEBAU Volume II
April 07, 2022

224:10 225:1
230:20 243:5
246:25 247:1
247:12,14,19
247:20,23
248:15 249:9
251:18,22
254:12 259:7,9
260:12 264:14
264:23
**projected**
177:13
**projects** 182:4
183:2 185:17
185:19 186:16
188:14
**prompted** 189:8
**proof** 162:3
173:12
**properly** 231:11
**property** 165:6
**proposition**
247:22
**prospective**
300:11
**protect** 162:11
**protected** 162:7
165:1 293:11
**protective** 163:4
**prove** 162:1
163:23,25
170:24 189:9
192:9 270:22
315:23
**proves** 251:14
**provide** 159:14
159:17 246:23
262:12
**provided** 216:21
217:16
**providing**
162:25 222:15
**provoked** 293:6
293:12
**pto** 236:10
**public** 280:21

317:23
**pull** 191:23
261:1 265:22
**pulled** 181:14
238:18 240:15
**pumping** 166:22
**punctuality**
194:4,14
221:17 226:14
226:24
**purge** 157:23
**purpose** 165:22
**purposely**
232:13,15
**purposes** 159:16
163:1 164:13
197:19 264:23
**pursuant** 199:6
**pursue** 171:9
**push** 217:1
289:23 298:2
300:22
**put** 156:13
168:11 180:7
188:3,22 197:6
197:12,18
204:2 212:12
215:2 224:9
245:25 252:1
252:25 254:5
256:17 268:23
272:23 279:14
279:23 280:24
291:6 305:1
308:9 309:18
313:25
**puts** 213:22
251:22
**putting** 178:25
233:6 242:11
263:2,25

_____
**Q**
**quality** 188:25
269:24 270:8
270:10,10,11

**quantity** 166:21
270:4 273:24
274:4,6 277:22
236:10
**quarter** 204:1,3
**question** 152:4
154:6 159:16
161:11,19
169:7,10 187:9
187:14 189:10
202:16,16
215:12 216:6
216:10,15
220:5 221:9
223:6 226:20
230:25 233:21
234:12,21
235:7 260:23
264:15,18
265:10 277:24
302:15 303:4
303:14 306:7,9
306:10,10
315:4
**questions**
149:17 150:15
161:21,23
167:5 170:21
194:24 220:7
228:7,9 236:16
262:5 267:6
276:18 278:1
283:25 285:2
308:10 312:17
317:8
**quibble** 247:9
273:7
**quicker** 258:3
**quite** 153:10
291:12,12
299:2,6
**quote** 201:5
221:18 233:19
236:15 262:23
**quoting** 308:5

_____
**R**
**r** 145:9
**racehorse**
167:19 269:25
**raised** 290:9
**rambling**
278:24,25
**ran** 196:16
**random** 155:20
**range** 185:20
**rapid** 254:21
255:1,6 291:13
292:3
**rating** 248:10
268:7 273:18
**rattling** 228:8
**reach** 222:22
**reached** 176:3
**reacting** 292:6
**reaction** 278:4
**reactivated**
205:2
**read** 149:22,24
150:8 158:3,5
161:12 170:13
172:3,4,6,18
172:25 191:15
194:22 195:3
209:3 212:13
230:6 237:5,6
237:16 246:14
248:8 250:20
293:14,16
305:18
**reading** 172:3
308:7
**reads** 222:24
301:19
**ready** 186:7
228:6 246:9
253:17 254:8
254:14 271:16
275:10
**real** 176:25
178:10 208:20

270:7
**realize** 263:9
**realized** 213:25
287:22,23
307:10
**realizing** 279:12
**really** 197:8
199:23 221:6
224:5 238:11
265:20 266:8
279:4 285:4,22
291:12 300:22
305:12
**reason** 151:25
227:15 259:12
280:1 284:21
312:6
**reasonable**
304:17
**reasons** 302:16
**rebuttal** 170:16
170:18 171:25
172:12 298:24
299:4
**recall** 167:24
169:25 174:25
175:15,20
182:6,9,23
184:18 190:6
194:5 196:18
228:10 229:21
240:13 253:23
254:18 256:22
268:1,2 270:20
280:16,17
290:20 291:12
291:13 295:18
296:7 306:13
306:14 307:8
309:9 310:9
311:1,2,10,20
312:22 313:5
313:19 315:7,9
316:3
**receipt** 158:2

KATHLEEN  LIEBAU Volume II
April 07, 2022

Page 340

receive 171:8
222:4 248:10
received 156:9
158:5 168:1,21
169:21 170:4
194:4,13
218:22 226:10
259:5 301:10
312:8
receiving 164:10
169:4
receptive 258:14
recess 213:8
294:9 304:2
reclassified
304:8
recognize
252:15
recognized
290:11
recollection
269:17
record 148:6,8
149:2 151:8
157:21 159:9
159:13 162:18
162:24 172:7
192:13 199:22
209:3 213:5,9
213:12,14
222:23 229:7
231:11 266:21
270:18 294:4,7
294:10 298:19
303:25 304:3,5
306:21
recorded 148:11
227:6 229:9
317:9
recording 148:7
records 159:20
159:25 160:3,7
160:9,13,19,24
161:3,8,16
165:13,14
175:15 176:7

185:1 189:9
197:19 226:12
245:18 250:15
257:25 258:2
274:7 307:12
redacted 159:13
159:15 162:24
163:24 164:2
reduce 269:24
reduced 217:24
317:10
reexamination
147:8 315:5
refer 198:22
287:5,6 305:16
reference
191:20 196:6
249:1
referred 245:15
referring 174:23
196:15 210:4
211:2,4,5
219:25 233:22
246:24 247:3
255:1 299:21
305:6,15
315:20
refers 199:15
reflect 162:18
213:14,16
254:1
reflected 208:24
214:11 226:13
227:4
reflection 282:7
reflects 166:17
refresh 150:18
193:8 194:18
251:13,23
280:3 315:16
refusal 274:23
302:21 303:9
refused 301:1
refusing 302:25
regard 183:18
regarding

222:24
regular 149:22
218:8 220:13
222:9 224:23
232:11 259:17
regularly
225:23
reinvent 251:12
251:19,24
rejected 226:11
rejecting 226:25
relate 156:19
related 148:22
157:11,23
158:25 174:23
176:17 184:18
227:10 317:12
relates 223:17
relating 156:11
236:10
relationship
275:1 296:20
297:3,17
reliability
206:13
remain 177:18
179:23,24
remainder
288:14
remains 157:8
remark 261:25
remember
194:9,23 214:5
228:11 229:19
229:20,20,22
232:17 256:16
278:17 282:2
285:22 288:2
293:15 297:4
299:20,25
300:21 306:24
remembered
227:22 232:22
232:24
remind 222:7
reminded 286:5

repeated 162:3
217:25
repeatedly
217:23
repercussions
280:24
report 165:24
177:7 212:5
reporter 148:24
149:2 161:13
reporting
174:19 264:22
represented
185:7 301:23
reprimand
166:8,11,18,20
168:4 194:9
224:5,7 227:14
244:20,22
265:14,19
279:7 297:5
reprimanded
166:2 210:20
210:23 211:1
230:12,13
276:13
reprimands
167:14,22
240:25 246:16
275:23 291:13
313:16
repull 250:15
repurchase
278:12,21
279:2
reputation
164:24 188:12
300:17
request 165:18
169:8 242:20
304:17,20
requested
316:11
requesting
200:20
requests 163:11

222:17
require 168:19
219:14
required 168:22
204:25 205:1
215:23 234:24
245:2 259:23
261:4
requirement
205:3 238:4
requirements
239:6
resistant 274:18
274:22 275:7
resort 152:13
resources
222:13 235:23
298:22
respect 151:9
163:22 275:14
303:9
respective
316:12
respond 161:23
168:14,18
191:4 234:21
236:16 245:13
264:7,21 265:4
265:7,10 278:1
281:21,23
282:1,4 308:10
responded
191:1 226:16
responding
183:17 220:7
266:10
response 159:11
162:23 168:19
172:12 208:20
241:2,10
250:19,24
265:8,15
282:24 293:10
298:22 301:10
responses
183:19

KATHLEEN LIEBAU Volume II
April 07, 2022

Page 341

responsibilities 233:8
responsibility 210:25 230:8
responsible 284:12
responsive 187:9 190:5
rest 184:24 249:24
restrictions 242:8
resurface 217:6
retained 271:24 272:5
retainer 283:24
retaliate 293:20
retaliated 289:17
retaliating 290:4 304:23
retaliation 171:2 289:17 289:25 290:6 292:2 293:1,6 293:10,12
retaliatory 292:14
retire 305:5,8,17 308:22
retirement 299:20 300:12 300:14
returned 263:3
revealing 163:18
review 166:17 167:16 181:21 194:21,25 232:18,19 240:22 248:10 250:9 252:1 267:18,22 268:4,23 270:13 276:24 278:4,8,9,14

279:3,4 292:9
reviewed 195:1
reviewer 232:3 232:6,9,16 233:6,8
reviewing 181:19
reviews 155:20 166:12 167:23 168:2 202:21 217:22 221:2,5 249:4 298:13
rex 198:7
right 150:23 151:25 153:9 154:2 155:16 155:22 156:7 156:17,25 157:3,8 158:10 158:16,17,20 159:3,23,25 161:21 162:14 162:15 164:9 164:15,23 166:15 168:14 169:2,6 170:3 171:9 172:2,20 173:2,24,25 175:5 176:10 177:3 178:8,10 180:3,17 181:16 182:20 184:3,10,15 185:1 186:9,14 186:19 187:16 187:21 188:8 188:24 189:3 190:13 192:2 192:13 193:7 193:14 194:3 194:12 196:21 197:1,14 198:25 199:14 199:24 200:9 200:17,17,24 201:3,10,18,19

201:23 202:2 202:11 204:20 208:12 209:3 209:19,23 212:11,17,24 214:9 215:4 216:15,20 218:17,18,21 219:4 220:1,16 220:22,23 221:3,20 222:4 222:11,19 223:5,7,23,25 224:17 225:9 226:10,20,23 229:24 230:11 231:7,7,14 232:1 233:7,16 233:17 234:13 236:17,19,22 237:1,1,1,3 239:17,20 240:1,18 241:13 242:7 242:11 243:4 243:23 244:18 244:23 245:1,4 246:18,24 247:1,3,6,17 248:9,20 249:8 250:5,5,10,17 251:15 252:12 252:14 253:5 254:3,6,17 256:21 257:2,6 258:10,24 259:4,19 260:12,16 262:8,19,25 263:6 264:7,21 266:15 267:2 269:18 271:9 272:5,9 273:14 275:16 276:22 277:15 278:24 278:25 279:9,9

279:14,21 280:9,12,19 281:3,25,25 282:5 283:2,11 284:8,19 285:11 286:1 286:24 287:5 288:9,14 289:4 289:8,16 292:17,19,25 293:18 294:3 294:22 296:16 298:17 299:2 299:11 300:25 301:7 305:4,13 306:15 307:16 307:22 308:17 309:1,5,7 310:5 311:4 312:15,18 313:14 315:15 316:5
rights 165:2
robin 160:3,9 164:1 165:24 166:6 186:9 187:1,6,17,19 187:21,25 188:10,21 189:4,20,20 190:2,11,14,23 190:25 191:4 191:13,17,20 253:19 258:4 271:2,10,14,19 272:14,14,17 280:14
robins 187:4 188:12,25 192:1 253:10 254:11,15,16 254:20,24 270:10,25 271:5,17 272:25
role 191:7 276:9

276:15,20
romeo 177:9,9 177:11,14,17 206:15 207:25
roof 267:8
room 186:2 267:7 277:14 277:18
rough 156:14 184:25
roughly 211:10
round 197:8,10 197:20
rounded 196:8 196:12 198:7
rounding 198:3
rounds 197:13
routinely 163:13
rpr 145:21 317:22
ruin 206:24
rule 195:14,22 195:24 196:1,9 196:9,10,22 198:3,18 199:22 203:15 203:18 204:6 207:16 244:3
rules 153:3 237:20
rumor 305:9,11
rumors 161:4 162:1 305:16 305:25
run 259:6,12,14 266:9
running 241:15 312:10
rush 177:17 178:22

**S**

s 182:4
sang 202:21
sarcastic 287:6 287:8

KATHLEEN   LIEBAU Volume II
April 07, 2022

Page 342

satisfaction 273:18
save 192:11 250:14 283:6 315:24
saw 177:15 217:10,11 219:23 227:23 263:25
saying 198:10 218:24 257:3 271:15 274:2,6 284:18,22 285:6 290:20 297:16 299:19 311:12
says 167:19 189:25 190:1 209:5 211:18 214:1 221:25 223:22 228:13 230:11 231:19 231:21,23,24 238:8 241:9 248:12 249:15 253:15 269:6,6 275:6 278:25 298:21 301:18 306:18
scanning 306:7
scds 182:2,5,8 182:21 183:4 183:16 184:12
scheduled 225:23 264:9
school 209:15 311:16
schultz 183:7,9 221:11
scope 263:16 264:15
screens 261:23 262:5
search 161:1
second 179:7,16 212:12 218:2

219:23 266:2 273:17 301:13
secretary 277:4
section 151:13 151:14,15
see 151:12,19 152:10 153:1,2 176:7 179:7 180:25 185:2,2 205:12,20,24 206:5,17,21 212:23 218:12 221:25 222:9 237:20 246:4 250:22 252:18 252:19 266:7 268:6 269:8,20 270:11 271:1,2 274:2 277:18 277:20 278:6,7 278:11 285:16 295:9 301:16 306:7
seeing 214:5 227:22
seek 202:11,17 203:6 230:14 230:17 244:1 245:5
seeking 203:1 299:16
seemingly 242:18
seen 150:5 173:4 174:7 190:14 199:20
semantics 211:24 276:2
send 180:18,20 181:22 245:12 254:4,13 271:15 278:18 278:20 281:6,9 282:19 285:1
sending 156:16 248:21 282:11

282:17
sense 184:19 185:16 188:8 223:7 285:10 300:14
sensitive 148:9 206:1
sent 156:8 157:19,21,24 172:11 180:22 183:21 190:18 191:12 192:18 211:13 228:20 230:16 259:23 263:1 264:1 265:21 269:15 271:2,3,10,19 273:1 278:18 281:10,19 282:20 286:10 306:19
sentence 241:6,8 273:21 274:4 276:15 305:18
separate 268:2
separately 272:8
separation 301:18
september 157:20,25 180:10 192:15 192:18,24 193:4,7,16,20 193:24 247:7 249:12
series 212:22 214:5 231:10
serious 280:23
service 183:22 305:15,19 306:6 308:21
services 222:16 234:3 299:12
servicing 237:15
session 209:25 226:14,24

set 231:20 256:23 264:16 307:24 308:1 317:8
sets 237:20
settle 217:1
seven 204:13,13 218:20 267:1
severe 166:11,19 240:25 246:16 277:2
shannon 234:14 234:20 235:1,9 235:18 259:13 259:18,23 261:3 263:1 265:21,25 266:1 283:6 285:1,5,6 294:15,22 295:1,4,10,14 295:20 296:2
shannons 234:23 259:16 263:23 264:1 295:23
share 306:3,11
shared 241:23 241:25 310:6
shed 235:13 278:20 287:1
sheet 226:11,13 227:1,3,14,18
shell 230:11
sherry 180:15 185:5
shes 166:13 177:6 180:17 186:10 191:4 191:16,20 226:11,25,25 228:23 229:5 233:25 237:17 240:8,10 249:13 250:2 254:7,12,12

264:22,22 265:1 281:5,5 284:18 286:1,3 296:11 309:4,6 314:17
shiemke 309:5
shingle 307:24 308:1
shit 197:17
shock 281:17 282:1
shocked 177:4,5 282:23
shoo 211:21
short 193:1
shorten 195:17 196:24
shortening 198:15
shorter 160:20
shouldnt 168:6 207:22 208:4 289:13
show 157:18 164:3,25 165:24 166:1 169:12 200:13 207:2 226:12 240:14,18 257:19 270:23 298:17 301:7 306:15
showed 195:18 229:15 232:17
showing 162:19 307:13
shows 163:25 229:16
sic 177:10 248:2 310:19
sides 237:24
sign 208:15
signature 316:11
signed 221:5,7 247:8

KATHLEEN   LIEBAU Volume II
April 07, 2022

significance
  163:17
significant
  173:18 251:17
  296:13
signing 208:16
simple 230:25
simplified
  269:13
simplify 268:14
simply 201:5
single 293:15
sit 176:1,13
  189:21 246:8
sitting 176:2
  246:4 282:8
  290:10 293:18
situation 198:19
  223:17,18
  244:17
six 190:17
  195:15 196:23
  198:12 199:4
  204:1,1,7
  205:5 206:2
  207:7 211:9,13
  211:25 225:14
  232:18,22
  258:3
sixes 204:3
sixminute
  195:14,22,24
  196:9,10,22
  198:18 199:22
  203:15,18
  204:6
skills 241:21
skip 238:9
skipping 159:4
slammed 237:21
  237:22,24
slightly 226:3
slow 160:15,16
  160:23 167:18
  241:5 258:1
  270:3,5 274:5

slowing 269:23
small 172:2
  175:22 248:2
smaller 154:3
smattering
  175:22
smoke 314:17
snarky 262:1
socalled 196:22
solely 171:8,12
somebody
  181:14 248:5
  274:8 300:22
  311:16
someones
  197:17 232:11
somethings
  310:3
somewhat
  245:23 312:9
soon 281:8
  300:3
sorry 211:22
  226:19 229:25
  237:1 307:20
sort 178:23
  265:22 289:21
sought 210:18
  244:6,13,15
  245:7,14,21
  304:12
sounds 189:20
southern 145:3
  148:15
southfield
  148:22
spark 293:23
speak 166:20
  248:4
speaking 189:17
speaks 153:8
special 153:3
  181:11 238:8
specialist 148:20
  237:18,19,22
  238:2,8,11,11

238:21
specialists
  237:13 238:5
specific 176:15
  193:15 200:10
  201:4 211:4
  212:7 215:10
  254:18 315:17
specifically
  254:19 259:22
  283:6 285:1,2
  285:7 299:25
speeches 236:17
speeding 313:13
  313:15
spending 176:7
  186:20
spent 187:2,17
  187:18 237:15
  286:6
spin 251:22
spinning 233:1,1
split 178:23
spoke 188:18,21
spoken 189:17
  225:3
spreading
  160:14 161:4
  162:2
spreadsheet
  259:21
spring 182:1,10
  182:15 183:8
spy 274:3
ss 317:3
stack 219:22
  239:10
staff 150:7
  151:16 240:20
stamp 159:11
  162:22 163:9
  163:12 218:2
stamped 153:12
  153:13 164:11
  194:20 212:18
  213:18 222:7

240:22 298:21
standard 150:25
  155:4 172:17
  173:9 174:1,8
standing 228:5
start 149:16
  192:23 197:1
  205:20 209:4
  228:8 239:13
  245:25 292:6
started 166:13
  175:3 180:11
  192:14 193:8
  193:19 206:19
  206:22 209:1
  209:12,20,22
  247:7 255:24
  285:21 292:2
  308:1 314:8,14
starting 163:9
  166:12 192:20
  255:18 278:2
state 149:1
  207:24 317:2
stated 153:1,5
statement
  170:14 172:8
  174:15 252:1
statements
  162:2 235:5
  252:19
states 145:1
  148:14 171:13
  190:14 199:12
  209:21 233:11
  241:1,9
stating 152:7
station 280:5,7
  280:10 282:9
status 180:20
  263:18
statutes 172:13
stay 195:17
  205:22 277:24
  279:3
stayed 204:12

212:16
staying 180:21
  198:16
stealing 164:16
  164:20,22
  195:12 203:19
  203:21
steeh 145:8
stenographic
  317:11
stenographica...
  317:9
sterling 146:4
sterlingattorn...
  146:6
steve 307:22
  308:11 309:23
stewart 234:14
  235:1 259:13
  263:1 294:15
  295:4
sticking 303:12
stop 173:1
  179:15 207:18
  210:16 237:14
  237:14 286:18
  286:18,18
stopped 247:9
  262:8
store 291:22,25
  313:4
stored 291:7
stories 284:11
storms 212:21
story 217:15
  260:2 284:14
  284:15 287:11
  287:12
straighten 281:3
streamlined
  269:3
strictly 156:7
strike 209:24
strong 249:2
stuck 209:15
  210:9,11 252:7

KATHLEEN  LIEBAU Volume II
April 07, 2022

Page 344

| | | | | |
|---|---|---|---|---|
| **stuff** 153:17,24 | 173:24,25 | 298:22 303:7 | **supervisory** | **system** 160:11 |
| 180:13,24 | 174:17 176:23 | 304:11,14 | 191:7 | 160:12 196:7 |
| 184:18 187:25 | 177:13,15 | 307:1 310:10 | **supply** 277:14 | 196:12,13 |
| 196:5,17 | 179:16,22 | 310:18 312:21 | **support** 148:21 | 197:12 198:7 |
| 210:23 211:3 | 180:18,20,24 | 312:25 313:6 | 148:25 172:13 | 238:13 263:12 |
| 232:23 235:16 | 190:19 192:18 | 313:10,19 | 183:9 257:24 | 263:13 273:4 |
| 236:11 249:16 | 194:13 195:18 | 315:2,7,17,19 | 277:3 294:18 | **systems** 192:12 |
| 254:13 256:21 | 199:16 204:25 | **sues** 179:12,12 | **supported** | |
| 259:22 261:19 | 208:14 210:1 | 230:13 233:18 | 188:13 | **T** |
| 261:24 262:1,3 | 211:18 213:22 | 236:9 241:16 | **supporting** | **table** 147:1 |
| 266:5 277:21 | 214:4 215:17 | 268:5 288:13 | 183:23 277:7 | **take** 148:7 |
| 278:16 284:2 | 216:7,20 | 290:25 313:11 | **supposed** 161:2 | 149:24 151:5 |
| 284:23 286:7 | 217:16,22 | 314:4,13 | 161:4 166:4 | 158:10,11 |
| 286:13 | 218:4,22 | **sufficient** | 168:12 177:22 | 161:7,15 164:9 |
| **style** 298:2 | 219:12 220:2 | 172:21 | 179:10 187:25 | 165:7,8,12,14 |
| **subject** 225:11 | 220:12,20,23 | **suggest** 193:15 | 195:16 201:5 | 165:17 172:4 |
| 230:23 259:2 | 221:2,14,18 | 234:11 235:14 | 204:14,19 | 184:22 194:21 |
| **subjects** 259:2 | 222:12,23,25 | 248:15 295:16 | 218:5,8 232:3 | 194:25 210:24 |
| **submission** | 223:11,12,19 | 295:19 | 241:17,19 | 211:10,12,18 |
| 159:10 261:9 | 223:22 226:10 | **suggested** 303:3 | 252:24 254:10 | 211:20 212:25 |
| 292:19,25 | 226:25 228:11 | 303:8,16 | 254:12 258:17 | 215:6 230:11 |
| 293:14 305:4 | 228:13,15 | 309:17,24 | 269:13 276:11 | 239:20 240:23 |
| 305:14 | 231:19,21,22 | **suggesting** | **sure** 187:15 | 246:16 250:17 |
| **submissions** | 232:2,13 233:5 | 191:12 194:7 | 209:16 210:4 | 256:19 266:25 |
| 162:22 293:5 | 235:14,18 | 198:13 | 213:1 224:6 | 267:10 303:23 |
| 298:20 | 236:13 239:11 | **suggestions** | 226:5 245:17 | **taken** 145:17 |
| **submitted** | 239:14,23 | 268:23 | 256:11 260:8 | 148:12 150:8 |
| 162:21 163:20 | 240:21 242:8 | **suing** 275:11 | 260:11 270:13 | 170:23 213:8 |
| 170:14 171:25 | 242:11 244:7 | **suite** 145:17 | 270:16 | 265:16 294:9 |
| 173:4,18 174:3 | 247:5 250:25 | 146:5,11 | **surgery** 181:5 | 304:2 307:3 |
| 208:25 298:25 | 255:13,13 | **summaries** | **surprise** 187:1 | 317:7,12 |
| 299:5 | 257:3 259:5 | 249:23 | 187:10,11,16 | **takes** 215:2 |
| **submitting** | 268:14 277:1,3 | **summary** | 295:7 | 223:12,19 |
| 170:22 | 277:7 278:8 | 163:10 165:17 | **surprised** 188:6 | 230:7 242:3 |
| **subpoena** | 279:12,18 | **supervised** | 295:3 298:11 | **talk** 155:16 |
| 301:11 311:10 | 280:5,22 281:3 | 221:12 | **swear** 149:2 | 162:9 181:16 |
| **substantiate** | 281:7,8,24 | **supervision** | **switch** 153:9 | 186:9 187:21 |
| 217:9 240:11 | 282:3,13,15 | 304:11,14,22 | 182:2,17,18 | 190:3 206:8 |
| 273:9 | 287:6 289:20 | **supervisor** | 184:16,24 | 223:25 224:1,2 |
| **substantive** | 289:24,25 | 152:14 191:6 | 235:17 251:5 | 225:6 240:14 |
| 251:5,18 | 290:2,4,11,14 | 200:20 220:23 | 261:16,19 | 244:10 246:5 |
| **successful** 251:7 | 290:14 291:3,9 | 221:10 240:21 | 262:1,3 266:5 | 259:4 261:12 |
| **sue** 152:6,14,21 | 291:9,11,15,23 | 257:14 304:22 | 283:11,14 | 262:11 263:7 |
| 162:3 168:6 | 292:1,2,10,11 | **supervisors** | 284:22 307:14 | 288:5,8 308:10 |
| 170:24 171:9 | 292:20,23 | 220:24 221:11 | **switched** 168:5 | 309:7 |
| 172:24 173:3 | 293:2,19 | 276:11 | **sworn** 149:10 | **talked** 176:19 |

EXHIBIT 1

KATHLEEN  LIEBAU Volume II
April 07, 2022

Page 345

| | | | | |
|---|---|---|---|---|
| 251:13 282:6 | 216:20 221:15 | **testimony** 163:2 | 305:24 306:23 | 315:18 |
| 288:4 300:24 | 222:1 240:23 | 214:9 258:10 | 310:6 313:25 | **things** 154:13 |
| 306:8 307:16 | 254:5 267:3 | 273:15 274:16 | 314:8 315:19 | 155:5,20 156:2 |
| 307:19,22 | 268:6 270:20 | 289:6 | **theirs** 310:2 | 179:20 181:19 |
| 309:16 | 270:24 271:4,9 | **thank** 162:16 | **theme** 217:25 | 181:19,20 |
| **talking** 180:15 | 271:18 272:24 | 230:4 303:22 | **theoretically** | 186:2 190:15 |
| 249:7,9,13 | 273:3,11 | 316:6 | 247:5 | 192:9 211:13 |
| 261:20 282:5 | 276:11 287:10 | **thats** 161:21 | **theres** 154:23 | 214:7,17 |
| 282:13 288:2 | 291:3 293:21 | 165:5 168:4,5 | 171:4 173:5 | 216:24 217:11 |
| 296:9 306:14 | 300:19 303:12 | 171:4 172:23 | 174:5 185:22 | 235:21 248:16 |
| 310:20 | 312:6,25 | 172:24 174:1 | 187:23 189:22 | 251:11 252:16 |
| **tanking** 166:13 | **telling** 160:15 | 178:12 184:4 | 211:11 214:3 | 256:15,16,21 |
| **tape** 294:5 | 177:6 222:5 | 184:25 187:9 | 223:8 231:20 | 256:23 257:1 |
| **tardies** 203:14 | 242:17 268:1,3 | 188:11,22 | 240:15 247:23 | 257:18 261:23 |
| 203:16 | 274:5 292:8 | 190:5,6 197:23 | 248:15 254:7 | 266:7 270:10 |
| **tardiness** 205:15 | **tells** 260:2 | 199:11,20 | 261:21 270:10 | 275:4 285:7,8 |
| 205:17 210:1 | **temporary** | 200:25 201:23 | 271:18 279:9 | 285:19 310:15 |
| **tardy** 210:7 | 174:11 251:2 | 202:16 208:21 | 283:21 286:21 | 310:19 315:23 |
| 226:16 | **ten** 188:5 206:8 | 212:9 214:1 | 291:21,24 | **think** 153:4 |
| **taskmaster** | 252:8 283:13 | 216:3 218:13 | 302:24 303:8 | 156:2 158:21 |
| 310:14 | **term** 176:23 | 218:19 219:8 | 310:5,12 | 161:10 162:14 |
| **taxes** 179:24 | 209:5 211:23 | 219:13,19,22 | 311:24 | 167:17 168:4 |
| 180:1 | 211:24 | 220:10 223:15 | **theyre** 158:22 | 173:7 176:19 |
| **team** 202:22 | **terminate** 257:4 | 223:22,24 | 159:25 160:3 | 177:22 180:22 |
| 222:25 247:24 | 257:14 303:17 | 225:17,20,25 | 161:1 162:8 | 180:23 181:14 |
| 248:1 250:10 | **terminated** | 231:4,4 232:9 | 164:5 166:12 | 182:9 185:21 |
| 250:11 252:20 | 172:14 255:10 | 232:23 233:19 | 174:4 186:5,5 | 185:21 189:7 |
| 274:18,19,25 | 255:10,14 | 238:9,13,22 | 212:1 213:18 | 191:16,19 |
| 275:7,8 | 256:8,8 272:4 | 239:1,14 | 222:16 240:15 | 192:25,25 |
| **teamwork** | **termination** | 241:19 250:2,9 | 243:22 257:5 | 193:10,23 |
| 277:12 | 255:9,23,25 | 250:15 251:18 | 258:7,8 269:8 | 196:18 198:7 |
| **technically** | 292:4 300:21 | 253:15 255:5 | 270:11 271:24 | 203:3 207:2,5 |
| 195:16 269:19 | 302:11,17,22 | 258:8 263:4 | 300:3 308:24 | 209:16 210:9 |
| **technician** | 303:1,10 | 268:2 269:1,6 | **theyve** 174:3 | 210:15 214:6 |
| 146:16 148:5 | **terminology** | 269:13,16 | 299:14 | 215:15,17 |
| 213:5,10 | 275:21 | 270:6,9,15,25 | **thick** 150:5 | 216:11 217:10 |
| 266:22 294:6 | **terms** 188:19 | 271:16 272:20 | **thing** 166:3 | 225:4,12 |
| 294:11 303:25 | 236:21 285:17 | 272:23 276:3 | 178:23 191:25 | 230:18 233:22 |
| 304:4 316:7 | 288:13 296:25 | 276:20 277:12 | 199:20 204:16 | 238:15,20 |
| **technologically** | **terrible** 249:1 | 277:12,12 | 206:24 211:17 | 248:6,14,19 |
| 178:18 | **territory** 222:20 | 278:13 279:13 | 232:9,20 | 249:15 251:12 |
| **telecommuting** | **testified** 149:12 | 280:8,13 285:3 | 238:20 243:25 | 254:3,6 258:18 |
| 151:18 | 274:21 293:21 | 289:14 291:8 | 243:25 255:25 | 258:19 261:18 |
| **tell** 174:2 191:5 | **testify** 149:10 | 292:5 299:4,4 | 261:3 276:13 | 262:1 265:20 |
| 191:9 193:13 | 163:2 173:14 | 299:11 301:3 | 279:11 283:4 | 266:5,12 |
| 206:19 215:25 | 274:11 | 301:22 305:9 | 293:15 303:7 | 268:22 270:9 |

**EXHIBIT 1**

KATHLEEN  LIEBAU Volume II
April 07, 2022

Page 346

274:8,19 275:7
275:13,14
276:3 277:1,3
277:6 278:4
279:4,6,20
280:19 281:1
284:10,22
285:18,19
288:7 289:24
290:9,11
291:17,21,24
291:24 292:7,7
292:18 295:13
295:25 299:6
299:18 300:5
300:22 304:17
306:22 308:5,7
308:24 312:9
313:13
**thinking** 175:4
231:2
**third** 161:9,17
163:18 164:13
**thought** 152:18
154:21 155:14
155:15 158:10
161:6,7,13,15
171:6 177:18
190:14 197:6
198:8 200:8
201:3,10 204:5
212:9 215:19
215:24 217:18
219:3,7 220:17
238:9 239:5
252:17 253:10
276:24 284:6
288:10 291:3,9
309:18,24
315:22
**thousand**
257:10
**threaten** 255:23
313:16
**threatened**
224:13 255:9

**threatening**
255:24 257:14
**threats** 292:4
**three** 161:21,23
167:9 179:10
195:20 249:5
252:6 297:21
309:22
**threemonth**
181:3
**throw** 248:5
310:23
**throwing** 220:9
248:14 304:15
**thrown** 248:6
**thursday** 145:20
148:2 203:7
235:19 243:2
261:11 263:10
282:2 287:20
287:21,23
**till** 222:22
**time** 148:6
149:24 150:8,9
159:20,25
160:3,7,9,13
160:20,24
161:3,8,16,22
175:19 176:6,8
179:7,8 180:10
180:13 182:5,8
183:4,23,25
184:10,11
185:8,14,23
186:19,22
187:2,17 189:9
191:3 194:25
195:17 197:1
197:12,19
198:11,15
202:5,10 203:5
205:18,20
206:1 207:3
208:19 209:14
212:16 213:2,6

213:12 216:13
216:19,21
218:6,7,8,10
218:11 219:2
219:12 220:13
220:17 222:4,8
224:4 225:12
225:23 226:11
226:13,24
227:1,3,6,14
227:18,19
229:8,13,17
231:11,17,17
231:19,25
232:2,6,8,9,16
232:20 233:3,6
233:8,9 234:2
236:21 237:4,7
237:9 238:3,7
238:13,17,23
239:5,12,13,21
240:3,7,12
242:20 243:11
243:11,20,20
244:1,7,12
245:18,25
247:7 249:19
250:22 251:13
255:16 257:25
258:2 266:9,11
266:18 269:22
272:10 273:22
274:7 275:3
277:25 282:3,4
286:6 287:24
288:9,20
289:20 294:2
294:13,13
297:11 299:8
304:1 307:12
309:15 312:25
316:8
**timecard** 151:16
**timekeeper**
278:9
**timekeepers**

238:16
**timekeeping**
149:19 150:16
152:24 196:7
196:12 213:17
221:16
**timeline** 255:8
**timeliness**
278:12 279:1
**timely** 251:20
**times** 167:9
184:3 204:22
207:8 210:3
244:15 278:22
292:18 314:14
**timesensitive**
247:17 269:22
**timing** 280:8
**title** 184:1
**today** 148:24
156:17 157:8
178:19 244:9
266:8 301:10
**told** 153:20
170:15,25
174:18 179:18
180:3 191:2
195:10 201:25
204:25 205:1,3
217:16 219:1
222:3,25 223:7
223:12,14,18
224:10,25
226:25 228:18
229:22 242:6
242:14 245:4
251:24 254:14
260:7,9 261:5
261:12 263:6,7
263:9,18
267:21 279:17
279:18 280:10
280:13 281:8
283:3,6,8
285:1,2,7
286:20 291:8

293:25 301:3
315:7
**ton** 205:13
**tone** 189:16,16
190:10 191:24
262:1 265:16
287:6,8
**tones** 190:3
233:18
**top** 167:24
213:21 217:8
263:5,23
306:18
**topic** 158:1
**total** 212:14
**totally** 190:3
275:2 312:9
**touch** 249:18,19
**touched** 246:18
**tough** 310:14
**tracked** 285:4,6
**tracking** 299:22
**traffic** 204:21
209:14
**train** 178:17
**training** 263:13
**transcript**
147:13 317:11
**transcription**
317:10
**transferred**
169:16,20
**transition**
174:16,22
**trashing** 300:17
**treat** 165:3
**treated** 177:7
**treating** 275:4
**treatment** 166:1
166:9 189:4,23
190:11 313:11
314:4,13,20,25
**trial** 176:5
180:14 186:5,7
212:22
**tried** 299:19,19

KATHLEEN   LIEBAU Volume II
April 07, 2022

Page 347

| | | | | |
|---|---|---|---|---|
| 299:19 300:1 | 258:4 266:22 | underlying | 164:12 176:22 | 266:22 294:6 |
| **trouble** 167:8 | 297:22 302:22 | 239:20 | 178:22 183:11 | 294:11 303:25 |
| **truck** 177:10 | 303:10 | **understand** | 189:18 200:1 | 304:4,4 316:7 |
| **true** 165:5 252:1 | **twohour** 252:11 | 163:16 196:21 | 214:25 228:10 | **videotaped** |
| 257:20 285:8 | **twominute** | 197:10 205:19 | 229:10 235:12 | 145:15 |
| 302:5,6,8,9 | 237:23 | 206:9 214:4,9 | 268:14 273:8 | **view** 158:20 |
| 317:11 | **twomonth** | 216:4 224:18 | | 165:6 166:18 |
| **truly** 239:4 | 176:20 | 224:25 235:7 | **V** | 199:25 203:13 |
| **truth** 149:10,11 | **twopart** 306:7,9 | 236:1 278:15 | **vacation** 231:15 | 216:6 225:25 |
| 149:11 242:17 | **type** 283:25 | 289:10 | 231:16,18 | 241:20 258:15 |
| 299:19 300:1 | **typically** 150:6 | **understanding** | 232:1 233:1 | 290:15 295:10 |
| **try** 249:19 280:3 | 278:21 | 154:20 155:2 | 259:14 263:3 | 296:2,2 298:12 |
| 300:8,9 | **typo** 166:2,11,24 | 197:22 199:21 | 264:10 272:18 | 306:3,11 |
| **trying** 166:24 | 167:9,18,20 | 233:7 254:15 | 272:20 | **vign** 309:1,1 |
| 176:8 212:2 | 254:16,17 | 269:14 275:22 | **valuable** 178:6,8 | **vigneau** 309:2,3 |
| 265:21 288:24 | 270:2,12 | 276:8,15 | 251:16 | **violated** 172:14 |
| 300:15 306:13 | **typos** 165:24 | **understood** | **value** 305:14,19 | **virtually** 162:8 |
| **tuesday** 203:7 | 166:13,19,21 | 172:20 173:5 | 305:24 306:5 | 165:1 209:14 |
| 243:2,16,17 | 167:14,17,22 | 204:14 214:22 | 308:21 | 216:18 235:11 |
| 245:13 286:8 | 246:20 248:22 | 221:22 239:1,2 | **varies** 185:21,21 | **visavis** 189:4 |
| 286:10 287:18 | 253:6,7,7,7,9 | 239:4 276:23 | **variety** 188:14 | 190:11 |
| 307:5 | 253:10,19 | **unduly** 154:25 | 258:8 | **viviano** 146:10 |
| **tupper** 307:22 | 254:7,10,15,20 | 250:18 252:13 | **various** 300:2 | **voice** 189:16 |
| 308:11 | 270:6 280:14 | **unfair** 180:7 | 310:21 | **volume** 145:16 |
| **turn** 194:3 | | **unit** 213:6,11 | **vary** 234:10 | 148:11 185:6 |
| 208:13 247:10 | **U** | 294:7,12 | **vast** 203:14 | 186:1 294:13 |
| 257:11 258:24 | **ultimate** 181:21 | **united** 145:1 | **vehicles** 182:7 | **voluminous** |
| 266:15 278:21 | 298:14 | 148:14 | **verbal** 189:16 | 153:11 |
| 289:16 297:19 | **ultimately** 251:1 | **unprofessional** | 189:24 216:24 | **vs** 145:7 |
| **turned** 257:22 | 292:5 293:23 | 282:7 296:17 | 217:2 224:4 | |
| 257:22 | **umbrella** 175:2 | **unreasonable** | **verbally** 171:18 | **W** |
| **twice** 156:16 | **umhmm** 171:15 | 233:25 | 200:19 203:22 | **wait** 218:18 |
| 179:5,6,13 | 171:17 186:23 | **unredacted** | 310:6 | 226:17 248:4 |
| 253:9 257:3 | 197:3 236:6 | 161:19 162:15 | **verbatim** 265:24 | 248:11 264:9 |
| **two** 160:21 | **un** 182:12 | 163:1 | 287:10 288:6 | 265:17 272:18 |
| 162:4 175:13 | 310:18 | **unsatisfactory** | 291:23 | **waited** 262:25 |
| 177:16 178:12 | **unaccurate** | 268:12,21 | **verifications** | 263:22 |
| 178:14 179:19 | 310:19 | 269:5,7,10,11 | 183:21 | **walked** 227:16 |
| 180:2,24 184:9 | **unauthorized** | **untruthful** | **verify** 273:4 | **walking** 260:1 |
| 195:19 203:24 | 200:1,3 209:6 | 275:13,14 | **version** 151:22 | **want** 154:7,9 |
| 204:20 209:17 | 209:7 | 288:16 | 159:12 | 159:17 163:20 |
| 223:16 234:16 | **unaware** 275:2 | **unwilling** 251:1 | **versus** 148:13 | 165:3,4 190:20 |
| 235:1 237:20 | **unbelievable** | **updates** 180:20 | 154:3 238:1 | 190:21,21 |
| 244:15,15 | 228:20 | **upset** 265:2 | **video** 146:16 | 192:13 211:14 |
| 245:14 251:8 | **uncommon** | **urgency** 278:15 | 148:5,7,10,20 | 211:15 217:14 |
| 252:4 253:4,8 | 174:1 | **use** 158:12,23 | 213:5,10 | 219:21,22 |

U.S. Legal Support | www.uslegalsupport.com

220:22 223:23
224:13,17
225:1,14,19
240:22 243:19
244:12 247:25
249:21 250:11
252:9 270:6
275:18 286:13
287:10,12
289:11 291:7
298:18,23
302:9,13,15
306:15,20
309:14 310:1,4
310:23 311:12
**wanted** 201:1,21
203:4 208:15
212:9 218:17
218:20 231:2
243:9,14,19,25
249:22 253:16
257:19 267:23
268:13,14
285:12 286:14
**wanting** 252:20
304:8 314:9
**wants** 215:15
221:19 291:15
**warrants** 284:10
**warranty**
192:14 246:25
**wasnt** 166:24
178:13 187:11
200:3 203:17
206:23 220:20
221:8,8,10,10
229:3 231:17
236:4,13
239:19 243:12
265:18 277:18
277:19 282:25
284:4 287:22
300:15
**wasting** 249:19
**way** 156:19
162:1 165:3

178:6 185:6
198:2 208:16
211:12 215:13
215:14 216:3
216:10 222:8
233:19 234:1
235:8,8 244:18
244:21 245:1
249:17 250:4
261:14 264:15
271:18 275:3
282:6 284:4
288:6,8 289:10
289:14 298:7
313:12 316:1
**wayne** 317:4,24
**ways** 156:15
189:13 314:13
314:25
**weather** 205:7,8
205:11 206:17
212:21,23
**website** 150:12
151:1,4 152:9
153:1,2 199:12
**wed** 272:8
309:12
**wednesday**
265:12 281:17
287:18,19
307:6
**wednesdays**
213:25 282:2
**week** 153:10,14
153:22 157:1,4
175:14,24
192:21 194:1
199:10 231:25
232:5,14
236:12 238:18
242:23 243:25
255:9,12,14
256:7 257:3,15
259:14 260:17
263:7 306:16
**weekly** 180:25

255:25
**weeks** 178:17
222:25 223:17
311:19
**went** 160:12
179:13 181:10
182:21 183:10
183:12 196:7
196:10 198:6
203:25 210:1
218:19 229:19
231:15 244:18
244:20 245:1
248:13 256:15
261:14 264:12
264:16,16
266:6 267:21
269:1 272:19
296:13 299:8
**weve** 173:4
184:1 219:20
245:14 275:25
**whatevers** 153:5
**whats** 153:1,8
155:16 157:18
175:20 191:11
200:2 207:25
219:6 223:6
227:9 228:7,7
228:7 231:13
233:21 240:19
252:23 283:22
283:22 288:18
288:25 309:10
**wheelchair**
290:10 291:7
291:16 293:22
294:1 308:6
309:8,11,11,16
309:18,21
312:22 313:1
313:10 314:1
315:8,18,19,21
**wheelchairs**
291:19
**wheres** 230:21

234:20 270:11
**whip** 249:23
**whispers** 148:10
**whittled** 287:16
**whoa** 211:21
265:20 283:7
**whos** 242:16
258:4 261:22
**williams** 231:16
**willing** 202:23
215:2,16
**winter** 301:21
**witness** 147:3
149:3,9 155:9
162:19 230:2
266:18 298:17
316:11
**woman** 171:6,6
296:8
**wont** 229:11
262:4
**woodward**
145:17 146:10
148:17
**woohoo** 264:4
**word** 203:21
214:25 215:6
229:10 242:18
266:13
**worded** 248:19
248:20
**wording** 279:3
**words** 214:16
220:10 224:12
224:21,22,22
225:3 285:4
297:4
**work** 151:18
152:17,19
154:11,12,13
154:24,24
156:11 160:16
160:20 162:4
163:12 164:12
164:17,24,25
165:2,19

166:21 170:10
174:12,16,22
174:24,25
175:22,23,25
176:17,25
177:20,23
178:1,5,6,8,10
178:17 180:12
181:8,17 182:2
182:14,17,23
182:24,25
183:3,3,4,8,13
183:14,15
184:16,17,19
184:20,23
185:3,8,15,19
185:20 186:1
186:11,15,17
186:20 187:7
187:13 189:1,1
189:22 190:20
193:5 196:25
200:5,6,8,19
200:21,22,25
201:2,6,16,17
201:22,25
202:4,8,14,17
202:23,23,25
203:5,6,16
204:4 205:21
206:1,6 209:16
209:17,18
210:22 211:15
212:3,3,4,6,9
214:3,8,14,15
214:20,20,23
214:24 215:8
215:14,16,18
215:19,20,20
215:21,22,23
216:3,4,9,16
217:21,24
218:15 219:1
219:11,14,21
220:18,25
221:1,6,12,13

KATHLEEN   LIEBAU Volume II
April 07, 2022

Page 349

222:13,15,17
223:8,21 225:1
225:5,9,16,19
225:22 230:11
231:2,5 233:20
234:1,1,2,3
239:9 241:18
242:5,6,20
243:6,9,13
244:6,8 245:2
245:4 246:7,10
246:18 247:25
248:1,1 249:14
249:24 250:3
250:13,16
251:2,5,6,14
251:15,21,23
252:4,20
253:20 254:24
258:15 259:17
262:10 263:16
264:16,16
269:24 270:9
270:10,22,25
271:5,19 272:6
272:25 273:2,4
275:9 277:22
278:11 279:1
280:4,7,10,14
282:9,25
288:22 293:3
295:20 296:13
297:15,17
299:8,24 302:6
302:21 303:13
304:13
**workday** 294:23
**worked** 150:17
181:24 183:1
184:11 185:22
202:5,6 204:13
205:17,17
207:10,23
208:5,6 211:3
230:10 232:14
234:1 242:23

243:2,11
245:11 247:15
252:8 262:3
283:13 294:16
297:25
**working** 152:23
176:16 186:15
186:16,22
187:18,22
193:16,19
194:5 201:24
202:7 210:2,14
212:15 215:14
215:24 218:5,9
223:10 224:9
225:18 230:24
242:9,10 243:5
245:23 246:1,2
246:22 248:24
249:10 250:11
275:20
**workplace**
289:22
**workrela** 153:18
**workrelated**
153:17,20,24
156:4 157:4
**works** 212:23
215:14 216:3,4
225:19 228:21
299:13
**worksheet**
236:10
**workspace**
280:21
**world** 178:18
222:15
**worlds** 222:16
**worry** 204:8
**worst** 206:17
267:22 276:24
**wouldnt** 170:10
179:23,25
199:13 208:6
236:7 250:14
252:18 265:8

287:8 290:11
298:11,11
309:14 310:1,3
**writ** 266:13
**write** 174:2
222:2 250:9
270:3,13
310:18
**writes** 250:20
253:1
**writing** 196:4
198:17,20
199:20 310:6
**written** 167:13
167:21 168:6
173:15 189:24
208:17 224:5,6
227:15,19
228:24 232:7
245:19 265:13
265:18 266:12
266:14 297:5
**wrong** 212:10
255:5,5 276:10
276:13 291:21
291:25 308:7
310:3
**wrote** 172:23
177:16 205:7
212:13,15
227:21 284:24
284:25 303:7

——————
**X**
——————
**Y**
——————
**yeah** 160:6
167:11 180:22
183:1 203:22
204:3,23
206:23,25
209:6 214:2
219:19 234:20
242:13 244:8
247:14 252:21
255:21,24

256:11,12
269:8 276:3
289:4,5,9
292:23 299:3
302:13 307:24
308:5,12,20
309:13 310:9
310:15 311:25
314:17,18,18
316:3
**year** 164:2 166:7
185:11,20
196:15 198:6
217:25,25
218:1,1,1
221:2 241:18
247:10 250:19
250:24 315:9
315:10,11
**years** 150:1
155:20,21
156:10 178:4
218:14 220:2,4
232:6,10
233:10,13
244:16 252:8
253:4 283:13
294:15 297:21
297:22 302:22
303:10 309:22
**yep** 159:5
171:24 172:19
209:10 258:21
296:10,12
**youd** 170:23
172:4 175:19
180:4 185:1
198:15 220:19
247:15 263:13
271:6 283:13
287:8 299:17
300:20
**youll** 151:12,19
222:21 226:5
258:9 266:7
311:22

**younger** 166:7
**youre** 149:20
152:21 161:2
167:3,19
173:14 178:25
179:10 180:15
193:5 195:1
197:16,18
198:10,11
205:22 206:11
207:4 208:1,17
208:17 209:17
210:4 216:5
218:8 219:25
220:6,8,8
225:6 229:11
234:24 235:1
236:16 237:1,1
238:10,23
246:5,6 248:15
249:9,19
258:16 264:15
264:22 267:5,6
273:8 274:5
276:18 278:2
278:24,24
281:19 289:3
289:25 304:18
308:5,7 311:10
**youve** 167:4,6
173:4 185:25
186:10 190:13
194:21 199:20
199:21 217:15
222:8 245:15
256:5 286:21
289:5 302:3
312:12

——————
**Z**
——————
**zero** 166:7,8
——————
**0**
——————
**00** 206:23,25
210:5 245:24
246:6 304:2

KATHLEEN   LIEBAU Volume II
April 07, 2022

Page 350

**0165** 159:11
**0199** 162:23
**0201** 163:9
**0211** 162:23

——————
**1**
**1** 145:19 147:14
148:3,6 150:20
150:24 151:7
152:8 153:5
190:18 194:17
200:15 211:9
211:11 213:6
223:11,11
230:22 258:4
301:20
**10** 147:21
213:13,15
218:3
**10th** 263:14
**11** 147:22
240:16,19
246:15,17
248:7 250:18
258:11
**12** 147:23
199:19 217:5
223:11 226:11
229:1 258:22
258:24
**12th** 242:14
**13** 145:19
147:24 148:3,6
170:18 184:23
185:9 223:11
267:16,18
273:14,15
275:18 276:23
**14** 185:11
253:14 279:16
280:4,6,9
285:13 304:3,5
**149** 147:6
**14th** 282:6
**15** 147:25
174:18 177:6

177:16 185:11
188:5 206:9,20
207:23 208:7
209:12,13,16
209:17 218:13
231:22 232:14
244:8 245:16
246:5 301:5,8
**150** 147:14,15
**157** 147:16
**159** 147:17
**16** 297:21
**162** 147:18
**17** 252:25 277:8
297:21
**170** 147:19
**18** 151:10 152:8
167:22 227:11
252:23,23
272:18 280:5
285:11 287:5
297:21
**19** 151:10 153:6
167:17,22
188:2 194:15
195:6,8 197:15
205:6 209:25
210:7,13,16
223:12 229:6
242:25 244:22
248:12,12
297:11
**194** 147:20
**198** 159:12
**1985** 204:17,17
**19th** 195:18
224:4

——————
**2**
**2** 145:16 147:15
148:11 150:20
151:2,7,12
152:8 153:5
156:15 172:6
194:17 209:8
211:11 213:3,7

213:8,9,11,12
227:11,14
229:1,1 258:5
258:5 261:11
284:9 294:7,13
**20** 174:18 240:2
240:9
**2000** 194:20
196:20 210:16
**2005** 182:9
**2006** 182:10,11
183:8 184:10
184:15
**2009** 184:7
**2010** 184:16,17
184:22
**2012** 198:25
199:3,18
213:22 214:11
215:8 216:16
216:22 233:9
**2013** 182:25
**2015** 218:4,22
219:16 220:3
220:12 222:5
296:7 297:21
**2016** 222:6,11
**2017** 166:18
174:10,22
175:9,17 182:1
182:15 183:8
184:10 194:16
241:18,19
247:4 249:12
303:9
**2018** 151:1,22
153:5 166:12
166:17 167:15
186:12,20
187:16 192:4
194:4,14 195:5
195:6 197:2,14
205:5 206:16
209:23,25
210:7,13,16
223:3 226:11

240:20 241:18
242:25 244:24
244:24 245:7
247:8 258:12
266:16 292:9
297:11
**2019** 151:3
152:8 157:20
157:22 169:24
187:21,22
197:4 219:24
239:11 240:2,9
253:14 255:17
255:19 258:25
259:6 266:15
267:19 268:9
278:4 279:15
279:16 290:18
290:23 291:5
298:23,23
303:1 306:22
313:18 314:5
314:21
**2021** 171:23,24
172:7
**2022** 145:20
148:2,6
**2025** 317:25
**20th** 306:21
**21** 200:15
317:25
**213** 147:21
**215** 194:20
212:18
**21cv11823**
145:7
**22** 171:23,24
**222** 194:20
**224** 298:21
**229** 298:21
**23** 303:1
**24** 240:22 241:7
241:7 278:22
**240** 147:22
**248** 146:6,12
**25** 170:19

**250** 146:5
**258** 147:23
**25th** 193:23
**26** 262:25
**267** 147:24
**27** 218:4,22
**28** 193:4,7 217:2
240:22 316:9
316:10
**280** 145:17
146:10 148:17
**28411** 148:21
**28th** 192:18
193:16,20
**29** 157:22 158:5
169:24 230:22
244:24 245:7
259:6 260:9
283:8 286:22
**29th** 263:7 287:2

——————
**3**
**3** 147:16 157:16
157:19 182:6
211:11 223:3
251:3 263:1
264:5,9,18
281:19 294:12
**30** 190:18 197:2
197:7,13,20,24
204:12 205:20
205:21 206:1
206:10 211:9
211:11,11,11
211:11,11,11
211:11 212:16
218:20 233:2
244:10
**301** 147:25
**312** 147:7
**315** 147:8
**33** 146:4
**34** 155:20
**35** 150:1 297:22
297:22
**358** 222:21,22

KATHLEEN  LIEBAU Volume II
April 07, 2022

| | | | |
|---|---|---|---|
| 226:6 | 233:2 244:10 | 213:22 214:11 | 279:15 291:6 |
| **36** 197:6,12,18 | 264:9 304:2,3 | 215:7 216:16 | |
| 197:23 | 304:5 316:9,10 | 216:21 264:8 | |
| **361** 226:2,18,20 | **50** 177:15,16 | 264:11,19 | |
| **362** 226:2,18,21 | 178:12,13 | 265:11 270:18 | |
| **37** 306:22 | 179:8 301:20 | 270:19,24 | |
| **396** 222:7 | **500** 230:22 | 271:4,10 | |
| **3rd** 223:16 | **501** 229:24,24 | 272:11,25 | |
| | 230:1 231:8 | 281:12,17 | |
| ————— **4** ————— | **50minute** | **75** 212:15 | |
| **4** 147:19 159:4,6 | 302:10 | **755** 236:18,19 | |
| 159:9,20 170:1 | **51** 227:11,15,20 | 236:25 | |
| 170:3 171:13 | 228:10,16,17 | **757** 236:18,25 | |
| 171:13 211:11 | 229:1,1,4 | **7th** 148:6 264:12 | |
| 212:15 218:20 | **5132** 317:22 | 265:4,14 | |
| 227:20 228:16 | **52** 213:9,12 | 281:19,20,25 | |
| 228:17 252:23 | **545** 240:1 | 282:22 | |
| 262:25 264:9 | **547** 240:1 | | |
| 294:8,9,10,13 | **548** 239:10,17 | ————— **8** ————— | |
| 306:22 | 239:18 | **8** 157:20,25 | |
| **400** 145:17 | **550** 239:10,18 | 258:4 264:8 | |
| 146:11 218:2 | **561** 226:19 | 265:11 281:12 | |
| **41** 213:3 | 233:14 234:19 | 281:17 | |
| **42** 213:7,8 | 236:24 | **8th** 265:4,12 | |
| **433** 213:21 | **562** 233:14 | 281:21 | |
| 214:12 | 234:19 236:24 | | |
| **44** 227:20,23 | **581** 153:11 | ————— **9** ————— | |
| 229:4 | **5th** 223:16 | **9** 147:20 172:7 | |
| **46** 177:14 | 227:12,13 | 194:10,12 | |
| 266:22 294:8,9 | | 195:4 197:2,6 | |
| **47** 294:10,13 | ————— **6** ————— | 197:7,12,13,18 | |
| **48009** 146:11 | **6** 147:17 159:1,3 | 197:20,23,24 | |
| **48304** 146:5 | 159:9 165:12 | 199:25 203:13 | |
| **493** 231:8 | 165:15 168:21 | 205:20,21 | |
| **495** 231:8 | 182:6 209:8 | 206:10,23,25 | |
| **499** 229:24 | 211:11 264:8,9 | 208:9,24 210:5 | |
| 230:1,2 | 264:19 270:15 | 212:12 227:11 | |
| | **60** 184:24 | 227:15,20,23 | |
| ————— **5** ————— | **6441500** 146:6 | 228:10,17 | |
| **5** 159:4,6 174:18 | **6450000** 146:12 | 229:1,1,4,4 | |
| 174:18 177:6 | | 239:11 245:24 | |
| 194:14 195:4 | ————— **7** ————— | 246:5,6 258:25 | |
| 204:12 206:1 | **7** 145:20 147:18 | 265:11 281:12 | |
| 209:23 211:11 | 148:2 162:17 | 290:17,23 | |
| 212:16 227:11 | 162:19 165:23 | 291:5 298:23 | |
| 227:14 229:1,1 | 168:21 211:11 | **9th** 265:5,13,18 | |