# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Kelly L. Stephens | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: April 23, 2024

Mr. Brian J. Farrar
Law Offices
33 Bloomfield Hills Parkway
Suite 250
Bloomfield Hills, MI 48304

Ms. Elizabeth Phelps Hardy
Mr. David Andrew Porter
Kienbaum, Hardy, Viviano, Pelton & Forrest
280 N. Old Woodward Avenue
Suite 400
Birmingham, MI 48009

Re: Case No. 23-1301, *Kathleen Liebau v. Dykema Gossett, PLLC*
Originating Case No. : 4:21-cv-11823

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc: Ms. Kinikia D. Essix

Enclosures

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0180n.06

No. 23-1301

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 23, 2024
KELLY L. STEPHENS, Clerk

| | |
|---|---|
| KATHLEEN L. LIEBAU,<br><br>    Plaintiff-Appellant,<br><br>v.<br><br>DYKEMA GOSSETT, PLLC,<br><br>    Defendant-Appellee. | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN<br><br>OPINION |

Before: McKEAGUE, STRANCH, and NALBANDIAN, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Plaintiff-Appellant Kathleen Liebau alleges that she was placed on probation and then terminated by her former employer, Defendant-Appellee Dykema Gossett, PLLC, due to age-based discrimination and retaliation. Below, the district court granted Dykema's motion for summary judgment. It found that Liebau had failed to establish that any decisionmaker acted on the alleged bias of Liebau's direct supervisor, and that there was insufficient evidence that Liebau's complaint about age-related discrimination caused her termination. We **AFFIRM.**

## I. BACKGROUND

### A. Liebau's History at Dykema Gossett

Dykema Gossett, a law firm, hired Kathleen Liebau in February 1985. Hired as a legal secretary, Liebau worked for Dykema over the years in a variety of administrative and support roles, including as an administrative assistant and project administrator. She also performed some paralegal duties, and an internal document from Dykema classified her as a paralegal.

No. 23-1301, *Liebau v. Dykema Gossett, PLLC*

Starting around 2005, Liebau began working on projects for attorney Clay Guise. According to Guise, Liebau's performance during much of her tenure at Dykema was strong, the two of them had "a positive, good working relationship," and Liebau had a "good eye for detail." Guise, however, did note one incident of inappropriate communication in dealing with a client, and stated that Liebau would need to demonstrate more patience in the future.

Around September 2017, Guise assigned Liebau to work on a new team handling auto warranty, or "lemon law," cases. By this time, Dykema's office administrator Sue Choma was Liebau's formal supervisor, conducted reviews of Liebau's performance, and had the authority to take employment actions against Liebau in tandem with Dykema's Human Resources department. In a January 2018 meeting, Choma brought to Liebau's attention alleged problems with tardiness and working unapproved overtime hours. Liebau took issue with some of Choma's allegations. In the spring 2018 evaluation of Liebau, which evaluated performance over the prior year, Choma also recounted additional incidents in which Liebau had been "confrontational" and shared inaccurate and confidential information. Guise and attorney Chelsea Larsen, who directly supervised Liebau on the lemon law project, also noted issues regarding Liebau's prioritization of tasks and willingness to accept ideas about procedures different than her own.

Despite these issues, however, Larsen's 2018 review of Liebau's 2017 performance praised Liebau's strong work product, professionalism and friendliness in communications, and quick delivery on urgent materials. Similarly, although Choma's review of Liebau's 2017 performance rated Liebau "not effective" in communication skills because of Liebau's alleged confrontational behavior and sharing of inappropriate information, it rated Liebau as "effective" or "highly effective" in most other areas, offering particular praise for Liebau's job knowledge and expertise.

Larsen's final annual review of Liebau, authored early in 2019 to assess Liebau's work over the previous year, noted that Liebau was meeting Larsen's needs, praised Liebau's subject matter knowledge, and listed turnaround time and quality of assessments as particular areas in which Liebau had improved, even as it noted some challenges related to time pressures and lack of attention to detail. Choma's final review, created in mid-April 2019, explained that Liebau was meeting expectations, had good overall communication skills, and recognized Liebau's effective teamwork, professional conduct, and expertise. Choma also noted Liebau's successful curtailing of overtime-related issues. The review did reflect areas for improvement noted by Larsen and Guise, including slowing down to reduce errors and taking fewer breaks.

**B.     Alleged Discriminatory Actions and the Lead-Up to Liebau's Probation**

Liebau identifies her discriminatory treatment as beginning with an October 2015 incident. That year, Liebau turned fifty. Larsen and others organized a fiftieth birthday event that included several items tied to Liebau's age—a wheelchair, fake pill bottles, and adult diapers. Larsen cast it as "traditionally what was done for a milestone birthday," and the wheelchair was later used in an analogous recognition of another employee's birthday. But Liebau was hurt by the event. After the party, Liebau picked up the offensive decorations, placed them on the wheelchair, and moved them into Larsen's office, but the next day, the wheelchair was back at the workstation next to Liebau's desk.

According to Liebau, around the same time, Larsen asked Liebau if she was going to retire and began raising the topic frequently. Liebau also complained to Larsen an "uncountable" number of times, without avail, asking her to remove the wheelchair. When Larsen discovered that Liebau had been placed with her on the lemon law project, Larsen frowned and said "Really?" According to Liebau, Larsen kept her out of the loop on certain issues related to the project because

Case 4:21-cv-11823-SDK-DRG ECF No. 37, PageID.985 Filed 04/23/24 Page 5 of 20
Case: 23-1301 Document: 37 Filed: 04/23/2024 Page: 4 (5 of 20)

No. 23-1301, *Liebau v. Dykema Gossett, PLLC*

of age-related bias, and treated her worse than another team member. By contrast, Liebau does not accuse Choma of age-based bias.

On April 11, 2019, Choma and Liebau met to go over a review Choma had prepared. According to Choma's notes about the meeting, she could sense that Liebau was not pleased with the review, even though Choma had given Liebau the overall rating "meets expectations." Several weeks later, on April 30, Liebau met with Larsen and complained that her review was the worst one she had received, conveyed her concern that she was going to be fired, and wondered out loud if she needed to get an attorney. Larsen reported the conversation to Choma the following day.

On Monday, April 29, the day before Larsen and Liebau's conversation about Choma's review, Larsen had asked Liebau to complete a conflict check—a common law firm undertaking—on a non-lemon-law project the parties would later call the "switch case." Larsen's administrative assistant Shannon Stewart, who normally would have completed the task, was on vacation. Though Liebau believed that another employee should have been given this project in Stewart's absence, she accepted the assignment. Realizing that she did not have the information required to do the work, Liebau told Larsen, "I don't have the information for the switch case. I don't even know who the billing attorney is." R. 24-2, Liebau Dep., PageID 559. According to Liebau, Larsen responded, "I think it's Clay [Guise] on all the switch [case] stuff. Go ask him." *Id.* But because Liebau did not see this comment as a direction and did not believe that Guise would have all the necessary information, she chose not to talk to Guise.

At 5:26 p.m. on Friday, May 3, Liebau sent an email to Stewart—copying Larsen—explaining that she was "[s]orry to leave" the switch case work for her, but that because Liebau did not know how to do the assignment, it was better to do so than to take time to bother Guise or another attorney. Hours later, Larsen responded that it was "not acceptable" to save the assignment

No. 23-1301, *Liebau v. Dykema Gossett, PLLC*

for Stewart despite Larsen's instructions not to do so, noting that she had told Liebau to talk to Guise to get the needed information. On May 6, Larsen forwarded the email exchange to Choma with the note "FYI."

On May 9, after consulting with Dykema's Chief Human Resources Officer Ayanna Clinton, Choma placed Liebau on a ninety-day probationary performance improvement plan. Choma's letter explained that Liebau's April 2019 evaluation had raised areas for improvement. It then took issue with Liebau's course of conduct outlined in the emails forwarded by Larsen to Choma and chronicled Liebau's failure to follow Larsen's directions; the letter further noted that Liebau failed to respond to Larsen's email from the previous Friday on Tuesday, May 7, when Liebau returned to the office. Choma explained that if Liebau's performance did not improve during the probationary period, she would be terminated.

### C. Probationary Period and Termination

On June 14, Liebau and Larsen had a conversation at Liebau's desk about a work issue. At some point, Liebau exclaimed that she was "on probation because of a fake conversation [Larsen] made up." This was the first Larsen knew of Liebau's probation; Choma had not consulted Larsen before placing Liebau on the performance improvement plan.

Four days later, Choma met with Larsen and Liebau to discuss the June 14 incident. Larsen and Liebau argued during the meeting, and—according to Choma—Liebau used "a mocking tone" in responding to Larsen. At one point, Liebau said to Larsen, "you didn't talk to me, honey," a phrase that Choma viewed as disrespectful. During the conversation, Liebau raised her complaint about the 2015 birthday event, expressed continued frustration with the wheelchair being near her workstation, and specifically alleged that she was being discriminated against because of her age.

-5-

No. 23-1301, *Liebau v. Dykema Gossett, PLLC*

The meeting ended after Liebau, having been chided for calling Larsen "honey," used the same word to refer to Choma.

Choma scheduled an additional disciplinary meeting for July 1 to inform Liebau that, due to her "ongoing incidents of misconduct," she was not on track to successfully complete her probation. Choma thereafter identified additional perceived flaws in Liebau's performance, including Liebau's declining to fix an out-of-office message and additional timekeeping and attendance policy issues. Larsen also brought one issue, involving Liebau's alleged improper nonuse of a database, to Choma's attention; Larsen noted, however, that she was "not looking to create a problem where none exists." But Choma came to believe that Liebau was making "no effort to comply" with the Dykema's timekeeping policy, and "[t]here was . . . no evidence . . . that [Liebau] was on a trajectory to succeed with probation." After the probationary period ended, Choma consulted with Clinton and terminated Liebau's employment on August 23, 2019. Larsen was not a part of the decision. The termination letter cited Liebau's "failure to maintain professional and respectful conduct, comply with firm policies and procedures, and failure to demonstrate satisfactory performance improvement" as the reasons for Liebau's discharge.

### D. Procedural History

After receiving a right-to-sue notice from the Equal Employment Opportunity Commission, Liebau filed this case against Dykema on August 6, 2021. Liebau's complaint contained claims for age discrimination and retaliation under the Age Discrimination in Employment Act (ADEA) and Michigan's Elliott-Larsen Civil Rights Act (ELCRA). Dykema moved for summary judgment, which the district court granted in full. Evaluating Liebau's discrimination claims, the court held that Liebau had failed to establish that Larsen was a part of the decisionmaking process in Liebau's termination, or that Larsen's bias influenced Choma's

decision to discharge Liebau. Regarding the retaliation claims, the court reasoned that because Liebau had not complained of age discrimination until after she was already on probation, she could not state a prima facie case of retaliation. Liebau timely appealed.

## II. ANALYSIS

We review de novo a district court's grant of summary judgment. *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 559 (6th Cir. 2022). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). Fact disputes are material and genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See id.* (quoting *Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 660 (6th Cir. 2020)). When evaluating a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw "'all justifiable inferences' in [that] party's favor." *Id.* (quoting *Kirilenko-Ison*, 974 F.3d at 660). At this stage, the court may not weigh evidence or make credibility judgments. *Id.* at 559-60.

Liebau appeals the district court's decision to grant Dykema summary judgment on her discrimination and retaliation claims. We take up each issue in turn.

### A. Liebau's Discrimination Claims

Both the ADEA and Michigan law prohibit employment discrimination "because of . . . age." 29 U.S.C. § 623(a)(1) (ADEA); Mich. Comp. Laws § 37.2202(1)(a) (ELCRA). Liebau pursues her discrimination claims "by means of an 'indirect case,' in which the evidence would allow a jury to infer unlawful discrimination." *Sloat v. Hewlett-Packard Enter. Co.*, 18 F.4th 204, 209 (6th Cir. 2021). Indirect cases are subject to the familiar framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under that framework, the plaintiff must first

establish a prima facie case of discrimination; if the plaintiff does that, the employer must identify a legitimate, nondiscriminatory reason for the adverse employment action; and if the employer does that, the plaintiff must prove that the employer's reason is a mere pretext for discrimination." *Sloat*, 18 F.4th at 209; *see also Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011) (noting that "Michigan has adopted the *McDonnell Douglas*" framework for ELCRA indirect-discrimination cases).

1. Prima Facie Case

The parties agree that Liebau satisfies the first three elements of her prima facie case: She is a member of a protected group because she was over forty when terminated, she was qualified for her position, and her employer took an adverse action against her. *See Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326 (6th Cir. 2021). That leaves the fourth element—whether the adverse action occurred under "circumstances that support an inference of discrimination." *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020) (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012)).

There are many "context-dependent ways by which plaintiffs may establish" the fourth element of "a prima facie case." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 529 (6th Cir. 2007) (emphasis omitted), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Liebau alleges that Larsen (1) threw her a fiftieth birthday party involving a wheelchair, adult diapers, and fake pills, (2) refused to remove the wheelchair from near Liebau's workspace despite frequent requests to do so, and (3) repeatedly broached the topic of Liebau's retirement. These constitute "allegedly ageist comments" and actions, which may be "sufficient to raise a plausible inference of discrimination." *Pelcha*, 988 F.3d at 326. On the other hand, we have stated that actions or comments by individuals with no "authority regarding personnel decisions,"

No. 23-1301, *Liebau v. Dykema Gossett, PLLC*

standing alone, can be "insufficient to satisfy [a plaintiff's] prima facie case." *Blair*, 505 F.3d at 530. As a result, the significance of Larsen's actions is partially tied to whether Larsen was a decisionmaker in the adverse actions taken against Liebau.

To be a decisionmaker, an individual must have a "direct relation to the actual [adverse employment] decision." *See EEOC v. Ford Motor Co.*, 782 F.3d 753, 768 (6th Cir. 2015) (en banc). Liebau points to a statement made by Larsen in her deposition that, at one time, she did not "know whether [she] was considering whether to terminate [Liebau] or not" or if she should "continue having [Liebau] work on [the] project." The full context of Larsen's response reflects, however, that she had no authority to take actual adverse employment action against Liebau: Larsen explicitly said that any decision to fire Liebau was "just not [her] call" and it was "certainly not something that [she] was deciding."

In fact, Choma, not Larsen, placed Liebau on probation and ultimately terminated her. These decisions were made in consultation with Ayanna Clinton, Dykema's head of HR. Choma did not ask for Larsen's opinion before making either decision. Accordingly, on this record, Larsen was not a decisionmaker with respect to the adverse actions taken against Liebau. *See Ford Motor Co.*, 782 F.3d at 768.

Even so, given Larsen's role as Liebau's manager on the lemon law project, her comments and actions have probative value. We have explained that "conduct of a nondecisionmaker may be probative of whether an adverse action directed at a plaintiff" occurred under circumstances supporting an inference of discrimination. *Rachells v. Cingular Wireless Emp. Servs., LLC*, 732 F.3d 652, 665 (6th Cir. 2013). "Discriminatory statements made by individuals occupying managerial positions," moreover, "can be particularly probative of a discriminatory workplace culture." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009).

-9-

No. 23-1301, *Liebau v. Dykema Gossett, PLLC*

Larsen's comments are especially probative here because Liebau pursues a "cat's paw" theory of liability.[1] *See Birch v. Cuyahoga Cnty. Prob. Ct.*, 392 F.3d 151, 166 (6th Cir. 2004) (explaining that, because *McDonnell Douglas* is a flexible test, there are multiple ways to prove a plaintiff's prima facie case). A plaintiff pursuing a cat's paw theory bases liability on a biased nondecisionmaker's discriminatory acts that cause an unbiased decisionmaker to take adverse action. *See Sloat*, 18 F.4th at 210. In the *McDonnell Douglas* framework, these actions can both support a plaintiff's case at the pretext stage, *see id.* at 210-13, and "provide[] the causal connection the plaintiff's prima facie case requires," *Lawrence v. Sch. Dist. No. 1*, 560 F. App'x 791, 795 (10th Cir. 2014) (Gorsuch, J.); *see also Sloat*, 18 F.4th at 209-10 (assuming the fourth element of the plaintiff's prima facie case in a cat's paw discrimination case because, in that case, the prima facie inquiry "largely duplicate[d] the pretext inquiry"). A cat's paw theory, premised as it is upon a nondecisionmaker's acts, does not fail at the prima facie stage simply because the plaintiff has failed to point to discriminatory statements by a decisionmaker. As a result, we proceed to steps two and three of *McDonnell Douglas*.

### 2. Nondiscriminatory Rationale and Pretext

At the second step of *McDonnell Douglas*, Dykema has articulated several nondiscriminatory reasons for taking adverse action against Liebau: The termination letter states that she was fired for a "failure to maintain professional and respectful conduct, comply with firm policies and procedures, and failure to demonstrate satisfactory performance improvement." R. 24-21, Termination Letter, PageID 789. The burden therefore returns to Liebau to show that these purported reasons were pretext for age discrimination. *See Sloat*, 18 F.4th at 210.

---

[1] Though this theory takes its name from an old fable, *see Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011), reference to the fable itself "obscures rather than illustrates the theory's particulars." *Sloat*, 18 F.4th at 210.

-10-

Case 4:21-cv-11823-SDK-DRG ECF No. 37, PageID.992 Filed 04/23/24 Page 12 of 20
Case: 23-1301 Document: 37-2 Filed: 04/23/2024 Page: 12 of 20

No. 23-1301, *Liebau v. Dykema Gossett, PLLC*

As noted, because Larsen was not a decisionmaker, Liebau's discrimination argument turns on a "cat's paw" theory of holding her "employer liable for the animus of an intermediate actor 'who was not charged with making the ultimate employment decision.'" *Sloat*, 18 F.4th at 210 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)). By addressing the risk of a supervisor's influence over a decisionmaker,

> the cat's paw theory accomplishes two goals. First, the cat's paw theory addresses situations in which decisionmakers unthinkingly adopt the recommendations of their biased lower-level supervisors; second, it "forecloses a strategic option for employers who might seek to evade liability . . . through willful blindness as to the source of reports and recommendations."

*Marshall v. The Rawlings Co.*, 854 F.3d 368, 378 (6th Cir. 2017) (alteration in original) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 486 (10th Cir. 2006)). This theory could provide Liebau with appropriate recourse if a "biased low-level supervisor with no disciplinary authority" (Larsen) used her influence over a decisionmaker (Choma) to "effectuate the termination of an employee" (Liebau) "from a protected class." *Id.* (quoting *BCI Coca-Cola*, 450 F.3d at 486).

To establish liability using this theory, Liebau must show that Larsen (i) exhibited animus, (ii) intended to cause an adverse employment decision, and (iii) proximately caused that decision. *Sloat*, 18 F.4th at 210. Starting with animus, the fiftieth birthday party, Larsen's inquiries about retirement, and her repeated refusal to remove the wheelchair from near Liebau's workstation provide an ample basis for a reasonable jury to conclude that Larsen engaged in age-based discrimination.

The next question is whether Larsen took actions indicating that she "*intended* . . . to cause an adverse employment action." *Staub*, 562 U.S. at 422. Liebau claims that both the probation decision and her ultimate termination were adverse actions taken by Dykema.

-11-

No. 23-1301, *Liebau v. Dykema Gossett, PLLC*

Though performance improvement plans, or PIPs, "do not constitute adverse employment actions alone, a PIP that results in termination may constitute an adverse employment action." *Giron v. Tyco Elecs. Corp.*, 762 F. App'x 233, 237 (6th Cir. 2019) (footnote omitted) (citing *Kyle-Eiland v. Neff*, 408 F. App'x 933, 941 (6th Cir. 2011)). We therefore turn to whether the evidence could support a reasonable finding that Larsen intended to cause either adverse action.

Prior cases provide examples of evidence from which a reasonable jury can infer a nondecisionmaker's intent to cause an adverse action. For example, a nondecisionmaker manager's proposal of several workforce reductions that would eliminate the plaintiff's job, including one reduction solely targeting the plaintiff, provides evidence that the manager wanted the plaintiff terminated. *Sloat*, 18 F.4th at 211-12. Discriminatory statements can also provide sufficient evidence of intent: A jury may infer intent from nondecisionmakers' assertions that they were trying to "get rid of" and were "out to get" the plaintiff, *see Staub*, 562 U.S. at 423, or from a nondecisionmaker's comments that the plaintiff's "demotion was his 'wish at the time,' and that [the] demotion would be a welcome 'solution,'" *see Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 581 (6th Cir. 2022). Finally, even absent evidence that a nondecisionmaker "desires" that an adverse action be taken against the plaintiff, intent can be inferred if that person "believes that [an adverse action is] substantially certain to result" from her conduct. *Staub*, 562 U.S. at 422 n.3 (quoting Restatement (Second) of Torts § 8A (Am. L. Inst. 1965)).

No analogous evidence is in this record. There is, for example, no indication that Larsen made any statements suggesting that she hoped an adverse action would be taken against Liebau; on the contrary, Larsen testified that she does not believe Liebau should have been put on probation. In Larsen's last review, moreover, she noted that Liebau's overall performance met Larsen's needs. She documented both Liebau's strengths—including "knowledge of the subject

-12-

Case 4:21-cv-11823-SDK-DRG ECF No. 37, PageID.994 Filed 04/23/24 Page 14 of 20
Case: 23-1301 Document: 37 Filed: 04/23/2024 Page: 14 (14 of 20)

No. 23-1301, *Liebau v. Dykema Gossett, PLLC*

matter and familiarity with client documents"—and her "work-related challenges," including understanding the urgency of certain work. Larsen also explained that Liebau was improving in multiple areas, and expressed her expectation that together, she and Liebau would "continue to work on improving our process." Larsen's largely positive review militates against a reasonable inference that she intended for Choma to take adverse action against Liebau.

Against this evidence, Liebau focuses on the email exchange that Larsen forwarded to Choma on May 6, 2019. Liebau contends that, contrary to Larsen's email, Larsen "never gave" her the directive to talk to Clay Guise about the switch case rather than saving the work for Larsen's assistant Shannon Stewart to do when she returned from vacation. More pointedly, Liebau accuses Larsen of having "made up" the conversation that Larsen recounted in her email response to Liebau.

Inventing and forwarding a conversation to make Liebau look bad would be probative evidence that Larsen intended to cause an adverse employment action—a jury could reasonably infer that Larsen would only take those actions if she was trying to get Liebau disciplined. But no reasonable juror could find that the record evidence supports this version of events. Accepting Liebau's sworn testimony, when she told Larsen that she did not have the needed information to complete the switch case assignment, Larsen responded: "I think it's Clay [Guise] on all the switch [case] stuff. *Go ask him*." R. 24-2, Liebau Dep., PageID 559 (emphasis added). But Liebau did not, and instead left the task for Stewart. Larsen's email explained her frustration that Liebau had chosen "to save this for Shannon [Stewart] despite [her] instructions not to do so." That statement accurately reflected Larsen's direction that Liebau should get needed information from Guise to complete her assignment, and the fact that—as both Liebau and Larsen were aware—if Liebau did not complete the conflict checks, the task would fall to Stewart upon her return. While Liebau and

-13-

Case 4:21-cv-11823-SDK-DRG ECF No. 37, PageID.995 Filed 04/23/24 Page 15 of 20
Case: 23-1301 Document: 37 Filed: 04/23/2024 Page: 15 of 20 (15 of 20)

No. 23-1301, *Liebau v. Dykema Gossett, PLLC*

Larsen disagreed about the details of their earlier conversation, the undisputed evidence shows that the conversation did happen. There is also no evidence suggesting that Larsen believed these emails would result in Liebau's probation, and Larsen testified that she did not find out about Liebau's probation until over a month after the fact. The evidence, in sum, does not support the conclusion that Larsen intended for her email exchange to lead to discipline.

Larsen's actions in the run-up to Liebau's termination likewise do not evidence an intent that adverse action be taken against Liebau. Larsen first learned that Liebau was on probation on June 14, when Liebau exclaimed that she had been disciplined due to Larsen's invention of a "fake conversation." Choma, not Larsen, scheduled a meeting to discuss this incident on June 18, which was terminated after Liebau referred to both Larsen and Choma as "honey." Choma would later identify other matters during the probationary period, including issues with Liebau's out-of-office message and timekeeping, that Larsen had no role in bringing to Choma's attention. Larsen flagged one issue for Choma, involving Liebau's alleged nonuse of a new database, but also noted that she was "not looking to create a problem where none exists." Larsen testified that she included that note because she knew that Liebau had previously been placed on probation and Larsen was "[a]bsolutely not" trying to get Liebau disciplined. Finally, Choma terminated Liebau without Larsen's input. A reasonable juror could not find that Larsen knowingly or intentionally tried to arrange Liebau's termination.

Liebau also argues that she raises a genuine question of material fact as to whether Dykema's purported reasons for her termination were valid. To start, Liebau claims that Dykema does not explain why she suddenly started having performance issues after decades of working at the firm. But the record provides an obvious explanation—Liebau transitioned to a new project that was not a great fit for her.

Liebau specifically challenges each of Dykema's alleged reasons for terminating her. But Choma placed Liebau on probation for a legitimate reason—Liebau's undisputed failure to follow instructions. After Liebau was on probation, she had to improve her performance to stay at Dykema. She points to evidence that the alleged disrespect on June 18 was "how Liebau generally communicates" and that she had received positive performance reviews in the past. But Liebau has not shown that her performance affirmatively progressed to such a degree that she should have survived probation. Based on the evidence in the record, the district court did not err in granting summary judgment to Dykema on Liebau's discrimination claims.

**B.     Liebau's Retaliation Claims**

Both the ADEA and ELCRA prohibit retaliation against a person who opposes age-based discrimination. 29 U.S.C. § 623(d) (ADEA); Mich. Comp. Laws § 37.2701(a) (ELCRA). Like discrimination claims, retaliation claims are subject to *McDonnell Douglas* burden shifting. Liebau has the initial burden of establishing her prima facie case by showing that she (1) "engaged in a protected activity, (2) the defending party was aware that the plaintiff had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and the adverse action." *Bledsoe*, 42 F.4th at 587 (brackets omitted) (quoting *Blizzard*, 698 F.3d at 288); *see Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606-07 (6th Cir. 2019) (applying *McDonnell Douglas* to an ELCRA retaliation claim).

The district court found that Liebau failed to establish her prima facie case. It first determined that Liebau's statement on April 30, 2019 to Larsen about potentially needing an attorney was not a protected activity. A plaintiff asserting a retaliation claim "must establish that [she] challenged an employment practice that [she] reasonably believed was unlawful."

-15-

*Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015).[2] A plaintiff's complaint about an unlawful practice need not "be lodged with absolute formality, clarity, or precision." *Id.* (quoting *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013)). A "vague complaint[]," however, is insufficient; the employee must put the employer "on notice" that she is protesting an act made illegal by the relevant law. *Id.* at 645-46.

Larsen testified that in a conversation on April 30, Liebau made one statement saying "something to [Larsen] about getting fired" and that Liebau "thought maybe she needed to get an attorney." R. 24-12, Larsen Dep., PageID 683. Because neither this comment nor any other statements previously made by Liebau "alleged acts of age discrimination" by anyone at Dykema, Liebau's comment did not represent "protected activity under the ADEA." *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007); *cf. Yazdian*, 793 F.3d at 641, 646 (reasoning that a plaintiff's complaint of a hostile work environment after a direct allegation of racial discrimination could constitute a protected activity under Title VII). The district court reasonably interpreted this comment, which did "not refer to discrimination or age," as too vague to constitute a protected activity. R. 30, District Court Op., PageID 944.[3]

---

[2] Although *Yazdian* involved Title VII of the Civil Rights Act of 1964, rather than the ADEA, "[w]e analyze the anti-retaliation provisions of the ADEA and Title VII similarly," and our caselaw in each area informs the other. *Yazdian*, 793 F.3d at 645 n.4.

[3] In paragraph nine of a declaration filed after the close of discovery, Liebau asserted that during the April 30 conversation, she "protested that [Larsen] had an age bias against me and I told her I may need to hire an attorney." R. 24-13, Liebau Decl. ¶ 9, PageID 712. But at her prior deposition, Liebau testified that she did not remember the attorney comment at all. R. 26-1, Liebau Dep., PageID 837 ("Q: . . . [L]et me know [why] you went to Chelsea Larsen and told her [Choma's 2019 review] was the worst review of your life and that you were considering—or wanted to know whether you should get an attorney. A: I heard [Larsen] say that during her deposition, and I do not recall ever telling [Larsen] I was going to get an attorney."). As a result, the district court declined to consider paragraph nine from Liebau's declaration, a decision we review for abuse of discretion. *See Reich v. City of Elizabethtown*, 945 F.3d 968, 975-76 (6th Cir. 2019). Because the relevant paragraph contradicted Liebau's earlier testimony, the district court's decision to disregard it was not an abuse of discretion. *See id.* at 976-77 (finding that a deponent's denial of knowledge contradicted a later affidavit).

Case 4:21-cv-11823-SDK-DRG ECF No. 37, PageID.998 Filed 04/23/24 Page 18 of 20
Case: 23-1301 Document: 37-2 Filed: 04/23/2024 Page: 18 of 20

No. 23-1301, *Liebau v. Dykema Gossett, PLLC*

Without the April 30 conversation in the mix, Liebau relies on what both parties agree was a later protected activity: her explicit allegation of age discrimination at the June 18 meeting with Larsen and Choma. Liebau had been placed on probation before that time, with Choma noting in the probation notice that if Liebau's "performance and adherence to stated directives" did not improve during the ninety-day probationary period, her "employment [would] be terminated." R. 24-19, Probation Notice, PageID 786. An employer "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever" that an adverse action is in retaliation for a protected activity. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). Because Liebau was already on probation when she complained of age discrimination on June 18, she must provide evidence of worsened treatment after that date to show causation between her protected activity and her discharge on August 23.

"[I]ncreased scrutiny" of an employee after a protected activity, coupled with temporal proximity, can establish the causal nexus necessary for a prima facie case. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435-36 (6th Cir. 2009). But Liebau has not shown increased scrutiny after the June 18 meeting. She points to continued documentation of issues after that date: Choma's chronicling of alleged timekeeping infractions in July and Larsen's email about the alleged database issue (which included a note to Choma explicitly saying that Larsen was not looking to create a problem where none existed). But the fact that supervisors continued to document perceived issues with Liebau's performance after her complaint does not reflect the illicit retaliation described in *Hamilton* and other cases—an employer increasing scrutiny after a protected activity, "waiting for an ostensibly legal basis for discharge to emerge," and then terminating that employee. 556 F.3d at 435 (citing *Jones v. Potter*, 488 F.3d 397, 408 (6th Cir.

No. 23-1301, *Liebau v. Dykema Gossett, PLLC*

2007)). In sum, the district court did not err in granting Dykema summary judgment on Liebau's retaliation claims.

### III. CONCLUSION

For the foregoing reasons, the district court's decision is **AFFIRMED**.

-18-

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-1301

KATHLEEN L. LIEBAU,

    Plaintiff - Appellant,

v.

DYKEMA GOSSETT, PLLC,

    Defendant - Appellee.

```
┌─────────────────────────┐
│        FILED            │
│     Apr 23, 2024        │
│  KELLY L. STEPHENS, Clerk│
└─────────────────────────┘
```

Before: McKEAGUE, STRANCH, and NALBANDIAN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Flint.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

*Kelly L. Stephens*

_____
Kelly L. Stephens, Clerk